

**FILED**

DEC 0 6 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1  Daniel Gonzalez
2  7125 Calvin Drive,
   Citrus Heights, CA 95621
3  Telephone (916) 247-6886
   Plaintiff

4

5

6

7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9  | DANIEL E. GONZALEZ, | **No.: 2:15-cv-1997 MCE DB PS** |
|---|---|

10         Plaintiff,

11  vs.                          **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES RENEWED MOTION FOR SUMMARY JUDGMENT**

12

13  UNITED STATES OF AMERICA; and DOES
    1 to 20, Inclusive,          Date:       December 14, 2018

14                               Time:       10:00 a.m.
          Defendants.            Courtroom:  27
15                               Magistrate Judge Deborah Barnes

16

17         Pursuant to Fed. R. Civ. P. 56 and Local R. Civ. P. 260, Plaintiff, DANIEL E. GONZALEZ,

18  (hereafter "Plaintiff"), submits this opposition to Defendants' Renewed Motion for Summary Judgment.

19  In support thereof, an accompanying Statement of Disputed Facts establishes genuine triable issues exist

20  material to medical malpractice. Local R. Civ. P. 260(b) and Fed. R. 56(a)(3).

21  **I.    INTRODUCTION.**

22         Plaintiff has treated continually at the Department of Veterans Administration medical facilities

23  since a low back injury forced his discharge in 1968 from military service. (See, Declaration of Daniel

24  Gonzalez ("Gonzalez Decl."), at ¶ 5.)  The VA informed Plaintiff he had a service-connected

25  "prostatitis" condition compensable at 10% rating.  On July 22, 2009, Plaintiff was injured in a rear-end

26  motor vehicle accident. ECF, No. 6.  The VA medical care provided for his 2009 auto accident injuries

27  triggered discovery of medical negligence, concealed for years, after he suddenly became partially blind

28  in January 2013.  The medical malpractice included deliberate indifference in ignoring lab results while

prescribing contraindicated medications knowing, or should have known, his 1968 back injury resulted in stage 3 kidney failure, nearly 4 years delayed and failed diagnose and treatment of two shoulder tears, complete omission of cardiovascular risk assessment, and omission of monitoring repeatedly prescribing non-steroidal anti-inflammatory drugs (NSAIDs) contraindicated for Plaintiff which resulted in retinal hemorrhaging and blindness in January 2013.

Defendant United States denied any accountability after a 2014 Federal Torts Claim filed, thus forcing litigation, having both financial and legal advantages. For over *14 months* (since October 2017), Defendant evaded discovery through unclean hands, concealing information and documentation material to prepare for trial. While obstructing discovery, once again Defendant moves for summary judgment involving typographic and grammatical errors in a modified opinion report of a prior expert opinion. Summary judgment is unwarranted. In opposing summary judgment, admissible evidence establishes genuine triable issues of disputed facts exist. The Defendant's motion should be denied, with prejudice.

## II.   APPLICABLE LEGAL STANDARD.

On a motion for summary judgment, the moving party bears the initial burden of demonstrating that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett.* 477 U.S. 317, 325, 91 L Ed. 2d 265, 106 S. Ct. 2548 (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See, Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Only then is it incumbent on the nonmoving party to *"set forth specific facts showing that there is a genuine issue for trial."* Fed. R. Civ. P. 56(e). The moving party bears the initial burden of establishing, through affidavits or otherwise, the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); see *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). It is fatal to summary judgment if the moving party fails to meet its initial burden that no genuine issue of factual dispute exists. (*Id.*) It is axiomatic that summary judgment may not be granted

1    unless the moving party is able to show that no genuine issues of material fact exist. *Devereaux v.*

2    *Abbey*, 263 F.3d 1070, 1075-1076 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

3           A factual issue is "genuine" if the evidence is sufficient to support a rational and legally

4    sustainable resolution of the issue in favor of the nonmoving party; a fact is "material" if it has the

5    potential to alter the outcome of the litigation. See *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248,

6    91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  The opposing party must demonstrate that the fact in

7    contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see

8    A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec.*

9    *Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence

10   is such that a reasonable jury could return a verdict for the nonmoving party, see *Wool v. Tandem*

11   *Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In the endeavor to establish the existence of a

12   factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.

13   The evidence of the opposing party is to be believed. See *Anderson*, 477 U.S. at 255.  All reasonable

14   inferences that may be drawn from the facts placed before the court must be drawn in favor of the

15   opposing party. See *Matsushita*, 475 U.S. at 587.  It is sufficient that "the claimed factual dispute be

16   shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec.*

17   *Serv.*, 809 F.2d at 631 (citing *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S. Ct. 1575,

18   1592,  20 L. Ed. 2d 569 (1968).

19           Furthermore, the California Supreme Court has declared that: "Credibility determinations, the

20   weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

21   those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

22   evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

23   *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

24           In ruling upon a motion for summary judgment, California courts must view the evidence in a

25   light favorable to Plaintiff as the nonmoving party, liberally construe Plaintiff's evidentiary submission

26   while strictly scrutinizing Defendant's own showing and resolve any evidentiary doubts or ambiguities

27   in Plaintiff's favor. *Shin v. Ahn,* 42 Cal. 4th 482, 499 (2007); *Yanowitz v. L'Oreal* USA, Inc., 36 Cal. 4th

28   1028, 1037 (2005); *Mann v. Cracchiolo,* 38 Cal. 3d 18, 35-36 (1985).  California law has cautioned that

1    "[t]he summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is
2    drastic and should be used with caution." *Mann*, 38 Cal. 3d at 35.

3    ### III.    FACTUAL SUMMARY

4          Plaintiff initially filed this action seeking declaratory judgment on mixed state and federal
5    questions. 26 U.S.C. § 1367 et seq.   On November 17, 2016, the Court severed the state and federal
6    issues, and retained medical malpractice issues pertaining to claims of physical harm consequential to
7    treatment by Defendant United States and Veterans Administration doctors.

8          Plaintiff served discovery requests[1] in September and October 2017 and made his expert
9    designation timely in December 2017. (Doc. No. 37 at 2:15-17).   Both defendants and plaintiff
10   inadvertently exchanged damaged CD's in September 2017, causing delays.   After a meet and confer in
11   December 2017, Plaintiff served a Request for Admissions, Set Two, seeking to confirm Defendants had
12   complete accessibility to all CD information as originally provided on October 6, 2017.   Defendants
13   confirmed they had the same information re-sent via email October 6, 2017.   In a letter sent in January
14   2018, Plaintiff requested that Defendants provide supplemental responses to Plaintiff's Request for
15   Admissions, Set One.   The deadline set to produce supplemental admission responses was February 10,
16   2018.   Multiple letters and emails followed between Plaintiff and defense counsel Broderick, asking for
17   the supplemental responses.   None ever came.

18         Defense counsel stipulated two VA doctors would appear at Accuracy Plus Reporting, not the
19   VA medical center, for their noticed depositions on February 27, 2017.   Just five days before the
20   depositions, the VA doctors breached their appearance, interfering with plaintiff's ability to meet a
21   expert discovery deadline of March 22, 2018. (Doc. No. 48).   After agreeing to reset the depositions,
22   Defendant's counsel then attempted to motion for summary judgment on April 4, 2018. (Doc. No. 49).
23   On April 6, 2018, Plaintiff served amended deposition notices with production requests from each
24   deponent on separate subject matters material to this action.   The documents provided were not
25   separately set making it impossible to know which of 1600 pages applied to each separate production
26   request.

27

28   ---
[1] On September 29, 2017, Plaintiff served Request for Admission, Set One, Request for Production, Set One, and Request
for Special Interrogatories, Set One, with a separate CD containing Exhibits A-P to the RFAS, all exhibits bate stamped.
**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES RENEWED MOTION FOR SUMMARY
JUDGMENT**
4

1    In May 2018, the VA doctors breached their fiduciary duty by broadcasting false and defamatory
2    statements through their expert witness, Dr. James Van der Bogaerde, with deliberate indifference.
3    Defendants actions expanded the scope of contentious issues beyond physical medical malpractice
4    subject matter in this action. Plaintiff's efforts since June 26, 2018, have been futile including an effort
5    for informal conferencing. Between June and October 2018, Plaintiff repeatedly requested full
6    discoverable documents and responses from Defense counsel without success. The refusal to identify
7    with particularity per Rule 34 has continued, preventing full preparation for trial because of Defendants'
8    obstructive conduct. Even with Plaintiff's expert provide conflicting testimony, and perhaps impeaching
9    the declarations and testimony of the VA doctors and expert, they motion for summary judgment. (See,
10   Doc. No. 92). Plaintiff concurrently has pending motions to compel further discovery.

11   **IV.    DEFENDANT FAILS TO MEET THE INITIAL BURDEN.**

12   Defendant fails to meet the burden of proving no genuine issue of factual dispute exist.
13   Summary judgment must be denied as Plaintiff produced a medical expert, contrary to the holding in
14   *Robinson v. Kaweah Delta Hospital.* See, ECF 92-1, at page 5, lines 15-26. In *Robinson*, the United
15   States stated in its separate statement at item no, 10, the following undisputed fact: "As of the date this
16   motion is filed, Plaintiff has not disclosed to the United States any expert opinion regarding the standard
17   of care, the conduct alleged to breach the standard of care, or causation of any injury." The district court
18   granted summary judgment in *Robinson* solely on the *complete absence* of any medical expert
19   disclosure. (*Id.*) Here, Defendants cannot meet its initial burden, even conceding that Dr. Bash as
20   Plaintiff's expert who wrote a conflicting expert report ("*He did disclose a Dr. Craig Bash and*
21   *eventually served a report purportedly authored by Dr. Bash and dated November 17, 2018.*"). (See,
22   Gonzalez Decl., ¶¶ 4, 6, 7, 8; see also, Plaintiff's Separate Statement of Disputed Facts ("Pl. Sep.
23   Stmt."), pp. 2-10, Nos. 2-4; ECF, No. 92, page 2, lines 1-2.) Defendants completely fail to establish
24   that *no medical expert* exists. (See, Gonzalez Decl., ¶¶ 4, 6, 7, 8, and Ex. 1, 2, 3.) Defendants admit
25   that Dr. Bash produced an opinion from a partial record[1] because Defendants refused to produce
26   documents specifically addressing medical malpractice questions demanded from expert, Dr. James Van

27   ---
     [1] See, ECF, No. 92-1, page 6, lines 4-6 ("*Instead, he only wrote "an incomplete report based on incomplete records" and*
28   *"didn't finish it."*). It begs the question: Can a defendant obtain summary judgment while evading material medical
     malpractice discovery for over 14 months?

1   Den Bogaerde, or VA treating doctor, Dr. David Siegel. (See, Pl. Sep. Stmt., Nos. 3-4.)    Indeed,

2   Defendants' obstructiveness has necessitated a pending motion to compel which may led to impeach Dr.

3   Bogaerde for making false statements in his initial opinion declaration.  At a minimum, impeaching

4   Defendants' expert is a genuine triable issue mandating denial of summary judgment.

5          Moreover, it is necessary to file two additional discovery motions to compel. (See, Gonzalez

6   Decl., ¶ 4.)  One motion deal with compelling production of particular material documents from Dr.

7   Siegel, specified in his amended notice of deposition.  Plaintiff is also moving to compel truthful and

8   accurate supplemental responses to his Requests for Admissions, Set One and Set Two.  As a result of

9   Defendant United States' *14 months* of delay and obstructive conduct, Dr. Bash made it abundantly clear

10  before appearing to testify he could only provide a draft opinion letter based on Defendants' missing

11  discovery still unresolved by the court. (See, Gonzalez Decl., ¶¶ 12, 14, and Ex. 7, 9.)  Plaintiff not only

12  disclosed a medical expert, Dr. Craig N. Bash, M.D., but produced him for deposition wherein his

13  medical testimony establishes triable issues of material factual disputes on the lack of quality care by

14  VA doctors since 2000. (See, Pl. Sep. Stmt., Nos. 2-4.)   Thus, Defendants' reliance on *Robinson* is error

15  in claiming a complete absence of a medical expert disclosure, inapposite to the instant case, and fails as

16  a matter of law.

17          **A.  Dr. Bash's Testimony Justified His Opinion Report Making It Admissible.**

18          Defendant next argues that Dr. Bash's draft report, served timely on August 17, 2018, is not

19  authentic or admissible because of a typographic error on the *date* in the August 2018 opinion report.

20  (See, ECF 92-1, at pages 6:9-7:28.)  Moreover, the position that Dr. Bash does not qualify under Rule

21  702 and his opinion testimony is inadmissible is absurd.  Dr. Bash is exceptionally qualified to give

22  expert opinions on the quality of care at VA medical centers nationally. (See, Gonzalez Decl., ¶ 8, Ex.3,

23  RT38:10-21—"A. I've been doing this for 20 years, done 5,000 patients. I don't need much else.")

24          Contrary to arguing non-compliance with Rule 26(a)(2)(B) that ("a retained expert has to provide

25  'a written report- prepared and signed by the witness.'"), Dr. Bash produced what he could pending

26  resolution of Plaintiff's motion to compel further responses. (See, Gonzalez Decl., ¶¶ 6, 7, 8, 12, 14, and

27  Ex. 1, 2, 3, 7, and 9.)  Defendant's exaggeration that Dr. Bash has not provided a "complete opinion."

28  Dr. Bash's testimony explains *how* he drafted his initial opinion pending discovery resolutions. (See,

1    Gonzalez Decl., ¶ 8, Ex.3, RT9:1-14; RT10:17- RT11:9; RT12:22-25; RT40:21-RT41:15.)   He also

2    detailed the causation element to medical malpractice by the VA doctors, including failing to inform

3    Plaintiff of his stage 3 kidney dysfunction (disease). (See, Pl. Sep. Stmt., Nos. 2-4; see, Gonzalez Decl.,

4    ¶¶ 6, 7, 12, 14, and Ex. 1, 2, 7, and 9.)

5         The confusion regarding the opinions of Dr. Bash are substantially justified and harmless due the

6    fact that on August 17, 2018, Dr. Bash was at a funeral and unavailable, but his administrative assistant

7    helped try to complete typographical and grammatical errors in his November 12, 2017 opinion. (See,

8    Pl. Sep. Stmt., Nos. 3; see, Gonzalez Decl., ¶¶ 9, 10, and Ex. 4, 5.)   The defense argues this constitutes a

9    violation of Rule 37(c) and warrants precluding Dr. Bash from testifying at trial.   Again, this is a

10   draconian attempt to evade discovery Defendants have refused to provide in a specific and intelligible

11   format, or supplement requests for admissions since October 6, 2017. (See, Gonzalez Decl., ¶ 4.)   There

12   is no merit to summary judgment while impeding proper and necessary discovery.   This argument

13   should be rejected.

     **B.**  **Dr. Bash's Expert Opinion Supports Plaintiff's Claim Of Causation Against Defendant.**

14

15        The defenses' conclusory statement that Plaintiff is unable to prove negligence or causation

16   for lack of an expert is patently false and unwarranted. (See, ECF., No. 92-1, page 8, lines 15-18.)   Dr.

17   Bash fully provided factual opinion on the causation attributable to the VA doctors. (See, Pl. Sep. Stmt.,

18   Nos. 2-4; see, Gonzalez Decl., ¶¶ 6, 7, 8, 11, 15-19, and Ex. 1, 2, 3, 6, 10, 11.)   Dr. Bash gave multiple

19   testimony statements to the resulting causation and the damages.   Defendant is grasping at straws and

20   the Court should reject entirely the summary judgment.

     **C.**  **Defendants' Experts Fail To Prove Dr. Bash Is Incompetent Or Unqualified.**

21

22        Without justification, it's argued Dr. Bash's testimony and opinions must be ignored after 14

23   months of Defendants' obstructive discovery conduct. (See, Pl. Sep. Stmt., Nos. 2-4; see, Gonzalez

24   Decl., ¶¶ 4, 6, 7, 8, 11, 15-19, and Ex. 1, 2, 3, 6, 10, 11.)   Dr. Bash warned twice, before defendants

25   prematurely forced taking his deposition, that the missing discovery should be resolved to provide

26   missing medical facts to complete his opinion letter. (See, Pl. Sep. Stmt., Nos. 3-4; see, Gonzalez Decl.,

27   ¶¶ 12, 14, and Ex. 7, 9.) Notwithstanding defendants' obstructive discovery conduct, Dr. Bash provided

28   a draft report, and gave expert testimony expressing conflicting expert evidence for which summary

judgment must be denied. *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988) (quoting *Landeros v. Flood*, 17 Cal.3d 399, 408, 131 Cal.Rptr. 69, 72-73, 551 P.2d 389, 392-93 (1976)).  Defendants' disingenuous plea to ignore Dr. Bash's opinion and testimony is unreasonable and demonstrates good cause to deny summary judgment·

## V.   ADDITIONAL FACTORS AND ADMISSIBLE EVIDENCE NEGATE DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT.

Where discovery is not complete, the facts are not sufficiently developed to enable the trial court to determine whether genuine issues of material facts exist. See *Singer v. Star*, 510 So. 2d 637, 639 (Fla. 4th DCA 1987).  Pursuant to Local Rule 260(b), granting Defendant summary judgment prior to compelling production of requested discovery, or prior to resolving the concurrent motions to compel truthful supplemental responses to requested for admissions which disclose material issues of fact regarding medical malpractice, would be improper and premature, and precludes summary judgment at this time. (See, Pl. Sep. Stmt., Nos. 3-4; see, Gonzalez Decl., ¶¶ 12, 14, and Ex. 7, 9.) Defendants actively interfered with expert witness testimony they now demand summary judgment upon typos and grammar errors.

California C.C.P. § 437c states, "(i) If, after granting a continuance to allow specified additional discovery, the court determines that the party seeking summary judgment has unreasonably failed to allow the discovery to be conducted, the court shall grant a continuance to permit the discovery to go forward or deny the motion for summary judgment or summary adjudication."  Here, for equitable reasons, summary judgment should be denied in that Defendant evaded and obfuscated discovery outstanding *since November 2017*.

In addition, the Court should weigh the following additional points which would affect the outcome at trial:

1.   Defendants' unwillingness, failure, or refusal to depose Dr. Bash's administrative assistant, Alice Burns, precludes summary judgment as she could testify about the typographical and grammatical errors between Dr. Bash's November 12, 2017 and August 17, 2018 opinion letters, and substantiate being at a funeral on August 17, 2018, (See, Pl. Sep. Stmt., Nos. 3; see, Gonzalez Decl., ¶¶ 9, 10, and Ex. 4, 5.);

2. Dr. Bash and Alice Burns live in Paradise, CA, and summary judgment should not be granted because of the Paradise "Camp Fire" disaster creating extraordinary hardship to their lives; attempts to contact Dr. Bash to review, or modify, his deposition transcript are unsuccessful and impossible;

3. Defendants' VA doctors breached their fiduciary duty by broadcasting false and defamatory statements knowing that would exacerbate Plaintiff's known history of PTSD from California government abuses, unconstitutional, or unlawful conduct.

## VI.   CONCLUSION.

Based on the foregoing reasons, Plaintiff respectfully requests summary judgment be denied in its entirety, with prejudice, and compel defendants provide the missing discovery so trial may be set.

December 5, 2018

By: _Daniel Gonzalez_
DANIEL GONZALEZ
Plaintiff, Pro se

Daniel Gonzalez/
7125 Calvin Drive,
Citrus Heights, CA 95621
Telephone (916) 247-6886
Plaintiff

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL E. GONZALEZ,<br><br>         Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; and DOES<br>1 to 20, Inclusive,<br><br>         Defendants. | **No.: 2:15-cv-1997 MCE DB PS**<br><br>**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Date:              December 14, 2018<br>Time:             10:00 a.m.<br>Courtroom:     27<br>Magistrate Judge Deborah Barnes |

| | **DEFENDANT'S MATERIAL FACTS AND SUPPORTING EVIDENCE** | | **PLAINTIFF'S MATERIAL FACTS AND SUPPORTING EVIDENCE** |
|---|---|---|---|
| 1. | Plaintiff alleges that he suffered injuries as a result of medical treatment below the applicable standard of care by doctors employed at the Veterans Administration.<br><br>First Amended Complaint, Doc. No. 11, at 5:1-10:17. | 1. | DISPUTED. Plaintiff filed a First Amended Complaint against the United States who employs doctors at the Veterans Administration.<br><br>See, Doc. No. 11, pp. 3:18-23, ¶7, 8:5-9:8, ¶¶35-37, 9:10-11:17, ¶¶38-41. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

1

| | | | |
|---|---|---|---|
| | | | DISPUTED.  Plaintiff further alleges he suffered a low back injury in 1968 during military service which developed chronic kidney disease the Veterans Administration doctors concealed until revealed in November 2017 by Plaintiff's medical expert and the Veterans Administration failed to compensate Plaintiff with deliberate indifference since 1968.<br><br>See, Declaration of Daniel Gonzalez ("Gonzalez Decl."), at ¶¶ 5, 6, 7, 8, 15, 16, 17, 18, and 19, and at  Ex. 1, 2, 3, 10, and 11, concurrently filed. |
| 2. | On or about August 21, 2018, the United States received Plaintiffs expert disclosures, which included a single report dated November 17, 2018, and purportedly from Dr. Craig Bash.<br><br>Declaration of Gregory Broderick ("Broderick Decl.") at ¶ 4, Ex. B. | 2. | DISPUTED: Plaintiff served a modified expert report on August 17, 2018 in accordance with the Court order dated June 26, 2018, which replicated the same or similar conflicting expert opinion of alleged medical malpractice by the Veterans Administration.<br><br>See, Gonzalez Decl., at ¶¶ 6, 7, 17, 18, and 19, and Ex. 1, 2.<br><br>DISPUTED.  As a matter of law, summary judgment must be denied if the moving party fails to meet its initial burden that no genuine issue of factual dispute exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608,  26 L. Ed. 2d 142 (1970); see *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).<br><br>DISPUTED.  As a matter of law, summary judgment must be denied because Plaintiff has produced an expert, Dr. Bash, who has given testimony asserting conflicting expert opinion. *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988) (quoting *Landeros v.* |

**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

2

| | | | |
|---|---|---|---|
| | | | *Flood*, 17 Cal.3d 399, 408, 131 Cal.Rptr. 69, 72-73, 551 P.2d 389, 392-93 (1976)). |
| | | | DISPUTED. Defendant received the Plaintiff's expert report from Dr. Craig Bash on August 21, 2018 because August 18 is a Saturday and August 19 is a Sunday when the United States Department of Justice is closed. Defendants received the expert report within three USPS mail service days on August 21, 2018. |
| | | | See, Gonzalez Decl., at ¶¶ 6, 7, and Ex. 2. |
| 3. | At his October 31, 2018, deposition, the report the United States received was marked Exhibit 1 to the deposition. Dr. Bash testified that the report Plaintiff served August 21, 2018 "is not my report." Broderick Decl. at , ¶ 5 Ex. C, at 18:23-19:6, 19:9-11, 20:3-5, 20:13-14, 21:22-22:2, & 25:16-22. | 3. | UNDISPUTED: Dr. Craig Bash appeared for his deposition as agreed by the parties. |
| | | | DISPUTED. As a matter of law, summary judgment must be denied because Plaintiff has produced an expert, Dr. Bash, who has given testimony asserting conflicting expert opinion. *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988) (quoting *Landeros v. Flood*, 17 Cal.3d 399, 408, 131 Cal.Rptr. 69, 72-73, 551 P.2d 389, 392-93 (1976)). |
| | | | DISPUTED. As a matter of law, "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). |
| | | | See, Gonzalez Decl., at ¶¶ 4, 17, 18, and 19. |
| | | | DISPUTED. Mr. Broderick: "Q. Hang on. Put that away. I'm asking about Exhibit 1. Did you write this report?" Dr. Bash: "A. I |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

3

didn't write this November 17th on there, because that's in the future."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT19:3-6.

DISPUTED.  Mr. Broderick: "Q. But I want to know if you wrote this report marked 17 November --" Dr. Bash: "A. It's not my report. It has the wrong date on it."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT19:9-12.

DISPUTED.  Dr. Craig Bash testified the modified expert report served on August 17, 2018 is similar to his November 12, 2017, except there are typographic and grammatical errors in the November 12, 2017 report that the August 17, 2018 report attempted to correct as follows:  "Mr. Broderick: Q. Did you write all of the words in Exhibit 1?" Dr. Bash responded: "A. Well, it's the same as this report here, 12 November 2017."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT20:15-17.

DISPUTED.  Dr. Craig Bash was at a funeral on August 17, 2018, unavailable, and testified not knowing who made the modifications to correct the typographic and grammatical errors from his November 12, 2017 draft report, stating his administrative assistant, Alice Burns, exchanged communications with Plaintiff including authorizing his signature.  Dr. Bash testified as follows: "THE WITNESS: I don't think so. I didn't send letters. I don't think -- my secretary might have sent something, but I don't know. We could look and see if I have some."

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

4

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT17:3-12.

See, Gonzalez Decl., at ¶¶ 9, 10, and Ex. 4, 5.

DISPUTED.  Defendant's attorney concedes draft reports by Dr. Bash contain the identical Veterans Administration Exam label as follows: Broderick: "Q. All right. At the top of Exhibit 1 and as well as your draft report, it says 'VAE Nexus Opinion.'  Can you tell me what that means?"  Dr. Bash responded: "A. Veterans Administration Exam is what VAE stands for.  Nexus means between problem and result. Something like that."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT26:21-27:1.

See, Gonzalez Decl., at ¶¶ 6, 7, and Ex. 1, 2.

