1  **WILLIAM A. WRIGHT-- SBN 75236**
   **11842 Opal Ridge Way**
2  **Rancho Cordova, CA 95742**
   **Telephone: (916) 380-1974**
3  **Email: armand4137@gmail.com**

4  **Attorney for Plaintiff,**
   **Daniel Gonzalez**
5

**RECEIVED**

APR 27 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____DEPUTY CLERK

6

7                 **UNITED STATES DISTRICT COURT**

8             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10  DANIEL E. GONZALEZ, | **CASE NO. No.: 2:15-CV-1997 MCE DB PS** |
| 11       Plaintiff, | |
| 12  vs. | **NOTICE OF LODGING EXHIBITS A, B, C, D, E, AND F AS AMEMDMENTS TO** |
| 13 | **DECLARATION OF WILLIAM A. WRIGHT IN SUPPORT OF PLAINTIFFS' REPLY TO** |
| 14 | **OPPOSITION TO AMEND OR ALTER** |
| 15  UNITED STATES OF AMERICA, DOES 1 to 20, Inclusive, | **JUDGMENT** **[ECF 139, ECF 153]** |
| 16       Defendants. | Hearing Date:  March 19, 2020 (vacated) |
| 17 | Time:  2:00 p.m. |
| 18 | Courtroom:    7, 14th floor  Judge:  Hon. Morrison C. England |

19

20      **PLEASE TAKE NOTICE** that Plaintiff, Daniel Gonzalez, through his counsel, hereby lodges[1]

21  Exhibits A, B, C, D, E, and F pursuant to Rule 15(c) to supplement[2] the declaration of William A. Wright

22  ISO Plaintiffs' Reply to Opposition to Amend or Alter Judgment described as follows:

23      **A.** Excerpts from the deposition of Dr. Samuel Hu with redactions providing material evidence that:

24          • Established the standard of care for proper and timely diagnosis and surgical treatment of
              shoulder rotator cuff injuries from trauma. Specifically, pages 7-9, 32-35, 45-75, 101-103,
25            exhibits 3, 9, 10-14, 17, and 19.

26

_____

[1] Due to the extended court closure order caused by the coronavirus, a tabbed hard copy of these exhibits will be sent separately
27  to the district judge via USPS.
[2] While Fed. R. App. R. 10(a) provides that the "record on appeal" automatically consist of all "original papers and exhibits filed
28  in the district court," plaintiff submits exhibits A, B, C, and D as redacted medical depositions on file to include only those pages
specifically necessary for resolution of the issues on appeal. Ninth Cir. R. 30-1.5.
Notice of Lodging Exhibits A-F as Amendments to Declaration of William A. Wright ISO Plaintiffs' Reply to Opposition to
Amend or Alter Judgment; And Request to Extend Discovery Per Rule 56(f)

1

- The United States failed to timely and properly treat and cure plaintiff's shoulder rotator cuff injuries from trauma and breached the standard of care. Specifically, pages 20-27, 45-75, 77-80, 92-97, 101-102, 113-114, exhibits 6-19.

- The United States attempted to unlawfully interfere with and influence the unbiased testimony of plaintiff's treating doctor as a percipient witness before trial. Specifically, pages 11-19 and exhibit 5.

- The United States established a genuine issue of disputed fact by its unauthorized use of plaintiff's mental health information making an intentional false representation that plaintiff sexually molested children as a dentist constitutes a breach of the medical duty of confidentiality. Specifically, pages 115-117.

**B.** Excerpts from the deposition of Dr. Craig Bash with redactions providing material evidence that:

- Established plaintiff's witness is a qualified medical expert. Specifically, pages 6, 52, 54-55, and 66-67.

- Established medical expert testimony based on plaintiff's medical records produced by the Mather Veterans Medical Center. Specifically, pages 8, 10, 41, and 44-46.

- The United States breached the standard of care for failure to properly monitor plaintiff in neglect of negative laboratory creatinine findings while the VA doctors improperly prescribed repeated maximum dosages of Motrin contraindicated in the presence of stage 3 kidney disease with 90% probability of increased risk of predisposing cardiovascular disease complications such as blindness. Specifically, pages 17-18, 32-35, 40, 44-47, and 51-52.

- The United States breached the standard of care for proper diagnosis and treatment of shoulder rotator cuff injuries caused by trauma and resulted in a poor outcome of blindness. Specifically, pages 32-35.

- The United States failed to impeach plaintiff's use of expert's declaration. Specifically, pages 22-23.

**C.** Excerpts from the deposition of Dr. David Siegel with redactions providing material evidence that:

- Established employment as plaintiff's primary treating doctor with the United States at the Mather Veterans Medical Center. Specifically, page 10.

- Established the United States failed to provide truthful and proper responses to over 200 of plaintiff's Request for Admissions, set one and set two, showing medical negligence. Specifically, pages 16-17, and 119-130.

- Established the United States relied on the same 304 pages of medical records from Mather Veterans Medical Center that Dr. Craig Bash relied on in providing an opinion letter and deposition testimony (see, Exhibit B) as plaintiff's medical expert. Specifically, pages 17-18.

- Established the attorney from the Department of Justice unlawfully acted under false pretense to be attorney for the deponent, Dr. David Siegel, and improperly obstructed the deposition by objections, coached the witness to make evasive responses, or repeatedly interrupted the deposition. Specifically, pages 40-44, 65-66, 74-75, 113-116, 146, and 150.

- The United States breached the standard of care between 2000 and 2013 by failure to document and recognize a service-connected kidney injury that predisposed plaintiff to

Notice of Lodging Exhibits A-F as Amendments to Declaration of William A. Wright ISO Plaintiffs' Reply to Opposition to Amend or Alter Judgment; And Request to Extend Discovery Per Rule 56(f)

2

stage 3 renal disease without disability compensation since 1968. Specifically, pages 21-25, 89-103, and 109-113.

- The United States breached the standard of care by disregarding negative laboratory findings between 2000 and 2012 and predisposed plaintiff to an 88% risk probability of cardiovascular disease complications such as blindness from a stroke by not treating hyperlipidemia (dyslipidemia). Specifically, pages 25, 29-32, 37-39, 46-52, 59-74, 89-103, and 153-160.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by failure to refer to an orthopedic surgeon within six months from initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 119-122, 124-125, 127-134, 136-139, and 153-160.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by failure to order any MRI of the shoulder within six months from initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 119-122, 124-125, 127-134, 136-139, and 153-160.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by failure to perform any MRI of the shoulder within six months from initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 119-122, 124-125, 127-134, 136, and 153-160.

- The United States breached the standard of care for treatment by improperly injecting contraindicated corticosteroids in the presence of rotator cuff disease without any possible corrective benefit several years after the initial trauma (July 2009 auto accident) that prevented healing of tendon tears. Specifically, pages 119-122, 124-125, 127-134, 136-139, and 153-160.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by delay of proper corrective surgical treatment for several years after initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 119-122, 124-125, 127-130, 136-139, and 153-160.

- The United States breached the standard of care guidelines of the American Heart Association between 2000 and 2013 by failure to document a 10-year risk factor analysis with an 88% risk probability for cardiovascular disease complications that predisposed plaintiff to blindness and stroke. Specifically, pages 29-32, 46-52, 74-103; 147-149, 153-160.

- The United States breached the standard of care guidelines of the American Heart Association between 2000 and 2013 by failure to prescribe statin preventive therapy based on an 88% risk factor probability within 10 years for cardiovascular disease complications that predisposed plaintiff to blindness and stroke. Specifically, pages 29-32, 46-52, 74-103; 147-149, 153-160.

- The United States breached the standard of care for treatment of shoulder rotator cuff tears by prescribing repeated maximum dosages of Motrin contraindicated for plaintiff since 2000 without proper monitoring in the presence of stage 3 kidney disease that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 29-32, 46-52, 74-103; 147-149, 153-160.

Notice of Lodging Exhibits A-F as Amendments to Declaration of William A. Wright ISO Plaintiffs' Reply to Opposition to Amend or Alter Judgment; And Request to Extend Discovery Per Rule 56(f)

3

- The United States breached the standard of care for treatment of shoulder rotator cuff tears by prescribing repeated maximum dosages of Motrin contraindicated and delayed proper corrective surgical treatment since the July 2009 auto accident that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 29-32, 46-52, 74-103; 147-149, 153-160.

- Provides admissible evidence for the purpose of impeachment. Specifically, pages 35-37, 50-52, 109-113, 137-139, and 141.

**D.** Excerpts from the deposition of Dr. Jean Lee with redactions providing material evidence that:

- Established employment as plaintiff's treating doctor with the United States at the Mather Veterans Medical Center. Specifically, pages 4-5, and 15.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by failure to refer to an orthopedic surgeon within six months from initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 11-14, 19-20, 36-50, 60-61, 64, and 69-70.

- The United States breached the standard of care for diagnosis and treatment of shoulder rotator cuff tears by failure to order any MRI of the shoulder from initial trauma (July 2009 auto accident) that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 11-14, 19-20, 36-50, 60-61, 64, and 69-70.

- The United States breached the standard of care for treatment of shoulder rotator cuff tears by prescribing repeated maximum dosages of Motrin contraindicated and delayed proper corrective surgical treatment since the July 2009 auto accident that resulted in blindness, stroke, rotator cuff disease, and other harms. Specifically, pages 22-29, and 51-59.

- Provides admissible evidence for the purpose of impeachment. Specifically, pages 22, 51.

**E.** Two Federal Tort Claims under Bivens Act dated October 17, 2019, for falsely claiming and publishing plaintiff sexually molested children as a dentist in support of the United States' MSJ.

**F.** Denial letter from the U.S. Department of Justice dated March 25, 2020, created a new triable issue of disputed material fact, i.e., whether the United States can assert a reasonable defense to medical malpractice in declaring plaintiff sexually molested children as a dentist. Rule 59(e)(2); Rule 60(d)(1), (2), and (3). The DOJ letter issued after the district court vacated a hearing date on February 21, 2020. (ECF 152)  This issue appears to relate with other state administrative agency misconduct involving Eastern District No. 2:15-cv-02448 raised by plaintiff before in this action. (ECF 57, 58.)

Executed  April 23, 2020.                               Respectfully submitted,
                                                        By: *William A. Wright*
                                                           WILLIAM A. WRIGHT
                                                           Attorney for Plaintiff,
                                                           Daniel Gonzalez

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

--o0o--

|  |  |  |
|---|---|---|
| DANIEL E. GONZALEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:15-cv-01997 MCE DB PS |
| | ) | |
| UNITED STATES OF AMERICA; | ) | |
| And DOES 1 to 20, Inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**CERTIFIED COPY**

--o0o--

Deposition of

SAMUEL HU, M.D.

Thursday, September 27, 2018

--o0o--

Reported by:   CATHERINE D. LAPLANTE
CSR License No. 10140



## Accuracy-Plus Reporting Inc.

### Certified Shorthand Reporters

MAIN OFFICE:
3400 Douglas Blvd., Suite 205, Roseville, CA  95661 • (916) 787-4277

SACRAMENTO OFFICE:
1234 H Street, Suite 105, Sacramento, CA  95814 • (916) 758-5941

Fax: (916) 787-4280 • Toll Free (877) 492-8130 • www.accuracy-plus.net

1                    A P P E A R A N C E S

2

3    For the Plaintiff:

4    DANIEL GONZALEZ, In Propria Persona
     7125 Calvin Drive
5    Citrus Heights, CA   95621
     (916) 247-6886
6

7

8

9    For the Defendants:

10   GREGORY T. BRODERICK
     Assistant United States Attorney
11   501 I Street, Suite 10-100
     Sacramento, CA   95814
12   (916) 554-2700

13

14
     For the Witness:
15
     LOW, MCKINLEY, BALERIA & SALENKO, LLP
16   By:   NICHOLAS J. LEONARD, Attorney at Law
     2150 River Plaza Drive, Suite 250
17   Sacramento, CA   95833
     (916) 231-2400
18

19
                          --o0o--
20

21

22

23

24

25

                                                              2

1                     INDEX OF EXAMINATIONS

2
    EXAMINATION BY:                                      PAGE
3
    Mr. Gonzalez                                     4,  109
4
    Mr. Broderick                                        108
5

6
                          --oOo--
7

8
                      E X H I B I T S
9

10
    Exhibit No.              Description              Page
11
    Exhibit 1       Subpoena, 1 page                    8
12
    Exhibit 2       Subpoena, 1 page                    8
13
    Exhibit 3       Curriculum Vitae, 3 pages          117
14
    Exhibit 4       Plaintiff's Notice of Motion        10
15                  and Motion to File Second
                    Amended Complaint, 2 pages
16
    Exhibit 5       Declaration of Samuel Hu, MD,       10
17                  2 pages

18  Exhibit 6       Portions of Deposition of           19
                    Daniel Gonzalez, 8 pages
19
    Exhibit 7       Portions of Deposition of           30
20                  Dr. Siegel, 5 pages

21  Exhibit 8       Portions of Deposition of           31
                    Dr. Lee, 11 pages
22
    Exhibit 9       Abstract, Symptomatic partial       32
23                  rotator cuff tears:  Diagnostic
                    Performance of ultrasound and
24                  magnetic resonance imaging with
                    surgical correlation, 1 page
25

                                                              3

| 1 | Exhibit 10 | Rotator cuff tears:  Prospective comparison of MR Imaging with arthrography, sonography and surgery, 6 pages | 35 |
| 2 | | | |
| 3 | | | |
| | Exhibit 11 | Chart Note, 5/7/13, 3 pages | 38 |
| 4 | | | |
| | Exhibit 12 | Operative/Procedure Report, 7/8/13, 7 pages | 47 |
| 5 | | | |
| 6 | Exhibit 13 | Rotator cuff tears:  Surgical treatment options, 6 pages | 51 |
| 7 | | | |
| | Exhibit 14 | Chart note, 2/26/13, 2 pages | 77 |
| 8 | | | |
| | Exhibit 15 | KDOQI Clinical practice guidelines for chronic kidney disease, 2 pages | 81 |
| 9 | | | |
| 10 | | | |
| | Exhibit 16 | Chemistry, 8/15/17, 2 pages | 84 |
| 11 | | | |
| | Exhibit 17 | Review Article:  The management of partial-thickness tears of the rotator cuff, 9 pages | 87 |
| 12 | | | |
| 13 | | | |
| | Exhibit 18 | Complications associated with the use of Corticosteroids in the treatment of athletic injuries, 3 pages | 94 |
| 14 | | | |
| 15 | | | |
| 16 | Exhibit 19 | Using the modified Delphi method to establish clinical consensus for the diagnosis and treatment of patients with rotator cuff pathology, 3 pages | 96 |
| 17 | | | |
| 18 | | | |
| 19 | Exhibit 20 | Document signed by Dr. Van den Bogaerde, 2 pages | 102 |

20

21

22

23

24

25

4

1          BE IT REMEMBERED that, on Thursday, the 27th day

2     of September, 2018, commencing at the hour of 4:40 p.m.

3     thereof, at Mercy Medical Group, 3000 Q Street, 6th

4     Street, California, before me, CATHERINE D. LAPLANTE, a

5     Certified Shorthand Reporter in and for the County of

6     Placer, State of California, there personally appeared:

7                         SAMUEL HU, M.D.

8     called as a witness, who, being by me first duly sworn

9     to tell the truth, the whole truth, and nothing but the

10    truth, was thereupon examined and interrogated as

11    hereinafter set forth.

12                    EXAMINATION BY MR. GONZALEZ

13    Q.        Good evening, Dr. Hu.  It's good to see you

14    again.

15    A.        Yes.

16    ███  ▐   ████████████████████████████

17    ████████  ███ ▐ ███████████████  ▐ ████████

18    ████████████████████████████████████████████

19    ████████████████████

20         █████████████████████████████████

21    ███████

22         ██████████████████████████████

23    ████████████████  ███████  ███████████████

24         ███████████████████████████

25    ████████████████████████  ████████████

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1 ██████ ██████ ██████ ████████ █████

2 ██████████████████ ████████

3 ████████████████ ██████

4 ██████████████

5       MR. GONZALEZ:  I don't know if there's anything

6 else that you would like to --

7       MR. LEONARD:  No.  We met before to prep him

8 for his deposition today.  He's ready to go if you want

9 to ask him questions.

10       MR. GONZALEZ:  Okay.

11 Q.     So I guess for the record the best thing is to

12 start off asking you, please provide your full name for

13 the record.

14 A.     My full name is Samuel J. Hu.

15 Q.     Okay.  And we are at Mercy Medical Group, and

16 I -- your profession here is an orthopedic surgeon; is

17 that correct?

18 A.     Yes.

19 Q.     Okay.  And you are a board certified orthopedic

20 surgeon?

21 A.     Yes.

22 Q.     Okay.  And how many -- I was simply going to

23 ask, without going through a long history, if you had a

24 CV, I could certainly get one, or you can fax it to me

25 later.

7

1        MR. LEONARD:  I can provide you with a CV.  I

2   have no problem if it will expedite the deposition.

3        MR. GONZALEZ:  Yes.  So for the sake of saving

4   time, we'll try and put Dr. Hu's CV as Exhibit 3.

5        It will be Exhibit 3, for the record.

6   ████████████        ████████████████

7   ██  ████████████████████████████

8        ███████ ▪ █████████

9       ██████    ████████████        ████

10  ████████████    ███████████████████▪

11  █████████████████████████████

12  █████████  ██████  ████████

13      ██████  █████████████████████

14  ██████████  ████████████████  ████████

15  █████████████████████████████

16      ██████  ██████████  █  --  ██████████  ████

17  ████████████████████████████████

18  ██████

19      ██████████████

20  █   ██████  ████  ████  ██▪  ██████████

21  ████████████  ███  ████  ██████████████

22  ██████████  █████████████████████

23  █████████████████████████████

24  ██████████

25      █████████████████



14    Q.      So are you aware of the fact that any of the

15    doctors at the VA have said that you did unnecessary

16    surgery?

19            You can answer.

20            THE WITNESS:   I am not aware.

9



1

2

3

4

5

6

7

8

9

10

11  --

12

13

14

15

16

17

18          MR. GONZALEZ:  I'd like to also add Exhibit

19  number 5.  Excuse me.  Yeah.  This one's 5.

20          A declaration.

21  Q.      And I'm going to ask:  Dr. Hu, have you seen

22  this declaration before, or is that something you're

23  familiar with?

24  A.      I signed this on March 28th, 2018.

25  Q.      So on page two of Exhibit number 5, it's marked

11

1  at the bottom there.  It has US 01626 at the bottom.

2  We're on the same page?

3          Did you prepare this with someone at Mercy, or

4  did you prepare this in contact with Mr. Leonard, or who

5  instructed you to prepare this declaration?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Q.      Is that a number that's to Mercy Medical, or is

25  that -- do you recall sending this or faxing this to

1  someone?

2  A.      I can't recall this.

3  Q.      Okay.  Do you know who may have typed this for

4  you?

5  A.      Unfortunately, I do not recall.

6  Q.      Okay.  The language that's in this, it's a

7  paragraph number three, those are your words, or was

8  that written for you, and you were asked to sign the

9  declaration?

10  ██ ███████    ████ ▌ ██████████

11  ███████████    ███████████████████████

12  Q.      BY MR. GONZALEZ:  I'm asking:  These words that

13  are in this paragraph number three, are those the words

14  that you specifically and personally wrote, or are those

15  words that were written for you by someone else?

16  ██ ███████    ████████████████████████

17  ██ ███████    ████████

18          THE WITNESS:  More than likely this was drafted

19  for me.

20  ██ ███████    ██████

21  █    ████████████████████████████████████████

22  ███████████████    ████████    ████████    ████████

23  █████████████████    --

24  █    ███████████ ▌ █████████

25  █    █████████

1          So this was sent on March 29, 2018.  There were

2     two pages.

3          Are these the two pages because they don't seem

4     to match, so I'd like to know, do you know where the

5     other page is at because they don't seem to match?

6     A.        Unfortunately, I do not know.

7          MR. GONZALEZ:  On the record, Mr. Broderick, do

8     you know where the other pages are at since you put this

9     together?

10         MR. BRODERICK:  I think these are both pages,

11    but I'll -- I'll go look at my office.  It might be the

12    first page came back funny, and somebody else like fixed

13    it, or something.  I don't know, but I'll take a look.

14         MR. GONZALEZ:  So you're -- you're saying this

15    was sent to your office then by saying that you're going

16    to look into it?

17         MR. BRODERICK:  Yeah.  I have a copy of this

18    someplace?

19         MR. GONZALEZ:  You have a copy of what, the

20    first page?

21         MR. BRODERICK:  I have a copy of the

22    declaration, so I'll go figure it out, and send it to

23    you.

24         You got this from me in the first place, right?

25         MR. GONZALEZ:  Well, yeah.  That's what I'm

14

1  asking you.  See, there's no signature --

2  Q.      Why isn't there a signature on the first page,

3  Doctor?  Do you see this at all?  The first page, did

4  you ever see it?

5          It's Bates stamped US 01625.

6  A.      Can you repeat the question?

7  Q.      Yes, sir.

8          Why isn't it that your signature is not on the

9  bottom of this page?

10  A.     I do not know.

11  ███  █████    ████████████████

12  █

13  █  █████  █████  ████████████

14  ████████████████  ██████████████

15  ██████████████

16  █  ██  █ ██████████  ████████████

17  ████

18  █  █████  ████████  █  █████████████

19  ████████  ██████████  ████████

20  ████  ██████  ████████  ████████

21  Q.     BY MR. GONZALEZ:  Do you have any idea where

22  the other page may have been?

23  ████████████  ████████████

24         THE WITNESS:  Unfortunately, I do not know.

25  Q.     BY MR. GONZALEZ:  Do you know where the

```
 1   original might be?  Because it was faxed over, would the

 2   fax --

 3            Would the original be here at Mercy Medical?

 4   A.       I would assume, yes.

 5            MR. LEONARD:  Don't assume.

 6            THE WITNESS:  I do -- I do not know.

 7            MR. GONZALEZ:  Right.

 8            MR. LEONARD:  Do you know where the original

 9   is?

10            THE WITNESS:  I do not know.

11            MR. GONZALEZ:  Okay.

12   Q.       So where would this be faxed?  Would it be from

13   your office where I used to see you, or would it be at

14   the administrative office here probably or --

15            MR. LEONARD:  If you know.

16   Q.       BY MR. GONZALEZ:  If you know.

17   A.       Unfortunately, I do not know.

18   Q.       Okay.  Okay.  You don't recall helping anyone

19   type this?

20   A.       No.  I do not recall.

21   Q.       I was referring to page 16, US 01626.

22            You don't recall helping anybody or dictating

23   that for anybody at all?

24   A.       I do not recall.

25   █.       ████████████████████████████████████
```

16

1 ████████████

2 ██ ██████ ██

3 ██ ████ ████ ██████

4 ██ ████ ██████████

5 ██████ █████████████ ██████

6 ████████████████████████

7 ████████████

8 ██ ██████ ████ ████

9  Q.      Dr. Hu, did you -- do you recall when you saw

10 me first, looking at your medical records?

11 A.      My first medical record I have on May 7, 2013,

12 was the first time I saw Mr. Daniel Gonzalez.

13 Q.      Okay.  And that was -- that was after I -- I

14 had seen Dr. Patel; is that correct?

15 A.      From my notes, that is correct.

16 Q.      Okay.  And when I came to see you, it was in

17 regards to having me evaluated -- evaluate my shoulder

18 pain, I guess would be the best way to describe it,

19 because that's what you specialize in; is that correct?

20 A.      Yes.

21 Q.      And Dr. Patel specializes more in cervical

22 surgery?

23 A.      Yes.

24 Q.      Okay.  And since we're on that subject, how

25 long have you been -- education and training, just for

20

1   the record, so we can cover some -- at least some of the

2   general background.

3         How many years have you been an orthopedic

4   surgeon?

5   A.     Currently I'm approaching 13 years as an

6   orthopedic surgeon.

7   Q.     Okay.  And how long have you been board

8   certified?

9   A.     I have been board certified since 2010 and

10   2011.

11   Q.     Okay.  And you do surgery on -- on people who

12   have accidents routinely, I would imagine, correct, car

13   accidents, automobile accidents, falls?

14   A.     I would not say routinely.

15   Q.     Okay.

16   A.     I do treat patients for those type of injuries.

17

18

19

20

21

22

23

24

25   Q.     BY MR. GONZALEZ:  When you do a -- when you're

1   assessing -- medically assessing someone who's been

2   injured for the first time, do you routinely ask them

3   what may have caused, if they know, that injury?

4   A.        ███

5   ██      ███      ████████████████████████

6   ████████████████████████████████

7   █████████████  ████████████████████████████

8   ████████████████████████████████

9   A.        Please rephrase that.

10  Q.        Sure.

11            Is it always important to you to know what may

12  be relative to the causing -- could cause the -- the

13  causative event that, you know, triggered that person to

14  come in to see you, whether it was an accident, a fall,

15  or is it, you know, a disease of some sort?

16  A.        Yes.

17  Q.        So in -- in regards to the care that you gave

18  me when I saw you, do you recall it was because I had

19  had an automobile accident?

20            ███  ████      ██████████████████

21  ████

22            ██  ██████    ████  █████████

23            ██  █████    ████████████████████

24  ██████████    ████████████    ██████████████

25            ██  ██████    ████████████████████

1        MR. LEONARD:  Okay.  Go ahead.

2        THE WITNESS:  So my records here had stated

3   that the patient had at least a three to four-year

4   history of right anterior-lateral shoulder pain, as well

5   as posterior scapular pain that he noted after

6   sustaining a motor vehicle accident back in 2009 where

7   he was rear-ended from behind while his car was parked.

8        He had brief loss of consciousness, comma, and

9   since that accident has had right shoulder pain.

10   ███  ██████        █████████████████████████

11   ██████  --

12       ████  ██████   ████   ████  ███   ███████

13   ████████

14   Q.      When someone has an accident, an automobile

15   accident, like in my case, do you -- are you interested

16   in only knowing what the tissue damage is, or do you

17   want to know what forces and what dynamics happened in

18   that accident that caused that?

19        Is that relevant to your treatment at all?

20   A.      It may or may not.

21   Q.      But it is something you inquire about?

22   A.      Yes.

23   █  ████████████████████████████████████

24   ██████████████████████   ████████████████████

25   ████████  ████████████████████████████



21  Q.      What -- what percentage of your practice would

22  you say is -- is dedicated to just specifically shoulder

23  surgery?  I mean, is it 80 percent of your practice, I

24  imagine, or more?

25  A.      No.

26

1    Q.        Because before I -- you had -- we had discussed

2    that that's basically where you focused on, so I was

3    kind of asking, is that like a subspecialty with an

4    orthopedic surgery?

5    A.        Shoulder surgery for some is subspecialty.  Not

6    everyone would say that shoulder surgery can only be

7    done by subspecialists.

8    Q.        Right.

9    A.        I do a lot of different type of surgeries.  At

10   that time I may have been up to 50 percent of my

11   practice doing shoulders.

12             Currently, though, I do not do as many

13   shoulders because our practice has other shoulder

14   surgeons who have taken that subspecialty.

15             So now I would say I do less.

16   ███  ████ ████

17        █████████████████████ ███ ████████

18   ██████████████ ██████ --

19   ██   ████

20   █   ██████████████ ████

21        ██████████████████ ███████

22   ██  █████

23   █   █████████ █ ███████████████████

24   ████████████ ████████████████████

25   ████████████ ██████ ██ █████ ████ █



20  Q.      BY MR. GONZALEZ:  Dr. Hu, what are the

21  diagnostic tools or the imaging instruments that you

22  used for me in coming to a diagnosis?

23  A.      In my notes I stated that you did have

24  radiographs of your right shoulder being performed.

25  Q.      Let me make sure I was clear.

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1          Is that at Mercy, or was that something that
2     you say that was done at the VA?
3     A.        The radiographs that were in my notes on May 7,
4     2013, indicated were done at Mercy Medical Group.
5               MRI of Mr. Gonzalez's right shoulder done on
6     May 3rd, 2013, from my notes, but also appear to be done
7     at Mercy Imaging Center Roseville.
8     Q.        Did you have any MRI imaging records you looked
9     at that were sent over from the Veterans'
10    Administration?
11    A.        I do not have any information of that.
12    Q.        Do you have any ultrasound records that you
13    looked at that were sent over from the VA, Veterans'
14    Administration?
15    A.        I do not have any records of that.
16    Q.        Okay.  In your practice, do you normally use
17    ultrasounds and MRIs as your -- as a tool -- that's
18    recognized by the Orthopedic Association as the tools
19    that normally are used to -- to make diagnosis?
20              MR. LEONARD:  Both ultrasound and MRI?
21              MR. GONZALEZ:  Both.
22    ███ ████████   ████   ███████████
23    ██████  ███  █
24              THE WITNESS:  Please restate your question.
25              MR. GONZALEZ:  Yes.

33

1  Q.        Do you use ultrasounds and MRIs as a recognized

2  diagnostic tool in the specialty of orthopedic surgery?

3  A.        For what purpose?

4  Q.        For diagnosis.

5  A.        Of what?

6  Q.        Rotator cuff.  Let's say rotator cuff tendon

7  injuries.

8           MR. LEONARD:  If you had suspicion of a rotator

9  cuff tendon injury?

10          MR. GONZALEZ:  Yes.

11          THE WITNESS:  I usually will use only MRI.

12 Q.        BY MR. GONZALEZ:  Only the MRI.

13          Is there a particular reason why you only use

14 the MRI with me?

15 A.        We do not have a good ultrasound facility with

16 people who I can trust to read ultrasounds for rotator

17 cuff tears.

18 Q.        Exhibit 9 identifies that ultrasounds and MRI's

19 are very accurate.  I mean, they sometimes can detect

20 things without having someone go through surgery.

21          Is that a good purpose for using ultrasounds

22 and MRI's?

23 A.        Ultrasounds are very operator dependent.

24 Q.        Hmm.  Okay.  MRI's are a little bit more -- you

25 know, more technical-controlled, more accurate that way?

34

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1    A.       MRI's are considered more accurate than

2    ultrasound.

3    Q.       Okay.  In your notes I noted that you used --

4    you used what's call a McKesson imaging system.

5             Do you recall?

6    A.       Yes.

7    ███       █ ███████████████

8             ████████████████

9         ██ █████  ████████████████████

10  ███████  ██ █████ ██████████████  ██ █████████

11  █████████████████████  ███ ████████

12  ████████████████████████████  █████████

13  ██████████████████████

14       ██ ████ ██████  █████  █████  ████████

15  ███████████████████  ██████████████████████

16  ██████████████████████████████

17  ████████

18       ██ ████████      ████████████████

19  ████████████████

20       ████████████████████████

21  ████████  ████████  █████████████████████

22  ███████████  ████████████████████

23       ██ ███████  █████  ██████████

24  █████████

25       ██ ██████  ██  ████████████████████



1

2

3

4

5

6

7

8   Q.        Dr. Hu, you work with physical therapy units or

9   departments, correct, I mean, regularly, after or before

10  surgery, I would imagine?