DISPUTED.  On four occasions, Dr. Bash revealed that Mr. Broderick had withheld records and deposition information from him when Broderick initiated a unilateral, unstipulated, and undisclosed telephone call to Dr. Bash on September 5, 2018, as follows:

Broderick: "Q. Would it change your opinion if other physicians had made a conflicting opinion?" Dr. Bash responded: "A. Yes, it would. Because then -- I'd be part of -- I asked you for that. I asked you for the medical records and reports."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT50:7-11.

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

5

Broderick: "Q. You didn't ask me for anything, and I don't –" Dr. Bash responded: "A. No. I did –"

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT50:12-13.

Broderick: "Q. I haven't given you anything." Dr. Bash responded: "A. I said something about -- we had a conversation, and he said that there was depositions stuff. I said, "I want to see everything.""

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT50:14-17.

Broderick: "Q.  Well, you may have asked Mr. Gonzalez for stuff, but I don't work for you, and you don't work for me; so –"   Dr. Bash responded: "A. On a phone call, I asked you about records.  Anyway, yes, I try and look at the whole record.  So -- and I referee other doctors' opinions. If I see another doctor says this, another doctor says that, then I consider that."

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT50:18-25.

DISPUTED.  Dr. Bash clearly established the November 2017 opinion report and the August 2018 opinion are similar as follows: "Mr. Gonzalez: Q. Dr. Bash, Mr. Broderick asked you earlier about the draft that was exchanged -- that we were exchanging in August of this year. Because last year -- I think the explanation is that there's a November 2017 or it says November 2018. And Dr. Bash was preparing the draft that was due August 17, and he was sending me this, and I was trying to help straighten out some of the corrections that -- grammatical things that Mr. Broderick was addressing in

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

6

| | | | |
|---|---|---|---|
| | | | the deposition. Do you -- you do recognize, though, that this is pretty much your format on this exhibit -- I think it's Exhibit 1. It's pretty much your format of –" "Dr. Bash responds: "A. It's similar to my 2017 report." |
| | | | See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT73:21-RT74:10. |
| 4. | Dr. Bash also testified that he never completed a report, that he only wrote a draft in November 2017, which he never finished. <br><br> Broderick Decl. at , ¶ 6, Ex. C, at 24:14-18, 30:14-31:3, & 69:1-24 | 4. | DISPUTED. As a matter of law, summary judgment must be denied because Plaintiff has produced an expert, Dr. Craig Bash, who has given testimony asserting conflicting expert opinion. *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988) (quoting *Landeros v. Flood*, 17 Cal.3d 399, 408, 131 Cal.Rptr. 69, 72-73, 551 P.2d 389, 392-93 (1976)). |
| | | | DISPUTED. As a matter of law, where discovery is not complete, the facts are not sufficiently developed to enable the trial court to determine whether genuine issues of material facts exist. See *Singer v. Star*, 510 So. 2d 637, 639 (Fla. 4th DCA 1987). |
| | | | DISPUTED. Dr. Craig Bash submitted two opinion reports which contain conflicting expert opinion different from Defendant's VA doctor testimony and expert declaration as he testified as to element of causation: Broderick: "Q. What is this document, a VAE nexus opinion, what is that used for?" Dr. Bash responds: "A. It's a generic sort of medical opinion about causation." |
| | | | See, Gonzalez Decl., at ¶¶ 6, 7, and Ex. 1, 2. |
| | | | See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT27:22-25. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

7

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT27:2-13.

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT37:10-RT38:6.

DISPUTED.  Dr. Craig Bash submitted two opinion reports based on 304 pages of Veterans Administration medical records Plaintiff received from Mather VA.   Most of the medical records Broderick claims are duplicates of the same 304 pages of medical records showing causation.

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT10:17-RT11:9.

See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT40:21-RT41:8.

DISPUTED.  Dr. Bash provided two declarations in April 2018 and October 2018 stating he could only conduct a partial review because of Defendants' 14 months (since Oct. 6, 2017) of failing or refusing to produce intelligible and accurate discovery responses sufficient to finalize opinions.

See, Gonzalez Decl., at ¶¶ 12, 14, and Ex. 7, 9.

DISPUTED.  Since September 6, 2018, Mr. Broderick is aware that the deposition transcript of Dr. Siegel contained reporter errors which would affect the outcome of trial of medical terms.  Those reporter corrections were not received until October 26, 2018.

See, Gonzalez Decl., at ¶¶ 13, and Ex. 8

DISPUTED.   Dr. Craig Bash could not complete a final report because defense expert, Dr. James Van Den Bogaerde,

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

8

refuses to specifically identify and produce documents requested since July 16, 2018. Defendants' discovery prejudices the ability of Plaintiff's expert from completing a final report.  Plaintiff has a pending motion to compel production per Rule 34 or have evidentiary sanctions imposed per Rule 37.

See, Gonzalez Decl., at ¶¶ 2, 4, 12, 14, 17, 18, and 19, and Ex. 6, 7, 9, 10, 11.

DISPUTED.   Dr. Craig Bash could not complete a final report because VA doctor Dr. Siegel refuses to identify and produce specific documents to request for productions since April 27, 2018. Defendants' discovery obstruction prejudices the ability of Dr. Bash from completing a final report.  Plaintiff has a pending motion to compel production per Rule 34 or have evidentiary sanctions imposed per Rule 37.

See, Gonzalez Decl., at ¶¶ 2, 4, 12, 14, 17, 18, and 19, and Ex. 6, 7, 9, 10, 11.

DISPUTED.   Dr. Craig Bash could not complete a final report because Defendant's attorney, Gregory Broderick, is a non-doctor who for 14 months refuses to provide properly supplemented responses to Plaintiff's request for admissions, Set One and Set Two (since October 6, 2017). Defendants' discovery obstruction directly prejudices and impedes Dr. Bash from completing a final report.  Plaintiff is to file concurrent motions to compel proper and accurate supplemented responses to admissions or have matters deemed admitted per Rules 36 and 37.

**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

9

| | | |
|---|---|---|
| | | See, Gonzalez Decl., at ¶¶ 2, 4, 12, 14, 17, 18, and 19, and Ex. 6, 7, 9, 10, 11. |
| | **PLAINTIFFS' UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
| 5. | Plaintiff has retained a qualified medical expert, Dr. Craig N. Bash, M.D., who provided conflicting medical opinion reports regarding acts and omissions of Defendants medical care.<br><br>See, Gonzalez Decl., at ¶¶ 6, 7, 12, 14, 17, 18, and 19, and Ex. 1, 2, 6, 7, 9, 10, 11.<br><br>See, Gonzalez Decl., at ¶ 8, and Ex. 3, at RT6:16-18; RT52:19-RT55:3; RT65:4-RT67:11. | 5. |
| 6. | Non-steroidal anti-inflammatory drugs ("NSAIDs") are contraindicated for Plaintiff because they cause retinal hemorrhaging.<br><br>Plaintiff established the element of causation based on the reported opinions and testimony of Dr. Bash identifying that Veterans Administration doctors repeatedly prescribed high dosages Motrin (and other NSAIDs) which caused retinal hemorrhaging in Plaintiff's left eye resulting in irreparable blindness.<br><br>Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | 6. |
| 7. | NSAIDs are contraindicated for Plaintiff because they cause renal hemorrhaging and damage renal prostaglandin synthesis worsening chronic kidney disease.<br><br>Plaintiff established the element of causation based on the reported opinions | 7. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

10

| | | |
|---|---|---|
| | and testimony of Dr. Bash identifying that Veterans Administration doctors repeatedly prescribed high dosages Motrin (and other NSAIDs) which caused irreversible renal hemorrhaging and damaged prostaglandin synthesis of Plaintiff's stage 3 kidney disease.<br><br>Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | |
| 8. | Plaintiff established the element of breach of duty based on the reported opinions and testimony of Dr. Bash identifying that Defendants knew, or should have known, they failed to perform proper monitoring of the damaging effects of administrating repeated high dosages of Motrin and NSAIDs contraindicated in the presence of stage 3 chronic kidney disease.<br><br>Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | 8. |
| 9. | Plaintiff established the element of fraudulent concealment based on the testimony of Dr. Bash identifying that Defendants knew, or should have known, and were deliberately indifferent, in concealing that Plaintiff had six different times abnormal creatinine levels marked "H" (high) from April 2000 through October 2017 indicating irreversible stage 3 chronic kidney disease.<br><br>Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | 9. |
| 10. | Plaintiff has established a triable issue of disputed fact on the departure from the standard of care in that Dr. David Siegel, employed by Defendants, concealed from Plaintiff the laboratory results from September 2009 through January 2013 indicate having untreated | 10 |

**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

| | | |
|---|---|---|
| stage three chronic kidney disease based on estimated Glomerular Filtration Rate ("eGFR") levels marked "L" or "LOW" two different times below 60 mg/dl.  Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | | |
| 11. Plaintiff established the element of fraudulent concealment based on the testimony of Dr. Bash identifying that Defendants knew, or should have known, and were deliberately indifferent, in concealing that Plaintiff until October 2017  Gonzalez Decl., at ¶¶ 4-19, and Ex. 1-11. | 11 | |

Plaintiff submits the statements of additional disputed material facts, at No. 6 to No. 11 above, that raise triable issues together with supporting evidence in opposition to defendant's "renewed" motion for summary motion.

DATED: December 5, 2018

*Daniel Gonzalez*
DANIEL E. GONZALEZ
Plaintiff

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED MATERIAL FACTS IN OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

12

Daniel Gonzalez
7125 Calvin Drive,
Citrus Heights, CA 95621
Telephone (916) 247-6886
Plaintiff

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL E. GONZALEZ, | **No.: 2:15-cv-1997 MCE DB PS** |
|       Plaintiff, | |
| vs. | **DECLARATION DANIEL GONZALEZ IN SUPPORT OF OPPOSITION TO DEFENDANTS RENEWED UNITED STATES' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES OF AMERICA; and DOES 1 to 20, Inclusive, | Date:          December 14, 2018<br>Time:          10:00 a.m.<br>The Honorable Deborah Barnes |
|       Defendants. | |

I, Daniel E. Gonzalez, declares:

    1.     I am the plaintiff in the above-captioned matter. I have personal knowledge of the facts stated within this Declaration, except as otherwise noted. As to matters based on information and belief, I believe that information to be true.

    2.     I am concurrently requesting ex parte leave to file or lodge this opposition late as I am asking the Court to reset all hearings to January 11, 2019, so that all discovery motions may be decided with this motion for summary judgment. Due to my current health and vision limitations, from time to time I rely on third party assistance to help prepare pleadings, including this declaration and opposition. Given there are two attorneys and four paralegals working for Defendant United States, Veterans Administration doctors, and some abusive California investigators and officials, it can be difficult to keep up with the piling on I have experienced.

**DECLARATION DANIEL GONZALEZ IN SUPPORT OF OPPOSITION TO DEFENDANTS UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

1

3.   On December 4, 2018, I attempted by letter to arrange a stipulation with defense counsel so as not to waste the Court's time needlessly opposing their motion for summary judgment at this time. Ms. Taylor and Mr. Broderick refused to stipulate.

4.   I believe the renewed motion for summary judgment lacks merit for several reasons. First, the cases cited by the Defendant for the proposition of obtaining summary judgment are based on the *complete absence* of a plaintiff having any medical expert. That is not true in this in action and thus Defendants fail to meet their initial burden showing a genuine triable issue does not exist. Second, Defendants argue the Court should disregard my medical expert's opinions because of typographical and grammatical errors, which is frivolous at best. Defendants failed to present any legal authority showing that typos or grammar errors are any basis for granting summary judgment. Third, through their counsel, Defendants engaged in obfuscating discovery for over 14 months with unclean hands, attempting to blame Dr. Bash in not completing his report as a basis for summary judgment. I believe Defendants conduct to be bad faith and abuses the process. Fourth, Defendants forced Dr. Bash's knowing he could not complete his final report while proposing to extend the scheduling order, which is an unworthy reason to grant summary judgment. Lastly, Defendant through counsel attempts to mislead the Court in their separate statement stating only a *portion* of all true relevant facts. Dr. Bash may not have put the incorrect date on the report served on August 17, 2018, but that is because he was unavailable to review the modified report on the date it was due, August 17, 2018. Disregarding all reason over clerical mistakes, and testimony by Dr. Bash that the two reports contain essentially the same conflicting expert opinions of disputed medical malpractice facts, Defendants pursue their meritless summary judgment.

5.   My federal action was triggered after an auto accident July of 2009, when I began suffering delay of proper care, diagnosis, and treatment at the Veterans Administration, which ultimately left me permanently blind in 2013. My VA treatments actually commenced after a military injury to my low back in 1968 during active service which forced my discharge.

6.   I retained Dr. Craig Bash, M.D., to evaluate and determine if there exist medical basis to prosecute this action. If Dr. Bash had not informed me in November 2017 that I had stage 3 chronic kidney disease, I believe Dr. David Siegel and other VA doctors would have continued concealing my

true renal condition and damages. Dr. Bash's initial opinion report dated November 12, 2017, he was unable to complete due to ongoing discovery disputes and omissions deliberately done by the Defendants. The draft of the initial opinion report of Dr. Bash contained many typographical and grammatical errors. It is essentially the same or similar to the opinion report served to Defendants on August 17, 2018. Attached hereto as **Exhibit 1,** is a true and correct copy of Dr. Bash's initial opinion report dated November 12, 2017.

7.      In the effort to comply with the scheduling order to provide an expert opinion report by August 17, 2018, Dr. Bash's modified version was an attempt to correct the 2017 typographical and grammatical errors but had the incorrect date of "17 November 2018" when it should have had the correct date of "17 August 2018." On that sole basis, Defendants wastefully attempt to evade a trial on the merits. Attached hereto as **Exhibit 2,** is a true and correct copy of Dr. Bash's modified opinion report served to Defendants on August 17, 2018.

8.      On October 31, 2018, Dr. Bash testified at his deposition, and expressed his expert opinion which conflicts with the Defendant's expert and treating doctors in significant material facts showing a genuine triable issue exist as the medical malpractice claims contained in my first amended complaint (Docket 11) in this action. Attached hereto as **Exhibit 3,** is a true and correct copy of the relevant highlighted excerpts from the deposition transcript of Dr. Bash taken on October 31, 2018.

9.      The assertions that Dr. Bash's opinion reports are not similar drafts is mean-spirited. Dr. Bash testified he was unaware whether his administrative assistant, Alice Burns, may have made typographic or grammatical corrections to his opinion reports sent to me in August 2018. I believe the modified opinion report was authorized by Dr. Bash through Alice, as I emailed her a request for his signature dated August 17, 2018. Attached hereto as **Exhibit 4**, is a true and correct copy of the email to Alice Burns requesting his signature dated August 17, 2018.

10.      It should be considered harmless that Dr. Bash's administrative assistant tried to help modify the initial opinion report because Dr. Bash was unavailable attending a family funeral on August 17, 2018. I do not know what communications occurred between Alice and Dr. Bash regarding these modifications. I tried to explain that to Mr. Broderick before and during the deposition, but he deliberately ignored the point, filing this baseless motion for summary judgment instead. Attached

DECLARATION DANIEL GONZALEZ IN SUPPORT OF OPPOSITION TO DEFENDANTS UNITED STATES' MOTION FOR SUMMARY JUDGMENT

3

hereto as **Exhibit 5**, is a true and correct copy of a partially redacted letter from Daniel Gonzalez to Alice Burns dated August 20, 2018, stating that Dr. Bash was unavailable due to the funeral on August 17, 2018.

11.     On April 27, 2018, I conducted the depositions of Dr. David Siegel and Dr. Jean Lee, two former VA treating doctors.  The misleading questioning of Dr. Bash may have resulted in some confusion or lack of recall of having some additional documents I did send him, such as all the exhibits attached to the deposition of Dr. David Siegel. Attached hereto as **Exhibit 6**, is a true and correct copy of an email dated May 8, 2018, sending exhibits from the deposition of Dr. David Siegel taken on April 27, 2018.

12.     In April 2018, Dr. Bash first informed defense counsel of their missing discovery information since October 2017 concurrently at issue by writing a declaration.  This includes missing documents requested from Dr. James Van Den Bogaerde, Dr. David Siegel, and supplemental responses to Set One and Set Two of my requests for admissions.  Attached hereto as **Exhibit 7**, is a true and correct copy of Dr. Bash's declaration attached as an exhibit to the deposition of Dr. David Siegel taken on April 27, 2018.

13.     An additional difficulty arose in September 2018 when it was discovered the deposition transcript of Dr. Siegel contained incorrect terminology affecting the outcome of trial in this action. There were multiple errors of the reporter incorrectly typing "hypolipidemia" rather than "hyperlipidemia."  Attached hereto as **Exhibit 8**, is a true and correct copy of the letter from Daniel Gonzalez to Accuracy Plus Reporting dated September 6, 2018, requesting a correction which took until October 26, 2018.

14.     In October 2018, Dr. Bash again attempted to inform defense counsel of the challenges caused by their missing discovery information by submitting a second declaration forewarning of the futility or impracticability of taking deposition without all the discovery information resolved.  Attached hereto as **Exhibit 9**, is a true and correct copy of Dr. Bash's second declaration executed October 3, 2018, previously submitted to the Court.

15.     In support of the veracity of Dr. Bash's testimony, I submit one of the medical articles he considered discussing Motrin causes retinal hemorrhaging.  Attached hereto as **Exhibit 10**, is a true and correct copy of a medical article Dr. Bash considered discussing Motrin causes retinal hemorrhaging.

16.     In support of the veracity of Dr. Bash's testimony, I submit one of the medical articles he reviewed discussing contraindicated use of NSAID (Motrin) for persons with moderate to severe chronic kidney disease causing damage to prostaglandin synthesis and renal hemorrhaging.  Attached hereto as **Exhibit 11**, is a true and correct copy of a medical article Dr. Bash considered, attached as an exhibit to the deposition of Dr. Siegel, discussing the contraindication of NSAID (Motrin) use in causing prostaglandin synthesis damage and renal hemorrhaging.

17.     Among several conflicting medical points Dr. Bash testified on causation of my blindness incurred after the failed treatment by the VA doctors between July 2009 and February 2013. He opines the Defendants repeatedly prescribed Motrin and other non-steroidal anti-inflammatory drugs for prolonged period of time while delaying proper diagnosis and treatment of my shoulder injury.  Dr. Bash testified that Motrin is contraindicated for me because it causes retinal (eye) hemorrhaging and renal (kidney) hemorrhaging.  Dr. Bash further testified that he discovered and informed me of my stage 3 kidney condition the VA doctors concealed most likely since 1968.

18.     With the opinions and testimony of Dr. Bash, I have established the element of causation in this action to several causes of action, including medical malpractice, negligence, abuse of process, breach of the fiduciary duty, and fraudulent concealment.   Drs. Siegel and Lee each admitted they did not diagnose two partial-thickness tears in my right rotator cuff after the auto accident on July 22, 2009; admitted never referring me to have an MRI or orthopedic evaluation since the car accident on July 22, 2009; admitted failed or refused to timely refer me for an orthopedic surgical evaluation between August 2009 and January 2013; admitted failed to inform, perform, or document four or more risk factor calculation for me requiring statin use since 2002 to maintain LDL-C under 100 mg/dl per the American Heart Association guideline standards; and admit disregard of abnormal eGFR lab results showing stage 3 chronic kidney failure.

19.     I have established triable issues as to defamation by Dr. David Siegel, Dr. Jean Lee, Dr. James Van den Bogaerde, and Defendants United States for willfully conspiring in making false

DECLARATION DANIEL GONZALEZ IN SUPPORT OF OPPOSITION TO DEFENDANTS UNITED STATES' MOTION FOR SUMMARY JUDGMENT

5

1  declarations, under the penalty of perjury, as a defense to medical malpractice, particularly: "His social

2  history prior to the 2009 accident includes losing his dental license over allegation of sexually abusing a

3  patient who was a minor." Or "He went into realty and shortly thereafter lost his real estate license, due

4  to some apparent financial improprieties."

5       20.     I ask the Court to deny the Defendants' motion for summary judgment on the basis that

6  they have not met their initial burden proving no genuine triable issue exist, and they continue to fail or

7  refuse to comply with discovery requests in a manner that permits a proper trial on the merits.

8       21.     I declare under penalty of perjury under the laws of the United States of America that the

9  foregoing is true and correct.  Executed December 5, 2018.

10

11                                 By: _____

                                    DANIEL GONZALEZ

12                                      Plaintiff, Pro se

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# VAE  NEXUS OPINION   2017

**(cell phone 301-651-6392)**

**To:  VA**

**Date: 12 Nov 2017**

**Re:   Gonzales, Daniel**

**Claim number:**

**916-247-6886**

dgonzie@gmail.com

**From:**

**Craig N. Bash, M.D.**
**Neuro-Radiologist**
**www.veteransmedadvisor.com**

4938 Hampden lane Bethesda, MD 20814
Phone: (301) 767-9525   Fax: (301) 951-9106
E-Mail: drbash@doctor.com

I reviewed this patient's records and did a clinical interview on this patient concerning his service time, which caused his **right shoulder injury and secondary loss of vision-blindness (non-vascular retinopathy –loss of renal function).**

**Rules of importance:**

**Positive and Negative:**

Moore vs Derwinski says that positive and negative info should be discussed thus as per VA rules of Benefit-of-the-doubt doctrine  [Dela Cruz v Principi  15 Vet app. 143, 148-149 (2001)]

My resume is attached and it is clear that my opinion (expert witness Nieves-Rodriguez 22 Vet App 295 (2008) is much more probative than the VA examiner for the following reasons:

1. I am a licensed physician with PGY-8 training (12 years post graduate training)  thus more probative than any nurse practitioner or Physician assistant (2-4-years) and most physicians see a comparison of credentials at the bottom of this letter)
2. It is competent, new/material and credible.
3. It is based on a review of the claims file-as provided by the patient (Claims file review not required in each case Snuffer v. Gobber, 10 Vet. App. 400. 403-04 (1997).
4. It is based on a patient interview/exam and DBQ forms.
5. It is based on a review of any available images.
6. It is based on a review of the literature.
7. It is based on referenced articles.
8. It is based on a review of the NEW lay statements ( Kowalski v Nicholson 19 Vet app 171-

9. It is based on my experience and training as a Physician with 30+ years experience.
10. It is based on my resume attached.
11. It is based on my experience with 500+ cases at BVA/COVA and 4000 RO cases and 100+ expert witness BVA testimonies and 50+ site visit trips for quality of care analysis to the VA tertiary medical centers with post trip reports to both the local Hospital director and SECVA.
12. It is based on known medical principles and the natural history of this disease.

## OPNIONS:

## Right shoulder injury

It is my opinion[1] considering every possible sound medical etiology/principle, to at least the 90% level of probability that his current right shoulder problems (status post surgery) are secondary to his military service injuries for the following reasons (Basis Sklar v. Brown, % vet. App. 140 (1993):

1. Per his military records he entered the service fit for duty without any doctor-diagnosed illnesses.
2. He had a right shoulder injury in service with a delay in diagnosis for 4 years, during that time he was miss diagnosed because an MRI scan was not ordered, In stead, he was given maximal does of MOTRIN 800 mg TID. The physician providing his care did not monitor him for secondary complications of blindness and renal failure, both of which are known to occur following max doses of motrin. See article below:

### buprofen and visual function

NS Levy, T Hanscom - Archives of Ophthalmology, 1976 - archopht.jamanetwork.com
... Archives 93:781, 1975) on their dou- ble-blind, prospective study of pa- tients with osteoarthritis who re- ceived either ibuprofen (**Motrin**) or buffered aspirin ... We first saw this woman one year prior to the beginning of ibuprofen therapy because of a sud¬ den **loss of vision** in her ...
Cited by 2 Related articles All 5 versions

### Ibuprofen and visual function

NS Levy, T Hanscom - Archives of Ophthalmology, 1976 - archopht.jamanetwork.com
... Archives 93:781, 1975) on their dou- ble-blind, prospective study of pa- tients with osteoarthritis who re- ceived either ibuprofen (**Motrin**) or buffered aspirin ... We first saw this woman one year prior to the beginning of ibuprofen therapy because of a sud¬ den **loss of vision** in her ...

3. His kidney function also declined on Motrin treatment with Creatinine levels in 1.16 to 1.4 level in the 2006 to 2009 time period and his eGFR during this time was also abnormal at 59.1. Motrin is known to cause renal dysfunction supported by the following:

### Nephrotoxicity of nonsteroidal anti-inflammatory agents

WL Henrich - American Journal of Kidney Diseases, 1983 - Elsevier
... The. group. of. phenyl-proprionic. acids. consisting. of. ibuprofen. (**motrin**),. fenaprofen. (nalfon).. and. naproxen. (naprosyn). were. introduced. as. ... eosinophilia. in. some. cases.. 5.. Rapid. decline. in. **renal. function**;. steroids. have. aided. resolution. in. some. cases.. 6.. Time. to. ...
Cited by 103 Related articles All 4 versions

## Nonsteroidal anti-inflammatory drugs in the elderly

M Buffum, JC Buffum - Pain Management Nursing, 2000 - Elsevier

... Prostaglandins are involved in both maintenance of normal body **function** and inflammatory response ... all of these physiological effects and result in NSAID-related peptic ulceration, bleeding, and **renal** damage ... Ibuprofen **Motrin**, 3.2 g/d, 200–400 mg q 4-6 hr (max: 1.2 g/d) onset: 30 ...

4. It is my opinion that both his vision loss and renal dysfunction was caused by his motrin prescriptions doses at maximum for about 4 years.
5. *His* current symptoms are per the attached lay statements, which show chronicity of symptoms.
6. He clinic doctor noticed his elevated creatinine and stopped motrin instantly in
7. The time lag between shoulder injury in service and current eye renal pathology is consistent with known medical principles and the natural history of this disease.
8. No other physician has made a conflicting opinion.
9. This opinion is consistent with the patient's subjective lay statements, the objective findings/imaging tests/diagnoses.
10. These disabilities and his total VA medical disabilities clinical problems affect his ability to be gainfully employed.
11. This illness is permanent in nature and thus is not expected to improve with time.