11  A.        Yes.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1   ████████████████████   ████████████████████   ███

2   ████████████████████████   --

3         ████████████████████████

4         MR. GONZALEZ:  Well, I've already said that --

5   Q.        When you saw me, you determined that surgery

6   was the option you had proposed for me concerning the

7   history of not having had successful conservative

8   treatment for four years.

9         So, are you aware of the fact that I had failed

10  treatment for four years?

11  A.        In my notes I had stated that you report pain

12  over the past year, and reports having pain with

13  lifting, pushing away, reaching away from overactivity.

14        You had both rest pain as well as occasional

15  night pain.  He reports pain to be up to seven to eight

16  L10 on a pain scale.  He has been taking Tramadol up to

17  three or four tabs a day, aspirin and Neurontin for

18  pain.

19        He has had no physical therapy, comma, but has

20  had at least two cortisone injections over the past year

21  when he was in the VA hospital, which gave him only a

22  few days of relief.  He has occasional numbness in his

23  right hand and fingers.

24  Q.        Can you tell me what date the records are that

25  you're reading from, please?

37

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    A.        From May 7, 2013.

2             MR. GONZALEZ:  I'm going to submit this as

3    Exhibit 11.

4             (Exhibit 11 marked.)

5             MR. LEONARD:  Just so you know, it's only three

6    pages on this document, and it's a six-page document so

7    you're aware.

8             MR. GONZALEZ:  That's what I was going to ask.

9    Q.        Doctor, can you look at Exhibit 11 and tell me

10   if that's the same notes that you're looking at?

11   A.        These are the same notes from pages 1 through

12   3.

13   Q.        All right.  At the bottom it has numbers.  You

14   can read out the numbers, or I can basically put it into

15   the record.

16             Bates stamped DG 000238 USDVA all the way to DG

17   000240 USDVA.

18

19

20

21

22   Q.        Do you have -- are these the notes that you're

23   reading from a moment ago into the record?

24   A.        Page one was where were I was reading from.

25

1    Q.        BY MR. GONZALEZ:  Do your notes tell you --

2    tell anything?  Would your notes tell me if I wanted --

3    A.        All I can say in my notes -- in my plan portion

4    on the third sentence I state, however, due to the

5    duration of symptoms and being his dominant extremity

6    and failure with conservative management, including

7    antiinflammatories, comma, pain medications, comma, and

8    Cortisone injections, comma, as well as having clinical

9    weakness, I am quite suspicious that the patient may

10   have a possible high-grade partial rotator cuff tear,

11   and that he is a surgical candidate.

12   Q.        Okay.  Now, you said that -- in your notes you

13   say that the conservative management failed; is that

14   correct?  Did I read that --

15   A.        Yes.

16   Q.        You're reading from -- I'm just going to read

17   out the number.  It's marked at the bottom.  It's 239,

18   Bates stamped 239, 000239.

19             Is that correct?

20   A.        Yes.

21   Q.        Okay.  So how did -- what makes you determine

22   that -- that conservative treatment had failed at this

23   point in the -- at this point in time for me?

24             Why couldn't I just stay on conservative

25   treatment?

1    A.        You had stated of having three to four-year

2    history of right shoulder pain.  You had been taking

3    pain medications, antiinflammatories.  You had

4    significant pain.

5            You have had two cortisone injections into the

6    shoulder.  You had been seen by a spine surgeon who also

7    felt potentially your symptoms were coming from your

8    shoulder.

9            Clinically, I was concerned of having weakness

10   that you had in your shoulder, and the decision was made

11   to consider surgery to look inside.

12   Q.        Okay.  So you said that there was -- I had

13   weakness, as I recall, and when you say to look inside,

14   is that what you refer to as arthroscopy?

15   A.        Yes.

16   Q.        Okay.  And before someone undergoes

17   arthroscopy, you prefer to have them on conservative

18   treatment before you have someone undergo arthroscopy,

19   unless it's obvious they must be examined surgically?

20            MR. LEONARD:

21

22

23

24

25

41

1    Q.        BY MR. GONZALEZ:  You mentioned earlier that

2    you knew that I failed with the conservative treatment

3    at the VA, correct?

4    A.        Yes.

5    Q.        So once you made that, is that the only thing

6    that would then say, hey, you know what, Dan needs to

7    have -- I need to go in there and look in there with the

8    scope and see what -- something's going on, or would

9    that now have an MRI ordered?

10   A.        You had an MRI done before seeing me on May 7,

11   2013.

12   Q.        Oh.

13   A.        You had the MRI that was performed on May 3rd,

14   2013.

15   Q.        Oh.  That --

16   A.        That was reviewed by me.

17   Q.        Okay.

18   A.        To assist me in making a decision for surgery,

19   sir.

20   Q.        So in your opinion then, you were -- you

21   believe that surgery was probably my -- my option that

22   would be more likely than not?

23            MR. LEONARD:  Your best option?

24            THE WITNESS:  That was my decision at that

25   time.  It appeared to be the best option.

45



10    Q.        So you got to see my shoulder in photographs?

11              MR. LEONARD:   MRI.

12              THE WITNESS:   Yes.   MRI.

13              MR. GONZALEZ:   The MRI's, okay.

14              So for Exhibit 12 --

15              (Exhibit 12 marked.)

16    Q.        BY MR. GONZALEZ:   At the bottom of Exhibit 12

17    it has a Bates stamp DG 000252 USDVA, and it goes all

18    the way to Bates stamp DG 000258 USDVA.

19              You agree?

20    A.        Yes.

21    Q.        Okay.   These are also part of your notes, is

22    that correct, Dr. Hu?

23    A.        Yes.

47

1           MR. GONZALEZ:  Yes.

2   Q.      Let me ask this:  How long is it that you

3   normally see people stay on conservative care --

4           MR. BRODERICK:  Objection.

5   Q.      BY MR. GONZALEZ:  -- until you determine that

6   it's not successful?

7           MR. BRODERICK:  Objection.

8           MR. GONZALEZ:  What is the objection?

9           MR. BRODERICK:  The -- if I can get it out.

10          The objection is you are asking him now for

11  expert opinions, not something he did in his care and

12  treatment.

13          MR. GONZALEZ:  I'm not asking your expert

14  opinion, Dr. Hu.

15  Q.      I'm only asking:  In your experience working

16  with physical therapists and seeing thousands and

17  thousands of patients successfully with me, you

18  generally see patients stay on conservative treatment

19  for a year before, six months before you decide --

20          They're coming back and forth to you with

21  ongoing complaints, or someone's referring back to you,

22  at some point, is there a time where you just say, you

23  know what, it hasn't worked after a year or so or six

24  months, the better option is let's go in and explore and

25  see what's going on in there?

1        MR. BRODERICK:  Objection.  Vague, incomplete

2   hypothetical, calls for expert opinion.

3        MR. GONZALEZ:  Okay.  I'll rephrase it.

4        THE WITNESS:  I will answer the question to the

5   best of my ability.

6   Q.      BY MR. GONZALEZ:  Thank you.

7   A.      From my experience and for what we are taught,

8   we usually try to treat patients up to about six months

9   with conservative management.

10       If after six months the proposed treatments

11  have not helped, surgical options are considered.

12       (Exhibit 13 marked)

13  ████ ██████ ████████████████████████████

14  ████████████████████████ ████████████████████

15  ████████

16  ██████████████████████████████ ████████ ██

17  ███████████████ ███ ████████ ██████████████

18  ████████████████

19  Q.      BY MR. GONZALEZ:  Well, Dr. Hu, could you at

20  least look at the first page because this is from the

21  American -- I think it's from American Academy of

22  Orthopedic Surgeons.

23       Are you familiar with that organization?

24  A.      Yes.

25  █ ████ ████████████████████████████████



1

2

3

4

5

6

7   --

8

9

10

11

12

13

14

15

16

17          MR. GONZALEZ:   Okay.

18   Q.      Dr. Hu, you said before you are familiar with

19   the organization that's the American Academy of

20   Orthopedic Surgeons, correct?

21   A.      Yes.

22   Q.      And that organization is made up of orthopedic

23   surgeons, as members.   Only orthopedic surgeons can be

24   members of that particular organization?

25   A.      Yes.

1   Q.       And so is that a state organization, or is that

2   something that's national?

3   A.       The organization is --

4   Q.       The American Academy of Orthopedic Surgeons, is

5   that a national organization?

6   A.       The organization is a national organization.

7   ███ ████████████████████████

8   █████████████ ██████ ██████ ██████ ████ --

9      ████ ██████ ██████

10  ███ ██████ ████████ ████████████████ ██

11  ██████████████ ████████████████████████

12  ████████████ ██████ ██████████

13     ████ ██████ ████████████

14     ████████████████

15     ████ ██████ ██████████

16     ████ ██████ ████████

17     ████ ██████ ████████████

18     ████ ██████ ████████████████

19  ██████████████

20     ████ ██████ ████ ████████

21  ███ ████████████████████████████ ██

22  ████████████████████ ██████ ████████

23  ██████████████

24     ████ ██████ ██████

25  ███ ██████ ██████ ████████████████████

1   Q.       Is the specialty orthopedic medicine or

2   orthopedic surgery?

3   A.       My degree is an orthopedic surgeon.

4   Q.       Okay.  So when you went to get your degree,

5   what did the school teach about conservative treatment?

6   I mean, what did you learn when you went to take your

7   board certification?  What was the standard that was

8   presented to you?

9          MR. BRODERICK:  I'll object that call --

10  clearly calls for a standard of care opinion.

11         MR. GONZALEZ:  He's board certified.

12         MR. LEONARD:  Yeah.  This is --

13         MR. BRODERICK:  You can't ask him -- I'm sure

14  he knows the answer; I'm sure he knows the standard of

15  care.  You can't ask him the standard of care because

16  he's not a disclosed expert.

17  Q.       BY MR. GONZALEZ:  Where did you -- where did

18  you -- where did you determine the six months that you

19  referred to earlier?  Where -- where is that --

20         What medical experience have you made that

21  determination from?

22         MR. BRODERICK:  Same objection.

23         MR. LEONARD:  You can explain why you have the

24  six months that you --

25         THE WITNESS:  The best I can say was that was

56

1   what I was taught during my residency training by my

2   professors.

3          MR. GONZALEZ:   Okay.

4   Q.      And where was he -- where was it that you did

5   your residency?

6   A.      I did my residency at the Medical College of

7   Georgia in Augusta, Georgia.

Accuracy-Plus Reporting, Inc.      (916) 787-4277



9  Q.      I had the accident July 2009, correct, from

10  your notes, from what you recall?  You had your notes.

11  You mentioned before it was July 2009, and you -- the

12  accident was in July 2009?

13          MR. BRODERICK:  Lacks foundation.  He only

14  knows what you told him.

15          THE WITNESS:  My notes state that, yes.

16          MR. GONZALEZ:  Okay.

17  Q.      Six months from the accident would have been

18  somewhere approximately January 2010.

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1 ████████████ █ █████ ████████

2 ████████████████████████████

3 ████████ ██████ ██████████ █████

4 ███ █████████ ██████████ ████████████

5 ██████

6 ███ ███████ ████████████████████

7 ████████████████████████ ████████████

8 ████████████████████████ ████████

9 ██████████████████████████

10   Q.       BY MR. GONZALEZ:  You located the tear; you do

11   the debridement.

12           You locate the tear in my shoulder.  What was

13   the next thing you did?

14   A.       The next thing I stated in here was that I had

15   done debridement of the tear.

16   Q.       Okay.  And that entails exactly what?  Taking

17   some instruments and kind of scraping where it's torn?

18   A.       Taking some instruments and removing a portion

19   of the torn tissue.

20   Q.       And why do you take the portion of the torn

21   tissue off?

22   A.       Because that would generate a healing response

23   and remove degenerative tissue.

24   Q.       And part of that healing response is that you

25   want some collagen to form and increase blood flow?

63

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   A.      We do not know the exact mechanism of the

2   healing.  We know that that for a certain amount of

3   patients will help with pain.

4   Q.      So when you -- okay.  So the debridement --

5   then you --

6           If I'm envisioning this, there's a tear, right,

7   and you got a tendon.  So you clean out this area that's

8   kind of not meeting.  Is it that the cells start to grow

9   back and meet up again; is that how it works?  Is

10  like --

11  A.      That's the best we can say.

12  ▮   ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮

14      ▮▮  ▮▮▮  ▮  ▮▮▮▮▮▮

15  ▮▮  ▮▮

16      ▮▮▮▮▮▮▮▮▮  ▮▮▮▮

17  ▮   ▮▮  ▮▮▮  ▮▮▮  -- ▮▮  ▮

18  ▮▮▮▮  ▮▮▮▮▮▮▮▮

19  ▮▮

20      ▮▮▮▮▮▮▮

21  ▮▮▮▮▮  ▮▮▮  ▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮

24      ▮▮  ▮▮▮  ▮▮▮  ▮▮▮

25      ▮▮  ▮▮  ▮▮▮▮

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   ████████████████████████████

2   ████████████  █ █████████████

3   Q.      BY MR. GONZALEZ:  So there is a difference,

4   though, between what I had in my records, the tendonitis

5   and the tendinosis?  There is a difference though,

6   right?

7           MR. BRODERICK:  Calls for expert opinion.

8   Outside the --

9           MR. GONZALEZ:  I'm asking about my records.

10          MR. BRODERICK:  No, you're not.

11          THE WITNESS:  I cannot say.

12          MR. GONZALEZ:  In my records, it mentions

13  tendinosis.

14          MR. LEONARD:  Is there something he documented?

15          MR. GONZALEZ:  Yeah.  It's in my notes.

16          MR. LEONARD:  Can you direct us to it?

17          MR. GONZALEZ:  Yeah.  Well, it's in the record.

18          MR. LEONARD:  I'm just asking like what page so

19  we can identify it.

20          MR. BRODERICK:  Read the number on the bottom.

21          MR. LEONARD:  Okay.  We found it.  The May 7th

22  initial visit.

23          MR. GONZALEZ:  This guy?

24          MR. LEONARD:  Yes.

25          MR. BRODERICK:  What's the number?

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1          MR. GONZALEZ:  Page one of the May 7 initial

2     visit.

3          MR. BRODERICK:  Mr. Gonzalez, what's the Bates

4     number on that document?

5          MR. GONZALEZ:  238.

6          MR. BRODERICK:  Thank you.

7     Q.     BY MR. GONZALEZ:  That's the reason I'm asking

8     the question because it was in here, so I want to

9     understand why tendinosis or tendonitis?  There's a

10    difference, though, isn't there?

11         MR. LEONARD:  In your practice when you say

12    tendinosis, is that different than tendonitis?

13         MR. GONZALEZ:  Yes.

14         THE WITNESS:  Tendinosis we would define as

15    potential degenerative changes in the tendon itself.

16         MR. GONZALEZ:  I'm sorry.

17    Q.     Did you say degenerative changes?

18    A.     Potential degenerative changes --

19    Q.     Okay.

20    A.     -- in the tendons.

21    Q.     And that's because it's been -- is that

22    considered like what they call rotator cuff disease, or

23    something, pathology, rotator cuff pathology disease?

24    ██ ████████   ███████████████████

25         THE WITNESS:  Potential.

68

1    A.       Tendinosis, the best we can say, is an actual

2    change in the tendon itself.   Tendonitis is more of a

3    clinical determination.

4    Q.       What is the clinical determination of

5    tendonitis?

6    A.       We would just define as pain.



15   Q.

1  [redacted]

2  [redacted]

3  [redacted]

4  [redacted]

5  [redacted]

6  [redacted]

7  [redacted]

8  [redacted]

9   Q.      BY MR. GONZALEZ:  Were there any complications

10  after the surgery?

11  A.      No.

12  Q.      Okay.  Did I -- did I attend all the physical

13  therapy as you instructed?

14          MR. BRODERICK:  Lacks foundation.

15          MR. LEONARD:  If you know, you can answer.

16          THE WITNESS:  I am aware that you attended

17  physical therapy.

18          MR. GONZALEZ:  Okay.

19  Q.      Do you recall in your notes, does it show when

20  was the last time that you gave me any medications in

21  relationship to my shoulder?

22          MR. LEONARD:  You mean prescribed medications?

23          MR. GONZALEZ:  Prescribed medications, yes.

24          THE WITNESS:  I'm sorry.  Please restate the

25  question again.

74

1          MR. GONZALEZ:  Yes.

2    Q.      Can you -- looking at your notes, can you tell

3    me when was the last time you prescribed me any kind of

4    medication for my shoulder in regards to my post-op?

5    A.      In my notes I state the last time I had seen

6    you on January 9, 2014, that I had given you a

7    prescription of Percocet.

8    ███  ███████████  ██████████████████████

9         ████████████████████████  ██████████

10   ████████████████████████████████████

11   ███████████████  ████████████████████████████

12   ████████████

13           ██████████████████████████  █████████

14   ████████████████████  ███████████████████████

15   ███████████████████

16        ████  █████████  ███████████████████████

17       ████████████████████████████████████████

18   ██████████████  ██████████████████████████

19        ████  █████████  █████  ███████████████  --

20   █████████████  ███████████████████████████

21   ██████████

22   ██  █████████████████████  ██████████████████████

23   ████████████████████████████████████  █████████

24   ████████████████████████  ██████████  ██████████

25   ████████████████████████████  ██

Accuracy-Plus Reporting, Inc.     (916) 787-4277



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          (Exhibit 14 marked.)

22          MR. LEONARD:  This is an incomplete portion of

23   a note by another physician, correct?

24          MR. GONZALEZ:  Yeah.  This is Bates stamped at

25   the bottom there.  It's DG 000, I think it's, 719, USDVA

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   to 720.

2   Q.      This is Dr. Saeed.  I imagine you know

3   Dr. Saeed is one of the primary care doctors at Mercy.

4   A.      I am aware that he is a primary care physician.

5   Q.      Okay.

6   A.      I do not know if he's here anymore.

7   Q.      Okay.  At the top of the page there it says,

8   February 26, 2013.  And when I first saw Dr. Saeed back

9   then, do your notes show that he referred me to have my

10  rotator cuff evaluated by Dr. Patel here at Mercy?

11  A.      I do not have recollection in my notes of that.

12  Q.      Okay.  There is a -- there is -- on the first

13  paragraph he says, he complains of pain in the leg and

14  shoulder area.

15          You see that?

16  A.      I'm sorry.  I do not see that yet.

17          MR. LEONARD:  How far down is it?

18          MR. GONZALEZ:  It's hard for me to read it.

19  It's in here somewhere.  Middle of that paragraph.

20          THE WITNESS:  Okay.

21  Q.      BY MR. GONZALEZ:  In his evaluation of me, he

22  had made a determination that initially after speaking

23  with him as a primary care physician, he made a

24  determination that I should have my shoulder evaluated

25  by specialists, you and Dr. Patel.

1  ████████████    ████████    ██████████████

2  ████████████████████████████████████████████

3  ████████████████████████    ██████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████

6   Q.      BY MR. GONZALEZ:  On the second page, he

7   mentions again that there's shoulder pain.  He doesn't

8   know what it's from.  He does make a referral.

9           Do your notes show whether Dr. Saeed sent me

10  over to have you guys -- that's where you -- that's who

11  you got the referral from?

12          MR. BRODERICK:  Asked and answered here.  He

13  said his notes don't reflect that.

14          THE WITNESS:  Unfortunately my notes state that

15  Dr. Patel saw you on 4/16/2013.  Felt that a lot of his

16  symptoms may be coming from his right shoulder.  And

17  Dr. Patel recommended that he have MRI done of his right

18  shoulder, and he had that done on 5/3/2013.

19          MR. GONZALEZ:  Okay.

20  Q.      So I see Dr. Saeed February 26, and I'm already

21  seeing a specialist, getting an MRI, May, three months

22  later; is that about correct?

23          MR. BRODERICK:  How could he possibly know

24  that?  I'll object.  It calls for speculation.

25          MR. LEONARD:  You're talking about hit -- Dr.

                                                          79

1    Hu's a specialist?

2            MR. GONZALEZ:  Of course, he's the specialist.

3    Oh, yeah.

4    Q.      Dr. Saeed was seeing me February 2013, and

5    three months later I was seeing you and Dr. Patel, the

6    specialist; is that correct?

7            Is that what you just mentioned?  It was

8    May 2013 I got the MRI.

9            MR. BRODERICK:  If he knows both ends of it.

10           THE WITNESS:  I can only state that Dr. Saeed

11   from these notes had seen you on February 26, 2013.

12           I had seen Mr. Gonzalez on May 7, 2013.  My

13   notes state he most recently had seen Dr. Patel on

14   4/16/2013, and that Mr. Gonzalez had an MRI done on

15   5/3/2013.

16   ███████  ███████  ████████████████████████

17   ████████████████████████  █████████████████████

18   ███████

19   ████  ███████  █████  ████████████████████

20   ██████████████████████

21   ██████  ███████  █████████████████████

22   ██████  ███████  ████████████  ████████████

23   ██████  ███████  ███████  ██████████████████

24   ██████  ███████  ███████  █████

25   ████████████████

Accuracy-Plus Reporting, Inc.      (916) 787-4277



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12   Q.      So did you consider giving me corticosteroid

13   injections?

14           MR. LEONARD:   In May 2013?

15           MR. GONZALEZ:   Yes.   Let me correct that.

16   Q.      Between May and July of 2013, before the

17   surgery, did you consider administering corticosteroid

18   injections into my shoulder?

19   A.      I can only say that you had told me that you

20   had at least two corticosteroid injections over the past

21   year when you were in the VA hospital, which gave you

22   only a few days of relief.

23   Q.      You consider that to have been a failure?

24

25

92

1  Q.      BY MR. GONZALEZ:  In your opinion, did the

2  corticosteroid injections, did they cure my -- my tear

3  in my shoulder?

4  ██████  ████████  ████████  ██████  █████████

5  ████████████  ████████████████████  ██████

6  ████████.

7  Q.      BY MR. GONZALEZ:  In my shoulder, I'm asking

8  about my shoulder, would it have cured my --

9          MR. LEONARD:  Would it have, or did the ones

10 you received previously cure --

11         MR. GONZALEZ:  Yeah.

12 Q.      Would receiving corticosteroid injections,

13 would that have ever cured the condition that you

14 uncovered in July, May, July, 2013?

15 ██████  ████████████  ████████████████

16 ██████  ██████████  █████████████

17 Q.      BY MR. GONZALEZ:  Between May and July 2013

18 when I saw him, would you -- you made a determination of

19 my condition then.

20         But what I'm asking is:  Would corticosteroid

21 injections have ever cured those tears?

22 ██████  ████████████  ████████████████

23 ██████  ██████████  ██████  █████████████

24 ████████  ████████████████████  █████████████

25 ██████  ██████████  █████████████████



5    MR. LEONARD:  You can answer that.

6    THE WITNESS:  At that time you had already

7  received two cortisone injections over the past year by

8  the VA hospital, and they had given you only a few days

9  of relief.

10 Q.    BY MR. GONZALEZ:  Are there any

11 contraindications, complications that you are aware of

12 with corticosteroid injections?  I mean, can they

13 rupture the tendon, could I have gotten worse if I had

14 had corticosteroid injections at that time that you saw

15 me?

18    THE WITNESS:  I cannot say.

21    (Exhibit 18 marked)

94

1    ███████████████████████████

2         MR. BRODERICK:  I'm going to draw a picture at

3    the end of that.

4    Q.     BY MR. GONZALEZ:  Dr. Hu, do you know -- I hope

5    I pronounce his name correctly, but do you know an

6    orthopedic surgeon by the name of Dr. James Van den

7    Bogaerde, spelled B-O --

8         MR. BRODERICK:  I'll spell it.

9         V-A-N, space, D-E-N, space, B-O-G-A-E-R-D-E

10   James Van den Bogaerde.

11        THE WITNESS:  The question was...

12   Q.     BY MR. GONZALEZ:  Do you know him?

13   A.     I do not know him personally.

14   Q.     Do you know him professionally?

15   A.     No.  I do not know him professionally.

16   █  ████  ▌ ████████████████ ▌ ████████

17   ▌ ███ ▌ ████████  ████████████████

18   ██████  ████████

19   A.     ████ ▌ ████

20   █  ████  ████████████████

21   ████████████  ██████  ████████

22   ████████████████ ▌ ████  ████

23        ██  ████  ████

24   ████████  ████████████

25   ██████████████

Accuracy-Plus Reporting, Inc.     (916) 787-4277



1

2

3

4

5

6

7

8

9       MR. GONZALEZ:

10  Q.      Now, Dr. Van den Bogaerde --

11          (Exhibit 19 marked.)

12          MR. GONZALEZ:  He presented this study about

13

14

15

16

17

18

19

20

21

22

23

24

25

96

1 ████████

2    ███ ██████    ██████████████

3 ██████████████

4    ███ ███████    █████████████████

5 ██████ ██████████

6 Q.       Well, you know, we were talking about

7 ultrasounds before, and the reason I brought this

8 exhibit in is only because you mentioned before that

9 here at Mercy you don't really feel comfortable with

10 the, I guess, staff.  It has human error with the

11 ultrasound.

12       But apparently in Canada, according to Dr. VDB,

13 he feels that his -- he relies on this as being the

14 standard of care, which is ultrasounds, so I just wanted

15 to kind of -- you know, kind of say that there's an

16 oddity between what goes on here, I guess, in America

17 and what goes on in Canada.

18       I'll leave it at that.

19    ███ ███████    ██████████

20    ███ ██████    ████    ██████████    ██

21 ██████

22    ███████

23    ███ ██████    ██████████

24 █    ████████████████████████

25 ██████    ████████████████████

97

1          MR. GONZALEZ:  Well, I'm basing it on the notes

2    that we brought in, the clinical -- your clinical notes.

3    Let me ask again in a different way.

4    Q.        The McKesson system gives you an image that you

5    can see.

6          What did you see on that image on July 8 -- or

7    excuse me -- May 7, 2013.

8    A.        I state in my notes, MRI of his right shoulder

9    performed on May 3rd, 2013, was reviewed by me on the

10   McKesson imaging system, and reveals the patient to have

11   a partial articular-sided tear involving the

12   supraspinatus tendon over the mid-portion with

13   tendinosis otherwise seen in both the infraspinatus and

14   supraspinatus.

15   Q.        Okay.  So at that point in time you determined

16   that surgery was the best option?

17   A.        At that point in time I had decided that

18   surgery was a best option for you.

19   Q.        ████

20   ██ █████████    █████████     ██████████████

21   ██████████████████████████████

22   ████████████    █████████████

23   ██  ███████ ██████    ██████████████████

24   ██   █████████

25   ██  █████ ████████████████████████████

1   ████████████████████████████████

2      ████  ██████████    ████████████████

3   Q.      BY MR. GONZALEZ:  To you, have I ever come back

4   to have you --

5   A.      I am not aware.

6   Q.      Okay.  And are you aware of the fact that I

7   still am a Mercy patient?

8   A.      I am not aware.

9   Q.      Oh, okay.  But if I had had some problem, you

10  probably would have been the first one they probably

11  would have referred me back to if I had a problem with

12  my shoulder?

13     ████  ██████████    ████████████████

14          THE WITNESS:  I would say, yes.

15          MR. GONZALEZ:  Thank you.

16     ████████  ████████████████  █ ██████

17          (Exhibit 20 marked.)

18          MR. GONZALEZ:  This Dr. VDB, who is paid $500

19  an hour --

20          MR. BRODERICK:  What the heck is this?

21          MR. LEONARD:  Have you marked the document as

22  Exhibit 20?

23     ████  ██████████  ████  ██████████  ██████

24  █████████████████████████████████████  █ ████

25  █████████████████

102

1          MR. GONZALEZ:  Yeah.  It's --

2          MR. BRODERICK:  I don't know what it is.

3          THE WITNESS:  It's redacted.  It's from your

4    expert's letter that says that Dr. Hu performed surgery

5    that wasn't required.

6          MR. BRODERICK:  That's not what it says.

7    ███ ████ ███ ██████████████

8    ██████████ ██████████ █████

9    ███████

10   ████████████████

11   ███ ████ ████ ██ █ ██████████

12   █████████████

13   ███ ████ ███ █ ███ ██████████████

14   ██████ ██████████ █████████

15   ████████████ █████

16   ███████████

17   ███ █████ ████ █ ██████████

18   █ ████████████ --

19   ██ ██████ █████████

20   ██ ██████ ██████

21   ██ ████ ███ █████

22   █ ███████████ █████████

23   ████ █ ███ ██████████ █████

24   ██ █████ ██████████

25   █ ███ ███ ███ █ ██████ ██████

103

1        ▮ ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬   ▬▬▬▬▬▬

2        ▬▬▬

3    Q.      BY MR. GONZALEZ:  You know, Dr. -- Dr. Van den

4    Bogaerde had no problem saying that you did

5    unnecessary --

6            MR. BRODERICK:  This is argumentative, and this

7    is --

8    Q.      BY MR. GONZALEZ:  -- surgery, so I would like

9    to know, how does that make you feel?

10           MR. BRODERICK:  This is garbage.

11           MR. LEONARD:  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

12   ▬▬▬  ▬▬▬▬▬▬▬▬

13           MR. GONZALEZ:  I'm asking how he feels.

14   Q.      How does that make you feel?

15           MR. LEONARD:  ▬▬▬▬▬▬▬▬▬   ▬▬▬  ▬▬▬

16           ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17           MR. GONZALEZ:  Why not?

18           MR. LEONARD:  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19   ▬▬▬▬▬▬▬▬▬▬   --

20           MR. GONZALEZ:  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

21   ▬▬▬▬▬▬▬

22           MR. BRODERICK:  That's garbage.  It's not

23   relevant, and this is argumentative, and if you don't

24   have anymore questions, you ought to bring this to a

25   close.

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1 ████████████████████████████████

2 ███████████████████████████████████

3 ███████████████████████████████████████

4 █████████

5 █████████████████████████████████

6 Q.     ████ ██████ ██ ██████████

7 ███████████

8 ████ █████ ██████

9 █ ██████ █████ ██████████ ████

10 ████████████████████

11 ████ ██████ ████████████████████

12 █████████

13 Q.     BY MR. GONZALEZ:  I'm asking you.

14      Did he tell you at that time that he was going

15 to have Dr. Siegel and Dr. Van den Bogaerde say that you

16 did unnecessary surgery because they said it under oath?

17      MR. BRODERICK:  That's a lie.

18      MR. GONZALEZ:  Black and white.

19      MR. BRODERICK:  This is argumentative, and it's

20 not related to the treatment that -- his actions when he

21 treated you.