**1151 Secondary loss of vision-blindness (non-vascular retinopathy).**

He had a [poor outcome form his shoulder injury in that he has l]vsion loss and renalk functiuon loss/ Thses outcomes are not the expected outcome form a simply shoiulder injury.  Mostpatiente gat radid doanshgos nand thretament ot[r phycial therapy and do not have 4 yeas of N=Motirn TID resulimng in n]loss of vosuon and rephropathy.

These poor puccomes represent 111 as decried below:

The eligibility requirement that fault on the part of the VA be found, or that death or disability be the result of an unforeseeable event, applies only to claims received on or after October 1, 1997. In order to meet the qualifications of 38 U.S.C. 1151, the proximate cause of additional disability or death must be carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in furnishing the hospital care, medical or surgical treatment, or examination an event not reasonably foreseeable been assigned a 10% code for his left knee but since he as developed secondary right patellar femoral syndrome (10%) and secondary right knee instability 20%.

The main fault in his care involves the delay in diagnosis (no MRI), which required high doses of Motrin without lab monitoring.  These high does of Motrin in my opinion caused his vision and renal losses.

The 1151 is clear when you consider that his vision renal losses are NOT the expected outcome for a patient with a simple shoulder injury.  In other words, his poor outcomes are below the

Respectfully submitted,

ELECTRONICALLY SIGNED
Craig N. Bash M.D. '86, M.B.A. '81, G.M.E. '95
Associate Professor of Neuroradiology
Diplomat, American College of Radiology
Fellowship 3 years in MRI - with 2 fellow years at NIH in Experimental Neuroimaging

# EXHIBIT 2

# VAE NEXUS OPINION 2018

☎ (cell phone 301-651-6392) ☎

**FAX**

**MEMO**

**To: VA**

**Date: 17 Nov 2018**

**Re: Gonzales, Daniel**

From:

**Craig N. Bash, M.D.**

Claim number:

Neuro-Radiologist

www.veteransme...

**916-247-6886**

dgonzie@gmail.com

4938 Hampden lane Bethesda, MD

Phone: (301) 767-9525  Fax: (301) 951-9106

E-Mail: drbash@doctor.com

20814

951-9106

---

I reviewed this patient's records and did a clinical interview on this patient concerning his service time, which caused his **right shoulder injury and secondary loss of vision-blindness (non-vascular retinopathy –loss of renal function).**

**Rules of importance:**

**Positive and Negative:**

Moore vs Derwinski says that positive and negative info should be discussed thus as per VA rules of Benefit-of-the-doubt doctrine [Dela Cruz v Principi 15 Vet app. 143, 148-149 (2001)]

My resume is attached, and it is clear that my opinion (expert witness Nieves-Rodriguez 22 Vet App 295 (2008) is much more probative than the VA examiner for the following reasons:

1. I am a licensed physician with PGY-8 training (12 years post graduate training) thus more probative than any nurse practitioner or Physician assistant (2-4-

EXHIBIT _____ 1 _____    PLTF. / DEFT.

WITNESS _Bash_

CONSISTING OF _____ 19 _____ PAGES

DATE _10-31-18_

BEHMKE REPORTING AND VIDEO SERVICES, INC.

years) and most physicians see a comparison of credentials at the bottom of this letter)
2. It is competent, new/material, and credible.
3. It is based on a review of the claims file-as provided by the patient (Claims file review not required in each case Snuffer v. Gobber, 10 Vet. App. 400. 403-04 (1997).
4. It is based on a patient interview/exam and DBQ forms.
5. It is based on a review of any available images.
6. It is based on a review of the literature.
7. It is based on referenced articles.
8. It is based on a review of the NEW lay statements (Kowalski v Nicholson 19 Vet app 171- 177 (2005).
9. It is based on my experience and training as a Physician with 30+ years' experience.
10. It is based on my resume attached.
11. It is based on my experience with 500+ cases at BVA/COVA and 4000 RO cases and 100+ expert witness BVA testimonies and 50+ site visit trips for quality of care analysis to the VA tertiary medical centers with post trip reports to both the local Hospital director and SECVA.
12. It is based on known medical principles and the natural history of this disease.

## OPNIONS:

### Right shoulder injury

It is my opinion[1] considering every possible sound medical etiology/principle, to at least the 90% level of probability that his current right shoulder problems (status post-surgery) are secondary to his military service injuries for the following reasons (Basis Sklar v. Brown, % vet. App. 140 (1993):

1. Per his military records he entered the service fit for duty without any doctor-diagnosed illnesses.
2. He had a right shoulder injury in service with a delay in diagnosis for 4 years, during that time he was miss diagnosed because an MRI scan was not ordered, Instead, he was given maximal does of MOTRIN 800 mg TID. The physician providing his care did not monitor him for secondary complications of blindness and renal failure, both of which are known to occur following max doses of Motrin. See article below:

### ibuprofen and visual function
NS Levy, T Hanscom - Archives of Ophthalmology, 1976 - archopht.jamanetwork.com
... Archives 93:781, 1975) on their double-blind, prospective study of patients with osteoarthritis who received either ibuprofen (**Motrin**) or buffered aspirin ... We first saw this woman one year

prior to the beginning of ibuprofen therapy because of a sudden **loss of vision** in her ...
Cited by 2Related articlesAll 5 versions

3. His kidney function also declined on Motrin treatment with Creatinine levels in 1.16 to 1.4 level in the 2006 to 2009 time period and his eGFR during this time was also abnormal at 59.1. Motrin is known to cause renal dysfunction supported by the following:

## Nephrotoxicity of nonsteroidal anti-inflammatory agents

WL Henrich - American Journal of Kidney Diseases, 1983 - Elsevier
... The. group. of. phenyl-propionic. acids. consisting. of. ibuprofen. (**Motrin**). furaprofen. (nalfon) and. naproxen. (Naprosyn). were. introduced. as. ... eosinophilia. in. some. cases. 5.. Rapid. decline.
in. **renal. function**; steroids. have. aided. resolution. in. some. cases. 6.. Time. to. ...
Cited by 103Related articlesAll 4 versions

### Nonsteroidal anti-inflammatory drugs in the elderly

M Buffum, JC Buffum - Pain Management Nursing, 2000 - Elsevier
... Prostaglandins are involved in both maintenance of normal body **function** and inflammatory
response ... all of these physiological effects and result in NSAID-related peptic ulceration, bleeding,
and renal damage ... Ibuprofen **Motrin**, 3.2 g/d, 200-400 mg q 4-6 hr. (max: 1.2 g/d) onset: 30 ...

4. It is my opinion that both his vision loss and renal dysfunction was caused by his Motrin prescriptions doses at maximum for about 4 years.
5. *His* current symptoms are per the attached lay statements, which show chronicity of symptoms.
6. He clinic doctor noticed his elevated creatinine and stopped Motrin instantly in
7. The time lag between shoulder injury in service and current eye renal pathology is consistent with known medical principles and the natural history of this disease.
8. No other physician has made a conflicting opinion.
9. This opinion is consistent with the patient's subjective lay statements, the objective findings/imaging tests/diagnoses.
10. These disabilities and his total VA medical disabilities clinical problems affect his ability to be gainfully employed.
11. This illness is permanent in nature and thus is not expected to improve with time.

**1151 Secondary loss of vision-blindness (non-vascular retinopathy).**

He had a [poor outcome forms his shoulder injury in that he has vision loss and renal function loss/ These outcomes are not the expected outcome form a simple shoulder injury. Most patients get rapid diagnosis and treatment of [r physical therapy and do not

have 4 years of Motrin TID resulting in n] loss of vision and nephropathy.

These poor outcomes represent as decried below:

The eligibility requirement that fault on the part of the VA be found, or that death or disability be the result of an unforeseeable event, applies only to claims received on or after October 1, 1997. In order to meet the qualifications of 38 U.S.C. 1151, the proximate cause of additional disability or death must be carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in furnishing the hospital care, medical or surgical treatment, or examination an event not reasonably foreseeable been assigned a 10% code for his left knee but since he has developed secondary right patellar femoral syndrome (10%) and secondary right knee instability 20%.

The main fault in his care involves the delay in diagnosis (no MRI), which required high doses of Motrin without lab monitoring. These high doses of Motrin in my opinion caused his vision and renal losses.

The 1151 is clear when you consider that his vision renal losses are NOT the expected outcome for a patient with a simple shoulder injury. In other words, his poor outcomes are below the standard of care.

Respectfully submitted,

ELECTRONICALLY SIGNED
Craig N. Bash M.D. '86, M.B.A. '81, G.M.E. '95
Associate Professor of Neuroradiology
Diplomat, American College of Radiology
Fellowship 3 years in MRI - with 2 fellow years at NIH in Experimental Neuroimaging

# EXHIBIT 3

# In The Matter Of:

*Daniel E. Gonzalez v.*
*United States of America, et al.*

*Craig N. Bash, M.D.*
*October 31, 2018*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*

Original File 34122Bash.txt
Min-U-Script® with Word Index

Daniel E. Gonzalez v. 2:15-cv-01997-MCE-DB   Document 108   Filed 12/06/18   Page 40 of 97
United States of America, et al.
Craig N. Bash, M.D.
October 31, 2018

## Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                  SACRAMENTO REGION

 4   - - - - - - - - - - - - - - - -

 5   DANIEL E. GONZALEZ,            )

 6            Plaintiff,            )

 7   vs.                           )  CASE NO.