22      MR. LEONARD:  Okay.  This is -- can I --

23      MR. BRODERICK:  I'm done.

24 Q.     BY MR. GONZALEZ:  Dr. Hu, may I ask you

25 something straight:  In your heart, you did the right

113

1    thing, correct?

2           MR. LEONARD:  You can answer that.  I think he

3    already has, but go ahead.

4           THE WITNESS:  I believe I did the best care for

5    you that I could.

6           MR. GONZALEZ:  Thank you.

7           MR. BRODERICK:  Before we go off the record --

8           You're done.  I don't need you guys here

9    anymore.

10           But before we go off the record, Mr. Gonzalez,

11   I wanted to ask you again to meet and confer about our

12   ongoing discovery dispute with respect to Dr. Bashir's

13   deposition, and see if you'll do that at this time on

14   the record with the court reporter.

15           Will you do that?

16           MR. GONZALEZ:  Not the purpose of it.

17           MR. BRODERICK:  Will you do that?

18           MR. GONZALEZ:  Not the purpose of it.

19           MR. BRODERICK:  Will you do that with me right

20   here right now?

21           I'll do it with you on the record or off the

22   record.

23           Will you do it?

24           Are you going to answer me?

25           MR. GONZALEZ:  I'm going to do this on the

114

1    record.  I'm going to wait until Dr. Hu --

2           THE REPORTER:  Wait.  I need to go over

3    exhibits before everybody leaves.

4           (Brief recess.)

5           MR. BRODERICK:  So you want to say something on

6    the record, Mr. Gonzalez?

7           MR. GONZALEZ:  I want to say for the record

8    that I will speak with Mr. Broderick's superior, but I

9    will not speak with Mr. Broderick.

10          Mr. Broderick, I did a report and request that

11   he be removed from this case for doing some pretty

12   atrocious stuff, and that's all I will say on the

13   record.

14          And I will see him with the judge next week.

15          MR. BRODERICK:  So with that, I'll just note

16   you're refusing to meet and confer.

17          MR. GONZALEZ:  I met and conferred.  I met and

18   conferred.  I did just exactly what you did last time

19   you met -- we met and conferred in July, and you hung up

20   the phone on me.

21          And then you lied in December -- you lied in

22   December.  I don't want to have a meet and confer with

23   someone I can't trust.

24          MR. BRODERICK:  All right.  So you're refusing

25   to meet and confer?

1           MR. GONZALEZ:  I can't trust you.

2           MR. BRODERICK:  Are you refusing to meet and

3     confer?

4           MR. GONZALEZ:  No.  I'm not refusing.

5           MR. BRODERICK:  I'm done.

6           MR. GONZALEZ:  I'm simply saying I need to

7     speak to someone other than you.

8           MR. BRODERICK:  Well, that's not going to be,

9     but okay.

10          Are we off the record?  Are we done?

11          MR. GONZALEZ:  I just need to speak to someone

12    other than him.

13          MR. BRODERICK:  Are we off the record?

14          THE REPORTER:  I don't say that.  You guys do.

15          MR. BRODERICK:  I know.

16          I'm asking him.

17          I'm done.  I'm ready --

18          MR. GONZALEZ:  Well, when you go around

19    accusing men who are good men, okay, who had their

20    profession -- you know what --

21          MR. BRODERICK:  Didn't accuse you of anything.

22          MR. GONZALEZ:  Sexual molestation.  You had

23    Dr. Van den Bogaerde say that I sexually molested

24    children.  We're going to go into it.

25          MR. BRODERICK:  No, I didn't.

1          MR. GONZALEZ:  We're going to --

2          MR. BRODERICK:  It's in your medical records.

3          MR. GONZALEZ:  No, no.  I'm sorry.  We're going

4     to subpoena the people that were responsible for that.

5     We're going to see where you can prove it.

6          MR. BRODERICK:  Are we off the record?

7          MR. GONZALEZ:  I just want to say one thing.

8          I notice in the rebuttals that Dr. Van den

9     Bogaerde, and Dr. -- none of them, none of them made the

10    acquisition in the rebuttal.

11         MR. BRODERICK:  Are we off the record?

12         MR. GONZALEZ:  We're off the record.

13         THE REPORTER:  Are you ordering?

14         MR. GONZALEZ:  Yes.

15         THE REPORTER:  Copy?

16         MR. BRODERICK:  Yes.

17         (Deposition concluded at 7:30 p.m.)

18         (Exhibit 3 marked)

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA )
                         )    ss.
 2    COUNTY OF PLACER   )

 3           I, Catherine Dawn LaPlante, Certified Shorthand

 4    Reporter, No. 10140 for the State of California, do

 5    hereby certify:

 6           That prior to being examined, the witness named

 7    in the foregoing examination was duly sworn to testify

 8    the truth, the whole truth, and nothing but the truth;.

 9           That said examination was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter reduced by me to typewritten form, and that

12    the same is a true, correct, and complete transcript of

13    said proceedings.

14           Before completion of the deposition, review of

15    the transcript [   ] was [ X ] was not requested.  If

16    requested, any changes made by the deponent (and

17    provided to the reporter) during the period allowed are

18    appended hereto.

19           I further certify that I am not interested in

20    the outcome of the action.

21           Witness my hand this 11th day of October.

22

23                      _____
                        CATHERINE D. LAPLANTE, CSR.
24

25
```

118

Accuracy-Plus Reporting, Inc.        (916) 787-4277

EXHIBIT "B"

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                  SACRAMENTO REGION

 4   - - - - - - - - - - - - - - - -

 5   DANIEL E. GONZALEZ,              )

 6                Plaintiff,          )

 7   vs.                             )  CASE NO.

 8   UNITED STATES OF AMERICA; and   )  2:15-cv-01997 MCE DB

 9   DOES 1 to 20, Inclusive,        )

10                Defendants.         )

11   - - - - - - - - - - - - - - - -

12

13

14

15           DEPOSITION OF CRAIG N. BASH, M.D.

16              WEDNESDAY, OCTOBER 31, 2018

17

18

19

20

21           BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                BY:   JULIE C. ROZELL, CSR NO. 14107

23                       160 SPEAR STREET, SUITE 300

24                    SAN FRANCISCO, CALIFORNIA 94105

25                            (415) 597-5600
```

1
2
3
4
5
6
7          Deposition of CRAIG N. BASH, M.D., taken on
8     behalf of Defendant, at U.S. Attorney's Office,
9     501 I Street, Suite 10-100, Sacramento, California,
10    commencing at 10:22 A.M., WEDNESDAY, OCTOBER 31, 2018,
11    before Julie C. Rozell, Certified Shorthand Reporter
12    No. 14107, pursuant to Subpoena.
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1  APPEARANCES OF COUNSEL:
 2      FOR PLAINTIFF, DANIEL E. GONZALEZ:
 3      DANIEL E. GONZALEZ, PRO PER
 4      7125 Calvin Drive
 5      Citrus Heights, California 95621
 6      Telephone:  (916) 247-6886
 7      Email:  dgonzie@gmail.com
 8
 9      FOR DEFENDANT, UNITED STATES OF AMERICA:
10      UNITED STATES ATTORNEY'S OFFICE
11      BY:  GREGORY T. BRODERICK, ASSISTANT U.S. ATTORNEY
12           KELLI TAYLOR, ASSISTANT U.S. ATTORNEY
13      501 I Street, Suite 10-100
14      Sacramento, California 95814-7306
15      Telephone:  (916) 554-2700
16      Email:  Gregory.Broderick@usdoj.gov
17              kelli.l.taylor@usdoj.gov
18
19
20
21
22
23
24
25
```

```
 1            WEDNESDAY, OCTOBER 31, 2018; 10:22 A.M.

 2

 3                    CRAIG N. BASH,

 4        having been first duly sworn, testified as follows:

 5

 6                      EXAMINATION

 7   BY MR. BRODERICK:

 8        Q.   Good morning, Dr. Bash.  We met off the record.

 9   I'm Greg Broderick for the United States, and I guess we

10   should make our appearances while we're doing this.

11        MS. TAYLOR:  I'm Kelli Taylor, also from the

12   United States.

13        MR. GONZALEZ:  I'm David Gonzalez, Plaintiff.

14        THE WITNESS:  Craig Bash.  I'm from the United

15   States.

16   BY MR. BRODERICK:

17        Q.   Dr. Bash, you were disclosed as a witness for

18   Mr. Gonzalez in this case; is that correct?

19        A.   Yeah.

20        ■■  ■■■■■   ■■■■■■■■■■■■■■■■■

21   ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

22   ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

23   ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

24   ■■■■■■■   ■■■■■■■■■■■■■■■■■■

25   ■■■■■■■■■■■■■■■■■
```



1

2

3

4

5

6

7

8

9

10

11

12 BY MR. BRODERICK:

13    Q.   Dr. Bash, you don't keep records, but did you

14 get records in this case?

15    A.   Yeah.  I got some records.  It wasn't that big

16 of a pile of records.

17    Q.   So can you tell me what records you got?

18    A.   Well, I got some records I talk about in my

19 report.  I talked about his medical care, like, how long

20 he was treated for, what medications he was taking.

21 That's what I used for the basis of the report.

22    Q.   Sure.  And if you can talk a little slower and

23 a little louder, that would help me out.

24    A.   I've got a spine injury; so I don't talk very

25 loud.  I talk in bursts.  I can try to talk slower.



17   Q.   Okay.

18   A.   It was mostly medical records.  I don't

19 remember anything that was not medical.

1   ███████   █████████████████████████

2   ██████

3      THE WITNESS:  I don't think so.  I didn't send

4   letters.  I don't think -- my secretary might have sent

5   something, but I don't know.  We could look and see if I

6   have some.

7   BY MR. BRODERICK:

8      Q.   So it's possible that there's emails or letters

9   from your administrative assistant to Mr. Gonzalez also?

10     A.   Right.

11     Q.   Is that Alice?

12     A.   Right.

13   ██   ████████████████████████

14   ███████████████████████████████

15   ████████████████

16   ██   █████████████████████   ███

17   ████████████████████████████

18   ██████

19   ██   ██████████████████████████

20   █████████████████   █████████████

21   ██████████████

22   ██   ███████████

23      Q.   All right.  I take it you formed some opinions

24   about the care that Mr. Gonzalez received from the VA

25   between 2009 and 2013.  Have I got that right?

1       A.    I have a report that says --

2       (Reporter clarification.)

3       THE WITNESS:  A report that says 12 November 2017.

4   That's my report date.  In there, I talked about at

5   least 2006, 2009 for his creatinine -- what did you say?





15      Q.   You indicated in -- I'll give you what's been

16   marked as 2.

17           (Defendant's Exhibit 2 was marked for

18           identification.)

19   BY MR. BRODERICK:

20      Q.   Exhibit 2 is a copy of a declaration.  Did you

21   sign this declaration?

22      A.   He copied my name over.  I didn't sign it

23   directly.

24      Q.   But you authorized him to -- it's got your

25   signature on there?

1      A.    There's some scribble on there.

2      Q.    Well, I guess --

3      A.    Looks like it might be mine.

4      Q.    Did you authorize someone to sign your name to

5  this declaration that's been marked as Exhibit 2?

6      A.    Yeah.  We talked back and forth.  He said he

7  needed to put this declaration out, and I looked at it.

8  I thought it was okay.

9      Q.    Right.  So my question is:  Did you authorize

10 somebody to sign your name on this declaration that's

11 been marked as Exhibit 2?

12     A.    Well, yes.

13     Q.    Okay.  And you -- did you review it first?

14     A.    I looked at it.

15     Q.    And --

16     A.    It's all legal, but it looked like it was okay

17 to me.

18 ███    ████████████████████████████████████

19 ████████████████████████████    ████████████████

20 ██

21   ███    ████

22   ███   █████   ████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10    Q.    All right.  In paragraph 2 here under "Right

11 shoulder injury," second line, it said "he was miss" --

12 M-I-S-S -- "diagnosed."

13    Is that supposed to say "misdiagnosed" all one word?

14    A.    Yeah.

15    Q.    And that's just a typo because you --

16    A.    There's about 40 typos in here in this

17 document.  That's -- what I'm trying to say here, if

18 you're asking --

19

20

21

22

23

24

25



```
 1      ████  ███████████████████████████████
 2   ████████████████████████████████   █████
 3   █████████████████████████████████   █████
 4   ████████████████████████
 5      ███  ████  █████████████████████████
 6   █████████████████
 7      ███  ███████████████
 8      ███  ███████████████████████████████
 9   ███████████████████████████████████████████
10   ████████████████████████████████████████
11   ███████████████████████████████████████████
12   ████████████  █████████████████████████
13      ███  ████
14      ███  ███████████████████
15      ███  █████████████████████████████  ████
16   ████████████████████████████████████████
```

17      Q.   But at any rate, it's just a bad key?

18      Okay.  And it says "He had a poor outcome forms his

19   shoulder injury."

20      Is that supposed to say "from"?

21      A.   Right.

```
22      ███  █████████████████████████████
23   ████████████████
24      ███  █████████████████
25      ███  █████████████████████████  █████████
```



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17      Q.    Both the bracket and the R are a typo, or is

18  that supposed to be a different word?

19      A.    "Most patients get rapid diagnosis and

20  treatment for" -- should be "or."

21      "Most patients get rapid diagnosis and treatment or

22  physical therapy."

23      Q.    I see.  Okay.

24      Next page, first line, there's an N and a bracket.

25  Is that supposed to be a different word, or what's going

1  on there?

2      A.   That sentence is supposed to say "Do not have

3  four years of Motrin" -- "resulting in loss of vision

4  and neuropathy."

5      Q.   I was just trying to figure out if there was a

6  missing word.

7      The next line says "These poor outcomes represent as

8  decried below."

9      A.   Supposed to be "described below."

10     Q.   What does it mean to "represent as described"?

11     A.   Poor outcomes.

12  ███  ████████████████████████████

13  ███████████████████████████████████

14  ██████████████

15  ███  ████████████████████████

16  ███████████████████████████████

17  █████████████████████████████████████

18  ██████████████████████████████

19  ███████████████████████████████

20  ███████████████████████████

21  ████████████

22  ███  █████████████

23  ███  ██████████████

24  ███  ████████████████

25  ███  ████████████████████████████

1 ■■■

2    Q.    Did you apply that benefit-of-the-doubt

3 doctrine informing your opinions here?

4    A.    Yeah.   I used that idea that the evidence is

5 more weighted in his favor.   But, and my opinion is,

6 too, that I raised that up to a 90 percent level of

7 probability.

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Q.    All right.   On the next page, under No. 3, it

22 says, speaking of your opinion, it says "It is based on

23 a review of the claims file - as provided by the

24 patient."

25    Did you review a claims file for Mr. Gonzalez?

1     A.    Claims file is a term the VA uses.  And the

2     claims file includes his service records, includes his

3     medical records, and includes any administrative

4     records.  So this pile on the table would be the

5     equivalent to the VA claims file.

6          But I said "as provided by the patient."  So

7     whatever the patient sent me was 300 pages, and that is

8     what I reviewed.

9          Q.    Did you review his medical -- I'm sorry -- his

10    military records?

11         A.    I don't remember seeing military records.

12         Q.    Some medical records -- in fact, I think you

13    told me everything you looked at was a medical record,

14    you think.

15         A.    From my memory, it was medical records.

16    ███  ███████████████████████

17    ███  ██████

18    ███  █████████  █████████████████

19    ████████████████████████████████████

20    ███████████████████████

21    ████████████████████████████

22    ██████████████████████████████████

23    ███  ████

24    ███  ████████████████████

25    ███  ██████████████



Q.

Skipping way down under "Opinions:  Right shoulder injury," paragraph two, it says "The physician providing his care did not monitor him for secondary complications of blindness and renal failure, both of which are known to occur following max doses of Motrin."

I would like to know how you reached the conclusion that the physician providing this care did not monitor him for those things.

1    A.   Well, there was no -- any -- there was no --

2  from my memory, there was no written information in the

3  record that said that "This patient is getting high

4  doses of Motrin.  I should be watching his lab values."

5       For example, those lab values, I had to pull out

6  myself from those records.  The doctor didn't talk about

7  those.

8       Q.   Right.  But my question is --

9       A.   That's how I got --

10      Q.   -- you reached this conclusion based on the

11  absence of a note or something in the record that -- to

12  the contrary?

13      A.   Yeah.  There was no notes that I remember of --

14  of the records that I got that were -- where the doctor

15  talked about being worried about the complications of

16  medication.

17      Q.   All right.  It says here "He was given maximal

18  doses of Motrin 800 milligrams TID," is the prior

19  sentence.  What's TID?

20      A.   Three times a day.

21

22

23

24

25

1    ■ ▬▬▬▬▬▬▬▬

2    ■ ▬ ▬▬▬▬▬▬

3        Q.    How do you know that he received -- that he was

4    given maximal does of Motrin 800?

5        A.    Because in my record review, I must have found

6    that.

7    ■ ▬▬▬▬▬▬▬▬▬

8    ▬▬

9    ■ ▬▬▬▬▬

10        MR. GONZALEZ:   If it helps, Greg, I have a record

11    here from the VA.

12        MR. BRODERICK:   It really doesn't.   I'm interested

13    in his opinions and how he got there.

14    BY MR. BRODERICK:

15        Q.    The next line down says "Ibuprofen and visual

16    function."   This is a clip of an article out of Google

17    Scholar?

18        A.    Right.

19    ■ ▬▬▬▬▬▬▬▬▬▬

20    ■ ▬▬▬▬▬▬

21        Q.    What are you citing this article for?   In other

22    words, for what proposition?

23        A.    My opinion is that Motrin causes vascular

24    changes, small vessel changes.   And we know that Motrin

25    causes small vessel changes in the kidney, and you get

1    renal problems with that.  And it's my concept that

2    Motrin can cause changes in the vision of people based

3    on changes in the retina, the small vessels in the

4    retina.  And so that's what my point was.

5        Q.   But that -- that's an interesting answer to

6    some other question.

7        My question was:  For what proposition are you

8    citing this article by Levy and Hanscom?

9        A.   Like I said, I think that Motrin causes

10   problems with small vessels.  And it's my opinion that

11   that damages your kidneys and eyes.  And I was trying to

12   find something that backed that up.

13       Q.   Okay.  So you're citing this Levy and Hanscom

14   article for the proposition that Motrin damages vision,

15   et cetera?

16       A.   Among other articles.

17   ██  ███  ████████████

18   ████████████  ████████████████

19      █████████████████  ███████████████

20      ██████████████

21   ███████████████████████████████████████  --

22   ███████████████████████

23   ██████████████  ████████████████████████████

24   ████████████

25   █ ████████████  █████████████████████



21    Q.    It says here in No. 6 "He clinic doctor noticed

22  his elevated creatinine and stopped Motrin instantly

23  in," and then it doesn't --

24    A.    Still a draft.

25    The point I was trying to make is that, somewhere

1  along in there, I saw that one of the doctors saw that

2  he had elevated creatinine, like I noticed, and he

3  stopped the Motrin.

4  ████ ███████████████

5  ████ ██████████

6  ████ ████████████████

7  ████ ████ ███████████████████

8  █████████████████████████████

9  ███████████████████████████████

10  ██████████████

11  ████ █████ ███████████████

12  ███████████████████████████████

13  ████████████████████

14  ████ ██████████████████████████

15  ███████████████████

16      Q.   Okay.  Let's -- I usually do this at the

17  beginning.  I kind of got into this backwards here.  But

18  let's talk about your background.

19      Your specialty is neuroradiology?

20      A.   Yep.

21      Q.   Can you tell me what that is?

22      A.   So radiology is the field of diagnosis.  So we

23  take X-rays and medical records and make diagnoses.  So

24  how that applies to the VA because the VA has --

25      Q.   You're wandering off.  I just want to know what

1    Q.   Okay.  So I don't know, but -- I'm a political
2    science major; so these questions may sound stupid, but
3    that sounds hard.  Is it pretty difficult to do
4    neuroradiology?
5        MR. GONZALEZ:  Can I object?  It seems very broad.
6    Can you kind of narrow it down a little bit?
7    BY MR. BRODERICK:
8        Q.   Is neuroradiology hard to achieve?  A specialty
9    in neuroradiology is difficult to achieve, that's what I
10   wanted to know.
11       A.   It didn't seem hard to me.
12       Q.   Would it be hard for other people?  That's a
13   bad question --
14       A.   Well, medical school -- nobody goes to medical
15   school -- radiology is 10 percent of medicine doctors.
16   Neuroradiologists are a small percentage of that.
17       Q.   Yeah.  So it's a -- what's the neuro part of
18   neuroradiology?  Does that mean, like, your head or your
19   nervous system or what?
20       A.   It's built on top of radiology.  So you do four
21   years of radiology which is all about your diagnosis.
22   We do that.
23       Then neuroradiology is a subspecialty training that
24   allows you to do more work in the brain and spine.
25       Q.   Okay.  And are you licensed as a doctor?

1     A.    Yeah.

2     Q.    And where are you licensed?

3     A.    Maryland.

4     Q.    Anywhere else?

5     A.    No.

6     Q.    What -- this may not make sense, but in

7  California, we love to regulate everything.  So you've

8  got to get a license to be a -- to braid hair, another

9  license to kill rats, another license to be a doctor,

10  another license to be a nurse, and so on.

11     Can you list for me or describe for me the medical

12  license that you hold?  Like what is it?

13     A.    I have a license in Maryland.

14     Q.    To do what?

15     A.    To be a physician surgeon.

16     Q.    Okay.  We've got that too.

17     Are there any other licenses that you hold in

18  Maryland?

19     A.    No.

20     Q.    Are there any other licenses -- and I don't

21  mean, like, your driver's license.  Are there any other

22  licenses or certifications that you hold in any other

23  state?

24     A.    I had one in California, but it expired years

25  ago.

1  spectrum of radiology has to do with the renal system.

2  So we're oftentimes referred to as a doctor's doctor.

3  They come to us to diagnose things.  So we have a lot of

4  specialized training in the renal system, and part of my

5  board certification is an oral board in the renal

6  system.

7  █ ███

8  █ ███

9      Q.   How about ophthalmology?

10     A.   So if you're asking about my general training

11  in ophthalmology; so --

12     Q.   I'm wondering about specialized training in

13  ophthalmology?

14     A.   In the spectrum.  So as a neuroradiologist, we

15  do brain, head, neck, and spine.  So in the eye of the

16  orbit, we image a lot with the MRI.  So I have a lot of

17  radiology training in the eye based on imaging.

18     I have an article -- I've written an article on the

19  eye in my CV.  The very first article that I wrote is on

20  the eye that I did in Maryland.

21     Q.   Is that --

22     A.   The vitreous humor silicone in the eye,

23  Baltimore.

24     Q.   From 1995.

25     All right.  What about orthopedic surgery?  Any

1   training -- specialized training or experience in

2   orthopedic surgery?

3        A.   I did rotations.  I wanted to be an orthopedic

4   surgeon before I got hurt; so I did one or two major

5   rotations of orthopedic surgery in medical school.

6        Q.   When was that?

7        A.   Same thing.  '80s.

8        Q.   1980s; okay.

9        A.   And then also, another subsection of the

10   radiology boards has to do with the bone system; so we

11   studied a lot of orthopedic things, since the imaging.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Normally -- the rule is they're supposed to send it

2   directly to you.  That's probably the best way to do it

3   here, unless you guys want to do something else.

4       MR. GONZALEZ:  No.  Send it to him.

5       THE WITNESS:  That's good for me.

6       MR. BRODERICK:  Will you get it at that 49 --

7       THE WITNESS:  Yes.

8       MR. BRODERICK:  Because I mailed you something there

9   and it bounced.  It came back.

10      THE WITNESS:  It's the UPS store.  It should go

11  right there.

12      MR. BRODERICK:  Okay.  So you'll get it there.

13  That's all.  Off the record.

14          (The proceedings concluded at 11:54 a.m.)

15

16

17

18          ------------------------------

19                  CRAIG N. BASH

20

21

22

23

24

25

1 | STATE OF CALIFORNIA       )

2 | COUNTY OF SACRAMENTO      )

3 |         I hereby certify that the witness in the

4 | foregoing deposition, CRAIG N. BASH, was by me duly

5 | sworn to testify to the truth, the whole truth, and

6 | nothing but the truth, in the within-entitled cause;

7 | that said deposition was taken at the time and place

8 | herein named; that the deposition is a true record of

9 | the witness's testimony as reported by me, a duly

10 | certified shorthand reporter and a disinterested person,

11 | and was thereafter transcribed into typewriting by

12 | computer.

13 |         I further certify that I am not interested in

14 | the outcome of the said action, nor connected with, nor

15 | related to any of the parties in said action, nor to

16 | their respective counsel.

17 |         IN WITNESS WHEREOF, I have hereunto set my hand

18 | this 6th day of November, 2018.

19 | Reading and Signing was:

20 | __x__ requested      _____ waived      _____ not requested

21 |

22 |

23 |

24 |                 JULIE C. ROZELL, CSR NO. 14107

25 |                 STATE OF CALIFORNIA

EXHIBIT "C"

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO REGION)

--o0o--

DANIEL E. GONZALEZ,               )
                                  )
            Plaintiff,            )
                                  )
vs.                               )  Case No.
                                  )  2:15-cv-1997 MCE DB PS
UNITED STATES OF AMERICA;         )
and DOES 1 to 20,                 )
inclusive,                        )
                                  )
            Defendants.           )
_____    )

**CERTIFIED COPY**

--o0o--

Deposition of

DAVID SIEGEL, MD, MPH, FACP

FRIDAY, APRIL 27, 2018

--o0o--

Reported by:  JEANETTE L. VISSIERE
RPR, CLR, CSR License No. 10431



**APR** Accuracy-Plus Reporting Inc.

*Certified Shorthand Reporters*

MAIN OFFICE:
3400 Douglas Blvd., Suite 205, Roseville, CA 95661 • (916) 787-4277

SACRAMENTO OFFICE:
1234 H Street, Suite 105, Sacramento, CA 95814 • (916) 758-5941

Fax: (916) 787-4280 • Toll Free (877) 492-8130 • www.accuracy-plus.net

1                       A P P E A R A N C E S

2

3

    For the Plaintiff:
4
            In Pro Se
5           BY:   DANIEL GONZALEZ
            7125 Calvin Drive
6           Citrus Heights, California 95621
            (916) 247-6886
7

8
    For the Defendants:
9
            US ATTORNEY'S OFFICE
10          BY:   GREGORY T. BRODERICK, Attorney at Law
            501 I Street, Suite 10-100
11          Sacramento, California 95814
            (916) 554-2780
12          E-mail:  gregory.broderick@usdoj.gov

13

14

15                            --o0o--

16

17

18

19

20

21

22

23

24

25

                                                              2

I N D E X

Page

Examination by:

MR. GONZALEZ                                    5

--o0o--

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-----------|------|
| Exhibit A | Notice of Taking Deposition of Defendant David Siegel, M.D., 1 page | 160 |
| Exhibit B | Second Amended Notice of Taking Deposition of Defendant David Siegel, M.D., 7 pages | 160 |
| Exhibit C | Curriculum Vitae of Craig Nicolas Bash, M.D., M.B.A, 16 pages | 56 |
| Exhibit D | First Amended Complaint, 18 pages | 61 |
| Exhibit E | Disability and Diagnostic Information, 1 page | 18 |
| Exhibit F | Medical Information, 2 pages | 53 |
| Exhibit G | Article entitled, "Indications and Contraindications for the Use of Nonsteroidal Antiinflammatory Drugs in Urology," 2 pages | 97 |
| Exhibit H | Article entitled, "The Top 10 Things Nephrologists Wish Every Primary Care Physician Knew," 11 pages | 99 |

3

1                        E X H I B I T S (Continued)

2
         EXHIBIT                  DESCRIPTION                PAGE
3

4    Exhibit I  Review Article entitled, "The
                Management of Partial-Thickness
5               Tears of the Rotator Cuff, 9
                pages                               120
6
     Exhibit J  Article entitled, "Rotator Cuff
7               Tears: Surgical Treatment
                Options, 6 pages                    121
8
     Exhibit K  Article entitled, "Rotator Cuff
9               Tears: Prospective
                Comparison of MR Imaging with
10              Arthrography, Sonography, and
                Surgery," 6 pages                   121
11

12                             --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        4

1          BE IT REMEMBERED that, on FRIDAY, the 27th day

2     of April, 2018, commencing at the hour of 9:14 a.m.

3     thereof, at the offices of Accuracy-Plus Reporting,

4     Inc., 3400 Douglas Boulevard, Suite 205, Roseville,

5     California, before me, Jeanette L. Vissiere, a Certified

6     Shorthand Reporter in and for the County of El Dorado,

7     State of California, there personally appeared:

8               DAVID SIEGEL, MD, MPH, FACP

9     called as a witness, who, being by me first duly sworn,

10    was thereupon examined and interrogated as hereinafter

11    set forth.

12               EXAMINATION BY MR. GONZALEZ

13    Q.     Could you please state your full name?

14    A.     David Siegel.

15          MR. BRODERICK:  Did you want us to make

16    appearances before we do all that?

17          THE REPORTER:  If you would like.

18          MR. BRODERICK:  Go ahead, Mr Gonzalez.

19          MR. GONZALEZ:  This is Daniel Gonzalez, taking

20    a deposition as the plaintiff in this case.

21          MR. BRODERICK:  And my name is Greg Broderick

22    from the US Attorney's Office in Sacramento.

23    ████████████████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████████████████████████████

                                                        5



1

2

3

4

5

6

7

8

9

10

11

12

13    Q.      BY MR. GONZALEZ:   You were my doctor from

14    approximately 1995 to 2013; is that correct?

15    A.      I believe so.   I went back in the medical

16    record.   Unfortunately, we switched to a computerized

17    medical record, so the earliest note that I have in the

18    computerized medical record is 2001.   However, there was

19    a written medical record, which I don't have easy access

20    to, which may have gone back several years prior to

21    that.

22

23

24

25

10

1   ██    ████ .

2        ██ █████    ████████████████████████

3   █████

4        ██ ██████    █████

5   ████████████ ██████████████████████

6   ████████

7   Q.    BY MR. GONZALEZ:    ██████████

8        Dr. Siegel, did you provide the responses to

9   discovery requests for admissions and special

10  interrogatories served between September 29, 2017, and

11  February 9, 2018, in this case?

12  A.    I am here.  That was my request.  In terms of

13  providing materials, I don't believe that was my

14  responsibility.

15  ██    ████████████████████████████

16  ████████████

17        I'm asking, did you answer -- did you

18  personally answer, provide the answers to the request

19  for admissions and the request for special

20  interrogatories that were served between September 29,

21  2017, and February 9, 2018?

22  A.    I don't believe I understand the question.

23        MR. BRODERICK:  I don't think he -- I don't

24  think he knows what you're talking about.  Do you want

25  me to tell you the answer, or do you want to ask him?

16

1    Q.       BY MR. GONZALEZ:  There were discovery

2    responses that were -- discovery requests that were

3    made, okay, that were sent to Mr. Broderick.  Did you

4    personally provide the answers to those discovery

5    questions?

6    A.       In a written format?

7    Q.       In a written format.

8    A.       No.

9    ████  ████████████████████████████████████████

10   ████████████████████████████  █████  ██████████

11   ███████

12   ██  █ ████████████████████████████  ██

13   ████████████████████████  ████  ████████████

14   ████████████████████████████████

15   ██████████  ████  █████████████████████████

16   ████████████  ██████  █  ████████  ███████████

17   ████████████████████  ████  █████████  ██████████

18   █████

19   █  ██████  ████████  █████████  ████████

20   ████  --

21   █  █████████  ████████████

22   Q.       Okay.  Have you reviewed the 304 pages of

23   records that were produced by Mr. Broderick, your

24   attorney, regarding the records that were covered or the

25   treatments that were covered from two thousand --

17

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   July 29, 2009, to approximately April of 2013?

2   ███ ███████ ████   ███ ████████████   ██ ████

3   █████████████████████████████   █ ██████   ████

4   ████████████████   █████████████████████████

5   ██████ █ ██████████████████

6          THE WITNESS:  I don't know.  But I haven't

7   reviewed all of the documents, no, I have not.

8   Q.      BY MR. GONZALEZ:  You have not reviewed all of

9   the documents?

10  A.      Not every page.  That's correct.

11  Q.      Okay.  And you have reviewed the notice, the

12  second notice of the deposition?  You have reviewed the

13  documents that were requested in that?

14  A.      Have I reviewed documents that are requested in

15  there?

16  Q.      Yes.  The requested documents, have you

17  reviewed those?

18  A.      No, I haven't reviewed all of those documents

19  either.

20          ███ ██████   ████████████████████

21  ███████████████████   ██████████████████████████

22  ████████████████

23          ███ █████████   ██████

24          (Exhibit E was marked for identification.)

25  █   ████ ████ █████ ██ ████   █████████

                                                      18

        Accuracy-Plus Reporting, Inc.      (916) 787-4277



1

2

3

4

5

6

7

8

9

10

11

12

13

14    Q.      BY MR. GONZALEZ:   Thank you.

15          Did you recognize -- in the medical records

16    that you prepared or entered in the VA records, did you

17    ever recognize that there was an injury to my back that

18    occurred back in 1968?

19

20

21

22

23

24

25

21

1  ███████████████████████████

2         THE WITNESS:  Well, in the medical records,

3  there's notes that -- actually, differed regions of your

4  back were bothering you.  Your low back, presumably your

5  lumbosacral area, as well as your cervical spine.  So

6  those -- yes, those were -- there were back issues or

7  complaints that were in the medical record, yes.

8  Q.     BY MR. GONZALEZ:  Did you -- let me rephrase my

9  question.

10        Did you ever note that those injuries were

11 present from my military service?

12 ████ █████████  ███████████  ████████████

13 ████████████

14        THE WITNESS:  I might have.  I'm not certain.

15 But I do know that I treated you for a diffuse range of

16 musculoskeletal conditions, including complaints about

17 your back, your cervical spine, your shoulder, your arm,

18 and so on.

19 Q.     BY MR. GONZALEZ:  So your answer is, you don't

20 know if you, in fact, entered any notes regarding the

21 relationship of my back to my military service?

22 A.     I certainly don't recall that I entered that

23 the back injury started in 1968.  That's correct.  I do

24 not recall that I entered that in the note.

25 ██  █████  ████████████████████

22



1

2

3

4

5

6

7

8

9

10

11    Q.      Do you -- have you seen, as a medical doctor,

12    injuries to the back that are associated with injuries

13    to the kidneys?

14    A.      Well, the kidney is certainly in the

15    retroperitoneal space, and if people have kidney

16    infection, for example, frequently the physical

17    manifestation is back pain on one side or the other,

18    below the rib cage.  That's why it's referred to as

19    costovertebral angle pain.

20    Q.      So --

21    A.      That's part of the back.

22    Q.      Okay.  So your answer is, yes, you have seen

23    kidney injuries related to back injuries?

24

25

1           THE WITNESS:  Back injuries, well, yes, I

2    believe that that's possible.  Mostly kidney injuries

3    are related to infection or some other metabolic

4    disorder.  Frequently --

5           When you say "injuries," do you mean traumatic

6    injuries?

7    Q.      BY MR. GONZALEZ:  Traumatic injuries.

8    A.      It's possible.

9    Q.      Okay.

10   A.      Yes.

11   Q.      Is there a condition called "acute kidney

12   injury"?

13   A.      It would be more of a description than a

14   condition.

15   ███  █████████  █ █████████████

16   ██████  █████████

17   ██  █████ █████████████████████

18   ███████████████████  ████████

19   ██████████  █████████████

20   Q.      Have you ever heard the term "acute kidney

21   injury"?

22   A.      Yes.

23   Q.      As opposed to chronic kidney disease?

24   A.      Correct.

25   Q.      And the kidneys are related to the genital

                                                    24

1  urinary system; is that correct?

2  A.      Yes.

3  Q.      And so is the -- so is the urinary bladder;

4  correct?

5  A.      Yes.

6  Q.      Okay.  Did you ever test my renal function once

7  you noted that there was a service-connected injury to

8  my back or to my kidney area?

9  A.      Well, that question presumes a connection.  I

10  test everybody's kidney function yearly, regardless of

11  other issues.

12  Q.      And what sort of test do you do to determine if

13  someone is having a chronic stage one, stage two, stage

14  three, or even worse renal dysfunction?

15  A.      Those are based on a serologic test, the blood

16  urea nitrogen, as well as the creatinine.

17  ██  ███  ████████████████████

18  ███  ██████  ████  █████████

19  █  ████  █████████  ████████████

20  ████  █  ████████████  █████████████

21  ██████  █████████  ███

22  █  ████████████████████

23  ███████████████

24  █  ████

25  █  ████

25

1   Q.        Okay.  So when I ask you about the creatinine,

2   is it not true that the laboratory results starting in

3   2000, let's say, indicated that my creatinine was high?

4   A.        I'll tell you what.  Why don't you show me the

5   lab, and I'll tell you what I think of your creatinine

6   in terms of whether it's high or not.

7   ███ █████████████████████████████████████

8   ██████████ ██████████████████████████ █████ █ ████

9   ████████████████████████████████████████████

10  ████████████████████ █████████ █████████████ ████

11  ███████ █ ███████████████████████ ████████████████

12  ████████████████

13       ██████ █████████ █████████ ████████ ████████

14  ██████████ █████████████████████████ █ ████

15  ███████████████ █ █████████████████████████ █ █████

16  ███████ ████████ █ ██████ █ ████████████████ ████

17  ███████████████████████████ ████████ █████████████

18  ████████ ██████████ █ █████████████████████████

19  ████

20       ██ █████████ █████████████ ████████

21       █████████ █████████

22       ██ ███████ █████████████

23       ██ █████████ ██████ ██████ █ █████████ ████

24  ████████████████ █ ████████████

25  //

29

Accuracy-Plus Reporting, Inc.      (916) 787-4277