 8   UNITED STATES OF AMERICA; and  )  2:15-cv-01997 MCE DB

 9   DOES 1 to 20, Inclusive,       )

10            Defendants.           )

11   - - - - - - - - - - - - - - - -

12

13

14

15          DEPOSITION OF CRAIG N. BASH, M.D.

16              WEDNESDAY, OCTOBER 31, 2018

17

18

19

20

21          BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:   JULIE C. ROZELL, CSR NO. 14107

23                160 SPEAR STREET, SUITE 300

24                SAN FRANCISCO, CALIFORNIA 94105

25                            (415) 597-5600
```

## Page 2

```
 1

 2

 3

 4

 5

 6

 7       Deposition of CRAIG N. BASH, M.D., taken on

 8   behalf of Defendant, at U.S. Attorney's Office,

 9   501 I Street, Suite 10-100, Sacramento, California,

10   commencing at 10:22 A.M., WEDNESDAY, OCTOBER 31, 2018,

11   before Julie C. Rozell, Certified Shorthand Reporter

12   No. 14107, pursuant to Subpoena.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:

 2       FOR PLAINTIFF, DANIEL E. GONZALEZ:

 3       DANIEL E. GONZALEZ, PRO PER

 4       7125 Calvin Drive

 5       Citrus Heights, California 95621

 6       Telephone:  (916) 247-6886

 7       Email:  dgonzie@gmail.com

 8

 9       FOR DEFENDANT, UNITED STATES OF AMERICA:

10       UNITED STATES ATTORNEY'S OFFICE

11       BY:   GREGORY T. BRODERICK, ASSISTANT U.S. ATTORNEY

12             KELLI TAYLOR, ASSISTANT U.S. ATTORNEY

13       501 I Street, Suite 10-100

14       Sacramento, California 95814-7306

15       Telephone:  (916) 554-2700

16       Email:  Gregory.Broderick@usdoj.gov

17               kelli.l.taylor@usdoj.gov

18

19

20

21

22

23

24

25
```

## Page 4

```
 1                      INDEX

 2   WEDNESDAY, OCTOBER 31, 2018

 3   CRAIG N. BASH, M.D.                        PAGE

 4       Examination by MR. BRODERICK            6

 5       Examination by MR. GONZALEZ            73

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

Page 5

```
1                     EXHIBITS
2                 CRAIG N. BASH, M.D.
3   Number      Description              Page
4   Exhibit 1   VAE Nexus Opinion 2018 - 19 pages    18
5
6   Exhibit 2   Declaration of Craig N. Bash,
7               M.D., M.B.A., Regarding Inability
8               to Complete a Competent Medical
9               Expert Opinion Letter - 2 pages      22
10
11  Exhibit 3   "Ibuprofen and Visual Function,"
12              Levy and Hanscom - 1 page            47
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 6

1       WEDNESDAY, OCTOBER 31, 2018; 10:22 A.M.
2
3              CRAIG N. BASH,
4   having been first duly sworn, testified as follows:
5
6              EXAMINATION
7   BY MR. BRODERICK:
8       Q.  Good morning, Dr. Bash. We met off the record.
9   I'm Greg Broderick for the United States, and I guess we
10  should make our appearances while we're doing this.
11      MS. TAYLOR: I'm Kelli Taylor, also from the
12  United States.
13      MR. GONZALEZ: I'm David Gonzalez, Plaintiff.
14      THE WITNESS: Craig Bash. I'm from the United
15  States.
16  BY MR. BRODERICK:
17      Q.  Dr. Bash, you were disclosed as a witness for
18  Mr. Gonzalez in this case; is that correct?
19      A.  Yeah.
20      Q.  All right. There was a court order compelling
21  this deposition which we sort of kind of had set up
22  anyways, but part of that court order says "Defendant's
23  subpoena of Dr. Bash also demanded the production of
24  documents. That request shall also be complied with
25  prior to Dr. Bash's deposition."

---

Page 7

1       So I basically requested your whole file. Do you
2   remember that?
3       A.  On the phone, I think you talked to me about
4   that; right?
5       Q.  Yeah. It was in the subpoena that we sent you
6   and that we talked about maybe back in September.
7       A.  Yeah.
8       Q.  But you don't have any documents for me today?
9       A.  I don't keep records.
10      MR. BRODERICK: Do you have documents?
11      MR. GONZALEZ: Can I put on the record that I have
12  documents that are --
13      MR. BRODERICK: Well, at least go ahead and put on
14  the record whatever it is that you have.
15      MR. GONZALEZ: Well, I would need to organize them
16  after we, you know -- we have a break. I'll need to
17  organize them.
18      MR. BRODERICK: Can you describe it generally,
19  maybe?
20      MR. GONZALEZ: Well, there are medical records and
21  deposition records and exhibits that were -- you know,
22  discovery, that I'd like to make sure they get submitted
23  in with the deposition so that if there's a question of
24  something that Dr. Bash doesn't have -- I apologize --
25  if Dr. Bash doesn't have access to it, he can certainly,

---

Page 8

1   you know, have the deposition -- look at it or get a
2   copy of it.
3       MR. BRODERICK: Sure. What I was asking for in my
4   request was anything that Dr. Bash had.
5       So is this -- just for the record, there's, looks
6   like, about a foot and a half worth of documents --
7   worth of papers. Is this all his file? I don't know
8   what this is.
9       MR. GONZALEZ: Well, this was the U.S. file.
10      MR. BRODERICK: Well, let me do it this way. I'll
11  just ask him.
12  BY MR. BRODERICK:
13      Q.  Dr. Bash, you don't keep records, but did you
14  get records in this case?
15      A.  Yeah. I got some records. It wasn't that big
16  of a pile of records.
17      Q.  So can you tell me what records you got?
18      A.  Well, I got some records I talk about in my
19  report. I talked about his medical care, like, how long
20  he was treated for, what medications he was taking.
21  That's what I used for the basis of the report.
22      Q.  Sure. And if you can talk a little slower and
23  a little louder, that would help me out.
24      A.  I've got a spine injury, so I don't talk very
25  loud. I talk in bursts. I can try to talk slower.

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 9**

1  Q.  Sure.  But can you -- beyond the sort of
2  general category of medical records, can you tell me --
3  like, can you identify these records in any way, like
4  maybe from where they came from or something like that?
5  A.  Well, the patient sent me the records.  I know
6  the VA keeps records.  These are all federal records;
7  so -- that's why I don't keep records because the VA
8  doesn't want me keeping records around my house.  The
9  records I saw were mostly, I think, medical records.
10  Q.  Right.  But is there a way for me to figure out
11  which medical records these are?
12  A.  Only based on what I said in my report that I
13  thought that he had delayed treatment and the medication
14  doses were too high.
15  Q.  Sure.  But those are conclusions.  I'm
16  wondering if you can tell me what records -- give me any
17  clue here what records you had or where I would go to
18  look for those things?
19  MR. GONZALEZ:  Can I just say an objection?  I think
20  he's -- you've asked and he's answered, I think; right?
21  MR. BRODERICK:  Well, he's answered that he had some
22  records at some point, and he doesn't have them anymore.
23  But what I'm trying to do is see if I can narrow it down
24  to figure out which those records are.  I don't think
25  we're ever going to get there, but --

---

**Page 10**

1  MR. GONZALEZ:  I don't think so --
2  MR. BRODERICK:  Hold on.  One at a time, fellas.
3  BY MR. BRODERICK:
4  Q.  So I'm trying to figure out if there's some
5  way -- perhaps it's like where they came from or what
6  time period they covered or if there's any way to narrow
7  down what records you were able to review for this?
8  A.  That was one year ago.  He sent me some
9  records, and I used those for my report.
10  Q.  Okay.  This will probably help me if I write
11  them down.
12  So one year ago, Mr. Gonzalez sent you some records.
13  A.  It wasn't that big a pile.  I know that.
14  Q.  So it wasn't as big as the 18 inches to 2 feet
15  of records we're looking at today?
16  A.  Right.
17  Q.  Okay.
18  A.  It was mostly medical records.  I don't
19  remember anything that was not medical.
20  Q.  Okay.  Can you tell me anything else to narrow
21  down what those medical records are here so that I can
22  make sure that it's either some subset of what
23  Mr. Gonzalez brought today or some overlapping set or
24  perhaps some entirely different set?
25  A.  Well, I don't know.  I think they all had his

---

**Page 11**

1  name on them.  I think they were his records.
2  I see in here that I looked at the creatinine levels
3  from 2006 to 2009; so I had some records from that time
4  period.  And I talked about how he had four years of
5  doses of Motrin.  That's probably that same time period.
6  And I show his creatinine levels at 1.16 and 1.4 with a
7  GFR of 59.1.  So those were medical records that I used.
8  His shoulder was delay in diagnosis for four years;
9  so there's a four-year set of records on his shoulder.
10  Q.  But you're reasoning that backwards from the
11  report.  What I'm asking you to do is can you --
12  A.  I don't remember.
13  Q.  You don't remember; okay.  Maybe that's the
14  best way to say it.
15  MR. BRODERICK:  Yes, sir?
16  MR. GONZALEZ:  I also wanted to raise that, if you
17  recall, we had a discovery problem, technically, with
18  the disks and all of that that happened.  And I didn't
19  have all the VA records that -- we went over that.
20  Because what I had got from the VA was only 304 pages.
21  And I think that's the records that he may have seen,
22  but he didn't see the 1,600 pages.
23  THE WITNESS:  I can confirm --
24  MR. GONZALEZ:  Because we had a delay, I think, in
25  getting those, I think, up until July or June of this

---

**Page 12**

1  year.
2  THE WITNESS:  I can confirm that wasn't 1,600 pages
3  of records.
4  BY MR. BRODERICK:
5  Q.  That was not?
6  A.  No.
7  MR. BRODERICK:  Well, let me ask it this way -- I'm
8  not really supposed to ask you questions, but if you're
9  willing to answer it -- can you tell me, do you keep
10  like a -- well, let me ask Dr. Bash.
11  BY MR. BRODERICK:
12  Q.  Were they marked in any way, perhaps with a
13  numbering --
14  A.  No.  They were just records.
15  Q.  All right.  You've got to let me finish my
16  question.
17  So were they marked in any way with, like, a
18  numbering system or Bates labels or anything like that,
19  as far as you remember?
20  A.  No.  I think they were just plain VA records.
21  Q.  All right.
22  MR. BRODERICK:  Can you tell me what you sent him,
23  or do you have, like, a log or something?
24  MR. GONZALEZ:  Do you remember when I told you that
25  we -- I sent in for the patient records over at Mather,

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

**Page 13**

1  and what they sent was 300 pages or so -- or 304 pages.
2  And that's all I had for the longest time -- for up
3  until I think -- I think it was in May that I think we
4  finally got --
5  THE WITNESS: May of --
6  MR. GONZALEZ: Yeah. May of --
7  MR. BRODERICK: I'm not super interested in how we
8  got there. I just want to know what the set of stuff
9  that he got is. Are you able, Mr. Gonzalez, to tell me
10  that today?
11  MR. GONZALEZ: I think it may -- the only thing I
12  had at the time was the 304 pages, if anything, from the
13  VA. That's the only thing I can recall if it's back a
14  year ago. That's all I can recall having.
15  BY MR. BRODERICK:
16  Q. All right. So, Dr. Bash, whatever records you
17  got, you don't keep those?
18  A. I don't keep records of any of my patients.
19  Q. So you had those at some point in this
20  litigation, but you shredded them or something?
21  A. Right.
22  Q. Okay. Did you ever exchange emails with
23  Mr. Gonzalez?
24  A. There's some emails back and forth, yes.
25  Q. Do you have those emails?

**Page 14**

1  A. They're on my computer.
2  Q. Okay.
3  A. So you want those?
4  Q. Are they on the computer that you brought right
5  here today?
6  A. Well, they're in my email -- we can go to my
7  email and print them all out.
8  Q. Like Gmail or something?
9  MR. GONZALEZ: Well, I want to object. You objected
10  when I asked for emails between you and Dr. Vandenberg
11  and Dr. -- not the other one, but Dr. Vandenberg, and
12  you said that those emails are privileged if they are
13  work product. So unless we get some clarification of
14  what he's talking about, that should be at least
15  something he should at least pass through me first, and
16  then we can talk about whether it's privileged or not.
17  MR. BRODERICK: Maybe. But I have a court order
18  that says that "Defendant's subpoena to Dr. Bash also
19  demanded the production of documents. That request
20  shall also be complied with prior to Dr. Bash's
21  deposition." So --
22  MR. GONZALEZ: Nonprivileged; right?
23  MR. BRODERICK: It doesn't say anything about that.
24  MR. GONZALEZ: But I'm raising it then. I'll raise
25  the objection; right?

**Page 15**

1  MR. BRODERICK: Well, whatever you want to do. I
2  asked for these things two months ago. I have a court
3  order that says I'm supposed to get them prior to
4  Dr. Bash's deposition, and I don't have anything. And
5  he doesn't know what records he had, and you don't
6  really know what records he had. You have a lot more
7  records than he had. He doesn't keep his records
8  anymore.
9  And now I'm hearing that there's emails maybe out
10  there that we might be able to get. And we can work on
11  something like that after the deposition is over as to
12  whether and how we're going to do all of that, but it's
13  going -- we're not going to be able to deal with those
14  emails today unless you're telling me you can print them
15  out and hand them to me right now or at a break or
16  something.
17  MR. GONZALEZ: Well, again, I think they should be
18  reviewed because some of that is work product.
19  MR. BRODERICK: Well, they ought to have been
20  reviewed between September, when I asked for them, and
21  now, but apparently that didn't happen.
22  MR. GONZALEZ: Well, I didn't know about the loss of
23  these records until the -- we're coming into this right
24  now. But I had brought these records thinking these
25  were going to furnish what you were requesting and what

**Page 16**

1  the court order was asking for.
2  MR. BRODERICK: Well, we're not going to solve this
3  in the next five minutes; so I'll move on, but we'll
4  come back to this issue and -- it's a problem.
5  BY MR. BRODERICK:
6  Q. Okay. Did you ever send any bills to
7  Mr. Gonzalez?
8  A. I don't know.
9  Q. Did you ever get paid for working for
10  Mr. Gonzalez?
11  A. He paid me a partial fee.
12  Q. Of how much?
13  A. I don't know.
14  Q. Ballpark it for me.
15  A. $1,000.
16  Q. Okay. And was that in response to, like, an
17  invoice?
18  A. No. I don't do invoices.
19  Q. You don't do invoices?
20  A. No.
21  Q. Aside from the emails that you exchanged, do
22  you have any other written correspondence with
23  Mr. Gonzalez?
24  MR. GONZALEZ: That's nonprivileged?
25  MR. BRODERICK: No. I'm just asking if anything

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 17**

1  exists. I can ask about the existence of privileged or
2  otherwise.
3      THE WITNESS: I don't think so. I didn't send
4  letters. I don't think -- my secretary might have sent
5  something, but I don't know. We could look and see if I
6  have some.
7  BY MR. BRODERICK:
8      Q. So it's possible that there's emails or letters
9  from your administrative assistant to Mr. Gonzalez also?
10     A. Right.
11     Q. Is that Alice?
12     A. Right.
13     Q. Besides Alice, anybody else that might have
14  sent or received correspondence to or from Mr. Gonzalez
15  connected to your work?
16     A. Skip is the guy that schedules for me. And
17  Skip does phone calls, but I don't think he wrote
18  anything.
19     Q. I think I talked with Skip a million years ago
20  when I was trying to locate you. He didn't sound like
21  an email kind of a guy.
22     A. No, he's not.
23     Q. All right. I take it you formed some opinions
24  about the care that Mr. Gonzalez received from the VA
25  between 2009 and 2013. Have I got that right?

---

**Page 18**

1      A. I have a report that says --
2      (Reporter clarification.)
3      THE WITNESS: A report that says 12 November 2017.
4  That's my report date. In there, I talked about at
5  least 2006, 2009 for his creatinine -- what did you say?
6  BY MR. BRODERICK:
7      Q. Could I see that report that you're looking at
8  right now? Because mine is dated 17 November 2018, the
9  one that was produced by Mr. Gonzalez. And mine looks
10  substantially different than yours.
11  So here's what we're going to do.
12     MR. GONZALEZ: That was the one that we had from
13  August.
14     MR. BRODERICK: I'm going to mark this as Exhibit 1.
15     (Defendant's Exhibit 1 was marked for
16     identification.)
17     MR. GONZALEZ: Yes. This is the report that was
18  emailed -- sent to Mr. Bash --
19  BY MR. BRODERICK:
20     Q. So I'll tell you that --
21     MR. GONZALEZ: -- in August of last year.
22  BY MR. BRODERICK:
23     Q. So let's look at this Exhibit 1. The date on
24  this is marked 17 November 2018. That is in the future,
25  of course. But I'd like you to review Exhibit 1 and

---

**Page 19**

1  tell me if that's a report that you wrote?
2      A. This one I wrote, this 12 --
3      Q. Hang on. Put that away. I'm asking about
4  Exhibit 1. Did you write this report?
5      A. I didn't write this November 17th on there,
6  because that's in the future.
7      MR. GONZALEZ: That was a mistake on --
8  BY MR. BRODERICK:
9      Q. But I want to know if you wrote this report
10  marked 17 November --
11     A. It's not my report. It has the wrong date on
12  it.
13     Q. Okay. Can you look at it, and aside from the
14  date, is there anything else in here that indicates to
15  you that this may or may not be your report?
16     A. I'll compare it to my draft of 12 November,
17  because that's my report.
18     Q. You're referring to a different document, which
19  we'll copy and get marked here in a little bit, dated 12
20  November 2017. But are you telling me that this thing
21  that we marked as Exhibit 1 is not your report?
22     A. It's not my date on there.
23     Q. Besides the date, is the rest of it your
24  report?
25     A. Well, there's a lot of words here. We should

---

**Page 20**

1  go through and check it word by word, you know.
2      Q. You can have all the time you'd like to check
3  it. I just want to know if this is your report or not.
4      A. It's not my report. It's got the wrong date on
5  it.
6      Q. But besides the date, is it -- is it your
7  report except for the date, or what you're telling me is
8  that you're not familiar with this document that we've
9  marked as Exhibit 1?
10     A. Well, it's either all or nothing in my mind.
11  If it's my report, it's got my date and stuff on it, and
12  it doesn't have my date on it.
13     Q. So this Exhibit 1 is not your report?
14     A. Right.
15     Q. Did you write all of the words in Exhibit 1?
16     A. Well, it's the same as this report here, 12
17  November 2017. I guess we should check and see.
18     Q. My question is did you write all the words in
19  Exhibit 1?
20     MR. GONZALEZ: I want to clarify something.
21     MR. BRODERICK: I'm asking the witness questions.
22  If you have an objection, you can make the objection.
23     MR. GONZALEZ: Yeah, I want to make an objection.
24     MR. BRODERICK: Okay. What's the objection to the
25  question: Did you write all the words in Exhibit 1?

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 25**

1    in November of 2017; is that correct?
2    A. Right.
3    Q. And you've -- you've got to let me finish my
4    whole question even though you're sharper than I am so
5    you know where I'm going with it.
6        But that -- that November 2017 report you described
7    today as a draft; is that right?
8    A. Are you done?
9    Q. Yes.
10   A. Yes.
11   Q. And the -- okay.
12   A. You're pausing your sentences; so I don't
13   know --
14   Q. It's fine. If you're not sure if I'm done, you
15   can ask me if I'm done. That's all right.
16       You've mentioned that there are some
17   differences between the draft that you produced dated 12
18   November 2017 and the thing that I've marked as
19   Exhibit 1. Do you know who made those changes?
20   A. No.
21   Q. It wasn't you?
22   A. No. Because --
23   Q. I guess that's a stupid question but -- sorry.
24   My question was bad.
25       Okay. How long did it take you to review the

---

**Page 26**

1    medical records that you reviewed for putting together
2    this draft report?
3    A. I don't know. I don't bill by the hour. I do
4    a flat rate; so I just look at the records and make my
5    opinion.
6    Q. Can you give me any estimate for how much time
7    you spent reviewing those records?
8    A. No, I can't. And the amount of time I spend is
9    not really critical because I can look at the records
10   very quickly and pick out what's pertinent.
11   Q. Yep. I'm just asking if you know -- I mean,
12   like, hours? days? minutes?
13   A. I don't know.
14   Q. No clue. All right.
15       How long did it take you to write the report,
16   the draft report that's dated 12 November 2017?
17   A. I'm an incomplete quad; so I type one finger at
18   a time. So it takes me a little longer.
19   Q. Can you give me any kind of an estimate?
20   A. No.
21   Q. All right. At the top of Exhibit 1 and as well
22   as your draft report, it says "VAE Nexus Opinion."
23   Can you tell me what that means?
24   A. Veterans Administration Exam is what VAE stands
25   for. Nexus means between problem and result. Something

---

**Page 27**

1    like that.
2    Q. Is this -- I guess I'm not familiar with that
3    terminology. I was wondering if VAE nexus opinion is,
4    like, a term of art?
5    A. I'm not sure if it's a term of art. I know
6    that the VA has a whole set of acronyms they use inside.
7    One of the things they use is this idea of nexus. So
8    what you want to do is get the right medical opinion.
9    Did his Motrin cause his eye problem? That's a nexus.
10   So that's a nexus opinion. And it's VA, and they use
11   the term of "examination" because I reviewed the VA
12   records. That's a term the VA uses inside a lot; so
13   they recognize it.
14   Q. Okay. And this is connected -- I'm not that
15   familiar. I don't do that much VA stuff, but this is
16   connected -- am I right? -- that this is connected to
17   something called, like, an 1151, like, a request for
18   benefits or something like that?
19   A. Well --
20   Q. I wandered around that question. Let me ask it
21   a different way.
22       What in this document, a VAE nexus opinion, what is
23   that used for?
24   A. It's a generic sort of medical opinion about
25   causation.

---

**Page 28**

1    Q. Okay.
2    A. So it could be used for claims for, like, if
3    someone wants to go from 10 percent to 30 percent, or it
4    can be used for 1151 which is a medical concept of not
5    the expected outcome in a result of care.
6    Q. Is that mostly what you do, the disability
7    ratings and the 1151 stuff?
8    A. I do all that almost exclusively now. I still
9    teach at the medical school a little bit.
10   Q. But when you write these kinds of reports, is
11   it your expectation -- these VA nexus opinions, is it
12   your expectation that it will be used for an 1151
13   proceeding or a disability rating, things being these
14   lines?
15   A. That's what -- that's the total purpose for it.
16   Q. Okay. And when you do these --
17       MR. GONZALEZ: May I object on one point? It seems
18   to be that you're limiting his ability only to -- the
19   question is, it seems to be --
20       MR. BRODERICK: Is there an objection, or you just
21   didn't like the answer?
22       MR. GONZALEZ: Well, I'm asking are you trying to
23   question him about his ability not being -- beyond just
24   1151s or disability ratings? I mean, because he's a
25   doctor; so I don't understand --

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

Page 29

1  MR. BRODERICK: The way this works is I'm going to
2  ask him questions; he's going to answer the question.
3  If you think my question is objectionable, you can make
4  an objection, but you don't get to argue afterwards what
5  the relevance of the information is or isn't or what the
6  consequence is. We can do that in court, but --
7  MR. GONZALEZ: I know, but I was asking -- it's sort
8  of misleading to him because he --
9  MR. BRODERICK: I'm paying this guy a lot of money
10  to sit in the chair here; so I'd like to ask my
11  questions and get out. If you think my question is bad,
12  you can make an objection --
13  MR. GONZALEZ: I was just asking about not limiting
14  it the way you were -- it seemed to be framed.
15  MR. BRODERICK: So if you have an objection, make
16  it; otherwise, you're really not supposed to say much.
17  MR. GONZALEZ: I'll try to keep quiet.
18  MR. BRODERICK: I have done well sometimes and not
19  so well at other times in our depositions. I'm not
20  going to give you too hard of a time for it.
21  BY MR. BRODERICK:
22  Q. These VAE exam opinions, how many would you
23  say you do in a given year?
24  A. I do about 300.
25  Q. Can you give me any estimate for how long those

---

Page 30

1  typically take you to do? It probably depends, but --
2  A. Well, if I'm doing 300 a year -- they're very
3  variable. One guy has an ankle. His ankle can take two
4  hours. The VA raters -- they give the VA raters three a
5  day, for example. I probably lope along and do one a
6  day; so 12 hours, maybe.
7  Q. You probably what along?
8  A. Lope along.
9  Q. Lope along. I see. All right.
10  But you can't tell me how long it took you to
11  do this one dated 12 November 2017?
12  A. I think you asked that before. I said, "No, I
13  don't know."
14  Q. Okay. I noticed there's, well, what appear to
15  me to be a number of errors in the opinion, mostly,
16  like, typos and stuff, but I --
17  A. This is just a draft opinion.
18  Q. It's a draft opinion. What does that mean?
19  A. It means it was my first iteration. Usually
20  what I do is I do a draft opinion. A patient pays me
21  some money for the draft. Then when they pay me some
22  more money, I do the rest of my work. He paid me
23  partially. I did the draft opinion. This is the draft
24  opinion.
25  Q. So this is not complete?

---

Page 31

1  A. No. I said in the sworn thing that this was an
2  incomplete report based on incomplete records and also
3  based on the fact that I didn't finish it.
4  Q. Okay. I want to ask you about a couple of
5  those things that I identified as typos on -- on page 2
6  of Exhibit 1, there's a footnote 1 --
7  A. Yep. There's no footnote.
8  Q. -- but there's no footnote?
9  A. That's my draft.
10  Q. Is it -- it's not like I'm missing something?
11  It just doesn't exist?
12  MR. GONZALEZ: I'm sorry. Could you repeat your
13  answer?
14  THE WITNESS: There's a footnote 1 on page 2 on the
15  right shoulder. That's kind of my boilerplate cut and
16  paste. There's no footnote on that one. I don't put
17  footnotes usually.
18  BY MR. BRODERICK:
19  Q. In paragraph -- well, how did that footnote get
20  in there?
21  A. It's my cut and paste when I start my document.
22  So I have some boilerplate cut and pastes I put in. So
23  it means that first paragraph is something I use a lot,
24  and that footnote is in there, but I don't use it.
25  Q. That footnote --

---

Page 32

1  A. Is in there, and I don't know how to get it
2  out.
3  Q. Oh, all right. So this is just a remnant of
4  something you copied from somewhere else?
5  A. I do 300 cases a year. A lot of these cases
6  have a lot of similar language as far as the way I think
7  about stuff. So I start the report with that, partial
8  records, then I get more records, then I polish and
9  move.
10  Q. All right. In paragraph 2 here under "Right
11  shoulder injury," second line, it said "he was miss" --
12  M-I-S-S, "diagnosed."
13  Is that supposed to say "misdiagnosed" all one word?
14  A. Yeah.
15  Q. And that's just a typo because you --
16  A. There's about 40 typos in here in this
17  document. That's -- what I'm trying to say here, if
18  you're asking --
19  Q. I'm not asking you that. I was just asking if
20  that was a typo, which is what I thought.
21  Okay. On page 3, at the very bottom, under "1151
22  Secondary date of vision - blindness". On Exhibit 1,
23  there are a bunch of, like, brackets and slashes and
24  stuff in this paragraph. Are those typos also, or is
25  that meant to signify something else?

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

Page 37

1    Q.  I think so.  That's what I thought.
2    A.  Yeah.  So this is a draft document, and it's
3    not complete.
4    Q.  So that thing about knees and 20 percent
5    whatever had to do with some other patient, and you used
6    the same template to write this report?
7    A.  To start.
8    Q.  And that's just an artifact that's —
9    A.  Right.
10   Q.  Okay.  If we go back to the first page here of
11   Exhibit 1, it says "I reviewed this patient's
12   records" — which we already talked about — "and did a
13   clinical interview."
14   Did you do a clinical interview with Mr. Gonzalez?
15   A.  Yeah.  I talked to him on the phone.
16   Q.  What did he tell you?
17   A.  I don't remember.
18   Q.  Did you keep notes of those interviews?
19   A.  No.  What I do is I talk to him on the phone, I
20   review the records, then I start working when it's in my
21   brain.
22   Q.  All close in time together?
23   A.  Yeah.
24   Q.  So can you tell me anything he told you on that
25   phone call, even if — you're not going to remember the

Page 38

1    exact words a year on or whatever, but can you give me
2    any recollection you have about what he told you on the