```
 1               ████████  ████████████████
 2               ████████
 3    Q.      BY MR. GONZALEZ:  Dr. Siegel, you recognize
 4    this as page 256 of 304 --
 5    A.      Uh-huh.
 6    Q.      -- of the records produced?
 7    A.      No, I don't.
 8    Q.      You don't.  But do you recognize, where it's
 9    highlighted, it shows the creatinine right there,
10    dated --
11    A.      It has -- this is -- what you have shown me is
12    some laboratory values for an unidentified individual.
13    I see on this creatinine 1.3 and a BUN of 15, correct.
14    I see that on this.
15    Q.      Does it say "H"?  Does it have an H next to it?
16            MR. BRODERICK:  ████████████████████
17    ████████████████████████████  Let me describe for the
18    record.  What is being shown is a computer with a
19    document on it, and some things are -- look like they're
20    highlighted on there, just so that the record is clear.
21            THE WITNESS:  Yes, I do see an H.  But what you
22    probably need to understand is that 1.3 -- I guess I'd
23    have to explain renal physiology to you.
24            Do you know what creatinine is a breakdown
25    product of?
```

30

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1  Q.       BY MR. GONZALEZ:  I'm going to -- I'm going to

2  stop your questioning.  This is my deposition of you,

3  Dr. Siegel.  I'm asking you questions.

4  ██████ ████████     █████████████████████

5  Q.       BY MR. GONZALEZ:  So I would like to just ask

6  you to acknowledge that the 1.3 that is on that date,

7  April 2000, indicates that creatinine was high.

8  Correct?

9  ██████ ████████     ██████████████

10 Q.       BY MR. GONZALEZ:  Yes or no?

11 A.       No.  What it indicates is that there's an H

12 next to it.  I would guess that 1.3 is -- if you look at

13 the normal values, it will be up to -- up to 1.3, and

14 the individuals with more muscle mass can have a

15 creatinine of 1.3, including African-Americans.

16 ████████████████     ████████████████

17 ██████████████████ ██████████████████████████

18 ██████████ █████████████ █ ██████████████    ███

19 █████████████████████████████████████████████████

20 ████████ ██████████████      █████████████████████

21 ████████

22 ██     ██████ ████ ████ ████     █████████████

23 ████████████████████████████

24 ██    ██████

25 Q.       You said before that you didn't recognize these

31

1   are my records.  Could you tell me, is that my name at

2   the bottom of that page that you were just looking at?

3   A.       Right.  Now you've changed the computer screen,

4   and I do see your name.

5   Q.       Dr. Siegel, is it not true that a reading of

6   1.2 of the creatinine level and a reading of 1.3 of a

7   creatinine level is a difference tenfold?

8   ███ ██████    █████████████ ██ ██████████

9   ███████████████████████████ ██████

10          THE WITNESS:  The answer to that question is

11  no.

12  ████████████████████████████████████████████

13  ██████████████████

14  ███████████████████████

15     ███ █████████ █████ ██████ ████████████████

16  █████████████ ██████ ██ ███ ███████████████

17  ████████

18     ███ ████████ ██ ██████████████ ██ ████

19  ████████████████████████████████████████████

20  ██████████████ █████ ──

21      ██████████   ████████████████████████████

22  █████████████████████████████

23  ███████████ █████████████████████████ ████

24  █████████████████████

25     ███ █████████ ████ █████████████████████

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   ████████ ███ ███ ████████████████

2   ██████████████████████████

3   ████████████ ████

4   ███ ███████████ █████████████████

5   Q.      BY MR. GONZALEZ:  Well, Dr. Siegel --

6   A.      Yes.

7   Q.      -- when I started treating with you, was I

8   blind?

9   A.      No.

10   Q.      In 2013 I was blind?

11   A.      No.

12   Q.      You don't consider I was legally blind in my

13   left eye in 2013?

14   ████████████ ██████████ █████████████

15   ██████████

16          THE WITNESS:  I read the ophthalmologist note.

17   They did not mention blindness in there.  They mention

18   what was an inconsistent field cut.  The term

19   "blindness" -- and I believe there's a legal definition

20   of that -- I'm not, frankly, prepared to discuss.

21   ████ ████████████████████████████

22   ██████████████████████████ █████████████

23   ███ -- ████████ █████████████████ █ ██████

24   ██████████████ █████████████████

25   Q.      BY MR. GONZALEZ:  Right.  And what did the note

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   reflect?  That there was a loss of vision; correct?

2   A.        There was some loss of vision.

3   ██ ██████ ████████ ██████

4   THE WITNESS:  Not blindness.

5   ██ ██████ █████████████ ███

6   ████████████ ████████████████

7   ███████████

8   Q.        BY MR. GONZALEZ:  Dr. Siegel, are you qualified

9   to diagnose or recognize when someone is blind, is the

10  same as vision loss?

11  ██ ██████ ██████ ████████████

12  ██████

13  THE WITNESS:  No.  Those are not the same

14  thing.

15  ████████████████████████████

16  ██████████████████████████████████

17  ████

18  ██ ████ █████ █████ ████ █████

19  ██████████████████ █████ ██████

20  ███████████ ████████████████████

21  █████████ ██████████ ▪ ████

22  █████ ██████████████████

23  Q.        BY MR. GONZALEZ:  Dr. Siegel, do you intend to

24  testify at the trial in this matter?

25  ██ ██████ ██████████████████

36

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1  █████████████████

2  █ ████ ████ █████████

3  █ ████ ██████ ██████

4  ████ ████ ██████

5  ██████████████████

6  ████ ██████

7  A.      If there is a trial and if I am subpoenaed and

8  go through the proper legal process, I will show up.

9  Yes.

10  Q.      And you will be testifying about expert opinion

11  subject matter; is that not correct?

12  ████ █████ ████████ ██████

13  ██████████ █████ █████

14  ███████ █████████████ ██

15  █████████ █████████

16          THE WITNESS:  I presume I will be asked to

17  testify within my area of expertise.

18  █ ████ ████ █████████████

19  ████████ ██ ████

20  ████ ██████ ██ ████████ █

21  ████████████ █████

22  ██████████████████████

23  ████████ ██████ ████████

24  Q.      BY MR. GONZALEZ:  Dr. Siegel, was that 1.3

25  creatinine level the only time that my creatinine was

37

1   above or high?

2   A.      I would have to look at the chart and review

3   that to say.

4   ██ ██████    █ ████████          ████████

5   ██████████████████   ██████   ██████   ██████

6   █ █████████████████   ██████████████

7   █████   ██████████████████   █ ███████

8   Q.      BY MR. GONZALEZ:   Well, do you rely on the

9   laboratory reports that come from the VA laboratory unit

10  at Sacramento?

11  A.      Within context (nods head up and down).

12  █        ██████████████████

13  █    █ ████████████████████   ███████████

14  ████████████████████████

15  ████████

16  █    ██

17  █    █ █████████████████ ██ ███████ █ █████

18  ████████████████ ██ █████████████████

19  ██████████   ███████   ██████   ██████

20  ████████████   █ ██████   ██████   ████

21  ████████

22  Q.        ████████████████████

23           I'm asking you a question as to your

24  reliability on the laboratory -- quality of the

25  laboratories at the Sacramento VA Medical Center?

38

1  A.       The quality of the laboratory of the Sacramento

2  VA Medical Center is very high.

3  ██  ████   ████   █████████████████████

4  █████████████████████  ███████  ███████  ████████

5  ██   ███████████████████████████████████  ▌

6  █████████████████████████  ▌███████████████████

7  █████████████████████████████████████████

8  ██████  ████████████████  ▌███████████████████████

9  ██████████████████████████   ████████

10  Q.       And over a period of years, from 2000 until

11  2012, did you recognize that the creatinine was always

12  consistently high?

13  ██  █████████   ████████   ████████████

14       THE WITNESS:   I would have to review the

15  medical record to make that determination.

16  Q.       BY MR. GONZALEZ:   And if that creatinine level

17  was high for all that period of time, without being

18  treated, is there some indication that there's something

19  going on --

20  ██   █████████   ███████████████████████████

21  ████████████

22  Q.       BY MR. GONZALEZ:   -- with the patient's

23  healthcare?

24  ██  ███████   ████████   ▌█████████████████████

25  ███████████████████████   ███████████████

1    ███████████  --

2            MR. GONZALEZ:  He's a medical doctor.  He's

3    going to be recognized as an expert in court, so....

4            MR. BRODERICK:  You didn't disclose him as an

5    expert, and I haven't disclosed any experts, so --

6            MR. GONZALEZ:  Well, you --

7            MR. BRODERICK:  So --

8            MR. GONZALEZ:  I'm not going to get --

9            MR. BRODERICK:  It's just a legal thing --

10   Q.      BY MR. GONZALEZ:  Can you answer the question,

11   please?

12           MR. BRODERICK:  Hold on.  Don't talk over me,

13   man.  Come on --

14   Q.      BY MR. GONZALEZ:  2000 to 2012 --

15           THE REPORTER:  I need the question to start

16   again.

17           MR. BRODERICK:  Don't talk over me.  I haven't

18   been out of control here.  I'm just trying to make a

19   record, and now I'll shut up and let him answer the

20   questions.  I need to make my objections, so don't --

21           MR. GONZALEZ:  We've been over this.  He's a

22   medical doctor.  He's going to be recognized as an

23   expert, because he already identified himself as an

24   expert.

25           MR. BRODERICK:  No, he's not.  He hasn't been

                                                          40

1   disclosed as an expert.  So you can't testify --

2   Q.       BY MR. GONZALEZ:  Dr. Siegel --

3            MR. BRODERICK:  Don't do that, man.  He can't

4   testify in court as an expert unless somebody discloses

5   you and offers you as an expert.

6            MR. GONZALEZ:  We haven't gotten to that.

7            MR. BRODERICK:  Your time for that was over a

8   long time ago.

9            MR. GONZALEZ:  We're not even going to discuss

10   the time issue.  We're not going to discuss anything

11   off --

12           MR. BRODERICK:  Please don't talk over me.

13           MR. GONZALEZ:  We're not going to discuss what

14   we have been us.

15           MR. BRODERICK:  Please don't talk over me.

16   Please don't talk over me.

17   Q.       BY MR. GONZALEZ:  Doc, I would like --

18           MR. BRODERICK:  No.  Let me finish.

19   Q.       BY MR. GONZALEZ:  I would like you to finish

20   your --

21           MR. BRODERICK:  No.  Let me finish.  Let me

22   finish.

23           MR. GONZALEZ:  I'm sorry, but Mr. Broderick is

24   threatening me.  He's pointing his finger.  He's

25   harassing, and he's badgering me, and he's threatening

41

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   me.

2           MR. BRODERICK:  He's not threatening.  He's

3   saying, "Let me finish."

4           MR. GONZALEZ:  I would like him to control

5   himself, or we're going to go to the court and ask if

6   someone --

7           MR. BRODERICK:  Good.

8           MR. GONZALEZ:  -- could manage him.

9           MR. BRODERICK:  I brought her number.

10  (916) 930-4128.  Call it if you want.  I'm going to

11  finish making my record, sir --

12          MR. GONZALEZ:  Why don't we call her.

13          MR. BRODERICK:  -- or we will terminate this

14  deposition.

15          MR. GONZALEZ:  I want you to stop yelling.

16          MR. BRODERICK:  Do not talk over me.  Don't

17  talk over me.

18          MR. GONZALEZ:  I want you to stop yelling at

19  me.

20          MR. BRODERICK:  Don't talk over me.

21          MR. GONZALEZ:  I want you to stop yelling at

22  me.

23          MR. BRODERICK:  Don't talk over me.

24          MR. GONZALEZ:  Stop pointing your finger, and

25  stop yelling at me.

42

1      MR. BRODERICK:  I'm pointing my finger at

2  documents.  Don't talk over me.

3      MR. GONZALEZ:  You're pointing your finger at

4  my face.

5      MR. BRODERICK:  Okay.  Don't talk over me.  I'm

6  going to make my objections --

7      MR. GONZALEZ:  Call the judge.

8      MR. BRODERICK:  -- and then I'll be quiet.

9      MR. GONZALEZ:  Please call the judge.

10      MR. BRODERICK:  Shut your mouth.  I'm going to

11  make my objections, and then I'm going to --

12      MR. GONZALEZ:  Please call the judge.

13      MR. BRODERICK:  No.  I'm going to --

14      MR. GONZALEZ:  Please call the judge.

15      MR. BRODERICK:  I'm going to make my

16  objections.

17      MR. GONZALEZ:  I'm asking you to please call

18  the judge.

19      MR. BRODERICK:  Sir, this deposition is about

20  five minutes from being over.  I'm going to make -- be

21  quiet and let me make my record, and then I will be

22  quiet and let you ask your questions.

23      MR. GONZALEZ:  I asked a question.  It's been

24  pending, and I've asked Dr. Siegel a question.

25      MR. BRODERICK:  You would not let me finish my

43

1   objection, and I'm not going to let him answer any

2   question.



44



1

2

3

4

5

6

7

8    Q.      BY MR. GONZALEZ:   You answered the question.

9    You said it didn't concern you.

10    A.      Correct.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1   ████████████ █ █████████████████████

2   Q.      ███████████████

3          You mentioned hypertension and diabetes.  Are

4   those risk factors that the American Heart Association

5   considers?

6   A.      For what?

7   Q.      For coronary heart disease.

8   A.      Yes.

9   █ █████████████████████████████

10  ████████████████████ ████████████████

11  ████████ ████████ ██████████████████

12  ██████ ██████████

13  █ ████████████ ██ █████████ █████ █ ████████

14  █████████████████████████ █ █ ████

15  ████████████████████ █████████████████

16  █████████████

17  █████████████████ █████████████████████

18  █████████████████████████████

19  ██████████████████████████████

20  ██████████████████████████████

21  ██████████████████████████

22  ██████████████████ █████████ █████████

23  ██████ ████████ ████████ ████████ ████████

24  █████████████████

25  █      ██████

1   ■   ■■■■■■■■■■■■■■■■■■■■■■■■■■

2   ■■■■■■■■■■■■

3   Q.      And in addition to that, family history is

4   important too, isn't it?

5   ■   ■■■■■■   ■■■■■■■   ■■■■

6           THE WITNESS:  Yes, it is.

7   Q.      BY MR. GONZALEZ:  It is a risk factor; correct?

8   A.      It is a risk factor.  That's true.

9   ■       And for males, if there is someone who -- who

10  had a heart attack or died prior to the age of 50, that

11  was a concern?  It was considered a risk factor for

12  someone, correct, a male?

13  A.      Incorrect.  The age is 55.

14  Q.      55?

15  A.      Yeah.  Prior to 55, in a male, first-degree

16  relative.  And 65, in a female, first-degree relative.

17  Q.      I had a brother who died at 44.

18  A.      Uh-huh.

19  Q.      You had that in my medical record; correct?

20  A.      I don't know.  I don't recall that I do, but if

21  you had -- if you had a brother who died at 44 of a

22  myocardial infarction, yes, that would be considered a

23  risk factor.

24  Q.      And being a male over 60 was also a risk

25  factor?  Would that not be considered also a risk

47

1   factor?

2   A.      Yes.   In the framing of risk score, it takes

3   into consideration gender and age.

4   ▮▮ ▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6          THE WITNESS:   For cardiovascular disease.

7   Q.      BY MR. GONZALEZ:   And cardiovascular disease

8   predisposes someone to complications, such as blindness,

9   stroke, heart attack; is that correct?

10   ▮▮ ▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

12   ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮ ▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

14   ▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮

15   ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮

18   ▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮

19          THE WITNESS:   So would you like a detailed

20   answer?

21   Q.      BY MR. GONZALEZ:   No.   I just want a "yes" or a

22   "no."   Is that not correct?

23   A.      It's incorrect in the way that you phrased it.

24   Q.      What are the complications for coronary heart

25   disease, Dr. Siegel, in your opinion?

48

1   ██ ██████  ████████

2          THE WITNESS:  The complications of coronary

3   heart disease are primarily heart issues, such as

4   congestive heart failure.  Risk factor for

5   atherosclerosis throughout the body are not a

6   complication of heart disease, but atherosclerosis is a

7   predisposition to heart disease.  So I think you are

8   confusing cause and effect with effect-cause.

9   ██ █████ █████ █ █████████████████████

10  ██████████

11  ██ ███ ███ --

12  ███ █████ ███████

13  ██████ █████ ███ ██████

14  █ -- █████████ █████ ██████████

15  ████████████████████████████

16  ██████ ██ █ ██████████ █ ███

17  ██████ ████████

18  Q.    BY MR. GONZALEZ: █████  ███ ███

19  ██ ███

20          Dr. Siegel, you are familiar with my LDL-C

21  cholesterol levels?

22  A.    LDL, your cholesterol levels?

23  Q.    Yeah.

24  A.    I, again, did not review them.  I was focusing

25  on the musculoskeletal system.  But if you show me your

49

1    LDL levels, I'd be happy to give you an opinion about

2    that.

3    ████ ██████████    ██████████████

4         ██████████████    ████████████    ██████████    █████████

5    █ █████████████████

6    Q.       BY MR. GONZALEZ:  Do you admit that you failed

7    to properly diagnose my LDL-C levels that were 140 on

8    June 2011, 116 on May 2010, 127 on September 2009, and

9    133 on August 2009?  Those are milligrams per deciliter.

10   ████ ██████████    █████████████████████████████

11   ███████████████████████████    █████████████████████████

12   █████████████████████    █████████████████████████████

13   ████████████████████████████████████████████████████████

14   █████████████████

15   Q.       BY MR. GONZALEZ:  It has to do with my

16   blindness.

17   ████ ██████████    ████████████████

18   Q.       BY MR. GONZALEZ:  I'm asking again a question

19   about my LDL.

20            Can you -- again, answer the question.  Do you

21   admit that you did not properly diagnose those high

22   levels that were over 100 milligrams per deciliter on

23   those dates?

24   ████ ██████████    ██████████████████

25            THE WITNESS:  The answer is no.  I noted those

50

Accuracy-Plus Reporting, Inc.       (916) 787-4277



1    levels. █ ██████████  ████  ███████████████

2    ██████████████████

3    █  ████ ██████ ███████  █████████████████

4    ██████  --

5    █     █████████

6    █    --  ██████████

7    █    ████████████████████████████

8    ███████████████████████████████████

9    ████████████████████████████████████████

10   █████████████████  ████████ █████████  ████████

11   ██████

12   Q.      Dr. Siegel, does the American Heart Association

13   for people who have two risk factors or more recommend

14   that they be treated with statins to maintain their LDL

15   levels at 100 milligrams per deciliter or lower?

16           THE WITNESS:  No.

17   ████ █████████ ███████████████

18   ████████████  █████████████

19   Q.      BY MR. GONZALEZ:  So there is no such

20   recommendation --

21   ████ █████████ ███████████████

22   Q.      BY MR. GONZALEZ:  -- from the American Heart

23   Association?

24   A.      You have your LDL levels mixed up.

25   Q.      Dr. Siegel, did you ever do a risk factor

51

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   assessment or ever document a risk factor assessment of

2   me, ever?

3   A.      A risk factor assessment for cardiovascular

4   disease?

5   Q.      Right.  Did you ever do a calculation for that?

6   Did you ever take in the risk factors that were

7   presented to you in my records and compute a risk factor

8   calculation?

9   A.      Yes, I did.

10  ▉   ▉▉▉▉▉

11  ▉   ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉ ▉ ▉▉▉ ▉▉▉ ▉▉▉▉

12  ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉

13  ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉

14  Q.      Well, I want to know, when is it -- when did

15  you doc- -- when did you document that, or when did you

16  do that particular documentation in your record --

17  medical records, of my risk?

18  A.      It may not be present in the medical records.

19  Q.      So it's just you saying that?

20  A.      It's just my knowledge of cardiovascular risk

21  factors and where you fit in.

22  Q.      And what value did you come up with at that

23  particular time?  What was the percentage?

24  A.      I didn't come up with a percentage.

25  Q.      And doesn't the calculation require a

52

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1  percentage of a certain range?

2  A.      That is one way of looking at things.  It's not

3  mandatory.

4  Q.      I would like to submit this as Exhibit F.

5          (Exhibit F was marked for identification.)

6  ██ ███████     █████████████      ██

7  ██████████████████

8      ▌ █████████████████████

9      ██ ██████    ██████████

10     ██ ██████    ████████████   ██████

11     ██ ██████ ▌ ██ ▌ █████████████

12     ██ ███████  ████████    ▌ ██████████

13 Q.      BY MR. GONZALEZ:  Dr. Siegel, have you seen

14 those type of risk factor calculations done before?

15 A.      I have.

16 Q.      But you don't have one you've produced that

17 shows what your risk calculation is for me?

18 A.      No, I don't have one that specifically

19 discusses you.  If I may ask, out of curiosity, when was

20 this done?

21 Q.      It was done based on the records from the

22 values that were in the medical records from the VA

23 medical records, between 2000 and 2013.

24     ██ ██████    ██████   █████████

25 ████████████ ▌ ██████████   ████   █████

53



1

2

3

4

5

6

7

8

9

10

11

12

13    Q.      BY MR. GONZALEZ:  Does it state right here --

14    indicate American Heart Association, AA -- AHA?

15

16

17

18          THE WITNESS:  I presume that ACC stands for the

19    American College of Cardiology; AHA stands for the

20    American Heart Association.  That's what -- I presume

21    that, yes.

22

23

24

25

54

1   ██████████████

2   ██ ████████ ████████

3   ████████████ ██████████████

4   ███████████ ████████ ████ ███████

5   ████████ ██████ ████████ ███

6   ██████████ ██████████

7   Q.      BY MR. GONZALEZ:     ██████████████

8   ██████████

9           So getting back to my question about the LDL

10  levels, it is your medical opinion that you don't

11  advocate placing patients on statin treatments to help

12  maintain their LDL cholesterol levels under

13  100 milligrams per deciliter?

14  ██ ████████ ████████████ █

15  ████████████ ████████

16  ██ ████ ██████

17  ██ ████████ ████████ ███

18  ██████████ ██████ ████████

19  ████████ ████████ ███

20  ███ ████████████ ████████ ████

21  ██████████

22  ████████ ████████ ████ ██████

23  █ ████ ████ ████ ██.

24  A.      For people who have demonstrated cardiovascular

25  disease, such as a prior myocardial infarction, one

57

Accuracy-Plus Reporting, Inc.      (916) 787-4277

```
 1    tries to maintain their LDL less than 100.  Actually,

 2    70.  For individuals with risk factors, there are other

 3    LDL level goals.

 4              Does that answer your question?

 5              So in all patients, the answer to your question

 6    of LDL less than 100, the answer is no for everyone.

 7    That is my opinion.

 8    Q.        And a couple more questions on that.  You

 9    mentioned earlier "atherosclerosis."  For the record, is

10    that the plaque buildup that occurs in the arterial

11    muscle walls, or within the internal muscle walls of the

12    arteries?  Is that what you're referring to?

13    A.        That is somewhat of a crass definition of that.

14    Q.        Your definition --

15    A.        I mean, that's not -- that would be one way to

16    think about it, as sort of a thickening of the intimal

17    layer of the blood vessels, the arterials.

18    Q.        The arterials?

19    A.        Yes.

20    Q.        Okay.  And those are plaque buildup -- those

21    are like little pieces of chips, of hard cholesterol

22    buildup; is that correct?