3    phone?
4    A.  I think he told me he had shoulder problems and
5    he had vision problems.  And I think the kidney problems
6    I found myself.
7    Q.  Okay.  Anything else you remember that he told
8    you on the phone?
9    A.  No.
10   Q.  All right.  Aside from the clinical interview
11   and the patient's records, did you have any other
12   information or data or documents that informed your
13   opinions in this case, particular to Mr. Gonzalez?
14   I gather you have a lot of experience as a doctor
15   and so on, but I'm saying you had some medical records,
16   which you can't really figure out what those are, and
17   you had a clinical interview with him on the telephone.
18   Did you do anything else informing your opinions for
19   this draft report?
20   A.  I've been doing this for 20 years, done 5,000
21   patients.  I don't need much else.
22   Q.  But you didn't, like, do a physical examination
23   of Mr. Gonzalez?
24   A.  No.
25   Q.  Talk to any of his doctors?

Page 39

1    A.  No.
2    Q.  Talk to any of his friends or relatives?
3    A.  No.
4    Q.  You didn't even meet Mr. Gonzalez until you got
5    here today?
6    A.  The first time I saw him was outside.
7    Q.  Outside this morning?
8    A.  Right.
9    Q.  All right.  On page 1 here, a couple other —
10   so what I'm going to do now is I'm going to ask about
11   some specific lines in your report.  So no — not hiding
12   the ball here.
13   Page 1, there's a reference to something called the
14   "Benefit-of-the-doubt doctrine."
15   Can you tell me what that is and how it informs your
16   opinion here, if it does?
17   A.  Well, the benefit-of-the-doubt doctrine means
18   that the VA can allow benefits to be assigned if the
19   evidence is imbalanced.  So an easy way to think about
20   that is the tie goes to the runner if you're playing
21   baseball.  So one doctor says this, another doctor says
22   that, and the evidence is kind of saying the VA can
23   allow that to be given the benefit of the doubt because
24   they know that soldiers are in combat and they know that
25   medical care is not perfect.  And so that's what that's

Page 40

1    about.
2    Q.  Did you apply that benefit-of-the-doubt
3    doctrine informing your opinions here?
4    A.  Yeah.  I used that idea that the evidence is
5    more weighted in his favor.  But, and my opinion is,
6    too, that I raised that up to a 90 percent level of
7    probability.
8    Q.  We'll get there.  I just wanted to know what
9    that is and if you applied it here, and you explained to
10   me what it is, and it sounds like you applied it; so —
11   In the next paragraph, it says that your
12   opinion is "much more probative than the VA examiner,"
13   and then you go on to give a series of reasons.
14   Are you — I'm not aware of any VA examiner being
15   involved in this case, are you?
16   A.  No.  This is my boilerplate again.  So that's
17   my natural case.  Because normally in a case, there
18   would be a VA examiner, and that's when the
19   benefit-of-the-doubt doctrine comes in.  So that's why
20   it's talking about that.
21   Q.  All right.  On the next page, under No. 3, it
22   says, speaking of your opinion, it says "It is based on
23   a review of the claims file — as provided by the
24   patient."
25   Did you review a claims file for Mr. Gonzalez?

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 41**

1  A. Claims file is a term the VA uses. And the
2  claims file includes his service records, includes his
3  medical records, and includes any administrative
4  records. So this pile on the table would be the
5  equivalent to the VA claims file.
6      But I said "as provided by the patient." So
7  whatever the patient sent me was 300 pages, and that is
8  what I reviewed.
9  Q. Did you review his medical — I'm sorry — his
10 military records?
11 A. I don't remember seeing military records.
12 Q. Some medical records — in fact, I think you
13 told me everything you looked at was a medical record,
14 you think.
15 A. From my memory, it was medical records.
16 Q. And nothing else that you remember?
17 A. Right.
18 Q. All right. Under No. 4, it says "It is
19 based" — your opinion again — "is based on a patient
20 interview/exam and DBQ forms."
21     Aside from the phone call that you had with
22 Mr. Gonzalez, did you do any other patient interview?
23 A. No.
24 Q. And that's one phone call?
25 A. I don't remember.

---

**Page 42**

1  Q. Could you tell me how long you talked to him
2  for?
3  A. I don't remember.
4  Q. I mean, ten minutes? two hours?
5  A. I don't remember.
6  Q. All right. You didn't do any other exam
7  besides that phone call?
8  A. Exam is — exam is a broad term. When I look
9  at the records, that's an examination of records. I
10 reviewed the records.
11 Q. So you reviewed some records, you talked to him
12 on the phone, any other exam for this case?
13 A. I looked at his labs. That's kind of an
14 examination.
15 Q. Is that part of the medical records?
16 A. Yeah.
17 Q. Okay. Besides the medical records, the labs
18 and talking to him on the phone for an indeterminate
19 period of time, did you do any other exam for
20 Mr. Gonzalez?
21 A. No.
22 Q. All right. There's a reference to DBQ forms
23 here. Can you tell me what those are and if you used
24 them in this case?
25 A. DBQ forms — once again, this is my draft.

---

**Page 43**

1  This is my boilerplate. DBQ forms are disability
2  benefit questionnaires. The VA has 70 of those,
3  roughly. They use those as a medical summary of a case,
4  and the VA kind of needs those a lot now. So — but
5  they didn't use them in this case.
6  Q. Did not use them here?
7  A. No.
8  Q. Okay. The next — No. 5 there, it says "It is
9  based on a review of any available images."
10     Is this speaking about, like, radiology and the
11 like?
12 A. I'm a radiologist by training; so a lot of
13 times I have images, but there was no images in this
14 case.
15 Q. No images here. Okay. That's what I wanted to
16 know because I don't have any either.
17     It says "It is based on a review of the literature."
18     Is this just another one of your boilerplate
19 statements?
20 A. No. That's — I looked at literature. That's
21 where I got these articles from.
22 Q. And then in the next one, it says "It is based
23 on referenced articles."
24     So I was just wondering if these were two different
25 things or the same thing, the literature and reference

---

**Page 44**

1  articles?
2  A. Well, literature is the global spectrum, and
3  reference articles are the specifics.
4  Q. I got it. All right.
5      Aside from the articles referenced herein — well,
6  in whatever draft you actually wrote, as far as this —
7  besides the articles referenced here, did you review or
8  consider any other articles?
9  A. When I review literature, I look at a lot of
10 articles, and I try and pick out representative articles
11 that serve — are on point. So there were more things
12 that I looked at than are here.
13 Q. Can you tell me what those other articles that
14 you looked at were?
15 A. I go to Google Scholar, and I look around in
16 there. I don't know what I looked at.
17 Q. You don't know what you looked at; okay.
18     Skipping way down under "Opinions: Right shoulder
19 injury," paragraph five, it says "The physician providing
20 his care did not monitor him for secondary complications
21 of blindness and renal failure, both of which are known
22 to occur following max doses of Motrin."
23     I would like to know how you reached the conclusion
24 that the physician providing this care did not monitor
25 him for those things.

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 45**

1    A.  Well, there was no -- any -- there was no --
2    from my memory, there was no written information in the
3    record that said that "This patient is getting high
4    doses of Motrin.  I should be watching his lab values."
5        For example, those lab values, I had to pull out
6    myself from those records.  The doctor didn't talk about
7    those.
8    Q.  Right.  But my question is --
9    A.  That's how I got --
10   Q.  -- you reached this conclusion based on the
11   absence of a note or something in the record that -- to
12   the contrary?
13   A.  Yeah.  There was no notes that I remember of --
14   of the records that I got that were -- where the doctor
15   talked about being worried about the complications of
16   medication.
17   Q.  All right.  It says here "He was given maximal
18   doses of Motrin 800 milligrams TID," is the prior
19   sentence.  What's TID?
20   A.  Three times a day.
21   Q.  Okay.  How do you know that?
22   A.  I looked it up somewhere, and it said that
23   Motrin three times a day is the maximum dose.
24   Q.  Can you tell me where you got that from?
25   A.  I looked it up somewhere.

---

**Page 46**

1    Q.  Somewhere in his medical records?
2    A.  No.  In my search of literature.
3    Q.  How do you know that he received -- that he was
4    given maximal dose of Motrin 800?
5    A.  Because in my record review, I must have found
6    that.
7    Q.  But you can't point me to where it is or
8    anything?
9    A.  I don't have those records.
10   MR. GONZALEZ: If it helps, Greg, I have a record
11   here from the VA.
12   MR. BRODERICK: It really doesn't.  I'm interested
13   in his opinions and how he got there.
14   BY MR. BRODERICK:
15   Q.  The next line down says "Ibuprofen and visual
16   function."  This is a clip of an article out of Google
17   Scholar?
18   A.  Right.
19   Q.  Is this one of the articles you relied on?
20   A.  It's one of the ones I looked at.
21   Q.  What are you citing this article for?  In other
22   words, for what proposition?
23   A.  My opinion is that Motrin causes vascular
24   changes, small vessel changes.  And we know that Motrin
25   causes small vessel changes in the kidney, and you get

---

**Page 47**

1    renal problems with that.  And it's my concept that
2    Motrin can cause changes in the vision of people based
3    on changes in the retina, the small vessels in the
4    retina.  And so that's what my point was.
5    Q.  But that -- that's an interesting answer to
6    some other question.
7        My question was:  For what proposition are you
8    citing this article by Levy and Hanscom?
9    A.  Like I said, I think that Motrin causes
10   problems with small vessels.  And it's my opinion that
11   that damages your kidneys and eyes.  And I was trying to
12   find something that backed that up.
13   Q.  Okay.  So you're citing this Levy and Hanscom
14   article for the proposition that Motrin damages vision,
15   et cetera?
16   A.  Among other articles.
17   Q.  Okay.  Let me show you --
18   MR. BRODERICK: Let's mark this as 3.
19       (Defendant's Exhibit 3 was marked for
20       identification.)
21   MR. GONZALEZ: Can I ask a clarification question --
22   is that okay -- before we go on?
23   MR. BRODERICK: It depends on what the question is,
24   but go ahead.
25   MR. GONZALEZ: If I may, just real quick.

---

**Page 48**

1    Dr. Bash, you said --
2    MR. BRODERICK: No.  No.  No.  We're not going to --
3    if you've got a question about the question I asked or
4    you didn't hear his answer, fine.  If you want to ask
5    him other questions --
6    MR. GONZALEZ: I didn't hear his last answer.
7    MR. BRODERICK: Well, then why doesn't the reporter
8    read it back.
9        Can you read back the last question and answer.
10       (The record was read as requested.)
11   MR. GONZALEZ: So I apologize.  I was asking -- I
12   think he said something about he looked at other
13   articles.  I think we had exchanged something that he
14   was referring to that there was other articles he sent
15   me.
16   MR. BRODERICK: Well, you can't really help him with
17   his testimony right now.  If you want to ask him
18   questions on your dime, you're free to do that, but I'm
19   asking questions.
20   BY MR. BRODERICK:
21   Q.  So I've handed you what's been marked as
22   Exhibit 3.  This would appear to be the Levy and Hanscom
23   article that you referenced here.  I got it from the
24   same website that's listed on Exhibit 1.
25       Is this the article you were referring to?

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

Page 49

1   A.  This is a draft.  This is the information I
2   found.  This, I didn't -- this is a 1972 article, and it
3   says at the bottom that "Carefully documented statements
4   have not been performed to demonstrate that ibuprofen
5   therapy" -- "Carefully documented statements have not
6   been performed that demonstrate that ibuprofen therapy
7   is associated with visual side effects."
8   Q.  So my question was just is this the article
9   that you were citing here in your report?  That's all I
10  want to know.
11  A.  No.  I said there were other things I looked
12  at.
13  Q.  Okay.  But is this the article that is cited
14  here at the bottom of page 2 of Exhibit 1?
15  A.  I just -- this was a draft.  This was my --
16  Q.  Is it the same article or isn't it?  I just
17  want to know if there's some other article out there.
18  A.  I just used the bullet point.  I didn't read
19  this article.
20  Q.  Okay.  Let's put that aside.
21      Let's go to page 3 of Exhibit 1.  It says there that
22  "No other physician has made a conflicting opinion."
23  I'm on No. 8.
24      Is that more of the boilerplate that we talked
25  about?

Page 50

1   A.  Well, you get back to the idea of the benefit
2   of the doubt.  Benefit of the doubt, other VA doctors.
3   This is something I use normally.
4       In this case, I had those 300 pages, we think, and I
5   don't remember other doctors saying that Motrin was safe
6   or that Motrin was good for his body.
7   Q.  Would it change your opinion if other
8   physicians had made a conflicting opinion?
9   A.  Yes, it would.  Because then -- I'd be
10  part of -- I asked you for that.  I asked you for the
11  medical records and reports.
12  Q.  You didn't ask me for anything, and I don't --
13  A.  No.  I did --
14  Q.  I haven't given you anything.
15  A.  I said something about -- we had a
16  conversation, and he said that there was depositions and
17  stuff.  I said, "I want to see everything."
18  Q.  Well, you may have asked Mr. Gonzalez for
19  stuff, but I don't work for you, and you don't work for
20  me, so --
21  A.  On a phone call, I asked you about records.
22      Anyway, yes, I try and look at the whole record.
23  So -- and I reference other doctors' opinions.  If I see
24  another doctor says this, another doctor says that, then
25  I consider that.

Page 51

1       At this point in time, I don't think there were
2   other doctors' opinions.
3   Q.  Going up to No. 5 on page 3 here, it says "His
4   current symptoms are per the attached lay statements,
5   which show chronicity of symptoms."
6       Is that something you did here, or is that
7   boilerplate again?
8   A.  That's another boilerplate because the VA will
9   rate people's cases based on a lay letter of chronic
10  symptoms from service until now.  Because combat
11  veterans don't get care.  That's what that's talking
12  about.
13  Q.  But we don't have something like -- there are
14  no lay statements here; is that right?
15  A.  I don't think -- in my mind, his lay statement
16  would be the conversation I had with him.  I have that.
17  Or I wrote this, but I don't have any other things.
18  Q.  Okay.  And that conversation you had with him
19  was just on the phone?  It wasn't written?
20  A.  Right.
21  Q.  It says here in No. 6 "He clinic doctor noticed
22  his elevated creatinine and stopped Motrin instantly
23  in," and then it doesn't --
24  A.  Still a draft.
25      The point I was trying to make is that, somewhere

Page 52

1   along in there, I saw that one of the doctors saw that
2   he had elevated creatinine, like I noticed, and he
3   stopped the Motrin.
4   Q.  And can you tell me where --
5   A.  The doctor --
6   Q.  Can you tell me what doctor did that?
7   A.  No.  I was going to say that if I had the
8   records, I'd look to see the doctor's name and date.
9   That's why I stopped the sentence because I was going to
10  go back and find it.
11  Q.  I see.  So the rest of that sentence, if you'd
12  gone back and completed the report, would have provided
13  the date or the doctor or some citation?
14  A.  My normal process is put the doctor's name, the
15  date, and sometimes I put the record in.
16  Q.  Okay.  Let's -- I usually do this at the
17  beginning.  I kind of got into this backwards here.  But
18  let's talk about your background.
19      Your specialty is neuroradiology?
20  A.  Yep.
21  Q.  Can you tell me what that is?
22  A.  So radiology is the field of diagnosis.  So we
23  take X-rays and medical records and make diagnoses.  So
24  how that applies to the VA because the VA has --
25  Q.  You're wandering off.  I just want to know what

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

Page 53

1  a neuroradiologist is.
2     A.  An X-ray doctor.
3     Q.  More than X-rays though; right?
4     A.  I was trying to explain.  We do diagnosis.
5  It's called diagnostic radiology.
6     Q.  Does radiology include more than X-rays?
7     A.  Yes.  It's called diagnostic radiology.  It's
8  X-rays, ultrasound, MRIs.  And the whole purpose of that
9  is to make a diagnosis.
10    Q.  So did you have to do, like, special training
11  in neuroradiology?
12    A.  Yes.  I trained one year at Baltimore and two
13  years at NIH.
14    Q.  But some guy who just went to medical school
15  can't just go out and say, "Hey, I'm a neuroradiologist
16  now," or whatever; right?  It takes more than that?
17    A.  I'm -- no.  It takes more than that.
18    Q.  It takes a lot more than that, I gather; right?
19  Am I right?
20    A.  What's your question?
21    Q.  It takes a lot more training than just medical
22  school; right?
23    A.  So neuroradiology is four years of medical
24  school, four years of radiology, and two to three years
25  of advanced training.

Page 54

1     Q.  Okay.  So I don't know, but -- I'm a political
2  science major; so these questions may sound stupid, but
3  that sounds hard.  Is it pretty difficult to do
4  neuroradiology?
5     MR. GONZALEZ: Can I object?  It seems very broad.
6  Can you kind of narrow it down a little bit?
7  BY MR. BRODERICK:
8     Q.  Is neuroradiology hard to achieve?  A specialty
9  in neuroradiology is difficult to achieve, that's what I
10  wanted to know.
11    A.  It didn't seem hard to me.
12    Q.  Would it be hard for other people?  That's a
13  bad question --
14    A.  Well, medical school -- nobody goes to medical
15  school -- radiology is 10 percent of medicine doctors.
16  Neuroradiologists are a small percentage of that.
17    Q.  Yeah.  So it's a -- what's the motor part of
18  neuroradiology?  Does that mean, like, your head or your
19  nervous system or what?
20    A.  It's built on top of radiology.  So you do four
21  years of radiology which is all about your diagnosis.
22  We do that.
23    Then neuroradiology is a subspecialty training that
24  allows you to do more work in the brain and spine.
25    Q.  Okay.  And are you licensed as a doctor?

Page 55

1     A.  Yeah.
2     Q.  And where are you licensed?
3     A.  Maryland.
4     Q.  Anywhere else?
5     A.  No.
6     Q.  What -- this may not make sense, but in
7  California, we love to regulate everything.  So you've
8  got to get a license to be a -- to braid hair, another
9  license to kill rats, another license to be a doctor,
10  another license to be a nurse, and so on.
11    Can you list for me or describe for me the medical
12  license that you hold?  Like what is it?
13    A.  I have a license in Maryland.
14    Q.  To do what?
15    A.  To be a physician surgeon.
16    Q.  Okay.  We've got that too.
17    Are there any other licenses that you hold in
18  Maryland?
19    A.  No.
20    Q.  Are there any other licenses -- and I don't
21  mean, like, your driver's license.  Are there any other
22  licenses or certifications that you hold in any other
23  state?
24    A.  I had one in California, but it expired years
25  ago.

Page 56

1     Q.  Physicians and surgeons also?
2     A.  Yes.
3     Q.  That's a "Yes"?
4     A.  Yes.
5     Q.  You ever had a complaint to the medical board
6  or whatever the governing body is in Maryland?
7     A.  I have one right now, actually.
8     Q.  For what?
9     A.  For -- well, it's not done yet.  It's in
10  process.
11    Q.  So what is the complaint?
12    A.  It's a patient that had complaints about the
13  DBQ process and my fee schedule.
14    Q.  All right.  But it's not somebody you were
15  treating?
16    A.  No.  I don't treat patients.
17    Q.  When's the last time you treated patients?
18    A.  Probably when I left NIH in 1990; -- depends
19  how you define it.  I had in-hospital privileges at NIH
20  in 1990 -- are you going to pick on me on the dates
21  or --
22    Q.  I don't care.
23    A.  1990s.
24    Q.  Mid '90s or early '90s?
25    A.  Mid '90s.

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

Page 57

1    Q. So about 25 years?
2    A. No. Because, see, now what I do -- it's
3  complicated. Because I do stuff with paralyzed
4  veterans. I was working with those guys. I was doing
5  site visits and making inferences on the care of the
6  hospitals. And then even now in Maryland, when I do
7  cases, I can make inferences on their care when it goes
8  to the VA, a change in their care pattern, but I don't
9  direct treatment.
10   Q. That's probably a better way I should have
11  asked it. So let's leave aside this sort of -- is
12  consulting a fair word for that, or what's a good --
13   A. Expert witness.
14   Q. Expert witness. Let's leave aside your expert
15  witness work that you do.
16      Outside of that, when's the last time you provided
17  care for an actual patient, like in a clinic?
18   A. Mid 1990s.
19   Q. Mid 1990s.
20      So let's get back to this complaint. I don't
21  want to drill down into all the nitty-gritty of it,
22  unless it looks like it's super relevant here.
23      So can you tell me what's the person's basic beef
24  about you that they're complaining about to the medical
25  board?

---

Page 58

1    A. They're complaining about the DBQ process and
2  my fee.
3    Q. They didn't -- they wanted to pay less money or
4  none?
5    A. It's the same as this case. I did my work. He
6  paid me the draft. I started to do more work. He
7  didn't want to pay any more money.
8    Q. And then you wouldn't do any more work; so they
9  complained?
10   A. Right.
11   Q. And the DBQ process, is that what you were
12  doing when they complained?
13   A. Right. This patient had six or eight DBQs. I
14  did the DBQs, and then I was going to do the nexus,
15  because a DBQ without a nexus is worthless, and then he
16  started to complain.
17   Q. And does that person who made a complaint to
18  the medical board have a name?
19   A. Yeah. But I'm not sure that -- I'm not sure I
20  should link those two because there might be some
21  privileged information because I've told you some stuff
22  about him.
23   Q. Well, I don't think that a complaint to the
24  medical board is privileged. So if the person made a
25  complaint to a public entity, that's -- all I want to

---

Page 59

1  know is who made the complaint. So maybe it's the
2  patient, maybe it's somebody else. I don't know. I
3  don't care.
4      MR. GONZALEZ: May I object? I thought you said you
5  weren't going to go deep into it. It seems like you're
6  making a lot about --
7      MR. BRODERICK: I just wanted to know --
8      MR. GONZALEZ: -- a complaint about a physician.
9  BY MR. BRODERICK:
10   Q. What's the person's name who made the
11  complaint?
12   A. I don't know if that's privileged or not.
13   Q. If I --
14   A. He's a patient.
15   Q. Let me tell you what I'm trying to do. I want
16  to be able to go look it up later and see if all the
17  stuff you're telling me is true and see what the beef
18  is, to the extent that's information I can get.
19      If you can give me that in a different way without
20  telling me the person's name or whatever, fine.
21      Like in our lawsuits, it's, you know, Gonzalez
22  versus United States. If there's, like, a file number
23  or a complaint number or somebody at the board to talk
24  to or if they're called, like, you know, complaint
25  against Dr. Bash or --

---

Page 60

1    A. Yes. My name's Bash. You can call the
2  Maryland board and ask them what the complaint is. It's
3  not -- it hasn't been resolved yet. We're still in the
4  process of gathering data, and we're still assessing
5  and --
6    Q. All right. But --
7    A. And there was one -- there was also one a few
8  years ago under the same kind of deal, a complaint about
9  my fee. I don't know the name of that one.
10   Q. Okay. So there's a complaint pending now.
11  Will you tell me the name of the person who made the
12  complaint?
13      MR. GONZALEZ: May I object? I think he answered
14  that. He said he thinks it might be privileged. It
15  might violate someone else's privileges.
16  BY MR. BRODERICK:
17   Q. All right. I just want to know if you're going
18  to tell me the name or not?
19   A. I'm worried that it's patient privilege.
20   Q. Okay. So that's a no, you're not going to tell
21  me who it is?
22   A. Yeah.
23   Q. Okay. And the person who made the complaint a
24  couple years ago against you, can you tell me that
25  person's name?

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

**Page 61**

1  A.  That was a few years back, and I don't remember
2  that name.
3  Q.  Can you tell me what that complaint was about?
4  A.  It was about the same thing.  About the fee.
5  Q.  So they paid a partial fee, you did some
6  work --
7  A.  Well, that one, I'm not sure exactly about a
8  partial fee.  I'm not sure -- I just remember it was
9  mostly about the fee.
10  Q.  Okay.  So aside from --
11  A.  That wasn't really a complaint.  That was a --
12  the board puts things in different categories; right?
13  So that one, the patient complained, but it didn't come
14  to the level of a complaint.  It was like an
15  administrative thing.  That probably won't even show up.
16  Q.  Was it resolved in some way?
17  A.  Yeah.  They asked me to modify my website and a
18  couple things like that.
19  Q.  Modify it how?
20  A.  Well, one thing they were concerned about was
21  the fact that I had listed my credentials as a
22  radiologist, because we do brain, spine, bone, and they
23  were saying that I was trying to represent myself as a
24  specialist in those areas, and I was not saying I was a
25  specialist.  I was trying to describe to the average

**Page 62**

1  18-year-old soldier with a head injury how I could help
2  him with his Veterans cases through my spectrum of
3  radiology diagnosis skills.
4  Q.  All right.  Anything else that they asked you
5  to do or told you to do or whatever as a result of that?
6  A.  That was the main part of it.
7  Q.  Right.  So that was the main part of it.  Was
8  there any other part?
9  A.  That's all I remember because they brought that
10  up in this complaint.
11  Q.  The guy who's complaining now brought that
12  prior complaint up?
13  A.  No.  The board did.
14  Q.  Oh, the board did.
15  Have you received correspondence from the board
16  regarding that prior complaint?
17  A.  Which one?
18  Q.  The one -- not the current one, but the one
19  before.
20  A.  Yeah.  Way back in the day.
21  Q.  Do you have any records on that still?
22  A.  There's records around.
23  Q.  And did you receive any correspondence from the
24  board regarding the current complaint?
25  A.  Right.  Yes.

**Page 63**

1  Q.  And do you -- have you kept those?
2  A.  Right.
3  Q.  You didn't destroy those; right?
4  A.  Well, they're still in process.
5  Q.  Aside from those two complaints, any other
6  complaints against you to any licensing board or any
7  other, you know, governing entity?
8  A.  I mean, Better Business Bureau, a couple
9  complaints once in a while, and that's it.
10  Q.  How many complaints to the Better Business
11  Bureau?
12  A.  Maybe in DC, maybe two.
13  Q.  Any complaints to the Better Business Bureau in
14  any other place besides DC?
15  A.  I don't think so.
16  Q.  Two complaints over what period of time?
17  A.  I've been practicing medicine since 1986; so a
18  lot of years.
19  MR. GONZALEZ:  I'm going to object to the relevance
20  to the case.  I'm here on a medical malpractice case,
21  and you're hunting on Dr. Bash like you're going after
22  him for criminal charges.  I want to deal with the
23  medical malpractice case --
24  MR. BRODERICK:  Good for you.
25  You can ask him whatever questions you'd like to ask

**Page 64**

1  him on your dime.  I'm entitled to explore these things.
2  Relevance is not a basis on which you can refuse to
3  answer a question.  Your objection is noted --
4  MR. GONZALEZ:  Aren't we talking about a medical
5  malpractice case?
6  MR. BRODERICK:  Good.  I'm going to ask the
7  questions I want to ask.
8  BY MR. BRODERICK:
9  Q.  So two complaints to DC Better Business Bureau.
10  Any complaints to any governing board in Maryland
11  besides those two licensing things we just talked about?
12  A.  I don't think so.
13  Q.  Any complaints made to any hospital you were
14  ever employed at?
15  A.  No.
16  Q.  Any complaints at any other place you were ever
17  employed at?
18  A.  No.
19  Q.  Any complaints at any hospital you held
20  privileges at?
21  A.  No.
22  Q.  Any complaints to you about your medical care
23  of any kind besides the two Better Business Bureau and
24  the two -- the Maryland Medical Board?
25  A.  No, sir.  Only these veterans.

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

Page 65