23    A.        Not precisely.

24    Q.        What is it, then, in your opinion?

25    █       ██ -- ████████
```

58



1
2  -- I
3
4
5
6  --
7   A.      It's fat deposition within the intimal layer of
8   the arterials.
9   Q.      It's what?
10  A.      It's fat.  You know, various kinds of fats.
11  Q.      Is there cholesterol in that?
12  A.      Yes.
13
14
15
16
17
18
19
20
21
22
23
24
25  Q.      Okay.  Is hypolipidemia considered a risk

59

1    factor?

2    A.      Dyslipidemia is a risk factor.

3    Q.      What's the difference between hypolipidemia and

4    dyslipidemia?

5    A.      Dyslipidemia refers to an abnormality of any of

6    the cholesterol components, including low HDL.  And as

7    you might think, low HDL is not a hyperlipidemia, which

8    refers to high.  So dyslipidemia is a more accurate

9    term.

10    Q.      And I've had low HDL cholesterol readings, have

11    I not?

12    ██ ██████████  ██████ █

13       THE WITNESS:  Again, I'd like to review the

14    medical record to see what your HDL levels are.  I

15    haven't looked at those recently.

16    Q.      BY MR. GONZALEZ:  And would that raise any

17    concern by you or typically any VA doctor, that there

18    might be a metabolic problem that's going on in a

19    patient?

20    ███ ████████ ██ ███ ██████████████

21    █████ ███████████████████ ██████ ████████

22    ███████████████████ █████████████████████

23    ████████████████████ ██████ ███████

24    ██████████████ ████ ████ ████ ████ █

25    █████████████████████

60

1    Q.      BY MR. GONZALEZ:  I'm asking you as my treating

2    physician, my primary care doctor, this is about whether

3    or not you consider the low HDL cholesterol an

4    indication that, with the LDL cholesterol that was above

5    100 milligrams per deciliter, would you consider those

6    combinations something that needed to have intervention

7    of some sort, preventive treatment of some sort?

8         ▮▮ ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮

9         THE WITNESS:  As phrased, no.  I -- if you

10   like, why don't you ask me to expand on that.

11   Q.      BY MR. GONZALEZ:  No.

12   A.      Okay.  No, it is not an indication for a

13   treatment without considering other factors.

14        ▮▮ ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮

15   ▮▮▮▮

16        ▮▮ ▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮

17        ▮▮ ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮

18        (Whereupon, a brief recess was taken from

19        10:33 a.m. to 10:46 a.m.)

20        (Exhibit D was marked for identification.)

21   ▮▮   BY MR. GONZALEZ:  ▮▮▮▮  ▮ ▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮.

23        Dr. Siegel, I was asking you a question about

24   arteriosclerosis earlier, and you said it was fatty

25   deposits.

61

1          Do those fatty deposits always stay soft?

2     A.        Pardon me?

3     Q.        Do they always stay soft, or are they always --

4     do they get hard?  Do they solidify?

5     ███ ██████    ████████████████████████

6     ████████████████████████  ██████████████

7     ██   ██████  ██████  ██████   ████████████

8     ████████████████████

9     A.        They can change their composition in time.

10    Q.        And how do they change their composition?  Is

11    that because they get calcified sometimes?

12    ███ ██████    ████████████  ██████████

13          THE WITNESS:  Yes, they may get calcified.

14    Q.        BY MR. GONZALEZ:  That means a hardened

15    condition; right?

16    A.        That's one way to describe it.

17    Q.        And is that what they refer to as hardening of

18    the arteries, to a layperson?

19    A.        I don't know what the term "hardening of the

20    arteries" means.  I'm not sure that that's necessarily

21    associated with issues of calcification.  I think it's a

22    laymen's term.

23    Q.        Right.  And those calcifications of the -- at a

24    post, the fat issue, at a post issue, is that one solid

25    piece, or is that made up of fragments?

62

Accuracy-Plus Reporting, Inc.    (916) 787-4277



21    A.        So do you recall the movie My Cousin Vinny,

22    where Marisa Tomei was asked to testify, and somebody

23    asked her a question about the suspension of a car, and

24    she said, "That's a bullshit question"?

25              And what she meant by that is, that the premise

65

1   of the question and the way that it was phrased was

2   inaccurate, which did not allow a precise response.

3         Many of your questions about the path of

4   physiology of atherosclerosis and cardiovascular disease

5   are of a similar nature.  I do consider myself

6   knowledgeable in this area, and you're asking imprecise

7   questions, and you're asking for a precise response to

8   those questions.



Accuracy-Plus Reporting, Inc.       (916) 787-4277

1   ████ --

2            MR. GONZALEZ:  Then I'm going to move to strike

3   his answer as nonresponsive.

4            Can I ask a question again for us to -- for the

5   idiot that sits across from you that doesn't understand

6   anything?

7   Q.       BY MR. GONZALEZ:  My question goes to the fact,

8   this hardening of the internal part of the arteries, is

9   it one solid, giant block, or is it made up of segments

10  and then fragments?

11  ██ ████████   █████████████████████████████

12  ████████████████████████████████████████

13           THE WITNESS:  And I would again say that that

14  is a question that lacks precision that doesn't allow me

15  to answer.

16  Q.       BY MR. GONZALEZ:  Why don't you give me a

17  description of what you consider to be arteriosclerosis,

18  a severe case?

19  ██ ████████   ██████████████████████████████

20  ██████████████████████████████

21           THE WITNESS:  What usually precipitates a heart

22  attack is a part of the plaque that is referred to as

23  vulnerable.  And then there is a rupture of the

24  vulnerable plaque, where they, with platelet adhesion

25  and a clot that forms in the lumen of the blood vessel,

67

1   which blocks blood flow.

2   Q.      BY MR. GONZALEZ:  And this could happen in any

3   artery; correct?

4   A.      No.   There are certain arteries that are more

5   prone to that than others.

6   Q.      Which are the ones --

7   A.      The ones that have vulnerable plaques.

8   Q.      Okay.   Which of those arteries?

9   ▉▉ ▉▉▉▉▉▉    ▉▉▉▉▉▉▉▉

10  Q.      BY MR. GONZALEZ:  To your knowledge.

11  ▉▉ ▉▉▉▉▉▉    ▉▉▉▉▉▉▉

12          THE WITNESS:  Again, that doesn't -- which are

13  those vessels?  I mean, it can happen in a coronary

14  vessel, if you're asking.  The left main, which is the

15  mid Widowmaker.  It can happen in the left anterior

16  descending, and it can happen in the right coronary

17  artery, the circumflex artery.  If you're saying which

18  vessels in the heart, obviously, there are other vessels

19  throughout the body where that could happen as well.

20  Q.      BY MR. GONZALEZ:  Yeah.  Peripherally in the

21  body, can that also happen?

22  ▉▉ ▉▉▉▉▉▉    ▉▉▉▉▉▉    ▉▉▉▉▉▉

23          THE WITNESS:  It's a different path of

24  physiology.  What I'm referring to primarily happens in

25  the heart.

68

1  Q.       BY MR. GONZALEZ:  But peripherally -- is there

2  a condition called peripheral vascular disease?

3  A.       Yes.

4  ████ ████████      █████████      ██████████████

5  ██████

6          THE WITNESS:  Yes, there is.

7  ██   ██████ ███████   ██████████████████

8  ██    █████ █ ███

9  Q.       Okay.  So peripherally, this arterial occlusion

10 that occurs with this plaque can happen throughout any

11 part of the body?

12 ████ ██████      ████████████      ████████

13 ████████

14          THE WITNESS:  One could have atherosclerosis

15 throughout the arterial system, yes.

16 Q.       BY MR. GONZALEZ:  Not throughout, but it can

17 happen in an extremity, a leg, where arteries --

18 wherever arteries have --

19 A.       Some blood vessels are more prone to it than

20 others.

21 Q.       And that's because of their size?

22 ████ ████████      ████████      ████████

23 █████████████   ██████████████████████████

24 █████ ████████████████████████████████

25 ████████████

69

1        THE WITNESS:  Well, I'm sorry.

2    Q.     BY MR. GONZALEZ:  Is that because of the

3    size --

4    ███ ██████  ███ ██████    ██████

5    ██████

6    Q.     BY MR. GONZALEZ:  -- of an artery?

7    A.     No.

8    Q.     Is that because of the blood flow that goes

9    through that artery?

10   ███ ██████   ██████████

11       THE WITNESS:  Not precisely.

12   Q.     BY MR. GONZALEZ:  Then what are the factors

13   that make a particular artery more prone to having an

14   occlusion occur from atherosclerosis?

15   ███ ██████   ██████████

16       THE WITNESS:  It's a good question.  It's not

17   precisely known, but it has to do with turbulence of

18   blood vessel.  It has to do with the issues of blood

19   bifurcations of blood vessels.  It has to do with --

20   frankly, it has to do with what's called endothelial

21   function.

22       I mean, it's a complicated question that people

23   have been working on for many decades, and the precise

24   answer is not a simple one.

25   Q.     BY MR. GONZALEZ:  And so this -- this -- you

1  mentioned earlier that it was like a cluster, right,

2  that breaks off, like a thrombi?  Is that what they call

3  thrombi?

4  A.        It's not a cluster.  It's a rupture in the

5  heart that we're talking about.

6  ███       █████████████████████████  ████████  ███

7  █ --

8  █         ████████  ████████████  █████████████  █████████

9  ████████  ████████

10           █████  █████  ██████████████  █████████

11  ████████████████  ██████  ███████████████  ████████████

12  ████████  ██████████████████████  █████████  ████

13  ████████

14  ██        ██████

15  ██        ██████  ████████  ████████████████████

16  Q.        Okay.  But when you get to smaller arteries and

17  arterials, it's more likely that these clusters can

18  occlude those areas; is that not correct?

19           █████  ██████████  █████████████  █████████

20  ████████

21           THE WITNESS:  I'm not sure what I understand as

22  the term "cluster" that you're referring to.

23  Q.        BY MR. GONZALEZ:  Well, you mentioned earlier

24  that there is a rupture of --

25  A.        A vulnerable plaque.

71

1    Q.      A vulnerable plaque is what you mentioned,

2    right.

3    A.      That's correct.  You mentioned that.

4    Q.      So that -- I'm picturing it's a piece of

5    some -- hardened piece of cholesterol or fatty tissue?

6    A.      No.  That's not what -- that's not what the --

7    what happens.

8    Q.      Okay.  So describe to me what happens?

9    A.      Again, there's something called the plaque

10   shoulder.  There's areas that are considered vulnerable.

11   Those could open up and rupture, and then there's

12   platelet adhesion, and a whole series of things that

13   results in a thrombus that occludes a blood vessel in

14   the heart.  That's not necessarily what happens at other

15   parts of the body.

16   Q.      But that piece that separates -- right?  It

17   separates; correct?  It separates from --

18   A.      Mr. Gonzalez, I'm again having difficulty

19   answering your questions, because quite frankly, you

20   don't have the background to ask the intelligent

21   question about what happens, nor would I expect you to,

22   because you're not trained, nor would most physicians,

23   by the way.

24   Q.      So is this a floating piece of -- you called it

25   a rupture or --

72

1   A.      No, it's not floating.  Okay?

2   Q.      So how does -- so how does an embolism occur?

3   ███ ███████  ████████  ████  ███████▙

4   ██████

5           THE WITNESS:  So an embolism is different than

6   the process that I described.

7   Q.      BY MR. GONZALEZ:  And how is it different?

8   ███ ███████  ████████  ████████████▙

9   ██████

10          THE WITNESS:  An embolism is, in fact,

11  something -- a discreet clot, let's say, or something of

12  that sort, that breaks off from somewhere, that

13  migrates.

14          So to give you an example, people in atrial

15  fibrillation are prone to develop clots in the atria of

16  the heart.  Those can break off and go to the brain and

17  cause a stroke.  Okay?

18  Q.      BY MR. GONZALEZ:  And that could happen -- and

19  you agree that the arteries and the arterials and the

20  venous structure in the eye is very small?

21  ███ ███████  ████████  ████████

22  ██████ ████████████████████  █████

23  ███████████████  ███████  ████████

24  █████████

25          THE WITNESS:  You lump the arterial system and

73

1  the venous system.  The path of physiology is totally

2  different.  You said the venous system.

3  Q.      BY MR. GONZALEZ:  Okay.  Well, the arterial

4  system, then.  Is that -- is that correct, is that

5  they're very small in the eye?

6          ███ ██████████  ██████  --

7          THE WITNESS:  Are you talking about the size of

8  the blood vessels?

9          ███ ██████████  █████████████  ████████

10  ██████████

11          THE WITNESS:  I would ask you, very small

12  compared to what?

13  Q.      BY MR. GONZALEZ:  Compared to the heart.

14  A.      Compared to the coronary arteries?

15  Q.      Compared to the carotid arteries.

16          MR. BRODERICK:  We're taking a break right now.

17  There's no question pending.  We're taking a break.  I'm

18  going to call somebody, and I'll be back.

19          MR. GONZALEZ:  You call in front of me is what

20  you will do.  You will call the judge, and then we can

21  have the judge decide whether he is --

22          MR. BRODERICK:  I'm going to call whoever I

23  want.  You're not going to tell me who I'm going to

24  call, but I'm not going to call the judge right now.

25          MR. GONZALEZ:  Why don't you call the judge

74

1   right now.  I'm going to ask the judge.

2        MR. BRODERICK:  I'm going to call somebody

3   else.  We're off the record, and we're going outside.

4             (Whereupon, a brief recess was taken from

5             11:00 a.m. to 11:08 a.m.)

6        MR. GONZALEZ:  Back on the record.

7        Could you repeat the question that was pending

8   to Dr. Siegel, the last question, please?

9             (Whereupon, the previous question was read by

10            the Reporter.)

11  Q.      BY MR. GONZALEZ:  Okay.  So going back to --

12  you mentioned the embolism.  The embolism can lead to a

13  stroke.  How does an embolism -- how's that?  Is that a

14  cluster, or does that occlude the artery?  Or is that

15  what happens?

16  ████████  ██████        ██████████████

17  ███████  ████████████████████████  ██████████████

18  ████████████████

19        THE WITNESS:  You know, I must tell you that

20  I'm capable of having an abstract discussion of the path

21  of physiology of various cardiovascular diseases, but I

22  don't believe it's something that I want to get into

23  right now.  I don't see how it's, frankly, pertinent to

24  this particular case.

25  █      ████████  ████████    ██████████

75

Accuracy-Plus Reporting, Inc.      (916) 787-4277



7   Q.       So my blindness, isn't that a result of an

8   embolism?

11          THE WITNESS:  Well, I'm not an ophthalmologist,

12   and I would just answer that probably the causes of

13   blindness are many.  Right?  So in what context I'm not

14   certain that you're referring to, but, again, I'm not an

15   ophthalmologist, so that's best -- issues pertinent to

16   the eye are best left to the ophthalmologist.

1   Q.      BY MR. GONZALEZ:  Did you read the

2   ophthalmologist's report when you referred me over there

3   in January of 2013?

4   A.      Yes.

5   Q.      So what was the diagnosis that the

6   ophthalmologist gave as a cause or condition of my left

7   eye blindness?

8   ▉▉ ▉▉▉▉ ▉▉▉▉▉▉ ▉▉▉▉▉

9   ▉▉▉▉▉▉

10          THE WITNESS:  To the best of my recollection,

11   the ophthalmologist was not certain, and, basically,

12   commented that your response to, I believe, various

13   tests that she did was somewhat inconsistent.

14   ▉ ▉▉▉ ▉▉▉ ▉▉▉▉▉

15   ▉ ▉▉▉ ▉▉▉ ▉ ▉▉▉▉▉▉

16   ▉▉▉▉ ▉▉▉▉ ▉ ▉▉▉

17   ▉▉▉▉▉▉▉▉

18   ▉ ▉▉▉▉▉▉ ▉

19   ▉▉ ▉▉▉ ▉▉▉ ▉▉▉

20   ▉▉ ▉▉▉▉▉

21   ▉▉▉ ▉▉ ▉▉▉ ▉▉

22   Q.      BY MR. GONZALEZ:  And does that mean that there

23   is no blindness in my left eye; that I'm somehow

24   fabricating it?

25   ▉▉ ▉▉▉ ▉▉▉▉

77

1    THE WITNESS:  You know, I'm going to leave that

2  to the ophthalmologist.

3  Q.    BY MR. GONZALEZ:  But I'm asking you.  Is that

4  what you believe, that it's just something that just

5  doesn't exist?

6        ▮▮ ▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮

7    THE WITNESS:  I'm not prepared to say that

8  there is no field deficit in your left eye, and I'm not

9  prepared to say that there is.

10 Q.    BY MR. GONZALEZ:  So you're saying that there

11 is no blindness in my left eye; is that what I

12 understood?

13 A.    No.

14       ▮▮ ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮

15       ▮▮▮▮▮▮▮ ▮▮  ▮▮▮▮▮▮▮▮▮

16       ▮▮ ▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮

17 Q.    BY MR. GONZALEZ:  So do you acknowledge that

18 the ophthalmologist recognized that there was an area of

19 blindness in my left eye?

20       ▮▮ ▮▮▮▮▮▮▮   ▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

23    THE WITNESS:  Right.  I think your question

24 would be best asked of the ophthalmologist.

25 Q.    BY MR. GONZALEZ:  I'm asking you as my primary

78

1   physician.  Do you acknowledge that -- you read the

2   records, and you read the report.  Did the

3   ophthalmologist make a conclusion that a certain

4   portion -- a large portion of my left eye is -- cannot

5   see?

6

7

8           THE WITNESS:  As I said, my recollection of her

9   note, which is not precise, was that she noted some

10   inconsistencies in your response to some of her testing.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79



9   Q.      BY MR. GONZALEZ:  So you're saying that there

10  was no blindness in January of 2013.  There was no loss

11  of vision in my left eye?

13              THE WITNESS:  No, I'm not saying that.

21  Q.      That's not answering what -- I'm asking you

22  about loss of vision.  Yes or no?

25              THE WITNESS:  I am trying to say to you --

80

1    Q.      BY MR. GONZALEZ:  Did you recognize that there

2    is a loss of vision on January of 2013?

3    A.      So maybe I should go back a step to note that,

4    in some instances, there is not a "yes" or "no"

5    response.  There is a measure of uncertainty.  But,

6    again, I think you need to ask the ophthalmologist what

7    she meant, because I've been trying to interpret what

8    she thought based on her note, which is imprecise.  She

9    probably could give you a more definite response to that

10   question.

11   ████  ████  ████████████  ████  ████

12   ████

13        ██  █████  ██████      ████████

14   ██████████████████████████████

15        ██████  ████  ██████████████

16   ███    ██          ██████████████

17        ██████████████████████████

18   ████████████████████      ██████

19   ████████  ██████      ██  ████████

20   ██████████████████████

21        ████████████████████████████

22   ██████████████████████████████

23   ████████████████

24   Q.      BY MR. GONZALEZ:  Did the ophthalmologist

25   diagnose loss of vision as -- did she term it as a

1   non-arterial neuropathy?

2   ███ ███████      █████████████████

3   ██████  █ █████████████████   ███████████

4   ██ █████████   █ ██████████████   ████████████

5   ████████████  --

6           THE WITNESS:  Well, I don't recall exactly what

7   she put in the note.  I'm sorry.  If you want to pull it

8   up, I'll be happy to look at it, her note, and see

9   exactly what it was that she said.

10           (Whereupon, a brief recess was taken from

11           11:17 a.m. to 11:19 a.m.)

12   Q.      BY MR. GONZALEZ:  Back on the record.

13           Earlier, Dr. Siegel, you acknowledged that you

14   saw the report of Dr. Judith Sabah, who is a -- I

15   believe in the ophthalmology department over at the VA;

16   is that correct?

17   A.      I don't -- I did read a note.  I can't remember

18   who the author of the note was, but if you want to give

19   me the note, I'll try to recall the details.

20   Q.      Okay.  Those are the notes from January 18,

21   2013.

22   A.      Okay.  I see the note dated January 18th, 2013.

23   Q.      Okay.  Did she conclude that I had a -- what

24   did she call it? -- a non-arterial optic neuropathy or

25   edema?

                                                              82

        Accuracy-Plus Reporting, Inc.    (916) 787-4277

1

2

3

4

5          THE WITNESS:  Let's see.  Okay.  What I see

6   written here is, "Optic nerve edema OS - unclear

7   etiology."

8   Q.        BY MR. GONZALEZ:  So edema means that there was

9   a hemorrhaging?

10  A.        No, it does not mean that.

11  Q.        What does that mean?

12  A.        Edema means swelling, in a laymen's term.

13  Q.        Edema means swelling.  Okay.  And is swelling

14  from fluids?

15

16

17

18          THE WITNESS:  So you use the word "hemorrhage,"

19  which refers to blood.  Edema is not generally blood.

20  It's almost always other tissue fluids.

21

22

23

24

25



1

2

3

4

5   --

6

7

8

9

10

11

12

13

14

15

16

17

18

19   --

20

21

22   Q.      So it was never diagnosed by the VA, then, that

23   I had any sort of neuropathy that occurred in my eye?

24

25

85

1 ███ ████ ████ ██████████

2 ████████████████████████████████

3 ███████████ ████ ████ █████████

4 ████

5 ████ ██████ ██████████████

6      THE WITNESS:  I'm trying to read this note

7 where it might mention that -- a quick perusal of the

8 note, I can't see the term optic neuropathy, although it

9 may be here somewhere.  It says, "Optic nerve edema OS -

10 unclear etiology," which means "cause unknown."

11 ████ ██████████

12 █ ████ ████ ████ ██████ ██

13 ██████ -- ██████████ █████

14 ██████

15 ████ ████ ██████

16 ██████████████████████

17 ██████ ███.

18 ████ ████ ████████████

19 ████ ██ ██████ ████ ████

20 ██████

21 ██████ █████████ ██████ █

22 ████████

23 Q.     BY MR. GONZALEZ:  Just so I understand, do

24 you -- do you believe that this embolism that occurs

25 when there's a rupture or something, when something

86

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   happens, that you said that causes a stroke; right?   You

2   said that earlier, that an embolism --

3   A.        I did not say that the term "rupture" and

4   "embolism" go together.   I did not say that, no.

5   ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ -- ▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮

9   ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

11  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮

12  Q.        BY MR. GONZALEZ:   Is that what happened to my

13  eye?

14  ▮▮ ▮▮▮▮▮ ▮▮▮▮▮

15            THE WITNESS:   I don't know what happened to

16  your eye, nor did the ophthalmologist who noted unclear

17  etiology.

18  Q.        BY MR. GONZALEZ:   Did you ever treat me for the

19  hypolipidemia that you noted in my medical records?

20  ▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮

21            THE WITNESS:   I don't know that I noted you had

22  dyslipidemia in the medical records.

23  Q.        BY MR. GONZALEZ:   You didn't note it in the

24  medical records that there was hypolipidemia?

25  A.        I don't recall if I did or I didn't over the

87

1   course of 15 years.

2   Q.        If you did record it --

3   ██████ ████████    ████████████████

4   Q.        BY MR. GONZALEZ:   -- what would be the

5   choice -- treatment of choice for you, for such a

6   condition?

7   ███ ██████   ████████████████████████████

8   ██████ ██████ ████████████████████   ████████

9   ████████████████   ████████████████████████

10  ████████████

11              THE WITNESS:   Again, it's an unclear question

12  that is not allowed a response.

13  ██    ███ ██████   ██ ████   ████████████

14  ███ ██████   ████████████████   ████████

15  ████████████████████████   ██████████████

16  ████████████████████████████   ████████

17  ████████████████████████   ██████████

18        ██████ ████████   ████████████████████████

19  ██████   ████████████████████████

20        ████████████   ████████████████████

21  ██   ██████████   ████████████████████████

22  ████████████████   ████████████████████████

23  ████████████████████████████████████████

24  ████████   ████████████████████   ████████████

25  ████



1

2  --

3

4

5  Q.

6

7

8

9

10

11

12  Q.      BY MR. GONZALEZ:  Do you know what the term

13  "eGFR" means?

14

15          THE WITNESS:  Yes, I do.

16  Q.      BY MR. GONZALEZ:  Okay.  And does that refer to

17  the glomerular filtration rate?

18  A.      Yes.  Estimated glomerular filtration rate.

19

20

21

22

23  Q.      And that is a measure of renal function, is it

24  not?

25  A.      Yes.

89

1   Q.      And it's a critical measure of renal function,

2   is it not?

3   ████ ██████████ ████████ █████████████

4   ██████ █████████ ██████████ ▌ ████████████████████████

5   ████████

6           THE WITNESS:   It is a measure of renal

7   function, yes, that is frequently used.

8   Q.      BY MR. GONZALEZ:  Do you consider it an

9   important measure of renal function?

10  A.      Yes --

11  ████ █████████ ███████████████

12          THE WITNESS:   -- I do.

13  Q.      BY MR. GONZALEZ:   In the lab reports that were

14  taken September 28, 2009, that were reported to you, the

15  estimated glomerular filtration rate was rated at 53.5?

16  A.      Uh-huh.

17  Q.      Is that, in your opinion, normal?

18  ████ ██████████ ██████████████ ████████████

19  ██████████████████████████████████████████

20  ████████████████ ▌ ████████████████████ ▌ ████████████████

21  ████████████

22  █ █████████ █████████ ███████ ███████████████

23  ████████████████████████████████████████ --

24  █ █████████ ▌ ████████████████████████████

25  ████████████████████████████████████████

90

Accuracy-Plus Reporting, Inc.     (916) 787-4277



Q.        BY MR. GONZALEZ:

          I'm going to move to strike as

nonresponsive to the answer to the question.

          Again, I'm going to ask you:  I gave you the

date, September 28, 2009.  The value of the eGFR from

the laboratory to you, right, in the medical reports, is

53.5.  I'm going to ask you again.  Is that within the

normal range --

A.        Would you like me to describe --

Q.        -- of eGFR?

91

1   A.      -- the various CKD 1 through 5, the creatinine

2   clearances related to each one? I can do that if you'd

3   like.

4   Q.      I would like you to answer the question.

5   A.      But I don't know what you're telling me is

6   accurate.

92

1   ███ ██████ ██████ ████ ████████

2   ███████ ███ █████████

3   Q.      BY MR. GONZALEZ:  Do you know what the normal

4   range is for eGFR?

5   A.        Actually, what I just described to you is -- I

6   can describe to you CKD 1 through 5 and the precise

7   creatinine clearances of that.  That would probably --

8   that would be considered a creatinine clearance of 53 --

9   I don't know why I'm answering this -- would be

10  considered CKD 3A, if you're interested.  CKD 4 would be

11  a creatinine clearance of 15 to 30.  CKD 5 would be less

12  than 15.

13  Q.      I'm asking you, do you know what the normal

14  is -- does it have to be above a certain number for it

15  to be considered normal range?

16  ███ ██████ ██████ █████

17  ██████

18  Q.      BY MR. GONZALEZ:  Or is it considered below a

19  certain number that is considered to be --

20  A.        I believe what you've described --

21  ███ ██████ ██████ █████

22  ██████ ████████ ███ ████

23  ████

24          THE WITNESS:  So for normal individuals, the

25  creatinine clearance is considered greater than 90.  For

93

1    a CKD 2, it is 60 to 90.  CKD 3 is 30 to 60.  CKD 3A is

2    45 to 60.  CKD 3B is 30 to 45.  CKD 2 is 15 to 30, and

3    CKD 4 is less -- creatinine clearance of less than 15.

4    Q.    ████ ████   ████

5    A.   ██████████████   ███████

6    15.

7    █  ███████████████ ███████████████

8    ████████

9    █   █████████████ ████ █████

10   ███████   ███   ██████████

11   ███████ ███ █ ███

12   █   █████████████   ███ ███

13   ███████   ████████████████

14   ████████ ██████████ █ █████████

15   ██████

16   █   ████████████

17   █   ██████ -- █████ ████████████

18   ██████████████ █ ██████████████

19   █   ███ █

20   ███████████ ████████ █████████████

21   ██████

22   █   ██████████

23   █   █████ █████ ███ ████████

24      ███ ██████   ██

25      ████████ ███ ████



94

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   [redacted]

2   [redacted]

3   Q.      BY MR. GONZALEZ:   Thank you.

4           So let's get back to this question of

5   nephrology.  Do you agree that, in your evaluation of my

6   medical care, that there was some renal dysfunction that

7   was occurring sometime between 2000 and 2012, 2013?

8   A.      Again, I would have to review the records.  But

9   to move this along -- because I really would like to get

10  to this issue of your -- shoulder issue, and I am not

11  anxious to come back -- a creatinine clearance of 53

12  would be considered chronic kidney disease stage 3A.

13  Q.      Thank you.  [redacted]

14  A.      If that was your creatinine clearance.  Okay?

15  Q.      Okay.  Now, you said creatinine, but I was

16  talking about the glomerular filtration rate.  Are we

17  talking about the same thing?

18  A.      In essence.

19  Q.      What's the difference?

20  A.      I'm not -- I don't want to get into that.

21  Q.      Why did you mention creatinine was the 53.5?

22  A.      I'm telling you what the definition is of

23  creatinine clearance with the various stages of chronic

24  kidney disease.  But there is a correlation between

25  glomerular filtration rate.  But what a physician

95

1  receives on the chart is an estimation of creatinine

2  clearance.

3  Q.      So that's the GFR that we were talking about,

4  glomerular filtration rate?

5  A.      It's related.

6  ████ ████████ ████ ████ ████████████

7  ███████████████████████████████████████████

8  ████████████████████████

9      ████ ████████ ████ ████████████████████

10 ████████████████████████████

11 Q.      BY MR. GONZALEZ:  I want to know why did you

12 mention creatinine when we're talking about the

13 glomerular filtration rate?

14 A.      Because that's what we receive as the estimated

15 creatinine clearance as part of the record, as part of

16 the laboratory values.  It will say "estimated

17 creatinine clearance."

18     ████ ████████ ████████ ███████ ████████████

19 ██ ████████████ ████████████

20     ████ ████████ ████ ████████████ ████████

21 ██████████████████████████████

22     ████ ████████████████████████████

23 ████████████ ████████ ████████ ████████████

24 ████████████ ██

25 Q.      BY MR. GONZALEZ:  All right.  Now, on

96

1  March 22nd, 2012, the medical records, when I was under

2  your care, indicated that the eGFR, the estimated

3  glomerular filtration rate, was at 55.9.  Did you

4  consider that to be normal?

5  ████  ██████████  ████████████████████

6  ████████████████████████████████████████

7  ██████████████████

8        THE WITNESS:  If that was the case, which I

9  don't have the chart in front of me to verify, that

10  would be considered CKD, chronic kidney disease, stage

11  3A.

12        MR. GONZALEZ:  Okay.  Now, I'm going to submit

13  this as Exhibit G.

14        (Exhibit G was marked for identification.)

15        THE WITNESS:  What is this?  This is,

16  "Indications and Contraindications for the Use of

17  Nonsteroidal Antiinflammatory Drugs in Urology."

18        Okay.  Yes, I see this.

19  Q.     BY MR. GONZALEZ:  Okay.  Do you note that that

20  is published in 1985?

21  A.     Yes.

22  Q.     Okay.  So since 1985, it's been medically known

23  that nonsteroidal antiinflammatory medications were

24  contraindicated for people with renal disease

25  dysfunction?

97

1    [REDACTED]

2    THE WITNESS:  No.  Again --

3    [REDACTED]

4    [REDACTED]

5    [REDACTED]

6    [REDACTED]

7    [REDACTED]

8    THE WITNESS:  Nonetheless, I will answer the

9   question no.  It's frankly much more nuanced than that.

10   [REDACTED]

11   [REDACTED]

12   [REDACTED]

13   [REDACTED]

14   [REDACTED]

15   [REDACTED]

16   [REDACTED]

17   [REDACTED]

18   [REDACTED]

19   [REDACTED]

20   Q.     BY MR. GONZALEZ:  I'm going to ask the question

21   again, Doctor.  Is it well-known since 1985 that, I'm

22   going to say, the nonsteroidal antiinflammatory drugs,

23   or otherwise known as NSAIDs, were contraindicated for

24   people who had renal dysfunction, regardless --

25   specifically, people who had severe or serious stage

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1  renal dysfunctions?

2  ████ ████████ █ ████████████

3  ████████ ████████████████████ ██████

4  ████████████████

5      THE WITNESS:  And I would respond again that

6  it's more nuanced than stating somebody has kidney

7  disease, because there are various stages of kidney

8  disease in various age groups.

9      MR. GONZALEZ:  I'd like to submit this as

10  Exhibit H.

11      (Exhibit H was marked for identification.)

12  Q.    BY MR. GONZALEZ:  Doctor, right here it says --

13  can you read that, "from similarly," into the record,

14  please?  "Similarly," forward for about two sentences

15  there.

16  A.    "Similarly, the kidney may be especially

17  susceptible to adverse effects of NSAIDs.  In diseases

18  such as peptic ulcers, diabetes, hypertension,

19  congestive heart failure, liver disease with ascites,

20  and renal insufficiency.  PGs seem to play a protective

21  role in the kidney."

22  Q.    What does "PG" stand for?

23  A.    Prostaglandins.

24  Q.    And doesn't the NSAIDs interfere or disrupt the

25  synthesis -- prostaglandins synthesis?

99

1  ███████ ████████ █████████ ████████████

2  ███████ ████████████████ ████████

3  ██ █████████ ██████████ ████████████████

4  █████████████████████████████████ ██████████

5  █████████████

6  ██ ██████ ████████████ ███████████ ████ ████

7  █████████████████████████████████

8  ███████████████ █████ ████████████████

9  ████████████████████████████████████████

10 █████████████████████████████████ █████ ██████

11 ████████

12  Q.      All right.  But to my question, doesn't these

13  NSAIDs interfere with the prostaglandins synthesis,

14  according to this article?

15  ████ ████████ ████████████ ████████

16  ██████████████████████

17          THE WITNESS:  I haven't read that article.

18  It's published in 1985 --

19  Q.      BY MR. GONZALEZ:  Right.

20  A.      -- in seminars in urology.

21          Urology is an independent subspecialty of

22  surgery, not -- so I have no familiarity with that

23  article.  But I'll answer your question.

24  Q.      Do you want to read it?

25  A.      No, I read what's said there, but, yes,

1  nonsteroid antiinflammatory drugs do have an affect on

2  prostaglandins.

3  Q.        Okay.  Negative effect; correct?

4  ████  ███████   ████████    █████████████

5  ██████   █████████████████████

6          THE WITNESS:  Again, a bit more nuanced than

7  that.

8  Q.        BY MR. GONZALEZ:  Is it -- is it helpful to put

9  someone on NSAIDs who has renal dysfunction history, or

10  is it less likely to be helpful --

11  ████   ███████    ████████    █████████

12  ██████

13  ██   ████████    ██████    ████████████

14      ████  ███████    ██████████████

15      ███████    █████████    ███████████

16  ███████████   █████████    █████████  ██

17  ██████████████    ████████████████

18  █████████████

19  █████████    █████████████████

20  ████████████████████    ██████████

21  ██████

22  Q.        BY MR. GONZALEZ:  I'll let you look at that

23  article by a nephrologist.

24  A.        Yes.

25  Q.        Can you read into the record what the title of

101

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    that article is, please?

2    A.        "The Top Ten Things Nephrologists Wish Every

3    Primary Care Physician Knew."

4    Q.        Okay.  In that article, is there a section

5    where the doctor talks -- the nephrologist talks about

6    NSAIDs being contraindicated specifically for people who

7    have any kind of renal history?

8    ███ █████████   ████████████████████████

9    ██████████████

10   ██   █████████ █████████   ████████████████

11   A.        I have not read this article.  And if you'd

12   like me to -- can you point out the section that you're

13   referring to?

14   ███ █████████  █████████████████████ █

15   ████████████████ ███████████████

16   ██████████ ██████████   █████████████████

17   █████████████████

18   Q.        BY MR. GONZALEZ:  Under section three of this

19   article, he talks about eGFRs and NSAIDs in correlation.

20   ███ █████████   ████████████████

21   Q.        BY MR. GONZALEZ:  And does -- isn't it not true

22   that the nephrologists do not recommend the use of

23   NSAIDs for people who have kidney dysfunction histories?

24   ███ █████████   █████████████ ████████████

25   ████████████ ██ ██████████████████

                                                          102

1　███████　████████████████

2　██████████████

3　　　　THE WITNESS:  Well, again, I would want to read

4　this article in its entirety to give you an opinion

5　about what this particular nephrologist is suggesting,

6　and I haven't had an opportunity to do that.

7　Q.　　BY MR. GONZALEZ:  Well, I'm sure when you get a

8　copy of the deposition, it will be attached, and you can

9　certainly have it then.

10　A.　　Well, thank you.  It talks about patients with

11　diabetes and albuminuria.

12　　　　MR. BRODERICK:  Do you want to read it?

13　　　　THE WITNESS:  No, no.  Go ahead.

14　█　███████ ███████　████████████

15　　　███ █████ █ █████████████　████████████

16　█████████ ████████████████████████ █ ████████

17　████████████████████████████████████████████████

18　██████ ████ ███ █████████████████ ████████

19　████████████ ██████████　█████████████

20　████████

21　　　█ ████████████████████ ████████████

22　████████ ████████ ███████ ██████

23　█████████ █ █ ██████████████████████

24　████████ █████████████████ ████████████

25　███████████ █████████████

1    ███████████████

2         ████   ████████   ████████   ████████   █   ██████

3    ████████

4         ████████████   ██████████████████████████

5    ████████████████████████████████████████████

6    ██████   ████████████████████████████████████   ███

7    ██████   ████████████████████

8    Q.       BY MR. GONZALEZ:  Doctor, I'm asking, when you

9    did see me, is it your duty to review all of the records

10   and the information, including laboratory results, and

11   make an assessment of those results?

12   A.       When I --

13         ███   ████████   ████████   ████████   █   █████

14   ██████████

15         THE WITNESS:  When I see you, I review all of

16   the laboratory results.

17   ███   ████████   ████████   ████████   ████████

18   ████████   ████████████████████████   ████   ██████

19         ████   ████████   ████████████████   ████

20   ████████████████   ████████████████████████████████

21   ██████████████   ██████   ████████   ██████████   ████████

22   ████████

23   █   ██████   ██████████████████████████████████████

24   ████████   ████████████   █   ██████   ████   █   ████████

25   ████████████████████████████████████████████████████

109

Accuracy-Plus Reporting, Inc.       (916) 787-4277



1

2

3

4

5

6

7

8

9

10

11

12

13  Q.     BY MR. GONZALEZ:  But when there's laboratory

14  results, that's the responsibility of the patient too?

15

16

17

18

19

20       THE WITNESS:  The laboratory -- the

21  responsibility of dealing with the laboratory results

22  are the responsibility of the ordering physician.

23

24

25

110

1 ████ ██████ ████ ████████████████

2 ██████████████████████████████████ ██

3 ██████████████████

4  Q.      BY MR. GONZALEZ:  So -- but when you're aware

5  of those laboratory results, and they're abnormal or

6  outside the normal range, is it not your duty to take

7  some sort of preventive action?

8 ████ ██████ ███████████

9 ██████████ ███████████ ██████████ █████

10 ████████ █████████████████

11 █████████████████████

12 ████ ██████ █████████████

13 ████████ ████ ████ ████████████

14       THE WITNESS:  So let me answer, if there is

15  something that can be done, it would be the duty of the

16  physician, but I don't think you have an understanding

17  of what one does with a creatinine of 1.38.

18  Q.      BY MR. GONZALEZ:  Dr. Siegel, earlier we

19  discussed that you mentioned that I had a stage 3 -- an

20  indication of a stage 3 renal dysfunction.

21 ████ ██████ █████████ ████████

22 ████████

23       THE WITNESS:  You were CKD 3A.

24  Q.      BY MR. GONZALEZ:  And that's a stage 3 that you

25  indicated; right?

111

1    A.        Stage 3A is a -- stage 3 is divided into A and

2    B.  A is less severe than B, which is more severe,

3    defined by creatinine clearance.

4    Q.        But you said before you're not a nephrologist,

5    so you don't know that?

6    A.        I'm not sure what you're asking.

7              I do know that --

8    Q.        Am I an A or a B?

9    A.        How could I not know it if I just said it, what

10   a definition of creatinine clearance is.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

112



1

2

3

4

5

6

7

8

9

10

11

12

13     Q.       BY MR. GONZALEZ:  How do you know --

14           MR. BRODERICK:  We're taking a break.

15     Q.       BY MR. GONZALEZ:  How do you know the

16 difference between the categories A and B?

17           MR. BRODERICK:  We're taking a break.  Let's go

18 off the record.

19           MR. GONZALEZ:  If you keep taking breaks, we're

20 going to keep dragging this out.

21           MR. BRODERICK:  This is the third break.

22 They've been a total of less than 10 minutes.

23           MR. GONZALEZ:  No, they haven't.  She's

24 documented them.  I've documented them.  There's almost

25 a 40-minute --

113

1        THE WITNESS:  How do I know the difference

2  between A and B?

3        MR. BRODERICK:  Stop.  You can go off the

4  record.

5        THE REPORTER:  Everybody has to agree for me to

6  go off the record.

7        MR. BRODERICK:  Come with me.  Come with me.

8        MR. GONZALEZ:  Put on the record that --

9        MR. BRODERICK:  Yeah, we're leaving the room.

10  You can stay on the record if you want.

11        MR. GONZALEZ:  And then there's a question

12  pending.

13        MR. BRODERICK:  The time is 12:01.  I'll be

14  back in less than four minutes.

15        MR. GONZALEZ:  This is going to continue for as

16  long as it needs to.

17        MR. BRODERICK:  Yeah, we'll see about that.

18        (Whereupon, a brief recess was taken from

19        12:02 p.m. to 12:04 p.m.)

20

21

22

23

24

25

114

1

2

3

4          (Whereupon, a brief recess was taken from

5          12:04 p.m. to 12:07 p.m.)

6          MR. BRODERICK:  12:06, we're all back.

7          MR. GONZALEZ:  I would also like to note that

8    the witness has taken approximately 30 minutes off

9    throughout this deposition.  I calculated it.

10         MR. BRODERICK:  I would like to note that I

11   don't agree that it's been 30 minutes.

12   Q.     BY MR. GONZALEZ:  Dr. Siegel, earlier you said

13   that it was a contraindication to -- you agree that it

14   was a contraindication to prescribe NSAIDs for someone

15   with a renal dysfunction problem?

16   A.     No, I did not say that.

17   Q.     Oh, so it's not -- it's not the case?

18

19

20         THE WITNESS:  It's more nuanced than that.

21

22

23

24   Q.     BY MR. GONZALEZ:  What does the nuance mean, in

25   your -- what's your meaning of "nuance"?

115

1    A.        So I think what I'm going to have to say here,

2    I've given you a variety of discussion of renal disease,

3    but I'm not a nephrologist, and I'm not prepared to

4    discuss further issues of nephrology.

5    Q.        I'm asking you about the -- there's

6    nonsteroidal antiinflammatory drugs?

7    A.        I believe I've already answered that question.

8    And I'm not -- I'm not prepared to answer anything

9    further related to that.

10   Q.        Well, is it or is it not known that it's a

11   contraindication for people with renal histories?

12   ████  ███████████  ███████████  ████████████████

13   █████████  ████████████████████████████

14           THE WITNESS:  It's more nuanced than that.

15   Q.        BY MR. GONZALEZ:  More nuanced.  I just don't

16   understand what you mean.  What's the definition of

17   "nuance"?

18   A.        It means it's more complicated than a "yes" or

19   "no" response to such a question.

20   Q.        So then it's your opinion that -- your medical

21   opinion that you -- it's okay to prescribe nonsteroid

22   antiinflammatory drugs to patients who have kidney

23   history dysfunction?

24   ████  ███████████  ███████████  █████  ██████

25           THE WITNESS:  It's more nuanced.

116

1   ███ █████████   ██████████████   ████████

2   ████████

3   Q.      BY MR. GONZALEZ:  Did you prescribe

4   nonsteroidal antiinflammatory drugs to me when I had

5   this stage 3 kidney dysfunction?

6   ███ █████████   █████████   ████████  ████ ██

7   ███████████

8   Q.      BY MR. GONZALEZ:  I'm going to ask you again.

9   Did you prescribe nonsteroid antiinflammatory drugs to

10  me while I had a stage 3 renal dysfunction?

11  ███ █████████   ██████████████

12         THE WITNESS:  So for a -- so to answer your

13  question, yes, you were prescribed nonsteroidal

14  antiinflammatory drugs for a very short period of time.

15  Q.      BY MR. GONZALEZ:  How many times did you -- do

16  you recall how many times you prescribed nonsteroidal

17  antiinflammatory --

18  A.      No, I don't.  I don't recall.

19  ███ █████████  ████  ██████████████████

20  ████████

21  ██   █████  ██████  ████████████  ██████

22  █████████████████████  ██████

23  ███ █████████  █████████  ████████  ██████

24  ███████████ █ ███████████████████████

25  ██ █ ████

117

Accuracy-Plus Reporting, Inc.      (916) 787-4277



13      Did you ever instruct or issue an instruction

14  that I should not be given nonsteroidal antiinflammatory

15  drugs because of my renal laboratory results?

16  A.      An instruction to whom?

17  Q.      To the other staff members, other doctors.  Do

18  you give instructions not to -- is there -- does the

19  system allow for you or any other doctors to say, "Hey.

20  This patient should not be given X, Y, Z, because it's

21  contraindicated for his situation or condition, or her

22  situation or condition"?

23

24      THE WITNESS:  So the system gives warnings

25  about drug interactions and contraindications and so on.

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    There is no contraindication or warning that is given

2    through the computerized medical record for the

3    prescription of NSAIDs to individuals such as yourself.

4    Q.        BY MR. GONZALEZ:  So is that left up to the

5    physician, or is that the system that decides that?

6    A.        Every medicine that's prescribed is left up to

7    the physician, except, again, if there is a

8    contraindication in the chart where there are warnings.

9    Q.        And when I became blind, I was also under your

10   prescription of ibuprofen, 800 milligrams, at the time;

11   is that not correct?

12   ███ ████████ ████████ ███████ ███

13   ██████████████████ ▌ █████████████████

14   ██████████ ███████ █████████████████

15   ███ ███████ ███████

16            THE WITNESS:  I don't recall precisely on what

17   date you were given a variety of medicines,

18   Mr. Gonzalez, because you were given a variety of

19   treatments for your various musculoskeletal problems.

20   Q.        ███ ████████ ██ ███ --

21            ███ ████████ █████████████

22   ████

23            (Exhibit I was marked for identification.)

24   ███ ██████ █████████████████

25   █

1        (Exhibit J was marked for identification.)

2        ███ ████████ █ ███████████████████████

3   ████████████████████████████  ███████████████

4   ████████████  █████████████████████████

5        ███ ██████████  ██████ █████ ██████████

6        ███ ████████  ██████████

7        ███ █████████  ████████████████████

8   ██████████

9        (Exhibit K was marked for identification.)

10  ██  ███████ ████████ █████ ██████████████ ████

11  █████████████████ ███████ █ ██████████████████

12  █████████████████████████████

13       ███ ████ ████████████████████████████

14  ██████████████████████ ███████████████████████

15  ██████████

16  ██      ██████

17  Q.      When did you first become aware of the fact

18  that I had a shoulder injury, and what was the source of

19  that injury from?

20       ███ ████████ ████████████████████████████

21  ███████████████████████ ████████████████

22       THE WITNESS:  Well, I believe when you came to

23  see me, and you told me you had been in, I believe, a

24  motor vehicle accident, and that you had injured -- you

25  had injuries related to that.  I believe you had gone to

                                                        121

1    the emergency room for that initially.  Isn't -- is that

2    correct?

3    Q.        BY MR. GONZALEZ:  Yes, sir.

4    ████  █ ████████████████████████████████████████

5    ███████

6    ██      ████  ████████████████████  █ ████████

7    ████████████████████████████████████  ████████████

8    ██    █ ████████████████████  ████  ████████████

9    ████ █ ████████████████████████  ████  ████  ████

10   ████████  ████████████████████████████

11   Q.        What was the purpose of your -- what was the

12   objective of your treatment of my shoulder injury,

13   initially, in August of 2009?

14   A.        Actually, Mr. Gonzalez, as I reviewed my notes,

15   it appeared that the problem that you mostly complained

16   of had to do with neck pain, that you had an injury you

17   felt was related to a motor vehicle accident, and that

18   you had been seen in the emergency room, and you had a

19   CAT scan that did not reveal any fractures.

20   Q.        So you're saying that there was no notation in

21   the emergency room, or there was no treatment for a

22   shoulder injury at that time?

23   A.        I'm not saying -- no, I'm not saying that.  I'm

24   saying that the major complaint had to do with your

25   cervical spine.

122



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15    Q.      BY MR. GONZALEZ:  Did you ever send me for an

16    MRI for my shoulder?

17    A.      I don't believe you had an MRI of your shoulder

18    at the VA; although, I'd have to -- I would have to

19    recheck the radiology records.

20

21

22

23

24

25    Q.      In September of 2010, did you receive a letter

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1  that was sent to you, telling you that I still had

2  problems with my shoulder and numbness in my arm?

3  A.       I don't recall that I received the letter in

4  2010.

5  ██  ████  ████████████████████████  ████████

6  ██████  ████  ████████

7          ████  ████████  █  ████████████  ████████

8  ████████  --  ████  ████████  ████████

9  Q.       BY MR. GONZALEZ:  So if the injury occurred in

10 July of 2009, when I first came to you to have it

11 treated, by September of 2010, that's a little over a

12 year.  And I still had --

13 A.       14 months.

14 Q.       Right.  And I was still complaining of pain.

15         ██  ████████  ████████████████

16         THE WITNESS:  Would you like me to respond to

17 that, Mr. Gonzalez?

18 Q.       BY MR. GONZALEZ:  Was I still complaining of

19 pain at that time?

20 A.       You were complaining of pain in your neck.  You

21 were complaining of pain in your lower back.  You were

22 complaining of pain in your shoulder.  You were

23 complaining of pain in your arm and your hand.

24 ██     ████████████████████████████  ████████

25 ██████████████████  █  ████████████████

125



1

2

3

4

5   Q.     So when did you -- when did you decide that my

6   pain would be cured by continuing with giving me

7   medications or --

8   A.     I never suggested it would be cured.

9   Q.     -- epidural injections?

10   A.     I didn't give you an epidural injection.

11

12

13

14

15

16

17

18

19   Q.

20         So why did you believe that that was going to

21   cure an ongoing problem with my shoulder?

22

23

24         THE WITNESS:  I did not -- I was hopeful -- I

25   was hopeful that it would help.

127

1 Q. BY MR. GONZALEZ:  But would it cure the

2 problem?  Would it cure what was actually the problem?

3 A. I was hopeful that it would help.

4 Q. And you never did order an MRI of my shoulder;

5 is that correct?

6 A. I'd have to review the chart, but I don't

7 believe that I did.

8 Q. Right.  And an MRI is considered to be the

9 favorite diagnostic tool for shoulder injuries, like

10 rotator cuff injuries; is that correct?

11 ████ ██████████ ██████████ ████████████

12 ██████████

13 THE WITNESS:  It is one modality.  It is a good

14 modality, to look for soft tissue injuries.

15 Q. BY MR. GONZALEZ:  And does Exhibit I help you

16 in identifying and Exhibit K help you identify that MRIs

17 are the preferred choice of diagnostic tools available

18 for you as a physician?

19 ████ ██████████ ████████████ ████████

20 ██████████ ██████████████

21 ████████ █████████████ ████████████████

22 ██████████████ ████████████

23 THE WITNESS:  Which is correct; I haven't read

24 these articles, so I can't tell you what it says.  And,

25 again, it's a nuance of when you order an MRI, so I'm

128

1  not -- can't really respond to that question.

2  Q.      BY MR. GONZALEZ:  When do you consider that

3  nonsurgical intervention of a shoulder injury is

4  failing?

5  ██  ████████  ████████████ ; ████████ ; █

6  ████████████████████

7        THE WITNESS:  I can give you my overall

8  assessment of what -- underlying your question is the

9  notion of when do you go to surgery for any kind of

10  musculoskeletal issue.

11       ██████████████████████████████

12  █   ████████ ████████  ██████████████████

13  ██████████

14  █      ████████

15  █      ████████████

16  A.      As a last resort, after somebody has actually

17  complied with physical therapy and nonsurgical

18  interventions, there is never a time limit on that.  It

19  has to be judged case by case.

20  █      ██████████████████████████████

21  ████████

22  █      ████████  ██████████████████████

23  ██████████████  ████████████  ██████████ ;

24  ████████████  ████████████

25  Q.      And so in lieu of you making a referral to an

1   orthopedic surgeon back in 2009 or 2010, you chose to

2   keep me on antiinflammatory drugs, nonsteroid

3   antiinflammatory drugs for four years; is that correct?

4   A.      I don't believe that is correct.  I think you

5   were on, among other medications, Flexeril, gabapentin,

6   Diazepam.  You had gotten some acetaminophen, and you

7   had gotten a very short course of Vicodin.

8           I also have to note that all of this is mixed

9   together with your variety of other complaints, so it

10  was not clear whether or not we were treating the neck,

11  the lower back, the shoulder, or the arm.





17  Q.      And so would -- reminding you that in August of

18  2012, I first saw Dr. Lee.  Would that help remind you

19  when you sent me to physical therapy?

20  A.      In August of 2012, if you say so.  Again, I

21  don't know that for a fact.

22  Q.      So it's approximately three years that you had

23  me on nonsurgical intervention for the shoulder injury,

24  but it was still failing; correct?

25  A.      No, actually.  At different points you said

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   that you felt better.   In between, you had right upper

2   quadrant pain, and I diagnosed gallstones and sent you

3   to surgery, and you had your gallbladder removed.

4

5

6

7

8

9

10

11

12

13

14

15   Q.      And so you didn't have an MRI, so you didn't

16   have the benefit of knowing whether, in fact, I had a

17   shoulder tear; is that correct?

18   A.      No MRI was ordered.   I believe that's the case.

19   I'm not certain of that.   But you did have an MRI of

20   your lower back.

21

22

23

24

25

132