```
1   Q.  I'm sorry?
2   A.  Only these Veterans.
3   Q.  Only those ones; okay.
4       All right.  You went to medical school where?
5   A.  Uniformed Services Medical School.
6   Q.  Did you get any training in ophthalmology while
7   you were there?
8   A.  We covered the eye.  You know, we -- basic
9   anatomy; we do physiology.  No specialized training.
10  Q.  No specialized training.  Just the general
11  medical school training that you would get in that
12  subject?
13  A.  Right.
14  Q.  Same question as to nephrology or kidneys?
15  A.  In med school, same general training.
16  Q.  Same question --
17  A.  I took a rotation for six weeks in nephrology
18  when I was a senior.
19  Q.  In medical school?
20  A.  Yeah.
21  Q.  What is that -- so like the '80s?
22  A.  Yeah.  I graduated in '86.
23  Q.  Any specialized education or training in
24  nephrology or ophthalmology after medical school?
25  A.  So radiology covers all spectrums.  So one
```

---

Page 66

```
1   spectrum of radiology has to do with the renal system.
2   So we're oftentimes referred to as a doctor's doctor.
3   They come to us to diagnose things.  So we have a lot of
4   specialized training in the renal system, and part of my
5   board certification is an oral board in the renal
6   system.
7   Q.  Okay.
8   A.  So --
9   Q.  How about ophthalmology?
10  A.  So if you're asking about my general training
11  in ophthalmology; so --
12  Q.  I'm wondering about specialized training in
13  ophthalmology?
14  A.  In the spectrum.  So as a neuroradiologist, we
15  do brain, head, neck, and spine.  So in the eye of the
16  orbit, we image a lot with the MRI.  So I have a lot of
17  radiology training in the eye based on imaging.
18      I have an article -- I've written an article on the
19  eye in my CV.  The very first article that I wrote is on
20  the eye that I did in Maryland.
21  Q.  Is that --
22  A.  The vitreous humor silicone in the eye,
23  Baltimore.
24  Q.  From 1995.
25      All right.  What about orthopedic surgery?  Any
```

---

Page 67

```
1   training -- specialized training or experience in
2   orthopedic surgery?
3   A.  I did rotations.  I wanted to be an orthopedic
4   surgeon before I got hurt, so I did one or two major
5   rotations of orthopedic surgery in medical school.
6   Q.  When was that?
7   A.  Same thing; '80s.
8   Q.  1980s; okay.
9   A.  And then also, another subsection of the
10  radiology boards has to do with the bone system; so we
11  studied a lot of orthopedic things, since the imaging.
12  Q.  Are you licensed to practice nephrology
13  anywhere?
14  A.  No.  I'm a radiologist.
15  Q.  Are you licensed to practice ophthalmology
16  anywhere?
17  A.  No.
18  Q.  Are you licensed as an orthopedic surgeon
19  anywhere?
20  A.  No.
21  Q.  Are you board certified in nephrology?
22  A.  No.
23  Q.  Are you board certified in ophthalmology?
24  A.  No.
25  Q.  Are you board certified in orthopedic surgery?
```

---

Page 68

```
1   A.  No.
2   Q.  Okay.  Let's do this:  Let's take a short
3   break.  I want to photocopy that opinion that you
4   actually brought, and we'll probably mark that and deal
5   with it.  So ten minutes?
6       (A brief recess was taken.)
7   BY MR. BRODERICK:
8   Q.  I think you told me you used to have a
9   California medical license, but it lapsed?
10  A.  Yeah.  I wasn't using it.  I let it expire.
11  Q.  So you let it expire because you weren't
12  practicing medicine at all or because you weren't
13  practicing medicine in California or what?
14  A.  No.  I'm from California originally.  I went to
15  medical school in Maryland.  So I got a California
16  license and a Maryland license, but I wasn't using the
17  California one, didn't see the need for it.
18  Q.  Before coming to this deposition today, did you
19  do anything to prepare for it?
20  A.  Tried to get the records.
21  Q.  Meaning what?
22  A.  I asked you for the records.  I asked him for
23  the records.
24  Q.  Did you get them?
25  A.  No.
```

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 69**

1  Q.  So you got some medical records but not all the
2  1,600 pages we talked about; is that right?
3  A.  We asked that question before, and I said I got
4  a partial -- in this thing, I have partial records.
5  Q.  And did you get any deposition transcripts?
6  A.  No.
7  Q.  Didn't see the deposition of Dr. Segal?
8  A.  No.
9  Q.  Didn't see the deposition of Dr. Lee?
10 A.  No.
11 Q.  Didn't see the deposition of Dr. Hu, H-U?
12 A.  Hu?
13 Q.  Did you see his deposition transcript?
14 MR. GONZALEZ:  He wouldn't have seen it because I
15 just got it last week.
16 MR. BRODERICK:  That's fine.
17 BY MR. BRODERICK:
18 Q.  Did you see any reports from any experts
19 disclosed by the United States?
20 A.  No.
21 Q.  Dr. Van Den Bogaerde?
22 A.  No.
23 Q.  Did you see any report from a Dr. Sami?
24 A.  No.
25 MR. BRODERICK:  S-A-M-I.

---

**Page 70**

1  BY MR. BRODERICK:
2  Q.  Did you see any report from a Dr. Segal?
3  A.  You asked that before, no.
4  Q.  But I'm -- I asked before about his transcript.
5  Now I'm asking about a rebuttal report.
6  A.  He has two reports?
7  Q.  No.  He only has one report.  So he has a
8  transcription of a deposition like we're doing right
9  now, but he also wrote a -- like, a report.
10 MR. GONZALEZ:  He wrote a declaration also.
11 BY MR. BRODERICK:
12 Q.  Yeah.  That's correct.  He wrote out a
13 declaration laying out his opinions.  Did you see that?
14 A.  No.
15 Q.  So you wouldn't be prepared to offer any
16 comment or opinions about those rebuttal reports or
17 declarations that they wrote because you haven't seen
18 them; right?
19 A.  If I did, then I'd put it in my report and say
20 "Dr. Smith and I agree" or "disagree."
21 Q.  Agree or disagree, whatever the case may be.
22 Have you seen any -- aside from the partial medical
23 records that you got before, have you seen any, like,
24 updated treatment records from Mr. Gonzalez?  Stuff that
25 is more recent.

---

**Page 71**

1  A.  No.
2  Q.  All right.  And so the big takeaway here -- and
3  I'm wrapping up here, and I'm going to be done in a
4  second -- the big takeaway is your 12 November 2017
5  report is just a draft; is that right?
6  A.  That's right.
7  Q.  Because you didn't have all the records and
8  other things you needed to do the final; is that right?
9  A.  That's what it says in this thing.
10 Q.  All right.  So -- if you got all those things,
11 you'd review them all and then you'd give us, like,
12 finalized opinions.  But you can't do that because you
13 don't have that stuff; right?
14 A.  That's correct.
15 Q.  I noticed you were taking some notes today on a
16 notepad.  Can I actually look at those real fast?  It's,
17 like, a couple notes.  I just want to see if I want them
18 or not.
19 A.  Yeah.  I was reading about --
20 Q.  Well, can I just look at them?  I just want to
21 see if I can decipher them if I want them.
22 MS. TAYLOR:  And more generally, when you review
23 medical records, we understand you got rid of the
24 medical records, but do you take notes, like, on a pad
25 like this that you might still have?

---

**Page 72**

1  THE WITNESS:  Normally, what I do is I take notes
2  on -- like, intake notes, I take the patient's name and
3  stuff like that, this guy wants 10 percent or whatever.
4  And then that's all I use.
5  And then when I do my reports, I just try and throw
6  stuff in my report, and I use that as my notes.
7  BY MR. BRODERICK:
8  Q.  So do you know whether you took any notes, for
9  example, on Mr. Gonzalez's records that you got as you
10 reviewed those records?
11 A.  What I would do is I keep these records, the
12 records right here, in a file like this.  I put a rubber
13 band around, all one thing.  And when I'm done with it,
14 I shred it and keep my report.  That's what I do.  So I
15 don't have any other records.
16 Q.  How long after you do your report do you shred
17 the records?
18 A.  Pretty soon because this stuff -- they can
19 be -- if I've done 5,000 cases, I'd have a whole --
20 Q.  So --
21 A.  Fast.  Weeks, months.
22 Q.  Sometime in 2017, probably?
23 A.  Yeah.
24 Q.  For this case?
25 A.  Right.

---

Daniel E. Gonzalez v.
United States of America, et al.

Craig N. Bash, M.D.
October 31, 2018

---

**Page 73**

1    Q.  Okay.

2    MR. BRODERICK: Do you have anything else?

3    MS. TAYLOR: You indicated, and in front of

4  Mr. Gonzalez is a whole stack -- various stacks of

5  documents; correct?

6    THE WITNESS: That's right.

7    MS. TAYLOR: And your understanding is you haven't

8  seen the vast majority of this; correct?

9    THE WITNESS: That's right. 300 pages probably

10  sounds about right.

11    MS. TAYLOR: I'm going to take a picture for the

12  record to show that since we didn't video it. Sometimes

13  we video it, but --

14    MR. BRODERICK: Smile for the photo.

15    Okay. I don't have any more questions. Do you have

16  anything else?

17    We're done. So I'm off the clock at 11:50, and

18  you're on.

19    MR. GONZALEZ: Thank you.

20         EXAMINATION

21  BY MR. GONZALEZ:

22    Q.  Dr. Bash, Mr. Broderick asked you earlier about

23  the draft that was exchanged -- that we were exchanging

24  in August of this year. Because last year -- I think

25  the explanation is that there's a November 2017 or it

---

**Page 74**

1  say's November 2018.

2    And Dr. Bash was preparing the draft that was due

3  August 17, and he was sending me this, and I was trying

4  to help straighten out some of the corrections that --

5  grammatical things that Mr. Broderick was addressing in

6  the deposition.

7    Do you -- you do recognize, though, that this is

8  pretty much your format on this exhibit -- I think it's

9  Exhibit 1. It's pretty much your format of --

10    A.  It's similar to my 2017 report.

11    Q.  Okay. And the other question I had was that

12  Mr. Broderick asked you about why you haven't seen

13  patients -- you hadn't seen patients since 1995. Is

14  that because it's -- you have a physical disability

15  which has limited your ability to treat patients as you

16  were prior?

17    A.  I've had a spinal cord injury for 34 years. I

18  had to get certification from the state of Maryland to

19  practice medicine because they thought I might not be

20  able to. So I'm fully capable of practicing. I did a

21  Herculean effort to go through radiology, and it got

22  hard on my body, so I decided to do a different pathway.

23    Q.  And just one last question. The issues that

24  are going on with the complaints about fees are pretty

25  much -- their grievances are pretty much about fees.

---

**Page 75**

1  It's not about anything about quality or anything about

2  quality of care?

3    A.  Maryland has several categories. It's a

4  category of professionalism.

5    Q.  Okay. I'm pretty much done. I would like

6  to --

7    MR. BRODERICK: Well, if you're done with the

8  questions, let's go off the record, and then we can let

9  him go, and then we can hash out whatever business we

10  have.

11    MR. GONZALEZ: The records are important.

12    MR. BRODERICK: So we're done now.

13    THE REPORTER: Mr. Gonzalez, would you like a copy

14  of the transcript?

15    MR. GONZALEZ: Probably, yes.

16    THE REPORTER: And, Mr. Broderick, you need this

17  transcript expedited by Wednesday?

18    MR. BRODERICK: Yes.

19    So you get a copy of this stuff. Have you ever done

20  this before, like in a lawsuit?

21    THE WITNESS: I have a huge case.

22    MR. BRODERICK: So you get a copy. You get to

23  review it and be, like, hey, I didn't say I smoke crack

24  or whatever in there or, gee, I said this, but I meant

25  that, and you get to make corrections.

---

**Page 76**

1    Normally -- the rule is they're supposed to send it

2  directly to you. That's probably the best way to do it

3  here, unless you guys want to do something else.

4    MR. GONZALEZ: No. Send it to him.

5    THE WITNESS: That's good for me.

6    MR. BRODERICK: Will you get it at that 49 --

7    THE WITNESS: Yes.

8    MR. BRODERICK: Because I mailed you something there

9  and it bounced. It came back.

10    THE WITNESS: It's the UPS store. It should go

11  right there.

12    MR. BRODERICK: Okay. So you'll get it there.

13  That's all. Off the record.

14    (The proceedings concluded at 11:54 a.m.)

15

16

17

18         ---------------------------

19         CRAIG N. BASH

20

21

22

23

24

25

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Page 77