```
 1
 2
 3
 4
 5
 6   Q.      Okay.  Getting back to the shoulder, if the
 7   shoulder -- you started seeing me from the motor vehicle
 8   accident that occurred in July of 2009.  So for
 9   three-and-a-half years or four years, no MRI was ever
10   taken of my shoulder?
11   A.      If you say so.  Again, I'd have to review the
12   record, but I don't -- I'm not going to sit here and say
13   an MRI should have been taken, quite frankly.
14
15
16
17
18
19
20
21
22
23
24
25   Q.      Dr. Siegel, are you aware of the fact that I
```

133

1     went to Mercy Medical Care in --

2     A.        As a matter of fact, I am.  I read the

3     operative report.



134

1    Q.       Show me where it says that partial-thickness

2    tears aren't considered surgical -- of surgical

3    necessity?

4    ███ ██████    ██████  ██████████████████

5    █████████████████████████

6         THE WITNESS:  I would have to read this

7    article, which I've never seen before, and note that the

8    statement says, "The average thickness of a normal tear

9    in the rotator cuff is 10 to 12 millimeters."

10        That's all I'm prepared, in terms of this

11   article.  If you want to point out to me something, as

12   well as if you want to show me the operative report

13   again, I would be happy to review it one more time.

14   █ █████████████████████████████████

15   █████████████  ███████████████  ██████████

16   ████████████████  ███████████████

17   ████████████  █████████████  ████  ████

18   █████████████████████  ███

19   █████████

20   Q.       BY MR. GONZALEZ:  So you don't acknowledge that

21   there were two tears in my shoulder?

22   A.       All I recall from the operative report is the

23   notation that there was a 2- to 3-millimeter tear.

24   ███ █████████████████████  ███  ██████

25   Q.       ███ █ ███████████████████



```
 1  ██  ████████
 2  █      ████  █████  ████  ███████████████
 3  ████████████    █████████████████       █
 4  ██████  ████████████  █████████████████
 5  ███████████████  ████████████████  ██████
 6  █████████  █████████████████████
 7  ████
```

8   Q.       But there was surgery that was required to get

9   it corrected, was it not?

10  A.       No, there was not.

```
11  █      ██  ██  █  ████   ████████████████
12  █████  █████████   ████████
13  █      ████████████████████    ██████
14  ███████████████████████████████   █
15  █████████  ██████████████████
16         ███████████████████  █  ███████████
17  ██████   ████████████████   █████████
18  ████████████████████
```

19  Q.       Do you know the difference between a

20  partial-thickness tear and a full thickness tear?

21  A.       I do.  I believe the terms are self-evident.

```
22  █      ███████████████████████
23  ███████████████████  ██  ███████████████████
24  ███████████   ████████████████
25  █      █████████.
```

Accuracy-Plus Reporting, Inc.       (916) 787-4277

1 ██    ████

2 ██    ████  ████

3 ██    ██████████  ██████

4        ███  ████████  █████  █████████████

5 Q.      BY MR. GONZALEZ:  Now, did you ever diagnose or

6 did you ever note in any of your records between July of

7 2009 or August of 2009, when you first saw me for the

8 shoulder injury, until I became blind and didn't want to

9 return back to the VA for your care in January of 2013,

10 or thereafter, did you ever note that I had a shoulder

11 tear?

12        MR. BRODERICK:   ████████████████████

13 ██▌███████████████████  ██████████

14 █████  ▐████████████████████████

15 ███  █████████  ████████████  █████

16 ████████████████████  ▐███████  ▬  ██████

17 █████████

18 Q.      BY MR. GONZALEZ:  So you're saying that in

19 2014, when I became pain-free from my shoulder, the

20 surgery in 2013 had nothing to do with that?

21        ███  ██████  ███████  █████████

22 ███████████  ███████  █████████████

23 █████  █████████  ████████████  ██████

24 ███████████  ███████████

25 ██    ██████████  ████████████

138

1

2   A.        I'd be happy to answer this.  You haven't asked

3   me about my training or expertise, but I actually

4   trained at UCSF in clinical epidemiology.

5            Cause and effect is really only -- can only be

6   established through a randomized, double-blind

7   prospective trial.  An individual who had a procedure

8   and then says, "I'm pain-free," that causality cannot be

9   inferred.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 ████████████████████████████████

2 ████████  █  █████████████████████████

3 █████████████    ██████████████████  █

4 █████  --  ████████  █  ████████████████

5 Q.      Did you ever give me injections between 2000

6 and 2009 in my shoulder?

7 A.      No.

8 Q.      Did you ever -- did you fail not to refer me to

9 an orthopedic surgeon, in your opinion, or not?

10 ████  ████████      ████████  --

11 THE WITNESS:   No.   I'll say no.   Not at all.

12 ████  ████████  --  █████  █  ███████  ████

13 ███████

14 Q.      BY MR. GONZALEZ:   So the orthopedic surgeon

15 that actually did the treatment for me later on and did

16 the surgery, are you saying that that was unnecessary?

17 A.      I'm not saying that either.

18 █   ████████████████████████████

19 █   ███  ███████.

20 ███  ████████  ████████

21 ████████  ████████

22 █  ████  ████  █████████████

23 ██████████

24 ███  ████████  █  ████████████████  ██████

25 ████████████████████████  ██  █  ████████



1

2

3

4

5

6

7

8

9

10

11

12

13   Q.        BY MR. GONZALEZ:  Do you consider that the

14   orthopedic surgeon who performed the surgery or the

15   debridement in July of 2013, the report that you read,

16   of Mercy General, are you saying or indicating that he

17   overtreated my injury?

18   A.        No.

19

20

21

22

23

24

25

142

1 ▮

2   Q.      BY MR. GONZALEZ:  I didn't ask that question.

3   I asked you, are you blaming me -- is it my fault that I

4   was taking your -- the prescriptions -- the medications

5   you prescribed me to take?

6   ▮▮ ▮▮ ▮▮▮

7   ▮ ▮▮ ▮▮ ▮▮▮

8   A.      No.

9   ▮▮ ▮▮ ▮▮▮

10  ▮▮▮

11  ▮▮▮ ▮▮▮ ▮ ▮

12  ▮▮▮ ▮ ▮▮▮

13  ▮▮ ▮▮ ▮▮▮

14  ▮▮▮

15  ▮ ▮▮ ▮▮ ▮▮▮

16  ▮▮▮

17  ▮ ▮▮

18  Q.      You said earlier -- he's not a defendant.

19  You're not a defendant in this action?

20          MR. BRODERICK:  Nope.

21  Q.      BY MR. GONZALEZ:  Okay.  All right.

22          MR. BRODERICK:  The only defendant is the

23  United States.

24  Q.      BY MR. GONZALEZ:  What is the criteria for you

25  to then prescribe statins?

Accuracy-Plus Reporting, Inc.      (916) 787-4277



15   A.        So anyone who has had a manifestation of

16   cardiovascular disease, basically should be on a statin.

17   So if someone's had a heart attack or they've got

18   angina, or if they've had peripheral vascular disease,

19   they should be on a statin.

20           In terms of other people, again, it's much more

21   nuanced.   It has to be, taking into consideration other

22   cardiovascular risk factors, and so on.



147



1

2

3

4

5

6

7

8

9

10

11

12   Q.      BY MR. GONZALEZ:  Is there something in

13   particular that indicated why you wouldn't prescribe

14   statins for me?

15   A.      You didn't reach the generally accepted

16   criteria for statin use during the time period when I

17   saw you.

18

19

20

21

22   Q.      BY MR. GONZALEZ:  Between 2000 and 2013, did

23   you ever recognize that I had at least three or more

24   risk factors recognized by the American Heart

25   Association?

148

1    A.       Well, let me go over this in my mind.  You

2    weren't hypertensive.  You didn't smoke.  You didn't

3    have diabetes.  Your LDL was, generally speaking, less

4    than 160, if you look at criteria at that time.  And

5    during that time, I don't believe that, even though

6    family history is a risk factor, it was not in the

7    criteria -- I don't believe -- I'd have to look back,

8    because things have changed over time.

9         So, no, I don't believe -- I don't believe a

10   statin was indicated for you at that time, given your

11   age at that time, and so on.



18   Q.       BY MR. GONZALEZ:  What would be the purpose of

19   you prescribing statins for me or anyone else?

20   A.       It decreases the probability of a future

21   cardiovascular event.



1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████████████████████

8   Q.      Okay.  Did you instruct Mr. Broderick to cancel

9   the first deposition that was scheduled on

10  February 27th?

11          MR. BRODERICK:  I'll object.  That's

12  attorney-client privilege.  He's not my client, but he

13  is an employee of my client.

14  Q.      BY MR. GONZALEZ:  Did you -- well, if he's

15  not -- if he's not your attorney, then I'm asking you,

16  did you tell him to cancel that February 27th

17  deposition?

18          MR. BRODERICK:  He's an employee of my client,

19  the United States, so my conversations with him under

20  some circumstances can be privileged, certainly as it

21  relates to the case.

22          I'll tell you, though, that, no, he did not.

23          MR. GONZALEZ:  That was your decision?

24          MR. BRODERICK:  That was -- that was --

25          MR. GONZALEZ:  That was your decision.

150

Accuracy-Plus Reporting, Inc.      (916) 787-4277



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15   Q.      So since you don't know the cause of the

16   blindness, you're basically saying it's just too bad?

17

18

19

20              THE WITNESS:  I don't know.  I don't know the

21   etiology of your blindness.  If it turned out, just to

22   give you a hypothetical, that the day before you had

23   been punched in the eye, I guess I would say that the

24   person who punched you in the eye.

25              But beyond the fact that I don't know the

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    medications?

2    ████████  ████████    ████████    ████████

3    ████████████████    ████████  ████████████

4    ████████████  ████████    ████████████

5            THE WITNESS:   It depends on the medication, is

6    the way I would respond to you.   There's some

7    medications that do not have any increasing risk with

8    long-term use, and there are some that do.

9            ████████    ████████████████████

10   ████████████████████████████████████████

11   ████████████████████

12   Q.      BY MR. GONZALEZ:   But when you give

13   medications, there is a thing called "potentiation," is

14   that correct, where they can actually give more negative

15   effects -- side effects than just giving one by itself?

16           ██  ████████    ████████████████

17   ████████

18   Q.      BY MR. GONZALEZ:   Have you heard of the term

19   "potentiation"?

20   A.      Again, I believe your question is not well

21   constructed for me to respond to.

22   ██  ████████  ████████████████████  ████████████

23   ██    ████████████

24   ██    ████████████████████████████

25   ██      █ ██

157

Accuracy-Plus Reporting, Inc.      (916) 787-4277