```
 1   STATE OF CALIFORNIA    )
 2   COUNTY OF SACRAMENTO   )
 3          I hereby certify that the witness in the
 4   foregoing deposition, CRAIG N. BASH, was by me duly
 5   sworn to testify to the truth, the whole truth, and
 6   nothing but the truth, in the within-entitled cause;
 7   that said deposition was taken at the time and place
 8   herein named; that the deposition is a true record of
 9   the witness's testimony as reported by me, a duly
10   certified shorthand reporter and a disinterested person,
11   and was thereafter transcribed into typewriting by
12   computer.
13          I further certify that I am not interested in
14   the outcome of the said action, nor connected with, nor
15   related to any of the parties in said action, nor to
16   their respective counsel.
17          IN WITNESS WHEREOF, I have hereunto set my hand
18   this 6th day of November, 2018.
19   Reading and Signing was:
20   __x__ requested  _____ waived  _____ not requested
21
22
23
24          JULIE C. ROZELL, CSR NO. 14107
25          STATE OF CALIFORNIA
```

EXHIBIT 4

 Gmail                                        **Daniel Gonzalez <dgonzie@gmail.com>**

## Signature Page
1 message

**Daniel Gonzalez <dgonzie@gmail.com>**                          Fri, Aug 17, 2018 at 2:30 PM
To: Alice Burns <assuredh20@comcast.net>, Craig Bash <drbash@doctor.com>

Dear Alice and Dr. Bash,
Please have Dr. Bash signed the attached signature page today pending approval of the final draft so that if he is asked it was signed on August 17, 2018, he can answer that question truthfully.

I am heading to court and will send the final draft this evening.

Thank you,
Daniel

📄 **Singanture Page_August 17, 2018.docx**
12K

EXHIBIT 5

Mr. Daniel Gonzalez
7125 Calvin Drive
Citrus Heights, CA 95621
(916) 247-6886



## CONFIDENTIAL AND PERSONAL

August 20, 2018

Dr. Craig Bash
6038 Clark Road A-164
Paradise, Ca 95969

Dear Dr. Bash:

It is unfortunate that we could not coordinate a draft letter as expected. Having learned that you were at a funeral is an understandable reason for not being able to prepare the sort of opinion letter I sought to submit.

Warmest regards,

*/s/ Daniel Gonzalez*

Daniel E. Gonzalez
Cc: Alice Burns

1

EXHIBIT 6

 Gmail

Daniel Gonzalez <dgonzie@gmail.com>

# EXHIBITS A-K From Deposition of Dr. Siegel

1 message

**Daniel Gonzalez** <dgonzie@gmail.com> Tue, May 8, 2018 at 5:08 PM
To: Craig Bash <drbash@doctor.com>
Cc: Alice Burns <assuredh20@comcast.net>

Dear Dr. Bash,
Please find the exhibits presented at the deposition on April 27, 2018. I also have the opposing medical experts opinion letter (mostly prepared by the AG). I will complete a question summary for you but you have the VA records sent before.

I will not have a transcript for you until after this Friday.

Will need a letter from you asap.

Thanks,
Dan

**EXHIBITS A-K_Siegel & EXHIBITS A-B_Lee_April 27 2018.pdf**
15123K

# EXHIBIT 7



Plt's
EXHIBIT NO. C
Siegel
J. VISSIERE 4/27/18

## CURRICULUM VITAE

# CRAIG NICOLAS BASH, M.D., M.B.A.

**NPI/UPIN-1225123318  (USA186-71-13/M24-80-938-fax 800-531-8877)**
C-29-707-755-- date 15 Sept 1984 ---b-Wise 8832028-800-830-9598
Anabolic 410-296-7574---800-625-8849 (304722)
Healthvet I.D.  MCBM-57-9513
NPI 1225123318 D43471

**Updated 10/2015**

**Office**
**Veteran medical Advisor**
4938 Hampden lane
Bethesda MD 20814
301-767-9525 (O)
301-951-9106 (F)
DrBash@doctor.com
www.veteransmedadvisor.com

| | | |
|---|---|---|
| DOB: 03/07/57 | Marital status: Married | Children: 3 sons |
| Location: Bitburg, Germany | Spouse: Margaret C. Bash M.D. | and 1 daughter |
| (Born to U.S. military parents | (Pediatric Infectious disease | |
| stationed overseas) | sub-specialist) | |

## TRAINING AND EDUCATION

| | |
|---|---|
| U.S. Air Force Academy, 1975 –1979<br>(USAFA) | B.S. |
| Golden Gate University (GGU), 1979 - 1981 | M.B.A. |
| Uniformed Services University of the Health<br>F. Edward Hebert School of Medicine<br>Sciences (USUHS), 1981 – 1986 | M.D. |
| (6 weeks Brigham and Women's Boston)<br>The George Washington University (GWU)<br>Hospital, 1986 – 1990 | Internship and Residency, Radiology<br>(Chairman Drs. Allman and Rockoff) |
| University of Maryland Medical Systems (UMMS)<br>and<br>R. Adams Cowley - Shock Trauma Center<br>1992-1993 | Clinical Fellowship, Neuro-Radiology<br>Drs. Numaguchi, Rothman and Zoarski<br>Dr. Murvis |

Daniel Gonzalez
7125 Calvin Drive,
Citrus Heights, CA 95621
Telephone (916) 247-6886
Plaintiff

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO REGION)

| | |
|---|---|
| DANIEL E. GONZALEZ, | **No.: 2:15-cv-1997 MCE DB PS** |
| Plaintiff, | |
| vs. | **DECLARATION OF CRAIG N. BASH, M.D., M.B.A, REGARDING INABILITY TO COMPLETE A COMPETENT MEDICAL EXPERT OPINION LETTER** |
| UNITED STATES OF AMERICA; and DOES 1 to 20, Inclusive, | |
| Defendants. | |

TO THE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:

I, Craig N. Bash, M.D., M.B.A., do hereby declare:

1.     In October 2017, Mr. Daniel Gonzalez tendered a retainer for my expert medical opinion concerning the quality of medical care he received at the Veterans Administration Medical Center in Sacramento, CA.  In November 2017, I could only conduct a partial review of a limited number of medical records available to Mr. Gonzalez.  In December 2017, Mr. Gonzalez anticipated additional medical records and discovery responses would become available after January as the court extended the discovery time. I conveyed to Mr. Gonzalez a request for deposition transcripts of the VA treating physicians before completing my final medical opinion letter due to the limited records and Inconsistent discovery responses.

Declaration of Craig N. Bash, M.D., M.B.A. in RE: Incomplete Medical Opinion Letter; Eastern District CA No. 2:15-cv-01997

1

2.      Regrettably, in late February 2018, Mr. Gonzalez learned that the VA treating physicians and their attorney refused to cooperate in giving testimony which I believe essential before finalizing my medical opinion letter.  According to Mr. Gonzalez, the uncooperativeness of the treating doctors Although my incomplete review notes the appearance of a departure from the standard of care, the thoroughness and soundness of my final opinion letter requires further information from the treating doctors.

3.      In the interest of fairness, I provide this declaration in joining Mr. Gonzalez in seeking an allowance of adequate time to obtain the deposition transcripts of the treating doctors and provide those to me so I may complete a competent, well-vetted final medical opinion letter in this action.  I attach my curriculum vitae to this declaration.

4.      I declare under the penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed April 25, 2018.

By: _____

DR. CRAIG N. BASH, M.D., M.B.A.,
Fellow, Board Certified Diagnostic Radiology,

Declaration of Craig N. Bash, M.D., M.B.A. in RE: Incomplete Medical Opinion Letter; Eastern District CA No. 2:15-cv-01997

2

EXHIBIT 8

Daniel Gonzalez                                                via U.S. Mail
7125 Calvin Drive
Citrus Heights, CA 95621
(916) 247-6886

September 6, 2018

Ms. Lori LeRoy, Manager
Accuracy Plus Court Reporters
3400 Douglas Boulevard, Suite 160,
Roseville, CA 95661

Re: Correction of April 27, 2018 deposition of Dr. David Siegel
        Eastern District, No. 2:15-cv-01997

Dear Lori,

Pursuant to our conversation, please have the court reporter correct the medical terms
"hypolipidemia" to "hyperlipidemia" as stated by Dr. Siegel.   A copy of this letter is being
mailed to the Assistant Attorney General (Mr. Broderick).  If Mr. Broderick makes no objection
within 10 days of this letter to you, which would then require an order from the Court, the
corrections should be made in the sealed court transcript as well as furnishing defendants and
me with an amended transcript.

Thank you for correcting this important matter.

Warm regards,


Daniel Gonzalez

Cc: G. Broderick

# EXHIBIT 9

☎ (cell phone 301-651-6392) ☎

| To: | |
|-----|-----|
| **Date:  2 Oct 2018** | |
| **Topic:  Gonzales**<br>**Pages: cover only** | **From:**<br><br>**Craig N. Bash, M.D.**<br>**Neuro-Radiologist**<br>**www.veteransmedadvisor.com**<br><br><br>4938 Hampden lane Bethesda, MD 20814<br>Phone: (301) 767-9525   Fax: (301) 951-9106<br>E-Mail: drbash@doctor.com |

DANIEL E. GONZALEZ,

     Plaintiff,

vs.

UNITED STATES OF AMERICA; and
DOES 1 to 20, Inclusive,

     Defendants.

**No.: 2:15-cv-1997 MCE DB PS**

**DECLARATION OF CRAIG N. BASH, M.D.,
REGARDING FUTILITY,
IMPRACTICABILITY, OR IMPOSSIBILITY TO
ATTEND A DEPOSITION DUE TO
INCOMPLETE DISCOVERY**

:

I, Craig N. Bash, M.D., do hereby declare:

1. Due to ongoing lapses in the discovery by the United States in this action, and the inability
   of plaintiff, Daniel Gonzalez, to deliver complete discovery responses to me, it is my
   conclusion that to appear at a deposition would be futile, impracticable, or impossible for me
   to provide competent testimony until full discovery is available for my review and legal
   issues are resolved by the Court so that a second deposition does not need to be done..

Thank You

Craig N. Bash M.D., M.B.A.
NIH Extended Visitor
USU Associate Professor--Cell 240-506-1556
NPI number 1225123318

# EXHIBIT 10

Cardiovascular thromboembolic adverse effects associated with cyclooxygenase-2 selective inhibitors and nonselective antiinflammatory ...

Case 2:15-cv-01997-MCE-DB   Document 108   Filed 12/06/18   Page 73 of 97

| PubMed ▾ | |

**Format**: Abstract

Anesth Analg. 2007 Dec;105(6):1793-804, table of contents.

**Full text links**

🔵 Wolters Kluwer

# Cardiovascular thromboembolic adverse effects associated with cyclooxygenase-2 selective inhibitors and nonselective antiinflammatory drugs.

Joshi GP[1], Gertler R, Fricker R.

  **Author information**

**Abstract**

**BACKGROUND:** Concerns of increased cardiovascular (CV) thromboembolic adverse effects from nonsteroidal antiinflammatory drugs (NSAIDs, both nonselective [NS]-NSAIDs and cyclooxygenase [COX]-2 selective inhibitors) have prevented their use despite numerous benefits.

**METHODS:** In this descriptive review, we critically examine the randomized, active- and placebo-controlled studies, observational trials, and meta-analyses evaluating the CV adverse effects associated with long-term and short-term use of COX-2 selective inhibitors and NS-NSAIDs. The potential mechanisms for these CV effects are also presented.

**RESULTS:** Although the studies evaluating the CV risks have limitations, there appears to be an increased CV risk with both COX-2 selective inhibitors and NS-NSAIDs, particularly in high-risk patients. Therefore, the United States Food and Drug Administration has given a similar "boxed" warning highlighting the potential for increased risk of CV events associated with their use. Nevertheless, there are differences in the CV risks between COX-2 selective inhibitors (e.g., higher CV risk with rofecoxib than celecoxib) as well as differences in the CV risks between individual NS-NSAIDs (e.g., higher CV risks with diclofenac than naproxen).

**CONCLUSIONS:** Until long-term, prospective, randomized, adequately powered, clinical studies in relevant patient populations have been completed, the CV risks associated with the use of NSAIDs, especially in high-risk patients, will likely continue to be controversial. Nevertheless, the benefits of their short-term (e.g., perioperative) use in patients without CV risks probably outweigh their potential CV adverse effects. Finally, careful risk/benefit assessment should be undertaken and both COX-2 selective inhibitors and NS-NSAIDs should be used with caution in patients with CV risk factors.

PMID: 18042885   DOI: 10.1213/01.ane.0000286229.05723.50

[Indexed for MEDLINE]

Drug Safety and Availability > FDA Drug Safety Communication: FDA strengthens warning that non-aspirin nonsteroidal anti-inflammator…

Case 2:15-cv-01997-MCE-DB   Document 108   Filed 12/06/18   Page 74 of 97

# FDA Drug Safety Communication: FDA strengthens warning that non-aspirin nonsteroidal anti-inflammatory drugs (NSAIDs) can cause heart attacks or strokes

[ 7-9-2015 ]

### Safety Announcement                                                                                                    ⌄

The U.S. Food and Drug Administration (FDA) is strengthening an existing label warning that non-aspirin nonsteroidal anti-inflammatory drugs (NSAIDs) increase the chance of a heart attack or stroke. Based on our comprehensive review of new safety information, we are requiring updates to the drug labels of all prescription NSAIDs. As is the case with current prescription NSAID labels, the Drug Facts labels of over-the-counter (OTC) non-aspirin NSAIDs already contain information on heart attack and stroke risk. We will also request updates to the OTC non-aspirin NSAID Drug Facts labels.

Patients taking NSAIDs should seek medical attention immediately if they experience symptoms such as chest pain, shortness of breath or trouble breathing, weakness in one part or side of their body, or slurred speech.

NSAIDs are widely used to treat pain and fever from many different long- and short-term medical conditions such as arthritis, menstrual cramps, headaches, colds, and the flu. NSAIDs are available by prescription and OTC. Examples of NSAIDs include ibuprofen, naproxen, diclofenac, and celecoxib (see Table 1 for a list of NSAIDs).

The risk of heart attack and stroke with NSAIDs, either of which can lead to death, was first described in 2005 in the *Boxed Warning* and *Warnings and Precautions* sections of the prescription drug labels. Since then, we have reviewed a variety of new safety information on prescription and OTC NSAIDs, including observational studies,[1] a large combined analysis of clinical trials,[2] and other scientific publications.[1] These studies were also discussed at a joint meeting of the Arthritis Advisory Committee and Drug Safety and Risk Management Advisory Committee held on **February 10-11, 2014 (http://wayback.archive-it.org/7993/20161022142539/http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/ArthritisAdvisoryCommittee/ucm380874.htm)**.

Based on our review and the advisory committees' recommendations, the prescription NSAID labels will be revised to reflect the following information:

- The risk of heart attack or stroke can occur as early as the first weeks of using an NSAID. The risk may increase with longer use of the NSAID.
- The risk appears greater at higher doses.
- It was previously thought that all NSAIDs may have a similar risk. Newer information makes it less clear that the risk for heart attack or stroke is similar for all NSAIDs; however, this newer information is not sufficient for us to determine that the risk of any particular NSAID is definitely higher or lower than that of any other particular NSAID.
- NSAIDs can increase the risk of heart attack or stroke in patients with or without heart disease or risk factors for heart disease. A large number of studies support this finding, with varying estimates of how much the risk is increased, depending on the drugs and the doses studied.
- In general, patients with heart disease or risk factors for it have a greater likelihood of heart attack or stroke following NSAID use than patients without these risk factors because they have a higher risk at baseline.
- Patients treated with NSAIDs following a first heart attack were more likely to die in the first year after the heart attack compared to patients who were not treated with NSAIDs after their first heart attack.
- There is an increased risk of heart failure with NSAID use.

Drug Safety and Availability > FDA Drug Safety Communication: FDA strengthens warning that non-aspirin nonsteroidal anti-inflammator…

Case 2:15-cv-01997-MCE-DB    Document 108    Filed 12/06/18    Page 75 of 97

We will request similar updates to the existing heart attack and stroke risk information in the Drug Facts labels of OTC non-aspirin NSAIDs.

In addition, the format and language contained throughout the labels of prescription NSAIDs will be updated to reflect the newest information available about the NSAID class.

Patients and health care professionals should remain alert for heart-related side effects the entire time that NSAIDs are being taken. We urge you to report side effects involving NSAIDs to the FDA MedWatch program, using the information in the "Contact FDA" box at the bottom of the page.

**Facts about non-aspirin nonsteroidal anti-inflammatory drugs (NSAIDs)**  ⌄

**Additional Information for Patients and Consumers**  ⌄

**Additional Information for Health Care Professionals**  ⌄

**Data Summary**  ⌄

**Table 1. List of non-aspirin nonsteroidal anti-inflammatory drugs (NSAIDs)**  ⌄

**References**  ⌄

**en Español (/Drugs/DrugSafety/ucm454962.htm)**

**Drug Safety Communication (/downloads/Drugs/DrugSafety/UCM453941.pdf)** (PDF- 84KB)

**Related Information**

- **Nonsteroidal Anti-inflammatory Drugs (NSAIDs)**
  **(/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm103420.htm)**
- **Medication Guides (/Drugs/DrugSafety/ucm085729.htm)**
- **FDA Strengthens Warning of Heart Attack and Stroke Risk for Non-Steroidal Anti-Inflammatory Drugs**
  **(/ForConsumers/ConsumerUpdates/ucm453610.htm)**

**Contact FDA**

**For More Info**
855-543-DRUG (3784)
and press 4
druginfo@fda.hhs.gov (mailto:druginfo@fda.hhs.gov)

**Report a Serious Problem to MedWatch**
Complete and submit the report **Online (https://www.accessdata.fda.gov/scripts/medwatch/)**.
**Download form (http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM163919.pdf)** or call 1-800-332-1088 to
request a reporting form, then complete
and return to the address on the
pre-addressed form, or submit by fax to
1-800-FDA-0178.

**More in Drug Safety and Availability
(/Drugs/DrugSafety/default.htm)**

**Drug Alerts and Statements (/Drugs/DrugSafety/ucm215175.htm)**

**Medication Guides (/Drugs/DrugSafety/ucm085729.htm)**

**Drug Safety Communications (/Drugs/DrugSafety/ucm199082.htm)**

Drug Shortages (/Drugs/DrugSafety/DrugShortages/default.htm)                                    ⌄

Postmarket Drug Safety Information for Patients and Providers
(/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/default.htm)          ⌄

**Information by Drug Class (/Drugs/DrugSafety/InformationbyDrugClass/default.htm)**

**Medication Errors (/Drugs/DrugSafety/MedicationErrors/default.htm)**

**Drug Safety Podcasts (/Drugs/DrugSafety/DrugSafetyPodcasts/default.htm)**

Safe Use Initiative (/Drugs/DrugSafety/SafeUseInitiative/default.htm)                            ⌄

Drug Recalls (/Drugs/DrugSafety/DrugRecalls/default.htm)                                         ⌄

Drug Supply Chain Integrity (/Drugs/DrugSafety/DrugIntegrityandSupplyChainSecurity/default.htm)  ⌄

Risk Evaluation and Mitigation Strategies (REMS) (/Drugs/DrugSafety/REMS/default.htm)            ⌄



**Ophthalmology Research: An International Journal**
*4(3): 80-82, 2015, Article no.OR.2015.032*
*ISSN: 2321-7227*

**SCIENCEDOMAIN** *International*
*www.sciencedomain.org*



# Sudden Loss of Vision Associated with Use of Systemic Non-steroidal Anti-inflammatory Drugs

## Adeoti Caroline Olufuniayo[1*] and Olaopa Adedolapo Olufunke[1]

[1]*Department of Ophthalmology, Ladoke Akintola University of Technology teaching hospital, Osogbo, Nigeria.*

*Authors' contributions*

*This work was carried out in collaboration between the authors. Author ACO designed, managed the literature search and wrote the final paper. Author OAO wrote the first draft of the manuscript and carried out the laboratory studies. Both authors read and approved the final Manuscript.*

*Article Information*

DOI: 10.9734/OR/2015/18295
Editor(s):
(1) Li Wang, Department of Ophthalmology, Cullen Eye Institute, Baylor College of Medicine, USA.
Reviewers:
(1) S. K. Prabhakar, Department of ophthalmology, JSS University, India.
(2) Rahmi Duman, Şevket Yılmaz Training and Research Hospital, Turkey.
(3) Anonymous, Venezuela.
Complete Peer review History: http://www.sciencedomain.org/review-history.php?iid=1023&id=23&aid=9553

**Case Report**

*Received 14th April 2015*
*Accepted 1st May 2015*
*Published 2nd June 2015*

## ABSTRACT

Non-steroidal anti inflammatory agents have long been used in ocular therapeutics as a result of their effect on inflammation coupled with the undesirable side effects of steroids in Ophthalmology. Bleeding peptic ulcers have been strongly associated with use of oral non-steroidal anti inflammatory drugs. We present the case of a 51 year old male patient who presented with 4 days history of visual loss in his right eye following the use of 400 mg Ibuprofen three times a day for 3 days one week prior to presentation. Fundus examination revealed a pre-retinal hemorrhage. There may be need to be cautious with the use of these drugs.

*Keywords: Non-steroidal anti-inflammatory drug; loss of vision; retinal haemorrhage.*

## 1. INTRODUCTION

Non steroidal anti inflammatory drugs (NSAID) have been used medically since 1763. Their strong effect on inflammation coupled with the undesirable side effects of steroids in ophthalmology has made NSAID popular in ophthalmic therapeutics. They are increasingly employed to reduce miosis, inflammation, and prevent/treat cystoid macular edema associated

*Corresponding author: E-mail: caroladeoti2001@yahoo.co.uk;*

Olufunlayo and Olufunke; OR, 4(3): 80-82, 2015; Article no.OR.2015.032

with cataract surgery. Furthermore, they are used to reduce postoperative pain and photophobia associated with refractive surgery and to reduce the itching associated with allergic conjunctivitis.

Retinal hemorrhages follow a number of situations such as presence of abnormal vessels that bleed easily such as found in diabetic retinopathy, central retina vein or artery occlusions, hypertensive retinopathy and so on. The pathogenesis in these conditions is as a result of ischemia, hypoxia and neovascularisation. These new vessels have fragile walls and tend to rupture easily. They can also be found in valsalva retinopathy in which there is raised intra abdominal pressures and raised intra-orbital pressures such as found after straining at defaecation, coughing, sneezing, weight lifting, vomiting and blowing musical activity.

Bleeding peptic ulcers have been strongly associated with use of NSAIDs.1 An association has also been found between type of non-steroidal anti inflammatory drug and dose used. Risk was found to be lowest for Ibuprofen and diclofenac, intermediate for indomethacin, naproxen and piroxicam while azapropazone and ketoprofen carried the highest risks [1,2].

However, retinal hemorrhage following systemic use of non steroidal anti inflammatory drugs (NSAID) has not been reported in literature.
Non steroidal anti inflammatory drugs (NSAIDs) inhibit the activity of both cyclooxygenase 1 and cyclooxygenase 2 and therefore the synthesis of prostaglandins and thromboxanes. Inhibiting COX2 leads to the anti inflammatory, analgesic and antipyretic effects and inhibiting COX1 can cause bleeding by increasing the permeability of blood vessels. NSAIDs have marked inter-subject variability in response and incidence of side effects [3]. Hemorrhages can be pre-retinal, sub retinal or intra retinal.

## 2. CASE REPORT

A 51 year old male patient with previously diagnosed hypermetropia and bilateral immature cataracts presented with 4 days history of visual loss in his right eye. He had no previous history of diabetes mellitus, hypertension, bleeding disorder or sickle cell disease. There was no history of trauma but one week before presentation, he treated body pains with Ibuprofen 400 mg three times a day for 3 days.

His visual acuity was counting fingers on the right and 6/6 on the left with glasses. Dilated fundoscopy using 1% tropicamide revealed a pre-retinal haemorhage involving the macular region. Fundus photograph of the same patient is as shown in Fig. 1.

His blood pressure was 130/80 mmHg, packed cell volume 42%, genotype AA, fasting blood sugar 92 mg/dl.



**Fig. 1. Pre retinal hemorrhage following the use of NSAID**

## 3. DISCUSSION

Retinal haemorrhages are commonly found in diseases such as systemic hypertension, [4] sickle cell disease, [5,6] diabetes mellitus, [7] central retinal vein occlusion and so on. Subhyaloid and retinal haemorrhages are usually associated with retinal neovascularization but they can also be caused by posterior vitreous detachment and retinal breaks that is associated with tearing of a major retinal vessel. The patient in this report did not have anything suggestive of these causes. Valsalva retinopathy is also associated with retinal haemorrhages but this patient did not have any history of straining at defaecation, coughing, sneezing, weight lifting, vomiting or blowing musical activity.

He has no history of bleeding disorders and his laboratory reports did not reveal sickle disease thrombocytopenia or anaemia.

Retinal haemorrhages may remain undetected for many years if they do not involve the macula. Sometimes they are picked up when the eye is examined in detail by ophthalmoscopy

Olufunlayo and Olufunke; OR, 4(3): 80-82, 2015; Article no.OR.2015.032

and fundus photography. However, some retinal haemorrhages can cause severe impairment of vision if they involve the macula as in this case or they occur in connection with posterior vitreous detachment or retinal detachment.

Non steroidal anti inflammatory drugs (NSAID) have a strong effect on fever, pain and inflammation. These effects have made them very useful in ophthalmology especially considering the undesirable side effects of steroids such as glaucoma. They are increasingly employed to reduce miosis, inflammation, and prevent or treat cystoid macular edema associated with cataract surgery. Furthermore, they are used to reduce postoperative pain and photophobia associated with refractive surgery and to reduce the itching associated with allergic conjunctivitis.

Systemic NSAIDS are used in selected cases in ophthalmic practice. However, the use of systemic NSAIDS for non-ocular conditions is still very common and patients tend to get them readily from pharmacy shops in developing countries.

Although, bleeding peptic ulcers have been strongly associated with use of NSAIDs, retinal haemorrhages have not been commonly reported [1]. This may be due to the fact that they may remain unreported if they do not affect sight.

This case illustrates a serious adverse effect of NSAIDs. It is therefore necessary to curb indiscriminate use of systemic NSAIDs.

## 4. CONCLUSION

Non-steroidal anti inflammatory drugs can cause sudden loss of vision from bleeding that affects the macula. Necessary steps should be taken to educate the populace to stop indiscriminate use of drugs especially NSAIDs.

## CONSENT

It is not applicable.

## ETHICAL APPROVAL

It is not applicable.

## COMPETING INTERESTS

Authors have declared that no competing interests exist.

## REFERENCES

1.  Langman MJS, Weil J, Wainwright P, Lawson DH, Rawlins MD, Logan RFA, Murphy M, Vessey MP, Colin-Jones DG. Risks of bleeding peptic ulcer associated with individual non-steroidal anti-inflammatory drugs. The Lancet. 1994;343(8905):1075–1078.

2.  La García Rodríguez, Jick H, Risk of upper gastrointestinal bleeding and perforation associated with individual non-steroidal anti-inflammatory drugs. The Lancet. 1994;343(8900):769–772.

3.  Richard O. Day, Garry G. Graham, Kenneth M. Williams, G. David Champion, Julien de Jager. Clinical pharmacology of non-steroidal anti-inflammatory drugs. Pharmacology & Therapeutics. 1987;33(2–3):383–433.

4.  E. McGregor, C. G Isles, J. L Jay, A. F Lever, G D Murray. Retinal changes in malignant hypertension. BMJ. 1986; 292:233-4.

5.  Jan C, van Meurs. Evolution of a Retinal Hemorrhage in a Patient with Sickle Cell-Hemoglobin C Disease. Arch Ophthalmol. 1995;113(8):1074-1075.

6.  Jampol LM, Condon P, Dizon-Moore R, Serjeant G, Schulman JA. Salmon-patch hemorrhages after central retinal artery occlusion in sickle cell disease. Arch Ophthalmol. 1981;99(2):237-40.

7.  Rosenblatt BJ, Benson WE. Diabetic retinopathy. In: Yanoff M, Duker JS, Augsburger JJ, eds. Ophthalmology. 3rd ed. Philadelphia, PA: Mosby Elsevier. 2008;619.

© 2015 Olufunlayo and Olufunke; This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Peer-review history:
The peer review history for this paper can be accessed here:
http://www.sciencedomain.org/review-history.php?iid=1023&id=23&aid=9553



**OPTOMETRIC**
**Management**
Article

## Get Side Effect Savvy

**Learn about the common ocular side effects of frequently prescribed systemic drugs.**

April 1, 2003

G+          4

systemic side effects

# Get Side Effect Savvy

**Learn about the common ocular side effects of frequently prescribed systemic drugs.**
*BY GARY A. LESHER, Ph.D., F.A.A.O., Chicago, Ill.*

As optometrists, your ability to identify drug-induced ocular side effects is critical to efficient and effective patient care. Many drugs interfere with normal visual function, some causing minor transient discomfort or vision changes, others significantly impairing vision with possible permanent consequences. This article will briefly describe the ocular effects of some of the more frequently prescribed systemic agents as well as some popular drugs that are safe on the eyes.

Fortunately, the most frequently prescribed drugs don't often cause serious ocular toxicities. However, even the minor, transient problems seen with some of these agents will bring your patient into the office with specific complaints that they may not associate with the drugs they're taking. Therefore you need to become familiar with these side effects and know what to look for in patients who take these agents. In general, if you see any ocular side effects that are associated with a drug treatment, consult the prescribing practitioner before making any adjustment in dosage.



ILLUSTRATION BY MARK HEINE

**Popularity has its risks**

NDC Health, a provider of health information services, lists hydroco-done with acetaminophen (#1), an opiate/ non-opiate analgesic combination, as the most prescribed drug in the United States in 2001. The number in parentheses after each drug represents the drug's ranking based on 2001 pharmaceutical sales

Case 2:15-cv-01997-MCE-DB   Document 108   Filed 12/06/18   Page 81 of 97

The most frequent ocular side effect seen with these agents seems to be transient drug-induced myopia, sometimes as much as 4.00D. This transient myopia seems to be caused by ciliary body edema, which relaxes the zonule fibers and allows the lens to thicken, causing a myopic shift in the refractive error. This effect may be related to a sensitivity reaction to the drug, and most sulfonamides (including many of the diuretics, antibacterials and carbonic anhydrase inhibitors) will cause this effect. Once the patient discontinues use of this drug, his refractive error returns to pre-drug levels within a few days to several weeks.

## Remember the least harmful

Amoxicillin (#8), in its many formulations, is the eighth most frequently prescribed drug in the country. Ocular effects with amoxicillin -- or with any of the penicillin class of antibiotics -- are rare and transient, with the exception of allergic reactions to these drugs, which isn't uncommon. One rare ocular effect is the risk of unmasking or aggravating the signs of myasthenia gravis.

Another popular antibiotic, cephalexin (#22), works in a manner similar to the penicillins and is closely related chemically. Allergic reactions to this drug, as well as cross-allergic hypersensitivity with the penicillins, are responsible for most of the ocular effects reported with its use.

The anti-anxiety benzodiazepines are also frequently prescribed, as represented on the list by alprozolam (#10). Ocular toxicities with this group of drugs are generally minor and transient but could include decreases in the corneal reflex, accommodation, depth perception and extraocular muscle abnormalities that lead to diplopia. These effects are also additive with other central nervous system depressants.

## Keep a low guard with inhalers

Physicians usually prescribe the beta agonist albuterol aerosal (#11) to treat acute broncho-spasm in reversible airway disease. This drug will only occasionally cause ocular toxicities, but reports to the Registry have included visual hallucinations, mydriasis (with a possible risk of angle closure in narrow-angle glaucoma patients) and possible ocular allergic symptoms. Some cases of mydriasis were seen after inadvertent ocular exposure to the aerosolized product.

## Safe SSRIs

The selective serotonin reuptake inhibitors (SSRIs) have become the most frequently prescribed antidepressants. Sertraline HCl (#15) and paroxetine (#16) head the list of these useful drugs. Even with the millions of prescriptions for these drugs worldwide, reports of ocular toxicities (e.g., nystagmus and diplopia) are rare. Blurred vision, along with numerous other central nervous system toxicities, have been reported after rapid withdrawal of the SSRIs, and practitioners should avoid this practice.

## Watch out for NSAID effects

Although ibuprofen (#19) is available "over the counter," it's still widely prescribed in a higher dosage tablet (up to 800 mg). In this form, it's most often used to treat osteo- and rheumatoid arthritis. Ibuprofen can cause refractive error changes, diplopia, photophobia, dry eyes and color vision abnormalities. When a patient stops taking ibuprofen, his vision returns to normal. Going back on ibuprofen causes the vision problems to return.

Ibuprofen, and the other non-steroidal anti-inflammatory agents (NSAIDs), have numerous other ocular toxicities that include optic neuritis, papilledema and visual field changes. Retinal hemorrhage has also been seen with this class of drugs.

Case 2:15-cv-01997-MCE-DB   Document 108   Filed 12/06/18   Page 82 of 97

Because of these serious but infrequent risks, practitioners should warn their patients to stop these medications if a sudden or unexplained decrease in vision occurs while taking one of these drugs and to have a complete eye exam to determine the actual cause of the vision problem.

The new group of selective COX-2 inhibitors, including celecoxib (#20) and rofecoxib (#24), are also considered NSAIDs, and may well have similar ocular toxicities. In fact, reports of blurred vision, conjunctivitis, ocular pain, increased IOP and cataract, have occurred with the use of these selective COX-2 inhibitors. Even though practitioners frequently prescribe these compounds, they don't yet have the track record of the older compounds.

For that reason, although there are few reports of severe or sudden vision loss, until we have much more data, these agents should also carry the same warning as the non-selective COX inhibitors, such as ibuprofen and aspirin.

**Follow diabetes closely**

Metformin (#23) has become the most frequently prescribed oral agent for patients who have type-2 diabetes mellitus. While it has only been used in the United States for about eight years, it has been widely used throughout the world for many more years. The risks of serious ocular side effects with this agent are minimal. However, any patient taking this drug or other antidiabetic agents needs careful monitoring of their vision to try and catch diabetic changes as quickly as possible.

**Be mindful of ACE inhibitor dosing**

The last drug on the top 25 list is lisinopril, an angiotensin converting enzyme (ACE) inhibitor. This is just one of the many ACE inhibitors available in the United States. They are useful in treating hypertension, congestive heart failure and acute myocardial infarction.

The ACE inhibitors have caused angioedema of the lids and orbit, which isn't always associated with angioedema or allergic-like phenomenon in other areas. The mechanism for these effects may relate to an increase in kinins caused by ACE inhibition. This type of reaction may subside with continued use of the drug, but usually requires a decrease in dose or discontinuance of the drug. Oral antihistamines may also help relieve the symptoms. There are also reports of conjunctivitis related to the use of this drug.

**Know your side effects**

In the end, only a few of these frequently prescribed drugs cause serious ocular toxicity. But even in the case of drugs that only cause minor, transient ocular effects, with this information, you'll be able to better manage each patient's visual complaints.

*Dr. Lescher is professor of pharmacology and toxicology and is chairman of the department of basic and health science at the Illinois College of Optometry. He is also a fellow in the American Academy of Optometry.*

---

**Make the Connection**

This guide lists ocular side effects and the popular systemic drugs most commonly associated with them.

Allergic Reaction

- cephalexin (Biocef, Keflex, Keftab)
- amoxicillin (Amoxil, Biomox, Polymox)

- albuterol aerosal (Ventolin, Volmax)

## Blurred Vision

- celecoxib (Celebrex)
- rofecoxib (Vioxx)

## Transient Myopia

- furosemide (Lasix)
- hydrochlorothiazide (Esidrix, Hydrodiurnal)
- triamterene with hydrochloro- thiazide (Maxide, Dyazide)

## Nystagmus

- sertraline HCl (Zoloft)
- paroxetine (Paxil)

## Changes in Refractive Error

- ibuprofen (Advil, Motrin, Nuprin)

## Ocular Pain

- celecoxib (Celebrex)
- rofecoxib (Vioxx)

## Angioedema of the Lids and Orbit

- lisinopril (Zestril, Prinivil)

## Decrease/Increase in Intraocular Pressure

- decrease, atenolol (Tenormin)
- decrease, metoprolol (Lopressor, Toprol XL)
- increase, celecoxib (Celebrex)
- increase, rofecoxib (Vioxx)

## Photophobia

- ibuprofen (Advil, Motrin, Nuprin)

## Pseudotumor Cerebri

- levothyroxine (Synthroid)

## Cataracts

- celecoxib (Celebrex)
- rofecoxib (Vioxx)

## Dry Eye

- ibuprofen (Advil, Motrin, Nuprin)
- atenolol (Tenormin)
- conjugated estrogen (Premarin)
- conjugated estrogen/medroxy- progesterone acetate (Prempro)

## Increased Bleeding

- acetylsalicylic acid (Aspirin)
- ibuprofen (Advil, Motrin, Nuprin)

## Miosis

- hydrocodone with acetamino- phen (Vicoden, Zydone)

# EXHIBIT 11

PubMed ▼



Format: Abstract

Semin Urol. 1985 Nov;3(4):301-10.

# Indications and contraindications for the use of nonsteroidal antiinflammatory drugs in urology.

Weisman SM, Felsen D, Vaughan ED Jr.

## Abstract

Prostaglandins are ubiquitous biologically active compounds that are involved in inflammatory reactions, hemostasis, and, under certain circumstances, the maintenance of renal function. NSAIDs, which inhibit PG synthesis, are used therapeutically most often as antiinflammatory agents in conditions of inflammation and pain, mostly of a nonurologic nature. However, since NSAIDs inhibit systemic PG synthesis, administration of NSAIDs can lead to adverse side effects. For example, the gastrointestinal irritation caused by NSAIDs probably reflects removal of a cytoprotective effect of gastrointestinal PGs. Similarly, the kidney may be especially susceptible to adverse effects of NSAIDs. In diseases such as peptic ulcers, diabetes, hypertension, congestive heart failure, liver disease with ascites, and renal insufficiency, PGs seem to play a protective role in the kidney. This protective role, which results from increased synthesis of vasodilator PGs in the face of elevated vasoconstrictors, is diminished in the presence of NSAIDs. Other side effects include the antagonism by NSAIDs of the action of diuretics, such that the dose of the diuretic must be adjusted accordingly. The diuretic triamterene should not be used in conjunction with indomethacin due to several reported cases of toxicity. Another drug interaction involves the salicylates, which have been shown to diminish the uricosuric effects of probenecid and sulfinpyrazone. Likewise, since corticosteroids increase the renal clearance of salicylates, it is important to monitor the patient carefully following termination of steroid treatment in patients receiving large doses of salicylates, since this change in elimination can precipitate toxicity. In addition, the NSAIDs bind to plasma proteins and, as such, can displace or be displaced by other drugs that bind in the same manner and can result in either decreased efficacy or toxicity. Despite the fact that the kidney may not be the target of NSAID therapy, renal function may be adversely affected by NSAID treatment. It has therefore been proposed that a renal-sparing NSAID would be a very useful therapeutic agent. Sulindac (Clinoril) has been suggested to be such an agent, eg, able to inhibit systemic PG synthesis (usually monitored by measuring serum thromboxane synthesis) without an apparent effect on renal PG synthesis (monitored by measurement of urinary PGs). However, recent data have suggested that Sulindac does inhibit renal PG synthesis and does not exhibit selectivity. The reasons for the discrepancy are not clear, but may relate to the doses or time intervals examined.(ABSTRACT TRUNCATED AT 400 WORDS).