```
 1    █       --  ████████████    ████████████
 2    ████████████  ██████  ████  ████████  ████████
 3    █████████████████████████████  ███
 4    ████████████  ████  █████████████████
 5          ████  ████████ █  █████████████
 6    ██████████████  █████████
 7    ████████████  ██████████████████
 8          ████████████  █████████████████
 9    █████████████████████████████████████
10    ███████████  █████████████████████
11    █████████████████████  █████████████
12    ██████████████████████  ████████████
13    ████████  ██████████  ███████████  █████████
14    ████████
15    █    ████████  ████████  ██████████  █████████
16    ████████████
17    █      ████
18    █    ████████  ████████████████████
19    █████████
20    █      ████████
21    █      ████████████████████
22    █      ████
```

23   Q.      Wasn't there a tendency that there would be

24   side effects that could affect -- have negative effects

25   in keeping me on those medications for four years --

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    three, four years, like you did?

2    ████ ███████ ████ █████████████

3    █████████ ██████ ████████████████

4    ████████████ █████████████████

5         ████████████████ -- ███████████████

6    █████████████████████████████ ███

7    ███████████████ █████████████

8    ████████ ███████████████████

9    Q.      BY MR. GONZALEZ:  Would you like to answer

10   anything about that question?

11   A.      Well, as I review your medications, there were

12   no drug interactions.  For example, gabapentin and some

13   of the other medicines you were on, there's no drug

14   interactions.

15   Q.      Would you explain to me if you have an

16   opinion -- are you aware that Dr. Lee, when she saw me,

17   after I became blind, are you aware of the fact that she

18   took me off of the Motrins that were prescribed and put

19   me on just strict aspirin?

20        ████ ██████ ███████████████████ --

21   ██████ ████ █████████████ █████████████

22   ███████

23        THE WITNESS:  Dr. Lee is the physical

24   therapist; correct?  She's not the ophthalmologist?

25   Q.      BY MR. GONZALEZ:  Right.  She's the pain

1    medicine doctor.

2           So are you aware of the fact she took me off

3    those Motrins when she learned --

4    A.      Again, I'd have to review the chart to be

5    certain.

6    Q.      Do you have a reason or explanation as to why

7    she would remove me off the Motrin?

8           ██  ████████      ███████████████████

9           THE WITNESS:  Why don't -- you should ask

10   Dr. Lee.

11          ██  ████████      ███████████████████

12          MR. GONZALEZ:  Okay.  I'm pretty well done.

13   Thank you.

14          MR. BRODERICK:  I don't have any questions.

15   ████████    ████████   █████████████████

16   ████ ████████  ████   ████  █████████ ▌ ███

17   ██████████████████████   █████ ▌ ██████████

18   ████▌ ████████████████   ████████████████

19   █████████████████   ████  ████

20          (Exhibit A and Exhibit B were marked for

21          identification after the conclusion of the

22          proceedings.)

23          (The deposition concluded at 1:05 p.m.)

24                        ---o0o---

25

160

1   STATE OF CALIFORNIA.)
                  )    ss.
2   COUNTY OF EL DORADO )

3         I, JEANETTE L. VISSIERE, a Certified Shorthand

4   Reporter No. 10431 for the State of California, do

5   hereby certify:

6         That prior to being examined, the witness,

7   DAVID SIEGEL, MD, MPH, FACP, named in the foregoing

8   deposition, was by me duly sworn to testify the truth,

9   the whole truth, and nothing but the truth;

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced by me to typewritten form, and that

13   the same is a true, correct, and complete transcript of

14   said proceedings.

15        Before completion of the deposition, review of

16   the transcript [   ] was [   ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed are

19   appended hereto.

20        I further certify that I am not interested in

21   the outcome of the action.

22        Witness my hand this 10th day of May, 2018.

23

24                    _Jeanette L. Vissiere_

25      JEANETTE L. VISSIERE, RPR, CLR, CSR #10431

161

EXHIBIT "D"

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO REGION)

--oOo--

|  |  |
|---|---|
| DANIEL E. GONZALEZ, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) Case No. |
|  | ) 2:15-cv-1997 MCE DB PS |
| UNITED STATES OF AMERICA; | ) |
| and DOES 1 to 20, | ) |
| inclusive, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**CERTIFIED COPY**

--oOo--

Deposition of

JEAN LEE, M.D., M.S.

FRIDAY, APRIL 27, 2018

--oOo--

Reported by:  JEANETTE L. VISSIERE
RPR, CLR, CSR License No. 10431



**APR** Accuracy-Plus Reporting Inc.

*Certified Shorthand Reporters*

MAIN OFFICE:
3400 Douglas Blvd., Suite 205, Roseville, CA 95661 • (916) 787-4277

SACRAMENTO OFFICE:
1234 H Street, Suite 105, Sacramento, CA 95814 • (916) 758-5941

Fax: (916) 787-4280 • Toll Free (877) 492-8130 • www.accuracy-plus.net

1                    A P P E A R A N C E S

2

3

        For the Plaintiff:
4
            In Pro Se
5           BY:  DANIEL GONZALEZ
            7125 Calvin Drive
6           Citrus Heights, California 95621
            (916) 247-6886
7

8

        For the Defendants:
9
            US ATTORNEY'S OFFICE
10          BY:   GREGORY T. BRODERICK, Attorney at Law
            501 I Street, Suite 10-100
11          Sacramento, California 95814
            (916) 554-2780
12          E-mail:  gregory.broderick@usdoj.gov

13

14

15                        --oOo--

16

17

18

19

20

21

22

23

24

25

                                                        2

1                           I N D E X

2                                                    Page

3    Examination by:

4       MR. GONZALEZ                                4, 68

5       MR. BRODERICK                                 65

6                          --o0o--

7

8                       E X H I B I T S

9                  (No exhibits were marked.)

10

11

12

13                         --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1           BE IT REMEMBERED that, on FRIDAY, the 27th day

2    of April, 2018, commencing at the hour of 1:50 p.m.

3    thereof, at the offices of Accuracy-Plus Reporting,

4    Inc., 3400 Douglas Boulevard, Suite 205, Roseville,

5    California, before me, Jeanette L. Vissiere, a Certified

6    Shorthand Reporter in and for the County of El Dorado,

7    State of California, there personally appeared:

8                   JEAN LEE, M.D., M.S.

9    called as a witness, who, being by me first duly sworn,

10   was thereupon examined and interrogated as hereinafter

11   set forth.

12          MR. BRODERICK:   Should we state our appearances

13   just for fun?

14          MR. GONZALEZ:   Yes, sir.

15          MR. BRODERICK:   Go right ahead.

16          MR. GONZALEZ:   Dave Gonzalez, plaintiff.

17          MR. BRODERICK:   Greg Broderick from the US

18   Attorney's Office, appearing on behalf of the United

19   States.

20               EXAMINATION BY MR. GONZALEZ

21   Q.     Hi, Dr. Lee.

22   A.     Hi.

23   Q.     Could you please for the record give your full

24   name, please, for the court reporter?

25   A.     My first name is Jean, J-e-a-n.  Last name is

                                                          4

1    Lee, L-e-e.

2    Q.        And for the record, you are employed by the

3    Veterans Administration?

4    A.        Yes, I am.

5    Q.        Okay.  And that is at Sacramento, California?

6    A.        Yes.

7    Q.        Okay.  And you've been with the Sacramento,

8    California VA for how long, as a doctor?

9    A.        Since 2004.

10   ████ ███████    ████████     █████████████

11   ████████████  ███   ███

12      ████████  █ ███████████          ████████

13      ████████

14   Q.       ██████   ██████     █████████

15   ███████████████████████████████████████████

16   A.       ███

17   Q.       ██████  ████████████████████████████████████

18   ███████████ █ ████████████████████       ████████

19   █████████████████████████     ██████████

20   ██████ ███ █████████     █████████       █████████

21   █████████    ████████████████     █████████

22   █████████

23      █ █████████████████     ████████   ███

24   █████████ ██████████████████████        ███

25   █████████████████████     █████████



```
16   Q.      So you were the director -- or I guess the --
17   the director of the pain management clinic over at the
18   VA?
19   A.      No, I'm not director.  I'm just regular
20   employee.  Staff.  Staff.
21   Q.      Staff?
22   A.      Yes.
23   Q.      But you concentrate in the pain management
24   area?
25   A.      We have a pain clinic.  It's a little
```

6

1   confusing.  There's a pain clinic, but there's a PMR

2   clinic.  So the pain clinic, the Army does the new

3   procedures, like interventional procedures.  The PMR

4   clinic, we also see brain injury patients, so we don't

5   just do pain.  We also do diagnostic tests.

6   Q.     You are -- or you are one of the treating

7   doctors that I saw when I was in the VA --

8   A.     Yes.

9   Q.     -- is that correct?

10   A.     Yes.

1    Q.      Maybe I should ask.  Have you had an

2    opportunity to -- have you had a chance to look at the

3    records, the medical records, regarding my treatment?

4    A.      I just looked at the records related -- I saw

5    you three times, so I just looked at those records, and

6    I didn't see anybody's.

7    Q.      Those records begin in August of 2012; is that

8    correct?

9    A.      Yes.  That is what I remember.

10   Q.      When you saw me in August of 2012, at that time

11   you were seeing me for treatment to my shoulder; is that

12   correct?

13   A.      That's what I -- yeah.

14   Q.      Okay.  You were not seeing me for my neck

15   injuries or pains or for my lower back?  It was

16   predominantly for my right shoulder; is that correct?

17   A.      That's how I remember it.

18   Q.      Yeah.  You described in one of your notes --

19   initial notes a condition called -- let me get the right

20   term.

21   A.      The shoulder, you mean?

22   Q.      Yes.  There was a condition that you described.

23   You gave a description of it.

24   A.      Subacromial impingement.

25   Q.      Subacromial impingement, correct.

8

1   ████  ████████  ██████  █████████████

2   ███████████████████████████████

3          THE WITNESS:   S-u-b-a-c-r-o-m-i-a-l,

4   impingement, i-m-p-i-n-g-e-m-e-n-t.

5   Q.       BY MR. GONZALEZ:   Okay.   And is that something

6   that has a specific description or has certain signs and

7   symptoms that indicate why it's called that?

8   A.       Yeah.

9   Q.       Yes.   Can you describe what those are --

10  A.       Well --

11  Q.       -- please?

12  A.       -- you have difficulty raise your arm above

13  shoulder --

14  Q.       Uh-huh.

15  A.       -- and you have trouble laying on the side to

16  sleep, and especially have trouble reaching back.   Also,

17  doing physical examination, the positive signs, like

18  Hawkin's and Neer's, those tests are positive.

19          So those signs, we will diagnose subacromial

20  impingement, which is very, very common symptoms -- I

21  mean, diagnosis.

22  ██  ██████  ████████████████████████

23  ███████████████████████  ██████████

24  ██████████████████████  █ █ █  ███████████

25  ████████  ██████████  ██████████████  █████

9

1   ███   ██ ███████ ████ █████

2   ████ █████ █████ █████ ████ ████

3   ███████ ████ █████ ███ ████

4   █████ ███ ███████ █████

5   ███ █████ ███████ ████████

6   ████ █████ █████ █████ ████████

7   ██████ ████ ████

8   ███ █████ ████ █████ ████

9   ███ █████ ████

10   Q.        BY MR. GONZALEZ:  So we can go to the

11   August 2nd notes.  Is that okay?

12   A.        Sure.

13   ███ ████ ███████████

14   ██████

15   ███ █████ █████ █████

16   ████████

17   ███ █████ ████ ███████

18   █████

19   Q.        BY MR. GONZALEZ:  So I believe I asked you the

20   question of what were the signs and symptoms that

21   indicate, and you mentioned that it would be positive

22   results to certain like Spurling's and Hawkin's and the

23   Neer's test?

24   A.        No.  Not a Spurling.  Hawkin's and Neer.

25   Q.        Okay, Hawkin's and Neer.  And those are tests

11

1  to see how far someone can move their shoulder, arm,

2  lift them up, rotate?

3  A.      No.   Those tests are showing if there is

4  impingement in the shoulder, not how far you can move

5  back.

6  Q.      When you say "impingement," is that related to

7  the ligaments, or is that related --

8  ▮.      ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮.      ▮▮▮▮▮▮▮▮▮▮▮

10 ▮      ▮▮▮▮

11        ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15        ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮

16 Q.      BY MR. GONZALEZ:   That's okay.

17        So it's only the tendons.   Does it deal with

18 ligaments at all, in the shoulder?

19 A.      Not that I know of.

20 Q.      What is the difference between the tendons and

21 the ligaments?

22 A.      Do I have to answer?

23        ▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

24        THE WITNESS:   Well, a tendon is the end of the

25 muscle.   You know, the end of the muscle.   It's fibrotic

12

1    tissue attached to the bone.

2         And ligament is something connected to the

3    joint.  You know, say, you -- joints, your medial

4    joint -- the medial and the lateral ligaments connect

5    them, but it's not necessarily attached to the muscle.

6    Q.      BY MR. GONZALEZ:  Okay.

7    A.      That's all fibrotic tissues.  That the

8    difference.

9    Q.      Okay.  So the shoulder -- the anatomy of the

10   shoulder, the way it rotates, it's referred to as the

11   rotator cuff; right?

12   A.      Well, the four muscles called rotator cuff

13   muscles wound -- go underneath the bony space.  So when

14   it's getting pinched, that's the muscle getting --

15   that's the tendon getting pinched.  That's a

16   supraspinatus tendon.

17        Do you need me to spell that one?

18   Q.      Yes, please.

19        THE REPORTER:  I know that one.

20   Q.      BY MR. GONZALEZ:  So there's four muscles to

21   that shoulder --

22   A.      It's called rotator cuff.

23   Q.      Rotator cuff, right.

24        And so does impingement also mean that

25   something could be torn, like a ligament can be pulled,

13

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   or a tendon can be broken, or something could be broken

2   or torn?

3   A.      You mean impingement?

4   Q.      Does that mean like pinched, or does that mean

5   something different?  Does it mean like something's

6   overstretched, something injured in some way, damaged in

7   some way?

8   A.      The tendon can be impinged, but sometimes the

9   tendon can be already partial torn or complete torn.

10  Actually, when it's completely torn, there's less pain,

11  because the tendon is just removed away.  It's not on

12  the impingement.

13  Q.      So partial tears are more painful, typically,

14  than full tears?

15  A.      That's what I understand.

16  Q.      Okay.  And that's based on your knowledge of --

17          MR. BRODERICK:  Her experience.

18  Q.      BY MR. GONZALEZ:  -- anatomy and your

19  experience in that area; right?  Basically; right?

20  A.      It's based on the textbook, yeah.

21  Q.      The textbooks, okay.  Is there any particular

22  textbook that you rely upon or any particular

23  association or organization you rely on to get

24  information from on research regarding the rotator cuff?

25  A.      The PMR textbook.

14

1    Q.        When someone experiences a traumatic injury to

2    the shoulder, you know, whether it's overextended or

3    something happens where they get -- there's force that

4    causes the tendons or the ligaments to break, right, or

5    the muscles to get injured, how long does it typically

6    take for that to heal?

7    ███  █████████    ██████████████████████████

8    ██████████████  ████████████████████

9    Q.        BY MR. GONZALEZ:  Let me backtrack.

10            Are you -- when you say you're a staff

11   physician, you specifically are -- are specialist of

12   some sort in pain management?

13   A.        We -- PMR has a lot of trainings, mostly

14   focused on -- actually, not only musculoskeletal and a

15   brain injury recovery and spinal cord recovery and the

16   focus on neurodiagnostic tests.  This whole list of

17   area, we got trained.

18   Q.        Okay.  Do you have any kind of specialty or

19   subspecialty certifications in that -- in this

20   particular area of pain and I guess --

21   A.        I have a subspecialty in electrodiagnostic

22   tests.  Now sports medicine, if you focus on joints, it

23   goes through sports medicine subspecialty.

24   █    █████  ████████████████████████████

25   ████████████████████████████

15

Accuracy-Plus Reporting, Inc.      (916) 787-4277

```
1    A.          ▬

2    Q.          ▬

3    A.          ▬

4    Q.          Sports medicine is different?

5    A.          Sports -- orthopedic is -- that's a surgical

6    training.

7    Q.          Okay.

8    A.          Sports medicine, if you're family practice

9    residency, you can go to sports medicine.  PMR can go to

10   sports medicine.  Internal medicine, if you want, they

11   can go to sports medicine, not involved with surgery.

12              I guess orthopedic surgeon, I don't know.  I

13   guess -- I don't know.  I'm not sure.  I can't guessing.

14   Q.          Okay.

15              ▬▬  ▬▬▬▬▬  ▬▬▬▬▬▬▬▬▬▬

16              ▬▬▬▬▬▬  ▬▬▬▬

17   Q.          BY MR. GONZALEZ:  But sports medicine is

18   focused on nonsurgical corrections is what you're trying

19   to say?  Is it less surgery involved in sports medicine?

20   A.          I would think so.

21              I'm curious.  Why do I get asked all those

22   questions?