PMID: 3939661

[Indexed for MEDLINE]



Mayo Clin Proc. 2009 Feb; 84(2): 180–186.                                PMCID: PMC2664589

# The Top 10 Things Nephrologists Wish Every Primary Care Physician Knew

Neil M. Paige, MD, MSHS and Glenn T. Nagami, MD

From the Department of Medicine, Division of General Internal Medicine (N.M.P.) and Nephrology Section (G.T.N.), VA Greater Los Angeles Healthcare System, David Geffen School of Medicine at UCLA, Los Angeles

Individual reprints of this article are not available. Address correspondence to Neil M. Paige, MD, MSHS, Department of Medicine, VA Greater Los Angeles Healthcare System, 11301 Wilshire Blvd (111A), Los Angeles, CA 90073 (neil.paige@va.gov).

Copyright © 2009 Mayo Foundation for Medical Education and Research

This article has been cited by other articles in PMC.

## Abstract                                                                Go to:

Renal disease is commonly encountered by primary care physicians during their day-to-day visits with patients. Common renal disorders include hypertension, proteinuria, kidney stones, and chronic kidney disease. Despite their prevalence, many physicians may be unfamiliar with the diagnosis and initial treatment of these common renal disorders. Early recognition and intervention are important in slowing the progression of chronic kidney disease and preventing its complications. The evidence-based pearls in this article will help primary care physicians avoid common pitfalls in the recognition and treatment of such disorders and guide their decision to refer their patients to a specialist.

ACEI = angiotensin-converting enzyme inhibitor; ARB = angiotensin II receptor blocker; BUN = blood urea nitrogen; CKD = chronic kidney disease; GFR = glomerular filtration rate; LDL-C = low-density lipoprotein cholesterol; NSAID = nonsteroidal anti-inflammatory drug

Chronic kidney disease (CKD) is a widespread public health problem with substantial morbidity and mortality. Outcomes associated with CKD are progression to kidney failure, cardiovascular disease, and premature death. Learning to recognize CKD in its earliest stage and understanding what measures to undertake to prevent its progression and associated complications are important goals developed by the Kidney Disease: Improving Global Outcomes (KDIGO) initiative.[1] The evaluation of difficult-to-treat hypertension and kidney stones are additional skills that primary care physicians will need to acquire. The evidence-based pearls in this article will help primary care physicians understand these concepts and avoid common pitfalls in the recognition and treatment of such disorders and guide their decision to refer their patients to a specialist.

### 1. A "Normal" Serum Creatinine Level May Not Be Normal.

Normal creatinine values may vary among different laboratories, and some patients with serum creatinine levels within the "normal" range may have substantial reduction in kidney function. For example, a 66-year-old man with a serum creatinine level of 1.4 mg/dL (to convert to μmol/L, multiply by 88.4) would have an estimated glomerular filtration rate (GFR) of 54

mL/min per 1.73 m$^2$. This perceived "normal" serum creatinine value actually corresponds to stage 3 CKD.[1] Likewise, the rate of increase or trend of serum creatinine levels can also indicate CKD. For example, a 66-year-old man with a serum creatinine level of 0.8 mg/dL and an estimated GFR of 103 mL/min per 1.73 m$^2$ would have an estimated GFR of less than 64 mL/min per 1.73 m$^2$ should the serum creatinine level stabilize at 1.2 mg/dL. This would represent at least a 40% reduction in GFR. Estimates of GFR can only be based on steady-state serum creatinine values and cannot be used to accurately estimate GFR when it is changing. A rapid increase in the serum creatinine level from 0.8 to 1.2 mg/dL within 8 hours could reflect a GFR approaching zero in a patient with acute renal failure. The interpretation of serum creatinine level also depends on muscle mass, age, sex, height, and limb amputation. A patient with an amputation and a high-normal creatinine level may actually have advanced CKD. Commonly used GFR estimation equations, such as the Modification of Diet in Renal Disease calculator (www.mdrd.com), have not been validated in patients with normal GFR and in fact may underestimate actual GFR in healthy people.[2] The take-home message is that recognition of CKD is important in order to identify and treat reversible causes of renal disease, slow the progression and avoid the complications of renal disease, and identify patients who may need dialysis or a renal transplant.[1]

2. **Know the Medications That Spuriously Elevate the Serum Creatinine Level.**
   In a number of scenarios, the serum creatinine level can increase without reflecting a change in the actual GFR. The antibiotic trimethoprim-sulfamethoxazole and the H$_2$-blocker cimetidine are 2 commonly used drugs that decrease the secretion of creatinine. This can result in a self-limited and reversible increase in the serum creatinine level of as much as 0.4 to 0.5 mg/dL (depending on baseline serum creatinine level). Famotidine and ranitidine can likewise cause an increase but to a lesser degree. The antibiotic cefoxitin can spuriously increase the serum creatinine level by interfering with the colorimetric assay used to measure serum creatinine levels.[3] In both instances, the blood urea nitrogen (BUN) typically does not change. As such, an increase in creatinine level suggests a true decrease in GFR only if accompanied by a corresponding increase in BUN levels.

3. **Patients With Decreased GFR or Proteinuria Should Be Evaluated to Determine the Cause; Positive Urine Dipstick Test Results for Protein Should Be Followed Up With a Spot Urine Protein to Urine Creatinine Ratio.**
   Chronic kidney disease is defined as a kidney abnormality that persists for more than 3 months. Persons with a normal GFR may have CKD if they have persistent proteinuria or hematuria of renal origin. Despite the difficulty associated with accurate assessment of near-normal GFR, most would agree that a persistent GFR of less than 60 mL/min per 1.73 m$^2$ would signify CKD. Proteinuria is initially detected by the urine dipstick test, which reflects the concentration of albumin in the urine. Because variations in urine flow and concentration can affect the semiquantitative dipstick determination, a quantitative estimation of proteinuria is required. The preferred method for quantitative estimation of protein excretion is the spot urine protein to creatinine ratio because it is accurate and more convenient than a 24-hour urine collection.[4,5] In patients at risk of proteinuria (eg, patients with diabetes), a spot urine albumin to creatinine ratio is helpful for detecting microalbuminuria, thereby guiding further therapy. Patients with diabetes who have microalbuminuria may be at higher risk of developing diabetic nephropathy. In a patient with a urine protein to creatinine ratio of 1 or more, the risk of progression of CKD is higher. In fact, any patient with an elevated ratio ($\geq$1) should be evaluated for causes of glomerular disease, including diabetes, collagen vascular disease (eg, systemic lupus erythematosus), malignancy (eg, multiple myeloma), infections (eg, human immunodeficiency virus infection, syphilis, hepatitis B and C), and use of medications such as nonsteroidal anti-inflammatory drugs (NSAIDs).[5] Solid tumors may also be associated with glomerular disease

(membranous glomerulopathy), but such tumors are generally either already known or readily detectable by age-, risk-, and sex-appropriate cancer screening.[9,10] Patients with a high degree of proteinuria or active urinary sediment, especially in the setting of deterioration in kidney function, should be referred to a nephrologist for further evaluation and treatment. A lower degree of proteinuria in association with CKD (unmodified by antiangiotensin or antialdosterone agents) suggests a nonglomerular etiology (Table). This Table should not be considered to be all inclusive; instead, it provides a conceptual framework for approaching the identification of the numerous causes of nonglomerular CKD. Preglomerular, intrarenal, and postrenal causes may be associated with long-term reductions in renal function and lower degrees of proteinuria. The key to the diagnostic assessment of patients with these conditions includes, most importantly, a careful history and physical examination, followed by renal Doppler ultrasonography to detect renal artery stenosis, obstruction, and/or cysts.



TABLE.
Causes of Low Proteinuric CKD[a]

## 4. In Patients With Early-Stage CKD, Periodic Evaluation and Intervention Are Appropriate to Slow the Progression of Renal Disease and Avoid Its Complications.

In patients with CKD, it is imperative to slow the rate of disease progression. Nephrotoxic drugs, such as NSAIDs, aminoglycoside antibiotics, and radiocontrast agents, should be used with caution or avoided completely. Systemic blood pressure should be monitored frequently and controlled with a goal blood pressure of less than 130/80 mm Hg. A lower blood pressure may be desirable in patients with proteinuric CKD. A spot urine protein to creatinine ratio should be obtained periodically, with a ratio of 1 or more suggesting a higher risk of CKD progression. Angiotensin-converting enzyme inhibitors (ACEIs) and angiotensin II receptor blockers (ARBs) may slow the progression of CKD, especially in patients with proteinuria. In addition to lowering systemic blood pressure, ACEIs and ARBs also lower glomerular capillary blood pressure and protein filtration, which may contribute to their beneficial effect in slowing progression. They may also help reduce angiotensin II-mediated cell proliferation and fibrosis.[11] Combination therapy with an ACEI and ARB may have a greater antiproteinuric effect than either drug alone, but patients should be monitored carefully for increases in serum creatinine and potassium levels.[11,12] Patients with progressive CKD are at risk of renal osteodystrophy. Phosphorus, calcium, and parathyroid hormone levels should be monitored closely in all patients with stage 3 to 4 CKD. Abnormalities in these values may indicate the need for dietary phosphate restriction, administration of oral phosphate binders, and/or the administration of vitamin D.

Patients with CKD also have an increased risk of cardiovascular complications, including myocardial infarction.[13] Aspirin (eg, 81 mg/d) and aggressive lipid-lowering strategies should be used, including 3-hydroxy-3-methylglutaryl (HMG) coenzyme A reductase inhibitors or statins, with a goal low-density lipoprotein cholesterol (LDL-C) level of 100 mg/dL or less (to convert to mmol/L, multiply by 0.0259). In patients with CKD and established coronary artery disease, some physicians recommend a goal LDL-C level of 70 mg/dL or less. Recently, several studies have suggested that statins may have the additional benefit of reducing proteinuria.[5,13] More studies are needed to determine whether tighter control of LDL-C levels translates into reduction of cardiovascular events or progression to end-stage renal disease.

Early referral to a nephrologist should be considered if CKD progresses or if the patient has uncontrolled complications, including nephritic-range proteinuria, uncontrolled blood pressure, uncontrolled secondary hyperparathyroidism, or active urine sediment. Consultation and/or comanagement with a kidney disease care team is advisable for patients with stage 3 CKD (GFR,

30-59 mL/min/1.73 m$^2$). All patients with a GFR of less than 30 mL/min per 1.73 m$^2$ (stages 4-5) should be referred to a nephrologist.[v]

5. **Do Not Automatically Discontinue an ACEI or ARB Solely Because of a Small Increase in the Serum Creatinine or Potassium Level.**

Two important drugs in the treatment of patients with CKD are ACEIs and ARBs. In management of proteinuric kidney diseases, ACEIs or ARBs are used not only to optimize blood pressure control (Joint National Commission VII) but can be titrated up in patients with proteinuria. They are also the drugs of choice to prevent progression of proteinuric CKD.[12,14,15] Patients who begin taking or have a dose increase in ACEIs or ARBs may experience an increase in the serum creatinine level. Although an increase of 20% to 30% is acceptable,[16] it is important to confirm that the serum creatinine level stabilizes at the higher value and does not continue to increase. Also, an increase in serum potassium levels is sometimes seen in patients who are taking ACEIs or ARBs. A serum potassium level of up to 5.5 mEq/L (to convert to mmol/L, multiply by 1.0) is acceptable as long as it is stable and as long as the patient is aware of the need for dietary potassium restriction and will not be exposed to additional medications, such as spironolactone, that may exacerbate hyperkalemia. Follow-up serum creatinine and potassium levels should be ordered within 1 week. In patients with an increase in creatinine level of more than 20% to 30% or in those with uncontrollable hyperkalemia, the ACEI or ARB should be discontinued or titrated to a lower dose. Frequent monitoring is necessary. Furthermore, diuretics that work with reduced GFR, such as furosemide or metolazone, are useful agents in the treatment of hypertension and hyperkalemia in CKD. However, it is important to note that volume depletion may make a patient more susceptible to an ACEI- or ARB-induced increase in the serum creatinine level.

6. **Anemia in Patients With CKD Should Be Treated With Erythrocyte-Stimulating Agents Such as Recombinant Human Erythropoietin But Should Not Be Overtreated.**

In patients with CKD, anemia has been associated with fatigue, reduced exercise tolerance, dyspnea, left ventricular hypertrophy, left ventricular systolic dysfunction, and an increased risk of cardiovascular events (stroke and myocardial infarction).[17,18] As such, the National Kidney Foundation Dialysis Outcomes Quality Initiative (K/DOQI) guideline for the treatment of anemia of CKD recommends that the hemoglobin target should be between 11 and 12 g/dL (to convert to g/L, multiply by 10) and should not exceed 13 g/dL.[18] Erythropoietin should be discontinued in patients with a hemoglobin level of 13 g/dL. In a number of well-publicized articles, patients taking erythropoietin who were corrected to normal or near-normal hemoglobin levels were at higher risk of cerebrovascular events, thrombosis, and hypertension.[18-21] All patients with anemia should be evaluated for other reversible causes, including vitamin deficiencies and iron deficiency. Routine evaluation would include a reticulocyte count and measurement of serum vitamin $B_{12}$ and folate, serum iron, ferritin, and total iron-binding capacity. Patients (especially males and nonmenstruating females) with iron deficiency should undergo a gastrointestinal evaluation with endoscopy and colonoscopy. Iron deficiency must be corrected if erythrocyte-stimulating agents are to be effective.

7. **Phosphate-Containing Bowel Preparations Should Be Used With Caution.**

Although sodium phosphate bowel preparation agents are effective and more convenient than other agents on the market, several recent studies have suggested that they can cause acute phosphate nephropathy, leading to acute renal failure or worsening of CKD.[22-24] A 2005 study reported 21 cases of acute phosphate nephropathy in patients who had undergone a recent colonoscopy and who had taken a sodium phosphate bowel preparation.[25] Although the pathophysiology was not fully understood, it was thought to be secondary to substantial fluid shifts and electrolyte changes. On the basis of their case evaluation, the authors of this study speculated that potential etiologic factors included inadequate hydration, increased patient age, a

history of hypertension, and current use of an ACEI or ARB. Subsequently, several professional societies have developed guidelines for the use of sodium phosphate bowel preparations.[26,27] In addition to the potential etiologic factors identified in the 2005 study,[25] patients with CKD or chronic heart failure and those taking NSAIDs or diuretics would also appear to be at higher risk of acute phosphate nephropathy. For these patients, the guidelines recommend an alternative bowel preparation agent, polyethylene glycol, which is not associated with volume shifts and electrolyte abnormalities. Because patients must drink a large volume of this alternative bowel preparation agent, adherence can be an issue. In deciding whether to use a bowel preparation agent and in selecting which one to use, clinicians should carefully weigh the benefits and risks for each individual patient.

8. **Patients With Severe CKD Should Avoid Magnesium- or Aluminum-Containing Oral Preparations. Concomitant Use of Citrate-Containing Preparations and Aluminum-Containing Oral Preparations Is Potentially Hazardous Because It Can Lead to Acute Aluminum Toxicity.**

In patients with severe CKD, over-the-counter antacids that contain aluminum and magnesium (eg, Maalox and Mylanta) should be avoided. Other medications, such as the cathartic agent magnesium citrate, should likewise be used with caution. Indiscriminate use of magnesium-containing preparations can lead to severe hypermagnesemia. In addition, decreased renal function also increases the risk of aluminum accumulation and subsequent bone disease and neurotoxicity.[28,29] Chronic aluminum toxicity has been linked to sporadic Alzheimer disease and other neurodegenerative disorders[30]; however, this link is highly controversial. Moreover, certain medications, such as calcium citrate, potassium citrate, and sodium citrate, markedly enhance aluminum absorption from the gut. A number of studies have suggested that the concomitant use of citrate-containing preparations and aluminum hydroxide is potentially hazardous.[31-33] In one such study, Kirschbaum and Schoolwerth[34] reported the development of a rapidly progressive encephalopathy marked by confusion, myoclonus, seizures, coma, and death in a group of women with renal failure who received an oral solution of citrate and aluminum hydroxide gel concurrently. Given these findings, patients with CKD who need to take a medication such as sodium citrate to prevent kidney stones or another citrate-containing preparation should not take aluminum hydroxide-containing medications. Because of the universal availability of such over-the-counter antacids, these patients should be advised of this specific contraindication.

9. **Although Most Patients With Hypertension Should Not Be Screened for Secondary Hypertension, Certain Clinical Clues May Suggest the Presence of an Underlying Cause That, When Addressed, May Resolve or Improve the Patient's Hypertension.**

From an epidemiologic standpoint, secondary hypertension is relatively uncommon. Of patients who are diagnosed as having hypertension in a primary care clinic, 95% have primary or essential hypertension, and only 5% have a secondary cause.[35] In a study at a hypertension clinic, secondary hypertension accounted for only 9% of all patients seen.[36] Severe or difficult-to-control hypertension, hypertension that suddenly develops or suddenly worsens, or hypertension that is associated with other clinical findings may indicate secondary hypertension.[37,38] Hypokalemia may suggest primary aldosteronism; however, in 1 series, hypokalemia was present in only 25% of patients diagnosed as having primary hyperaldosteronism.[39] Headaches, palpitations, and sweats may suggest pheochromocytoma. Moon facies and/or striae may suggest Cushing syndrome, and a history of snoring in an obese patient may suggest obstructive sleep apnea. A bruit on one side of the abdomen may indicate renal artery stenosis. Worsening blood pressure or renal function on initiation of an ACEI or ARB may also suggest renal artery stenosis. Patients with peripheral vascular, cardiovascular, or cerebrovascular disease are at risk of also having renovascular disease. Other potentially

correctable systemic conditions that can cause hypertension include hypothyroidism and hyperparathyroidism.

Each of these findings or the already described historical features may suggest a secondary cause of the hypertension. Treatment of the underlying disorder can improve the patient's blood pressure and, in some instances, may resolve the patient's hypertension. Clinicians should determine whether the patient's medications (eg, NSAIDs, birth control pills, or certain decongestants) or lack of adherence to dietary restrictions (eg, ingestion of sodium and sodium-containing foods) is contributing to his or her suboptimal control and should review the patient's antihypertensive regimen for appropriateness. Assessment for target organ damage is also appropriate to determine cardiovascular risk. Determining when to evaluate for a secondary cause of hypertension is based on the pretest probability or the likelihood that 1 or more of the above historical features or physical findings are present. A stepwise approach should be used.

10. **In Patients With Recurrent Stone Disease, an Indepth Metabolic Evaluation Is Needed to Identify and Treat Modifiable Risk Factors, Thereby Preventing Further Episodes and/or Promoting Stone Dissolution.**

Nephrolithiasis, a common problem encountered by primary care physicians, can cause substantial morbidity. The likelihood that stone disease will develop in a man by age 70 years is as high as 1 in 8.[39] The 10-year recurrence rates after a first calcium oxalate stone can be as high as 50% without treatment. It can be much higher in patients with a metabolic risk. As such, patients with an initial stone should undergo risk assessment. Patients with a family history of stones, concomitant gastrointestinal disease such as inflammatory bowel disease, frequent urinary tract infections, or a history of nephrocalcinosis should be referred to a nephrologist for further evaluation. Patients without these risk factors should have a simplified evaluation that includes a dietary history, a review of medications that can promote stone development, urinalysis, and measurement of levels of serum calcium, phosphorous, electrolytes, and uric acid.[40] Compositional stone analysis is an integral part of the metabolic evaluation because it can provide guidance for therapy.[41] The first-time diagnosis of a single calcium-containing kidney stone in a patient without a family history of kidney stones and with normal findings on an initial metabolic evaluation can be managed by increasing fluid intake to maintain a urine output of about 2 L/d. If a uric acid or cystine stone is detected on stone analysis, further metabolic evaluation with a 24-hour urine stone risk profile (eg, UroRisk or StoneRisk Panel [Mission Pharmacal Company, San Antonio, TX]) is warranted to guide both dietary and medical interventions.[42] Likewise, in patients without a stone available for analysis or in patients with multiple calcium stones, further metabolic evaluation, including the 24-hour urine stone risk profile, is recommended.

## One Additional Point: Cyclosporine and Tacrolimus, Drugs Commonly Used in Patients With Renal Allografts, Have Many Drug-Drug Interactions. Go to:

Every new medication (prescribed, over-the-counter, and herbal) that is given to a patient with a renal allograft should be reviewed to determine if it will interact with his or her transplant medications (eg, tacrolimus or cyclosporine). Some medications may decrease calcineurin inhibitor levels; others may cause cyclosporine or tacrolimus toxicity.[43] In both instances, the health of the patient or the success of the renal allograft may be jeopardized. For example, St Johns Wort, a herbal preparation, may decrease cyclosporine levels substantially, potentially resulting in acute rejection. Several other commonly prescribed medications that can be associated with reduced cyclosporine levels include rifampin, phenytoin, and carbamazepine. In contrast, diltiazem, verapamil, and erythromycin may increase cyclosporine levels. Cyclosporine can interfere with the metabolism of certain statins such as simvastatin, increasing the risk of statin-induced rhabdomyolysis. If any medication must be given to a patient with a renal allograft who is taking tacrolimus or cyclosporine, a careful review of its

interaction with these medications should be made. If a drug must be used that has a considerable interaction, dose adjustment may be needed with careful follow-up of the calcineurin inhibitor levels. Careful monitoring is the rule.

## CONCLUSION                                                              Go to:

Renal disease is commonly encountered by primary care physicians. Early recognition, evaluation, and appropriate treatment and/or referral are necessary to moderate the substantial morbidity and mortality that are often associated with diseases of the kidney.

## Supplementary Material                                                  Go to:

**CME Test:**

Click here to view.

## Notes                                                                   Go to:

After reviewing this article, the reader should be able to (1) interpret the clinical relevance of the serum creatinine level in the setting of age, sex, muscle mass, and medications the patient is taking; (2) identify chronic kidney disease in its earliest stage and apply measures to prevent its progression and complications; and (3) initially diagnose, evaluate, and manage other common renal diseases, such as nephrolithiasis and hypertension, encountered by primary care physicians.

## Questions About Common Renal Problems                                   Go to:

1. A 65-year-old man with stage 3 chronic kidney disease (CKD) is noted to have proteinuria on dipstick testing and a subsequent urine protein to creatinine ratio of 0.7. The patient's blood pressure has been in the range of 130/80 mm Hg while he has been taking a moderate dose of an angiotensin-converting enzyme inhibitor (ACEI). You increase his ACEI dose and see him in follow-up a week later. Although his blood pressure has improved and his urine protein to creatinine ratio has decreased to 0.5, you note that his serum creatinine level has increased from 1.4 to 1.7 mg/dL. Which *one* of the following is the *next best* step in the treatment of this patient?
    a. Stop the ACEI and initiate dihydropyridine calcium channel blocker therapy
    b. Lower the ACEI dose back to baseline and initiate dihydropyridine calcium channel blocker therapy
    c. Continue the current regimen but recheck the patient's serum creatinine level in 1 week
    d. Add an angiotensin II receptor blocker (ARB) to his current regimen
    e. Stop the ACEI and start an ARB

2. A 55-year-old man presents with a blood pressure of 160/90 mm Hg and a 15-year history of hypertension and long-standing hypercholesterolemia treated with a medication regimen of 50 mg/d of losartan, 10 mg/d of amlodipine, 100 mg/d of atenolol, and 25 mg/d of hydrochlorothiazide. He is otherwise feeling well and denies headaches or flushing. During the past year, his blood pressure has been more difficult to control (averaging 160/90 mm Hg), and, 1 week previously, the dosage of losartan was increased to 100 mg/d. His serum electrolyte levels are normal, and his serum creatinine level is 1.1 mg/dL. Which *one* of the following should be the *next* step in the management of this patient?
    a. Initiate 12.5 mg/d of spironolactone
    b. Obtain an aldosterone-renin ratio; refer for ultrasonography to rule out renal artery stenosis

c. Increase the dosage of hydrochlorothiazide to 50 mg/d

d. Initiate 5 mg of minoxidil twice daily

e. Perform magnetic resonance imaging of the abdomen

3. Which *one* of the following statements is *false* about the management of a patient with a serum creatinine level of 2.2 mg/dL?

a. Certain over-the-counter medications, such as nonsteroidal anti-inflammatory drugs (NSAIDs) and antacids, should be avoided

b. Both ACEIs and ARBs can be used in patients with proteinuria

c. Serum phosphorus, calcium, and parathyroid hormone levels should be monitored closely

d. Treating anemia with recombinant human erythropoietin to the normal hemoglobin range has been shown to reduce morbidity and mortality

e. In addition to lowering cholesterol, statins may also reduce proteinuria

4. Which of the following patients is *likely* to have CKD?

a. A 55-year-old woman with a serum creatinine level of 1.2 mg/dL

b. A 45-year-old man with bilateral below-the-knee amputations and a serum creatinine level of 1.1 mg/dL

c. An 80-year-old woman with a serum creatinine level of 1.0 mg/dL

d. A 70-year-old man with some muscle wasting who weighs 65 kg and has a serum creatinine level of 1.1 mg/dL

e. All of the above

5. Which *one* of the following statements is *false* about the management of a patient with a kidney stone?

a. Compositional stone analysis identifying the type of stone will help guide therapy

b. A first calcium stone can be simply managed by increasing fluid intake to maintain a urine output of 2 L/d

c. If a stone is not recovered and sent for analysis, a 24-hour urine stone risk profile should be ordered

d. A first uric acid or cystine stone can be simply managed by increasing fluid intake to maintain a urine output of 2 L/d

e. Patients with inflammatory bowel disease are at increased risk of kidney stones

**This activity was designated for 1 AMA PRA Category 1 Credit(s).™**

Because the Concise Review for Clinicians contributions are now a CME activity, the answers to the questions will no longer be published in the print journal. For CME credit and the answers, see the link on our Web site at mayoclinicproceedings.com.

## REFERENCES                                                      Go to:

1. Levey AS, Eckardt KU, Tsukamoto Y, et al. Definition and classification of chronic kidney disease: a position statement from Kidney Disease: Improving Global Outcomes (KDIGO). *Kidney Int.* 2005;67(6):2089-2100 [PubMed]

2. Fadem SZ. MDRD GFR Calculator (With SI Units): Web site. 4 variable MDRD study equation using serum creatinine, age, race, gender http://www.mdrd.com/ Accessed December 17, 2008

3. Stevens L, Perrone RD.Drugs that elevate the serum creatinine concentration UpToDate Online. http://uptodateonline.com/online/content/topic.do?
topicKey=fldlytes/32725&selectedTitle=2~150&source=search_result.
http://uptodateonline.com/online/content/topic.do?
topicKey=fldlytes/32725&selectedTitle=2~150&source=search_result Accessed December 17, 2008.

4. Kannel WB, Stampfer MJ, Castelli WP, Verter J. The prognostic significance of proteinuria: the Framingham study. *Am Heart J.* 1984;108(5):1347-1352 [PubMed]

5. K/DOQI clinical practice guidelines for chronic kidney disease: evaluation, classification, and stratification, Part 5: evaluation of laboratory measurements for clinical assessment of kidney disease guideline 5. assessment of proteinuria. NKF K/DOQI Web site. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p5_lab_g5.htm. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p5_lab_g5.htm Accessed December 17, 2008.

6. Ginsberg JM, Chang BS, Matarese RA, Garella S. Use of single voided urine samples to estimate quantitative proteinuria. *N Engl J Med.* 1983;309(25):1543-1546 [PubMed]

7. Schwab SJ, Christensen RL, Dougherty K, Klahr S. Quantitation of proteinuria by the use of protein-to-creatinine ratios in single urine samples. *Arch Intern Med.* 1987;147(5):943-944 [PubMed]

8. Warren GV, Korbet SM, Schwartz MM, Lewis EJ. Minimal change glomerulopathy associated with nonsteroidal antiinflammatory drugs. *Am J Kidney Dis.* 1989February;13(2):127-130 [PubMed]

9. Burstein DM, Korbet SM, Schwartz MM. Membranous glomerulonephritis and malignancy. *Am J Kidney Dis.* 1993;22(1):5-10 [PubMed]

10. Brueggemeyer CD, Ramirez G. Membranous nephropathy: a concern for malignancy. *Am J Kidney Dis.* 1987;9(1):23-26 [PubMed]

11. K/DOQI clinical practice guidelines for chronic kidney disease: evaluation, classification, and stratification, part 4: definition and classification of stages of chronic kidney disease guideline 2. evaluation and treatment. NKF K/DOQI Web Site. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p4_class_g2.htm. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p4_class_g2.htm Accessed December 17, 2008.

12. Wolf G, Ritz E. Combination therapy with ACE inhibitors and angiotensin II receptor blockers to halt progression of chronic renal disease: pathophysiology and indications. *Kidney Int.* 2005;67(3):799-812 [PubMed]

13. Douglas K, O'Malley PG, Jackson JL. Meta-analysis: the effect of statins on albuminuria. *Ann Intern Med.* 2006;145(2):117-124 [PubMed]

14. K/DOQI clinical practice guidelines for chronic kidney disease: evaluation, classification, and stratification, part 7: stratification of risk for progression of kidney disease and development of cardiovascular disease guideline 13. Factors associated with loss of kidney function in chronic kidney disease. NKF K/DOQI Web Site. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p7_risk_g13.htm. http://www.kidney.org/Professionals/Kdoqi/guidelines_ckd/p7_risk_g13.htm Accessed December 17, 2008.

15. Kunz R, Friedrich C, Wolbers M, Mann JF. Meta-analysis: effect of monotherapy and combination therapy with inhibitors of the renin angiotensin system on proteinuria in renal disease. *Ann Intern Med.* 2008January1;148(1):30-48Epub 2007 Nov 5 [PubMed]

16. Bakris GL, Weir MR. Angiotensin-converting enzyme inhibitor-associated elevations in serum creatinine: is this a cause for concern? *Arch Intern Med.* 2000;160(5):685-693 [PubMed]

17. Levin A, Thompson CR, Ethier J, et al. Left ventricular mass index increase in early renal disease: impact of decline in hemoglobin. *Am J Kidney Dis.* 1999;34(1):125-134 [PubMed]

18. K/DOQI clinical practice guidelines and clinical practice recommendations for anemia in chronic kidney disease: 2007 update of hemoglobin target. *Am J Kidney Dis.* 2007;50(3):471-530 [PubMed]

19. Phrommintikul A, Haas SJ, Elsik M, Krum H. Mortality and target haemoglobin concentrations in anaemic patients with chronic kidney disease treated with erythropoietin: a meta-analysis. *Lancet* 2007;369(9559):381-388 [PubMed]

20. Drüeke TB, Locatelli F, Clyne N, et al. CREATE Investigators Normalization of hemoglobin level in patients with chronic kidney disease and anemia. *N Engl J Med.* 2006;355(20):2071-2084 [PubMed]

21. Singh AK, Szczech L, Tang KL, et al. CHOIR Investigators Correction of anemia with epoetin alfa in chronic kidney disease. *N Engl J Med.* 2006;355(20):2085-2098 [PubMed]

22. Fine A, Patterson J. Severe hyperphosphatemia following phosphate administration for bowel preparation in patients with renal failure: two cases and a review of the literature. *Am J Kidney Dis.* 1997;29(1):103-105 [PubMed]

23. Vukasin P, Weston LA, Beart RW. Oral Fleet Phospho-Soda laxative-induced hyperphosphatemia and hypocalcemic tetany in an adult: report of a case. *Dis Colon Rectum.* 1997;40(4):497-499 [PubMed]

24. Ullah N, Yeh R, Ehrinpreis M. Fatal hyperphosphatemia from a phosphosoda bowel preparation. *J Clin Gastroenterol.* 2002;34(4):457-458 [PubMed]

25. Markowitz GS, Stokes MB, Radhakrishnan J, D'Agati VD. Acute phosphate nephropathy following oral sodium phosphate bowel purgative: an underrecognized cause of chronic renal failure. *J Am Soc Nephrol.* 2005November;16(11):3389-3396 Epub 2005 Sep 28 [PubMed]

26. Makkar R, Shen B. What are the caveats to using sodium phosphate agents for bowel preparation? *Cleve Clin J Med.* 2008;75(3):173-176 [PubMed]

27. Wexner SD, Beck DE, Baron TH, et al. American Society of Colon and Rectal Surgeons. American Society for Gastrointestinal Endoscopy. Society of American Gastrointestinal and Endoscopic Surgeons A consensus document on bowel preparation before colonoscopy: prepared by a task force from the American Society of Colon and Rectal Surgeons (ASCRS), the American Society for Gastrointestinal Endoscopy (ASGE), and the Society of American Gastrointestinal and Endoscopic Surgeons (SAGES) [published correction appears in *Gastrointest Endosc.* 2006;64(1):154] *Gastrointest Endosc.* 2006;63(7):894-909 [PubMed]

28. Alfrey AC. Aluminum toxicity in patients with chronic renal failure. *Ther Drug Monit.* 1993;15(6):593-597 [PubMed]

29. Drüeke TB. Intestinal absorption of aluminium in renal failure. *Nephrol Dial Transplant.* 2002;17(suppl 2):13-16 [PubMed]

30. Yokel RA. The toxicology of aluminum in the brain: a review. *Neurotoxicology* 2000;21(5):813-828 [PubMed]

31. Coburn JW, Mischel MG, Goodman WG, Salusky IB. Calcium citrate markedly enhances aluminum absorption from aluminum hydroxide. *Am J Kidney Dis.* 1991;17(6):708-711 [PubMed]

32. Walker JA, Sherman RA, Cody RP. The effect of oral bases on enteral aluminum absorption. *Arch Intern Med.* 1990;150(10):2037-2039 [PubMed]

33. Bakir AA, Hryhorczuk DO, Ahmed S, et al. Hyperaluminemia in renal failure: the influence of age and citrate intake. *Clin Nephrol.* 1989;31(1):40-44 [PubMed]

34. Kirschbaum BB, Schoolwerth AC. Acute aluminum toxicity associated with oral citrate and aluminum-containing antacids. *Am J Med Sci.* 1989;297(1):9-11 [PubMed]

35. Danielson M, Dammström B. The prevalence of secondary and curable hypertension. *Acta Med Scand.* 1981;209(6):451-455 [PubMed]

36. Omura M, Saito J, Yamaguchi K, Kakuta Y, Nishikawa T. Prospective study on the prevalence of secondary hypertension among hypertensive patients visiting a general outpatient clinic in Japan. *Hypertens Res.* 2004;27(3):193-202 [PubMed]

37. Trewet CL, Ernst ME. Resistant hypertension: identifying causes and optimizing treatment regimens. *South Med J.* 2008;101(2):166-173 [PubMed]

38. Calhoun DA. Resistant or difficult-to-treat hypertension. *J Clin Hypertens (Greenwich)* 2006;8(3):181-186 [PubMed]

39. Fang LS-T. Approach to the patient with nephrolithiasis. In: Goroll AH, May LA, Mulley AG, editors. , eds. *Primary Care Medicine: Office Evaluation and Management of the Adult Patient* 4th ed.Philadelphia, PA: Lippincott Williams & Wilkins, 2000:782-787

40. Preminger GM. The metabolic evaluation of patients with recurrent nephrolithiasis: a review of comprehensive and simplified approaches. *J Urol* 1989;141(3, pt 2):760-763 [PubMed]

41. Kourambas J, Aslan P, Teh CL, Mathias BJ, Preminger GM. Role of stone analysis in metabolic evaluation and medical treatment of nephrolithiasis. *J Endourol.* 2001;15(2):181-186 [PubMed]

42. Pak CYC, Griggith DP, Menin M, Preminger GM, Resnick MI.ABCs of Medical Management of Stones. http://www.abcsofstonedisease.com/ http://www.abcsofstonedisease.com/ 2003 revised ed. Accessed December 22, 2008.

43. Magee CC.Pharmacology and side effects of cyclosporine and tacrolimus UpToDate Online 16.3. http://uptodateonline.com/online/content/topic.do?topicKey=tx_rheum/8690&selectedTitle=4~150&source=search_results. http://uptodateonline.com/online/content/topic.do?topicKey=tx_rheum/8690&selectedTitle=4~150&source=search_results Accessed December 22, 2008.

Articles from Mayo Clinic Proceedings are provided here courtesy of The Mayo Foundation for Medical Education and Research

<u>DECLARATION OF PERSONAL SERVICE</u>

I, Robert Gonzalez, declare that I am over the age of 18 years and not a party to the above-entitled cause. I am employed in the County of Sacramento; my business address is 6206 Longford Drive, #1, Citrus Heights, California 95621.

On December 5, 2018, I served a true and correct copy of the following document(s):

**Case No. 2:15-cv-01997 MCE DB**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION; SEPARATE STATEMENT OF**

**DISPUTED FACTS; DECLARATION; EXHIBITS; ISO**

by depositing a copy to the United States Attorney General Office to the following persons:

> Ms. Kelli Taylor
> Mr. Gregory T. Broderick
> Assistant U.S. Attorneys
> 501 I Street, Suite 10-100
> Sacramento, CA 95814

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 5th day of December 2018.

By: _____