23              ▬▬  ▬▬▬▬▬  ▬▬▬▬▬▬▬▬▬▬

24   ▬▬▬▬▬  ▬▬  ▬▬▬▬▬▬  ▬

25              ▬▬▬▬▬  ▬▬▬▬
```

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15   Q.      BY MR. GONZALEZ:  So, yeah, looking at the note

16   that I located, which is January 28th, 2013, you entered

17   some notes in there and identified -- you said --

18   identified right shoulder subacromial impingement

19   syndrome.

20           Do you see that?

21   A.      Okay.  Diagnosis, okay.

22   Q.      At the very first page.  I'm looking at --

23   A.      Oh, yeah.

24   Q.      -- US00347.

25   A.      Okay.

19

1    Q.     Do you see that at the bottom?

2    A.     347, yes, I have it.

3    Q.     Okay.  All right.  You noted that I had lost

4 vision in the paragraph just underneath that.

5         Do you see where it says --

6    A.     Right, right.

7    Q.     -- "Also noticed vision loss in the left eye in

8 that morning"?

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

Accuracy-Plus Reporting, Inc.    (916) 787-4277

1   ██████████   ████████████████   ███████

2   ███████████

3   Q.      The Hawkin's test and the Neer's test, then

4   that's more for the shoulder?

5   A.      That's purely for the shoulder.

6   Q.      Okay.  But I was also positive in those tests

7   as well?

8   A.      That was on my note on August 8th.

9   ███   ████████   ███████

10  Q.      BY MR. GONZALEZ:  Back in August 2012, you have

11  already identified that.  Okay.

12  ███████████████████████████████████

13  ██████████████████████   ██████████

14          The second time when I came to see you in

15  January of 2013, did we have a discussion about the

16  medications I was on?

17  A.      Excuse me.  So on the notes, yes, I noted you

18  were taking Motrin and Neurontin.

19  Q.      Did you talk to me about side effects of

20  different medications during that visit or any visit at

21  all?

22  A.      I don't remember.

23  Q.      Okay.  Do you recall that in those visits in

24  2013 with you, you took me off of the Motrin and ordered

25  me to only be on aspirin?

1   A.      On my note.

2   Q.      What day was that and what page, please?

3   A.      That was 349.

4           MR. BRODERICK:  US0349?

5           MR. GONZALEZ:  Yes.

6           THE WITNESS:  (Nods head up and down.)

7   Q.      BY MR. GONZALEZ:  Did you note -- where is

8   it that -- where it says under Plan?

9   A.      Yes, under Plan.

10  Q.      And could you read for me what your note says

11  there, please?

12  A.      "Advise patient to stop taking Motrin

13  800 milligram twice a day.  Take aspirin 325 milligram

14  once a day with food.  Anticoagulation, also for pain

15  and a headache."

16  Q.      Oh, headache.  Okay.  What was the

17  anticoagulation?  What was that in reference to, please?

18  A.      Because you reported a visual loss, and I

19  thought -- first thing come to my mind would be worry

20  about stroke, so that -- we put people on aspirin.

21  That's the standard way to do.  Then that's why I put

22  you on aspirin.

23          And the reason I take off Motrin, because you

24  don't put both together.  You increase chance of

25  bleeding, so I stopped Motrin and put you on aspirin.

1    That's the purpose I did that.

2    Q.        Okay.  So the Motrin, does it cause clogging,

3    is what the Motrin does, or does it have anticoagulant

4    properties, or?

5    A.        Motrin does not have anticoagulant property.

6    Q.        Okay.  And the concern for the stroke was

7    because it could have been something that caused the

8    stroke in my eye to go blind?  Is that possibly what the

9    reason was?

10   ███  ████████   █████████   ████  ██

11   ████████   ███████████████████████████

12   ██████████████████████████████████

13   Q.        BY MR. GONZALEZ:  I want to know -- you

14   instructed to take me off the Motrin and put the aspirin

15   on.  So I don't think it was -- they could not be

16   speculation if you had a good sound reason for changing

17   the medication to aspirin.

18          What I'm asking is, is that because, as you

19   mentioned earlier, it was because I could have had a

20   stroke in my eye as the cause of the vision loss?

21   ███  ███████   █████████   ██  ████████

22   ██████████   ████████████

23          THE WITNESS:  I'm honestly not -- I'm not

24   worried about -- I mean, I don't mean stroke in the eye.

25   I was worried about a stroke in the brain.

24

1    Q.        BY MR. GONZALEZ:  Stroke in the brain.  Why

2    would I have a stroke in my brain?

3    A.        Do I have to answer that?

4    ███ ████████ █ █████████████ ██ ██

5    ████████████████████ ████████ ███████

6    ██████

7    Q.        BY MR. GONZALEZ:  Yeah.  I want to know the

8    medical basis for why --

9    A.        Why you have vision loss -- you don't have a

10   trauma to your head.  If somebody have a vision loss,

11   based on my background/training, I worry about the

12   stroke, because the way the PMR physician, we also take

13   care of people after stroke, rehab.  Right?  PMR.  "R"

14   stands for rehabilitation.

15            So that's my background, just -- I was worried

16   about you might have a stroke, so I said, well, get

17   aspirin and order CT scan of your head.  But you have

18   MRI already pending.  That's the reason I did that.

19   Q.        Okay.  But the MRI -- you mentioned the MRI was

20   for?

21   A.        For your brain.

22   Q.        For the head?

23   A.        Yes.

24   ██ ███████ █████████████████ ████████████████

25   ██████ --

Accuracy-Plus Reporting, Inc.      (916) 787-4277



1

2  --

3

4  A.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Q.      Above where it says, "Plan," can you read the

21  notes that -- can you read that, where it says, "Sudden

22  onset"?

23  A.      "Sudden onset of left lateral hemianopia two

24  weeks ago.  Unlikely giant cell arteritis.  Needs to

25  rule out stroke (although, it is most likely in

26

1    bilateral eyes) or occupying lesion."

2            That means rule out occupying lesion.  That's

3    what it means.

4    Q.      Okay.  What is "hemianopia"?

5    A.      Hemianopia is partial visual loss in one eye,

6    partial vision loss.

7    Q.      So partial vision loss, meaning that could mean

8    20 percent, 50 percent?

9    A.      That's 50 percent.

10   Q.      More than 50 percent?

11   A.      Yeah.

12   Q.      Oh, this eye.  Okay.  Got it.

13   A.      It's just in one eye, half of the vision loss.

14   It's called hemianopia.

15   Q.      Is vision loss -- to you, does it mean

16   blindness, or does it mean something different?

17   A.      Vision loss, I don't know how to answer that.

18   I'm not sure.

19   ███  ████████  ▌ ████████████████

20   ████████████████████

21   Q.      BY MR. GONZALEZ:  Yes.  Can you be partially

22   blind?

23   A.      There is a legally blind definition, but I

24   don't remember the definition of what's legally blind.

25   But you don't have to be totally, you can't see anything

27

1    to be --

2    Q.       But you can be partially blind, like you said,

3    half side?

4             Is that -- I guess what I'm asking is, that it

5    says hemi, which I guess means half.  So you can be

6    partially blind?

7    A.       Partially vision loss, yes.

8    Q.       Okay.  Is there a difference between vision

9    loss and blindness?  I'm a little confused?

10   A.       It's not really my field.  I'm not --

11   ███ █████████   ██████████████   ███████

12   █████.

13            THE WITNESS:  I don't know.  I usually say

14   "vision loss" or "blindness."  I'm sorry.  I don't know.

15   ███ █████████   ██████████████

16   Q.       BY MR. GONZALEZ:  I also notice in that page 2

17   that, above there, it actually -- you marked down that I

18   had positive Neer's and Hawkin's.  Is that correct, on

19   that same page?

20   A.       Yes, yes.  I see that.

21   Q.       You marked it.  So that meant that I had that

22   shoulder -- that was for problems with the shoulder?

23   A.       ██████

24   ██   █████   ████████████████████████ █ █████

25   ██████████████████ ███ █████████████████ █

28



9    Q.      BY MR. GONZALEZ:  Well, you specialize in pain

10   management; is that correct?

11   A.      Right.  But I rarely prescribe medication to

12   people, because I prefer doing acupuncture, so....

13   Q.      Okay.  But why is it you have a hesitancy or

14   why do you withhold prescribing medication, may I ask?

15   Why is it you prefer not to prescribe medications?

16   A.      Acupuncture works quite well.  So you apply

17   something I can do, I just -- it's part of my training.



1  Q.       When you first diagnosed the, I'm going to just

15  say, the shoulder impingement in August of 2012, did

16  you -- did you feel that it wasn't something that

17  required having some sort of MRI diagnosis or some

18  further testing, you know, diagnostic testing?

19  A.       I didn't feel -- I -- usually the standard

20  practice we do is, often refer to physical therapy

21  first.  And then if that doesn't get any better or

22  people request a surgery, then we order MRI, because

23  surgeon will want MRI.  Usually we don't just send you

24  to get MRI right away.  It's not what we do.

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   ███████████████████

2   ██       Physical therapy.

3   ██       ████████

4        ████  ████  --

5   ██   ████  ████████

6            ████  ████████   ████████████

7   Q.        BY MR. GONZALEZ:  If the physical therapy is

8   not successful, or it doesn't seem to be, is a --

9   A.        Your shoulder pain --

10  Q.        -- surgical referral next?

11  A.        I would usually proceed with cortisone

12  injection, if a patient agree or if patient have no

13  diabetes.  I mean, you could have diabetes under good

14  control, then we do the cortisone injection or

15  acupuncture.

16           And I rarely, rarely refer -- I remember I

17  referred one person to surgery, because he has torn of

18  the rotator cuff tendon.  He couldn't raise his

19  shoulder.  So that's something, you know, I order the

20  MRI right away and send them to get a surgical opinion.

21           The surgeon may still not do anything, because

22  if you're over 50, you're not an athlete.  A surgeon may

23  just leave it alone, because if there's no pain

24  involved.

25  Q.        So you have surgeons that you refer to for

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1    these kind of problems at the VA hospital?

2    A.      We do have orthopedic department.

3    Q.      You have an orthopedic department?

4    A.      Yes.

5    Q.      But at the time that you saw me, because it was

6    August 2012, you didn't believe at that point in time

7    that I would be a good candidate for going to see an

8    orthopedic surgeon?

9    A.      No.  We order specialties.  See people before

10   surgeons.  Usually that's the case.

11   Q.      Were you familiar with the fact that I had an

12   automobile accident in July of 2009?

13   A.      Based on my note.

14   ███ █████████  █ █████████████████████████

15   █ █████████████████████████  █████████████

16   █████████████

17           THE WITNESS:  Must be you told me.  Otherwise,

18   how would I know?

19   Q.      BY MR. GONZALEZ:  Well, it's in the notes.

20   A.      I said that you have shoulder pain for duration

21   three years after rear-ended accident.

22   ███ █████████  ████████████████████████

23   ███████████████████████

24   █   █████████ █████████ ██████████████

25   █   ████████████████████████████████

                                                            38



17    Q.        BY MR. GONZALEZ:  Did you -- were you

18    interested in finding out if they had any trauma that

19    related to this impingement that you diagnosed?

20    A.        I wrote what you tell me.

21              I mean, I only saw Dr. Siegel once in a big

22    conference room.  That's all.  I mean, we don't -- we

23    don't -- when new patient come, we don't just call the

24    other doctor, talk to the other doctor.

25              Everybody is so busy.  Can you imagine every

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    day?  You see so many people.  You won't have time to

2    talk to all of the doctors for each patient, unless

3    there's something you want to do right away.  Then we

4    still just make the note to the other doctor to sign.

5    Then the other doctor will get notification.

6    Q.      But would -- having a trauma, would that be

7    something important to consider as a source of causing

8    something like an impingement to occur?

9    A.      Yeah.  Source of pain, it could be resulting

10   from the shoulder or -- I mean, could it be -- well,

11   based on, you said, you have shoulder pain after a car

12   accident.

13   Q.      Right.  So --

14   A.      So, yes, you could have shoulder problem after

15   car accident.

16   ███ ████ █████████████████████████████████████

17   ████████████████████████████████████████████████

18   ███████████ ████████████████████████████████ █

19   ███████ ███████████████████████████████

20         ██████████ ████████████████████████

21   ████████████████████████████████████████████

22         ███████████ ██████████████████████████

23   ██    ███████████ █ ███████████████

24      ██████████ ██████████████████ █████████████

25   ████████████████

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1

2

3

4

5

6      (Whereupon, a brief recess was taken from

7      2:47 p.m. to 2:58 p.m.)

8    Q.    BY MR. GONZALEZ:  So I guess I was asking about

9    trauma.  Is that a high percentage of cases, that you

10   see patients like myself that have had trauma, causing

11   impingement problems in the shoulder, would be a cause

12   of that problem?

13   A.    Well, a trauma -- the shoulder problem can be

14   caused by either trauma or already have existing

15   degenerative changes.

16   Q.    Is there anything anywhere in the record that

17   indicates that I had degenerative change in my shoulder,

18   other than, you know, prior to 2009?

19   A.    I don't know.  I didn't see your record before

20   2009.

21   Q.    Okay.  That's not something you would look at,

22   to see if there was prior treatment of the shoulder for

23   the same problem?

24   A.    I would look, but I don't remember.

25   Q.    But there's nothing in the notes in 2013 or

1    2012 that indicates you saw something that was before

2    2009?

3    ████ ████████  ██████████  ████████  ██████

4    ████ ████████  ████████████

5           THE WITNESS:  I do remember you said you got an

6    injection outside the VA, so you did get treatment

7    outside of the VA.  I remember in my note saying

8    somewhere there.

9    Q.      BY MR. GONZALEZ:  Can you show me where --

10   A.      Yeah, I don't remember.

11   Q.      -- where it indicates --

12   A.      First time I saw you.

13           (Reviews document.)

14           See, you had a cortisone injection of the right

15   shoulder, but did not help.  That's the first time I saw

16   you.  So you got it somewhere.  You told me, or I saw in

17   the note or somewhere.  I don't remember.

18   Q.      Dr. Siegel -- you're talking about when

19   Dr. Siegel gave me the injection?

20   A.      I don't know.  But --

21   Q.      But you said it was outside the VA, so I want

22   to know, is it something you saw in the records that was

23   outside the VA?  Because I don't recall being treated

24   outside the VA at the time.

25           At the time do you recall --

                                                              42

           Accuracy-Plus Reporting, Inc.    (916) 787-4277

1    A.       I don't --

2    Q.       -- that I was treated outside the VA?

3    A.       I'm not -- I'm not a hundred percent sure.

4    Q.       And this is in August of 2012?

5    A.       Yeah.  The first time I see you, you said you

6    got a cortisone injection, already in the past.

7    Q.       Right.

8    A.       But I'm not sure if it's from Dr. Siegel.

9    Q.       Are you aware that Dr. Siegel gave me

10   injections --

11   A.       No, I'm not aware.

12   Q.       -- in the shoulder?

13   A.       No.

14            Did he give the injection into the shoulder?

15   Q.       Yes.  It's in the medical records, yeah.

16            Why did you not refer me -- again, could you

17   explain why did you not refer me to the orthopedic unit?

18   ████ ██████ ████████████

19   ████ ███████ █████

20   ██ ██████ ██████████

21   Q.       BY MR. GONZALEZ:  Well, just refresh my memory.

22   I don't recall why you said you didn't consider -- or

23   didn't refer me to the orthopedic unit.

24   A.       What do I do first, is refer people to get

25   physical therapy.  Because the surgeon, orthopedic

43

1    surgeon -- I mean, your case is not necessary, needs to

2    get a surgery right away.  It's not a surgical urgency.

3            So we usually always do conservative treatment

4    first.  That's the first step.  That's why I send you to

5    physical therapy.

6            Then when I saw you the second time, your

7    shoulder pain is better, but you have more neck pain.

8    Q.      But you were aware I've been under treatment

9    since 2009?

10   A.      I don't remember.

11   Q.      You never discussed with Dr. Siegel any of

12   your --

13   A.      No.  Like I said, I only saw Dr. Siegel once.

14   That was --

15   Q.      So there was no consult between you and

16   Dr. Siegel about why this was still going on, this

17   particular shoulder pain was still going on since 2009?

18   A.      I didn't send any note to Dr. Siegel.

19   Q.      Okay.  Again, in your opinion, what is the

20   importance of having an MRI, magnetic resonance imaging,

21   in cases like impingement, and this sort of thing?

22   A.      The purpose of MRI, for impingement, almost

23   never order MRI right away.  Almost never, unless the

24   patient really insist.  The reason I will order MRI is

25   if I suspect a sudden tear and if I suspect this

44

1  acromial -- not acromial -- labrum tear.  That's the

2  cartilage that connect the joint.  Then, you know, that

3  surgical may be indicated.

4        For subacromial, a lot of times it gets better

5  on its own, a lot of times, or especially with physical

6  therapy or resting.  So you never -- I would never refer

7  to surgeon right away.  Because surgery is not always

8  have good outcome.  It's a -- surgery itself is a trauma

9  to your body.

10  Q.      But as to MRIs, do you consider them important

11  as far as diagnosing tears?



15        THE WITNESS:  If I suspect a tear, I would

16  order MRI, because I may think I may refer to the

17  surgeon.  If it's just subacromial impinge- -- just

18  impingement, I would not order MRI.

19  Q.      BY MR. GONZALEZ:  But a patient could have a

20  tear, and you may not diagnose it, because you only are

21  speculating, maybe, or guessing that there is no tear,

22  based on what you're examining the patient with?



25        THE WITNESS:  There's no urgency to -- can you

45

1  say your question again?

2  Q.        BY MR. GONZALEZ:   Sure.

3           Isn't it possible that you could make a

4  mistake, because you can't see a tear with the natural

5  eye that may be there, and make a mistake in diagnosis,

6  where if someone may have a tear, but it doesn't

7  indicate, because they may have a pain tolerance that

8  doesn't indicate what you think might be a tear?

9  A.        But based on your case, you're able to, you

10  know, forward 140 degree, and the abduction 100 degree,

11  the complete tear is very, very, very unlikely.   So

12  that's why I didn't -- I never suspect a tear on you.

13  Q.        Right.   But is it only complete tears, full

14  tear -- when you say "complete tears," are you talking

15  about full-thickness tear?   Right?

16  A.        I'm talking about, yeah, right.   Full-thickness

17  tear, you have trouble.

18           For partial tear, I guess you can still do some

19  range of motion and --

20  Q.        Partial tears, you can move but --

21  A.        Right.

22  Q.        -- but they are more painful than full, as you

23  said earlier?

24  A.        (Nods head up and down.)

25           ██ ████████   ████████   ▌ ████████

                                                          46

1   ████████████

2   Q.       BY MR. GONZALEZ:  Are partial tears usually

3   more painful, or can be more painful than full-thickness

4   tears?

5   A.       For impingement purpose, if it's for -- if it's

6   torn, the tendon retract and get away from the

7   impingement, so it's less painful.  But if it's partial

8   torn, the tendon still under the bony space can be still

9   impinged when you move it, so it can be still painful,

10  when you do the range or motion.

11         ████  ██████████   ██████████████

12         ████████████  ████████

13  Q.       BY MR. GONZALEZ:  Are you aware that I went --

14  I had surgery in July of 2013 for the shoulder trauma?

15  A.       The last time I saw you was February 2013.

16  Now, you didn't come back twice.  That was the last time

17  I saw you.  I didn't know you have a surgery after that.

18  Q.       So would you find it reasonable that an

19  orthopedic surgeon did determine that I had at least one

20  tear, possibly two, in my shoulder?

21         ████  ██████████   █████████████████

22  ████████████████████████████████████████████  ████

23         ██████████████  █████████████████

24  ████████████████████████████████████████████████████

25  ████████████

47

Accuracy-Plus Reporting, Inc.      (916) 787-4277



1

2

3

4

5

6

7

8

9

10

11    A.       I can't answer that.  I mean, I can't answer

12    how to -- how orthopedic surgeon think, what's their

13    assessment.

14    Q.       Okay.  But if, in fact, the orthopedic surgeon

15    did find there were tears --

16    A.       You had MRI?

17    Q.       Yes.  After I left the VA, I had MRIs.

18             And if, in fact, the orthopedic surgeon did

19    identify there were tears, was that something that

20    wasn't detected while I was at the VA?

21

22

23

24

25

48

1   ██████ ▌ ████ ██ ▌ ████████████████

2   ████████████████████

3        THE WITNESS:  I can't answer.  I only saw you

4   three times.  You were no show twice.  I mean, this is

5   such a short period of time.  How would I know?

6   Q.       BY MR. GONZALEZ:  But in the time that I saw

7   you, and in the time I saw Dr. Siegel, neither one of

8   you ever detected that I had tears?

9   A.       Was it a complete tear?

10  ████ ███████ ██████ ██████████████████

11  ████████████ ██████████████████

12  ████████ ███ █████

13  ████ ███████ ██████ ████████████

14  ████████████████████ █████████████████

15  ████████████ ████████████ ██████ ▌ ████████

16  ████████████ ███████████████

17  Q.       BY MR. GONZALEZ:  In evaluating all of the

18  notes, I mean, that you looked at from --

19  A.       My three notes.

20  Q.       Your notes only.  You're only looking at your

21  notes; correct?  You didn't look at any other notes, any

22  other history --

23  ███ █████████ █████ █████████████████ ████

24  ████ --

25  Q.       BY MR. GONZALEZ:  -- regarding my care?

1    A.        I mean, it was a long time ago.  I don't

2    remember.

3    ██ ████        ███████████████████

4    ████████████        █████████████████

5    ███████████████

6    Q.        BY MR. GONZALEZ:  I'm asking, did you look at

7    the history -- before seeing you August 2012, the

8    history back to, let's say, to the auto accident, when I

9    first went in complaining about the shoulder injury?

10   A.        I don't remember for sure if you look at yours,

11   but if there's a patient referred to me, I always look

12   at the primary care doctor note or the related, you

13   know, issue or problem.

14          Say, if somebody referred to a back problem,

15   I -- you're already seeing somebody.  I always see that

16   person's note.

17          But I don't remember specific to you if I

18   looked at Dr. Siegel's or somebody else's note or not.

19   Q.        Do you recall if there were any MRIs that were

20   taken of my shoulder between the car accident when I

21   first went to --

22   A.        I don't recall.  That was a long time ago.

23   ██ ████        █████████████████

24   ████

25        ███████        ██ ████

50

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   ████ ██  ████████    ██████████████████ ████

2   █████ ███ ███████

3   Q.      BY MR. GONZALEZ:  And the last time that you

4   saw me in February of 2013?

5   A.      I don't recall.

6   Q.      You don't recall.  Okay.

7           Did you ever have a conversation with me about

8   the side effects that may cause blindness from

9   medications?

10  A.      I never said that, because for sure I looked at

11  your medication.  I didn't think any of the medication

12  was causing blindness on you.

13  Q.      So if there wasn't medications provided for,

14  let's say, coronary heart disease, that may have

15  blindness as a complication, or a stroke -- is that

16  correct, that blindness or a stroke may be a

17  complication of coronary heart disease?

18          ████ ████    ███████████████

19  ████████████████████████████████ ███████ ██████

20  ████████████ ██████ █████████

21          THE WITNESS:  Yeah, you're right.  I'm not

22  internist.

23          ██ ███████    ████████████████████████

24  ████████ ███████ █████ ██ █████████████████████

25  ███████ ██████████████████████████████ █

Accuracy-Plus Reporting, Inc.    (916) 787-4277

1   ▌████████████████████████

2   Q.      BY MR. GONZALEZ:  You are a physician, are you

3   not?

4   A.      Yeah, but everybody has their own specialty.

5   Q.      Correct.  But you are a physician?

6   A.      Yes, I am.

7   Q.      You know general medicine; correct?

8   A.      Depends.  What do you define "general

9   medicine"?

10  Q.      Well, before you became a specialist, you had

11  to go to medical school; is that correct?

12  A.      Yes.  One year internal medicine training.

13  Q.      Well, my question is, are you saying that you

14  don't know that a stroke can be the result of untreated

15  coronary heart disease?

16  ████ ████████   ████████████████████

17  ███████ ▌████████

18          THE WITNESS:  This is --

19  ████ ████████   --   ██████████████████

20  █████████████████████████████████████

21  ███ █████████████████████████████████

22  █████████████  ████████████████████████

23  ████████████████████████████████

24  ██████████

25          ████████████   ████████████████████

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   ▮▮▮

2   ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮   ▮▮▮▮

4   Q.      BY MR. GONZALEZ:  Well, you acknowledge that I

5   had lost vision?

6   ▮▮▮ ▮▮▮   ▮▮▮▮▮▮▮   ▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮   ▮▮▮▮

8   ▮▮▮   ▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮ ▮▮▮   ▮▮▮   ▮▮▮▮

10  ▮▮▮   ▮▮▮

11  ▮▮ ▮▮▮▮   ▮▮   ▮▮

12  ▮▮▮▮▮   ▮▮▮▮▮▮▮▮

13  ▮▮▮▮

14  Q.      BY MR. GONZALEZ:  Dr. Lee, I'm not trying to

15  trick you.  I'm just trying to ask you.  Are you

16  familiar with the side effects or the negative effects

17  of untreated coronary heart disease?

18  ▮▮ ▮▮▮▮▮   ▮▮▮▮▮▮   ▮▮▮▮▮

19  ▮▮▮

20          THE WITNESS:  The side effect of untreated

21  coronary artery disease?

22  Q.      BY MR. GONZALEZ:  Yes.  Are you --

23  A.      Yeah.  That's leads to heart attack.

24  Q.      Okay.  Is stroke one of those things that could

25  possibly occur also?

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1    A.      From coronary artery --

2    ████  ██████████  ███████████████

3    THE WITNESS:  I can answer that if you want.

4    ████  ██████████  ██████  █████████████  ████████

5    ████████████████████████████████  ██████████

6    ███████████

7    THE WITNESS:  Okay.  Sorry.

8    ████  ██████████  ███████████████

9    Q.      BY MR. GONZALEZ:  You're qualified to answer, I

10   know, so go ahead, please.

11   A.      So for coronary artery disease, straight leads

12   to stroke, no.  But after stroke, if people have really

13   bad heart, then that could form -- the heart is not

14   pumping blood sufficiently, if they're forming a clot,

15   then the clot dislodge and travel to the brain and block

16   the artery, that can lead to stroke.

17   Q.      And the reason I'm asking this question is

18   because earlier you said that you were concerned that I

19   had a stroke or a potential stroke in my brain, correct,

20   and that's why you wanted to get me on to the aspirin?

21   A.      Because you said you have vision loss, so I

22   worry about the vision loss could lead to stroke.

23   That's why I put you on aspirin.

24   Q.      Okay.  And so -- I understand that you didn't

25   take me off of the Motrin --

54

1    A.        I ask you to stop Motrin.

2    ███ ████████    █████████████████████

3    ████████████  ████████

4    Q.        BY MR. GONZALEZ:  You said in your notes you

5    told me to stop taking Motrin?

6    A.        Right.

7    Q.        And you didn't take me off the Motrin, because

8    the Motrin may have had some effect with some other part

9    of my body, let's say, my kidneys or perhaps my

10   circulation?

11   A.        I don't understand your question.

12   Q.        Okay.  You did put me on aspirin; is that

13   correct?

14   A.        Right.

15   Q.        And that was because it has an anticoagulant

16   quality?

17   A.        Right.

18   Q.        And was that because the -- putting someone on

19   aspirin, putting me on aspirin, would help to maybe

20   reverse what happened with my eye?

21   ███ ████████    ██████████████████████

22   ███████████████████████████████  █████████████

23   ███████████████████████ ███████████ ██████ ████

24   █████████████████████████.

25   Q.        BY MR. GONZALEZ:  So you also put me on the

1   aspirin, because you wanted to make sure that I wouldn't

2   have a stroke in my brain?

3   ██ ████████   ████████   ████████

4   ████████  ████  ████████████

5           THE WITNESS:   That's -- aspirin is used to --

6   when you suspect, you know, people maybe have embolic

7   stroke, then you just give aspirin.   That's standard

8   practice.

9           Aspirin is -- you have no contraindication to

10  take aspirin, so that's why I give you aspirin.

11  Q.      BY MR. GONZALEZ:   What told you that I

12  didn't have -- what indicated to you that I didn't have

13  any contraindications to having aspirin?

14  A.      Only somebody have a GI bleed.   And you don't

15  have any GI -- you don't have any contraindication I can

16  think of, so....

17  Q.      So does the aspirin help to reverse maybe the

18  effects of a stroke?   Is that what I understand?   Or is

19  it only just to prevent --

20  A.      To prevent.

21  Q.      -- damage from a stroke?

22  A.      It's to prevent.

23  Q.      Preventive?

24  A.      Right.

25  Q.      Okay.   And you never had said to me when you

                                                    56

1    were typing in your -- when you were typing -- when you

2    were treating me in February and January of 2013, you

3    never said to me that my blindness could be from side

4    effects from the medications?

5    A.        No, it's not possible.  Because you have

6    single -- your single vision -- I don't know any

7    medication can cause single -- single-eye vision loss.

8    I simply -- I don't know.  Why would I tell you that?  I

9    won't even know myself.

10   Q.        But you're saying that doesn't happen at all,

11   or is it just that you don't know?

12   A.        I don't know.  I mean, causing single --

13   Q.        It can happen?

14   A.        I don't know.

15   ██  ███████████████████████████████████████████████

16   ████████████████████  ██████████████████████████████

17   ███████████

18   ██  ████████████████████████████████████████████████

19   ██████  █████

20   Q.        Are there physical reasons why someone could

21   have the vision loss?  Is there like a thrombus, you

22   know, a piece of -- you know, a cluster of, you know,

23   cholesterol, hardening of the arteries, you know,

24   atherosclerosis, are those things that can also cause

25   strokes?

1   ███ ███████   ████████████████████████

2   █████████████████████

3   █   █████ ██████   ██████ ┴ █████████████

4   ████████████████   ██████████████████

5   ██████ --

6   A.      Yeah.  If you have atherosclerosis in your

7   artery, those plaque, if it dislodge, can travel to your

8   brain, and the blocked artery then can cause stroke.

9   Q.      So putting -- prescribing aspirin would help to

10  avoid something like that?

11  A.      It's thinning the blood, prevents the platelet

12  aggregation.  Yes, that's the purpose of it.

13  Q.      Just a few more questions.

14          When you had me as a patient, is it -- any

15  patient that you see, do you typically look at their

16  laboratory report results in the past in determining

17  what medications you might prescribe for them?

18  A.      In general, I do look at the lab.

19  Q.      Is there anything in my lab reports that

20  indicated that I had abnormalities of any particular

21  sort?

22          ███ █████████   ████████ ┴ █████████

23          THE WITNESS:  I don't remember.

24  █   █████ ██████   ████████████████████

25  █████████████

58



18  Q.      Okay.  And have you looked at the surgical

19  report that was done by Mercy?

20  A.      Why would I look at them?  The last time I saw

21  you was in February.  You never came back.

22  Q.      I'm just asking.  Have you looked at any of the

23  medical reports from Mercy?

24  A.      No.  No, I didn't.

25  Q.      So as you sit here today, though, this is the

1   first time you found out that there was surgery that was

2   performed in July of 2013?

3          MR. BRODERICK:  I might have told her.  I don't

4   remember.

5   Q.     BY MR. GONZALEZ:  For my shoulder.

6   A.     I think he told me you had shoulder surgery,

7   but I don't know the detail at all.  I never seen the

8   report.  I mean, the document.

9   Q.     In your opinion, the impingement that you

10  diagnosed, do you feel that it wasn't -- it didn't

11  require surgery?

12  █████ ████████  ████  ███████████████████

13  ███████████████████  ███████████████

14  ███████████████

15  ██████████  ██████████  ████████████

16  █████████████████████████

17  ███  ████████  ████████  ██████████████

18  ██████████████████████████

19  ██████

20  █  █████████████  ███████████████

21  A.     I would not refer to people to surgery right

22  away.

23  █  █ ████  ████████████████████

24       ██████████ █ █  ████████████████

25  ██████████████



1 ████████████████████████████████████████

2 █████████████████████████████

3    ████ ██████ ████████ ██████  --

4 ██ █████ ██ ████████████

5    ████ ██████ █ ████████████████

6 █████████████████████████████ ██████

7 ██████  --

8 ██ ██████████ ██████████

9 ██ ████████

10   Q.      Yeah.  In three visits that you saw me, did you

11  have a report that said the shoulder pain, the

12  impingement, was directly coming from the neck?

13  A.       Not in my impression.  My impression is that

14  you had a shoulder impingement, and you had a neck

15  problem.  You have two different things.

16  Q.       That's what I wanted to identify, right.  There

17  were two different things; right?

18  A.       Right.  That's my impression.  From the first

19  time I saw you, I said two different things you have.

20 ██ ████ ██████ █ ████████ ██████

21 █████████████ ███ ███

22    ██ ████ ████████████████

23 ██████████ 

24    ██ ██████ ██████████████████ ██

25 ████████

Accuracy-Plus Reporting, Inc.      (916) 787-4277

1   ███████████      ████████       █████████████

2   Q.      BY MR. GONZALEZ:  But you also referred that

3   you didn't know at the time whether I had a stroke or

4   wouldn't have a stroke to my brain until you got the MRI

5   report back?

6   A.      Of course.  I mean, how would anybody -- I

7   mean, especially in your case, you just have vision

8   loss.  It's not like somebody present a very classic

9   sign of stroke.  You pretty much -- but in your case,

10  just one eye vision loss, you know, the possibility --

11  stroke is on the high list, based on my training.

12  That's why I put you on aspirin.

13  Q.      Okay.  So -- but just like the MRI ruled out

14  that I didn't have a stroke in my brain?

15  A.      Right.

16  Q.      -- an MRI would have helped to rule out that I

17  didn't have a tear in my shoulder, though?

18  ███    █████████      █████████

19  Q.      BY MR. GONZALEZ:  Isn't that correct?

20  ███   █████████   █████████████████   ████ █

21  ████████████    ████████████████████      ████████

22  ███  --  ██████████████████████

23  Q.      BY MR. GONZALEZ:  Is there any difference

24  between having the use of an MRI for the shoulder, as

25  opposed to using the MRI for the brain?

Accuracy-Plus Reporting, Inc.     (916) 787-4277

1   A.      But the consequences is huge.  Somebody with a

2   stroke, it's -- it's like detrimental to the function.

3   But somebody with chronic pain on the shoulder, it's not

4   going to result in the same consequence of somebody

5   suffers stroke.

6   Q.      But I'm not asking about consequences.  I'm

7   asking about the use of the MRI is a benefit.  Just like

8   it was for the benefit of the brain, it would have been

9   a benefit to the shoulder --

10   ███ ██████ █████████

11   Q.      BY MR. GONZALEZ:  -- in diagnosing problems?

12   Is that correct?

13   ███ ██████ ██████████ █████

14   ██████████████████████ █████████

15   Q.      BY MR. GONZALEZ:  Doctor, is that not correct?

16   A.      If you want to find out if there's a tear in

17   the shoulder, I guess MRI is the image.

18   █ ████ ████████████████████████

19   ██████████████████ ██████████████

20   ████████.

21   A.      █ █████████ █████

22   █ ██████████████████████████████

23   ███████████████ ██████████

24   ██████ ████████████████████████

25   ██████████████████████████████

70



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      (The deposition concluded at 3:39 p.m.)

24              ---oOo---

25

71

```
1    STATE OF CALIFORNIA.)
                         )    ss.
2    COUNTY OF EL DORADO )
```

3           I, JEANETTE L. VISSIERE, a Certified Shorthand

4    Reporter No. 10431 for the State of California, do

5    hereby certify:

6           That prior to being examined, the witness,

7    JEAN LEE, M.D., M.S., named in the foregoing deposition,

8    was by me duly sworn to testify the truth, the whole

9    truth, and nothing but the truth;

10          That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced by me to typewritten form, and that

13   the same is a true, correct, and complete transcript of

14   said proceedings.

15          Before completion of the deposition, review of

16   the transcript [   ] was [   ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed are

19   appended hereto.

20          I further certify that I am not interested in

21   the outcome of the action.

22          Witness my hand this 10th day of May, 2018.

23

24   _____

25   JEANETTE L. VISSIERE, RPR, CLR, CSR #10431

72

Accuracy-Plus Reporting, Inc.       (916) 787-4277

EXHIBIT "E"

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Veterans Affairs | Daniel E. Gonzalez 4300 Black Avenue, P.O. Box 847 Pleasanton CA 94566 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| [X] MILITARY [ ] CIVILIAN | 08/09/1949 | Single | 05/07/2018 | Monday | 1:30 P.M. |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Per Bivens Act, H.I.P.P.A., 42 U.S.C. §§ 1983, 28 U.S.C. §§ 1346(b), 2401(b), 2675(a)(b), and 2679(b)(2)(A)(B), and 2780(h).  The VA failed to correctly diagnose and treat claimants' two rotator cuff tears, leaving permanently blind in 2013.  In May 2018 the DOJ attorneys and VA doctors violated the duty of confidentiality owed to claimant by conspiring with an orthopedic surgeon to broadcast the private VA psychotherapy notes of claimant without the veterans' written authorization.  The orthopedic surgeon signed a declaration under the penalty of perjury that falsely swore claimant sexually molested children.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Legal abuse syndrome related to post-traumatic stress disorder, defamation, assault, battery, abuse of process, and/or malicious prosecution.  The DOJ defense attorneys and VA doctors knew, or it was reasonably clear they knew, that the statement by James Van den Bogaerde declaring claimant committed sexual molestation of children was false, retaliatory, and defamatory with the maliciously purpose and intent to inflict permanent and irreparable harm, loss, and damage to claimant.

**11. WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Gregory T. Broderick | Department of Justice, 501 I Street, 10th Floor, Sacramento CA 95814 |
| Secretary, Robert Wilkie | Dept. of Veterans Affairs, 810 Vermont Ave,, NW, Room 1000 Washington, DC |
| David Siegel, M.D. | Sacramento VA Medical Center 10535 Hospital Way, Mather, CA 95655 |

**12.** (See instructions on reverse). **AMOUNT OF CLAIM** (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| 25,000,000 | 25,000,000 | | 50,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature]* | (916) 247-6886 | 10/16/2019 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government.  (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

| Authorized for Local Reproduction Previous Edition is not Usable 95-109 | NSN 7540-00-634-4046 | STANDARD FORM 95 (REV. 2/2007) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2 |
|---|---|---|

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☒ No | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) BACK

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Justice | Daniel E. Gonzalez<br>4300 Black Avenue,<br>P.O. Box 847<br>Pleasanton CA 94566 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| [X] MILITARY  [ ] CIVILIAN | 08/09/1949 | Single | 05/07/2018     Monday | 1:30 P.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Per Bivens Act, H.I.P.P.A., 42 U.S.C. §§ 1983, 28 U.S.C. §§ 1346(b), 2401(b), 2675(a)(b), 2679(b)(2)(A)(B), and 2780(h).  The VA failed to correctly diagnose and treat claimants' two rotator cuff tears, leaving permanently blind in 2013.  In May 2018 the DOJ attorneys and VA doctors violated the duty of confidentiality owed to claimant by conspiring with an orthopedic surgeon to broadcast the private VA psychotherapy notes of claimant without the veterans' written authorization.  The orthopedic surgeon signed a declaration under the penalty of perjury that falsely swore claimant sexually molested children.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Legal abuse syndrome related to post-traumatic stress disorder, defamation, assault, battery, abuse of process, and/or malicious prosecution.  The DOJ defense attorneys and VA doctors knew, or it was reasonably clear they knew, that the claim or statement by James Van den Bogaerde of claimant committing sexual molestation of children was false, retaliatory, and defamatory with the maliciously purpose and intent to inflict permanent and irreparable harm, loss, and damage to claimant.

| 11. | WITNESSES |
|---|---|
| **NAME** | **ADDRESS (Number, Street, City, State, and Zip Code)** |
| Gregory T. Broderick | Department of Justice, 501 I Street, 10th Floor, Sacramento CA 95814 |
| James Van Den Bogaerde, M.D. | UC Davis Medical Center, Sacramento CA |
| Vance W. Raye | Third District Court of Appeals, 914 Capitol Mall, Sacramento CA 95814 |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | | |
|---|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). | |
| 25,000,000 | 25,000,000 | | 50,000,000 | |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature]* | (916) 247-6886 | 10/16/2019 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

| Authorized for Local Reproduction<br>Previous Edition is not Usable<br>95-109 | NSN 7540-00-634-4046 | STANDARD FORM 95 (REV. 2/2007)<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2 |
|---|---|---|

EXHIBIT "F"

**U.S. Department of Justice**

Civil Division, Torts Branch
Federal Tort Claims Act Staff

_Post Office Box 888_
_Benjamin Franklin Station_
_Washington, D.C. 20044_

JGT:GKJ:LWoods:lw
157-16-66075

MAR 2 5 2020

CERTIFIED MAIL –     7018 0360 0000 2631 9114
RETURN RECEIPT REQUESTED

Mr. Daniel E. Gonzalez
4300 Black Avenue
P.O. Box 847
Pleasanton, CA 94566

Re: <u>Administrative Tort Claim of Daniel E. Gonzalez</u>

Dear Mr. Gonzalez:

We have reviewed the administrative tort claim you submitted to the U.S. Department of Justice on October 25, 2019, relative to the alleged acts or omissions of employees of the United States Attorney's Office for the Eastern District of California and the Department of Veterans Affairs occurring on May 7, 2018. After careful consideration, it has been determined that your claim is not compensable. Accordingly, your claim must be and hereby is denied.

I am required by law (28 C.F.R. §14.9(a)) to inform you that, if you are dissatisfied with the denial of your claim under the Federal Tort Claims Act, you may file suit in an appropriate United States District Court no later than six months after the date of mailing of this notification. 28 U.S.C. § 2401(b).

Very truly yours,

JAMES G. TOUHEY, JR.
Director, Torts Branch

cc:     Honorable McGregor Scott
United States Attorney
Eastern District of California

Mr. James M. Byrne
General Counsel
Department of Veterans Affairs